## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**MASIMO CORPORATION,**
**Patent Owner/Appellant**

**Appeal No. 2022-1894**

**v.**

**APPLE INC.,**
**Petitioner/Appellee**

**Proceeding No.: IPR2020-01526**

_____

### NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed June 8, 2022, in the United States Patent and Trademark Office in connection with the above identified *Inter Partes Review* proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date: July 25, 2022

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 25th day of July, 2022, as follows:

| PATENT OWNER: | PETITIONER: |
|---|---|
| Joseph R. Re<br>John M. Grover<br>Jeremiah Helm<br>Stephen C. Jensen<br>Shannon Lam<br>KNOBBE, MARTENS, OLSON & BEAR, LLP<br>joseph.re@knobbe.com<br>john.grover@kmob.com<br>jeremiah.helm@knobbe.com<br>steve.jensen@knobbe.com<br>shannon.lam@knobbe.com | Lauren Ann Degnan<br>Robert Courtney<br>Laura E. Powell<br>Walter Karl Renner<br>Ryan Teel<br>FISH & RICHARDSON PC<br>degnan@fr.com<br>courtney@fr.com<br>powell@fr.com<br>renner@fr.com<br>teel@fr.com |

By: *Macia L. Fletcher*

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

# U.S. DEPARTMENT OF COMMERCE
## United States Patent and Trademark Office

**July 25, 2022**

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

**APPLE INC.,**
Petitioner,

v.

**MASIMO CORPORATION,**
Patent Owner.

**Case:  IPR2020-01526**
**Patent No. 6,771,994 B2**
By authority of the

## DIRECTOR OF THE UNITED STATES
## PATENT AND TRADEMARK OFFICE



*Certifying Officer*



**Prosecution History ~ IPR2020-01526**

| Date | Document |
|---|---|
| 8/31/2020 | Petition for Inter Partes Review |
| 8/31/2020 | Petitioner's Power of Attorney |
| 9/21/2020 | Patent Owner's Mandatory Notice |
| 10/19/2020 | Notice of Filing Date Accorded to Petition |
| 1/8/2021 | Petitioner's Updated Exhibit List |
| 1/19/2021 | Patent Owner's Notice of Waiver of Preliminary Response |
| 4/16/2021 | Decision - Institution of Inter Partes Review |
| 4/16/2021 | Scheduling Order |
| 4/30/2021 | Patent Owner's Objections to Evidence |
| 5/14/2021 | Notice of Deposition - Anthony |
| 6/10/2021 | Notice of Stipulation to Modify Due Dates 1-3 |
| 7/20/2021 | Patent Owner's Response |
| 7/27/2021 | Petitioner's Objections to Evidence |
| 8/20/2021 | Notice of Deposition - Madisetti, Ph.D. |
| 8/26/2021 | Patent Owner's Updated Mandatory Notices |
| 8/30/2021 | Patent Owner's Corrected Supplemental Mandatory Notices |
| 10/22/2021 | Petitioner's Reply to Patent Owner's Response |
| 12/3/2021 | Petitioner's Oral Hearing Request |
| 12/3/2021 | Patent Owner's Sur-Reply to Reply |
| 12/3/2021 | Patent Owner's Request for Oral Argument |
| 12/17/2021 | Order - Setting Oral Argument |
| 12/21/2021 | Patent Owner's Updated Mandatory Notice Changing Lead Counsel |
| 1/10/2022 | Unopposed Motion for Pro Hac Vice Admission - Helm, Ph.D. |
| 1/10/2022 | Patent Owner's Updated Exhibit List |
| 1/14/2022 | Patent Owner's Demonstratives for Trial Hearing |
| 1/14/2022 | Patent Owner's Certificate of Service for Demonstratives for Trial Hearing |
| 1/14/2022 | Petitioner's Updated Exhibit List |
| 1/14/2022 | Patent Owner's Supplemental Power of Attorney Adding Helm, Ph.D. |
| 1/18/2022 | Order - Pro Hac Vice Admission - Helm, Ph.D. |
| 2/16/2022 | Oral Hearing Transcript |
| 4/12/2022 | Final Written Decision |

Trials@uspto.gov                                          Paper 31
571-272-7822                                  Entered: April 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

IPR2020-01526
Patent 6,771,994 B2

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining the Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01526
Patent 6,771,994 B2

# I.     INTRODUCTION

## A.     Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent"). Paper 2 ("Pet."). Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6. We instituted an *inter partes* review of the challenged claim on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314. Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 12, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 17, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply"). An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record. Paper 30 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Based on the record before us and for the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that claim 15 of the '994 patent is unpatentable.

## B.     Related Matters

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

IPR2020-01526
Patent 6,771,994 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '994 patent.  Paper 3, 1.

## C.    *The '994 Patent*

The '994 patent is titled "Pulse Oximeter Probe-Off Detection System," and issued on August 3, 2004, from U.S. Patent Application No. 10/374,303, filed February 24, 2003.  Ex. 1001, codes (21), (22), (45), (54).  The '994 patent claims priority through a series of applications to Provisional Application No. 60/140,000, filed June 18, 1999.  *Id.* at codes (60), (62).

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition.  Ex. 1001, code (57).  The '994 patent relies on

electrical contacts that contact the skin of a patient when the probe is
properly attached and a number of louvers placed in front of a sensor's
photodetector to filter out oblique light rays that do not originate from a
point in front of the detector. *Id.* According to one aspect of the invention,
if the emitter and photodetector are not properly aligned, the photodetector
will not produce a signal within the valid operating range of the pulse
oximeter, which may trigger an alarm or warning. *Id.*

As depicted in Figure 1 below, pulse oximeter 140 is attached through
connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which
are "preferably configured to produce different wavelengths of light." *Id.* at
3:21–55, Fig. 1.



*FIG. 1*

Figure 1 illustrates a schematic of a pulse oximeter system. *Id.* at 2:30–31.
The wavelengths of light pass through the flesh of a patient to be detected by
photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain
embodiments where the photodetector is placed opposite the light emitters to
detect transmitted light as it emerges from the user's body tissue. *See id.* at

4

IPR2020-01526
Patent 6,771,994 B2

1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



## FIG.5B

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

IPR2020-01526
Patent 6,771,994 B2

#### D.    *Claim 15*

Claim 15 is the only challenged claim and it is reproduced below.

15. [pre] A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers pre–c added).

#### E.    *Applied References*

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

Pet. 3–4.

IPR2020-01526
Patent 6,771,994 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W.
Anthony, Ph.D. (Ex. 1003).  Patent Owner submits, *inter alia*, the
Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).  The parties also
provide deposition testimony from Dr. Anthony and Dr. Madisetti.
Exs. 1038, 2003.

### F.     Asserted Grounds

We instituted an *inter partes* review based on the following grounds.
Inst. Dec. 7, 29.

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

## II.     DISCUSSION

### A.     Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b), including
construing the claim in accordance with the ordinary and customary
meaning of such claim as understood by one of ordinary skill in the art and
the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b)
(2019).

Petitioner submits that the entirety of clause 15[c] requires
construction.  Pet. 8.  Clause 15[c] (set forth above), requires in part, "a
plurality of louvers *positioned over* the light sensitive detector to accept light
from the at least one light emission device *originating from a general*

*direction* of the at least one light emission device and then transmitting through body tissue." Ex. 1001, 8:29–35 (emphases added). Petitioner contends that this limitation requires that the light sensitive detector must "be positioned opposite the at least one light emission device." Pet. 8–9. Petitioner seemingly bases this interpretation on one embodiment in the Specification, "which only depict[s] and describe[s] the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. 9 (citing Ex. 1001, 1:41–43 ("[T]he 'photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [body] tissue.'" (second alteration in original))).

Although Petitioner describes one embodiment of the invention that may be encompassed by the claim scope, this one embodiment is narrower in scope than the claim language of clause 15[c]. For example, the claim requires the louvers positioned over the detector to accept light originating from a general direction of the at least one light emission device, while the light also passes through tissue. Petitioner contends that for this to occur the detector must be positioned opposite the light emission device, as depicted in Figure 5B. Pet. 9.

In the Institution Decision, we noted that Petitioner does not explain why it is even necessary to adopt its proposed claim construction. Inst. Dec. 8–9. We noted that for purposes of our analysis, we accept that the embodiment Petitioner relies upon (positioned opposite) is within the claim scope of clause 15[c], but we were not prepared to limit the claim to just this embodiment without further explanation and evidence. *Id.* We determined that clause 15[c] provides sufficient detail as to the positioning of elements

such that further defining the limitation did not seem necessary.  We invited the parties to further explain why these terms would require construction for this proceeding.  *Id.* at 9.

In its Response, Patent Owner argued that further defining the limitations of clause 15[c] is not necessary.  PO Resp. 22.  Patent Owner contends that "Apple's attempt to inject the non-claimed requirement of the detector being opposite the light emission device is unnecessary and inappropriate."  *Id.*  Patent Owner provides several reasons in support of this position.  *Id.* at 22–26.  Likewise, at oral argument Patent Owner maintained it was unnecessary to reach the claim construction issue in this proceeding. *See* Tr. 38:3–19.

In its Reply, Petitioner did not provide any justification as to why it would be necessary in this proceeding to construe the limitations of clause 15[c].  *See generally* Pet. Reply.

Based on the final record, it is unnecessary for us to construe the limitations of clause 15[c] as requested by Petitioner.  We determine that clause 15[c] provides sufficient detail as to the positioning of elements such that further defining the limitation is not necessary to resolve this proceeding.  Further, no other terms require construction.

## B. *Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007).  The question of obviousness is resolved on the basis of underlying

IPR2020-01526
Patent 6,771,994 B2

factual determinations, including (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) objective evidence of non-
obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When
evaluating a combination of teachings, we must also "determine whether
there was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art
elements would have produced a predictable result weighs in the ultimate
determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The
burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## C.    *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information,
including but not limited to physiological monitoring technologies." Pet. 7–

---

[1]  Neither party has introduced objective evidence of non-obviousness.

IPR2020-01526
Patent 6,771,994 B2

8 (citing Ex. 1003 ¶¶ 1–15, 36–37). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the [person of ordinary skill in the art] POSITA characteristics stated above." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, Masimo nonetheless applies Apple's asserted level of skill." PO Resp. 21.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

## D.    *Obviousness over Webster and Melby*

Petitioner contends that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby. Pet. 29–44; *see also* Pet. Reply 4–5. Patent Owner disagrees. PO Resp. 42–46; *see also* Sur-reply 12–15.

Based on our review of the parties' arguments and the cited evidence in the final record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 15 is unpatentable.

### 1.    *Overview of Webster (Ex. 1010)*

Webster is a book titled "Design of Pulse Oximeters" that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood." Ex. 1010, xv[2]. Webster

---

[2] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book. We adopt Petitioner's citations for clarity.

IPR2020-01526
Patent 6,771,994 B2

details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods." *Id.* Webster provides a comprehensive summary of the state of the art as of 1997, and also describes the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components. *See generally* Ex. 1010, Chs. 2, 5–7.

As shown in FIG. 7.1 of Webster, reproduced below, Webster explains that the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Ex. 1010, 86.



Figure 7.1 of Webster depicts a probe using a transmittance principle such that light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode. *Id.* at 87. The LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." *Id.* at 86. Webster explains that its "photodiode has to detect the light transmitted through the tissue" and is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." *Id.* at

87. Because light from the LEDs "is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector," reducing the amount of light that eventually reaches the detector, the assembly "must be protected from the ambient light for the wavelengths to which the photodiode is sensitive." *Id.* at 86. Because the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered." *Id.* at 71 (emphasis omitted).

Webster describes how the LEDs can be "powered alternately so that light of one particular wavelength will pass through the tissue, and the transmitted light will be detected by the photodiode" before light of the other wavelength is emitted. Ex. 1010, 86. Webster notes that the "intensity of the light emerging from the tissue is attenuated by the amount of blood present in the tissue." *Id.* Because this intensity "varies with the arterial pulse," it can be used "as a measure to indicate the pulse rate." *Id.*

As seen in Figure 7.13 below, Webster describes the importance of preventing light other than the actual signals of interest (e.g., light that has passed through the tissue carrying pulsing blood) from reaching the detector. *See* Ex. 1010, 95 (describing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue).



Figure 7.13 of Webster depicts light that does not pass through arterioles causing optical shunting. *Id.* Webster states that optical shunting can occur "when light from the sensor's LEDs reaches the photodiode without passing through the tissue" and "leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting." *Id.*

Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of light filter" can be placed over the detector. *Id.* at 79. Using a light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood." *Id.* Indeed, Webster discloses that in order to "minimize errors, the pulse oximeter designer must

attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue" containing arterial blood. *Id.*

### 2.    *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images." Ex. 1008, code (54). Melby discloses a light control film, or a "louvered plastic film." *Id.* at code (57). Melby describes a film that includes "louver elements," and Melby acknowledges that it was known to cant louver elements with respect to a louvered plastic film, which produces a film that transmits light in a direction other than perpendicular to the surface of the film. *Id.* at 1:9–22, 3:46–62. Melby describes using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. *Id.* at 3:21–22.

Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). As shown in Figures 1 and 2 of Melby, reproduced below, Melby discloses "a louvered plastic film has a plurality of clear regions separated by louvers," where each louver has "a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction." *Id.* at 3:1–8.

IPR2020-01526
Patent 6,771,994 B2



Figure 1 of Melby depicts a schematic cross section of a louvered

plastic film and Figure 2 depicts an enlarged drawing of a portion of the

louvered plastic film. Ex. 1008, 3:10–14. Melby describes its louvered film

as including "cover sheets 11 provided for clarification and includes

alternating clear layers, such as layer 12 and louvers, such as louver 14," that

"includes outer layers 16 and 18 and inner layer 20." *Id.* at 3:46–4:25.

Referring to Figure 2, Melby describes the operation of the louvers:

A light ray 22 enters transparent layer 12. It then strikes layer 16
at surface 24. Because layer 16 has only a low concentration of
carbon black, there is not a large difference in index of refraction
between it and layer 12. Therefore very little of the light is
reflected by layer 24. Most of the light will enter layer 16 and be
refracted. As the light traverses layer 16, some will be absorbed.
Some, however, will strike layer 20 on surface 26. Some of light
beam 22 will enter layer 20 where, due to the relatively high
concentration of carbon black, it will be absorbed. Some of light

beam 22 will be reflected at surface 26 due to the large difference
in index of refraction between layer 16 and layer 20.

Ex. 1008, 3:63–4:10.

### 3. Independent Claim 15

Petitioner contends that claim 15 would have been obvious over
Webster and Melby. Pet. 29–44. Below, we set forth how the combination
of prior art references teaches or suggests the claim limitations that are not
disputed by the parties. For those limitations and reasons for combining the
references that are disputed, we examine each of the parties' contentions and
then provide our analysis.

> i. [15 pre] *"A sensor which generates at least first and
> second intensity signals from a light-sensitive detector
> which detects light of at least first and second wavelengths
> transmitted through body tissue carrying pulsing blood;
> the sensor comprising:"*

The cited evidence and argument supports Petitioner's undisputed
contention that Webster and Melby satisfy the subject matter of the
preamble. Pet. 30–32. According to Petitioner, Webster describes devices
known as "pulse oximeters," which provide "an empirical measure of
arterial saturation." Pet. 30 (quoting Ex. 1010, 13). Webster describes the
operation of the devices as shining "light of two wavelengths through a
tissue bed such as the finger or earlobe and measures the transmitted light
signal." *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the
probe of a pulse oximeter.

IPR2020-01526
Patent 6,771,994 B2



Petitioner's annotated and highlighted Figure 7.1 of Webster depicts a probe using transmittance of light from two LEDs (blue labeled as "Light Emission Device") passing alternately through the tissue of the finger such that it is detected by a photodiode (green labeled as "Light Sensitive Detector"). Pet. 31; Ex. 1010, 87.  Petitioner persuasively relies on Webster's teaching of how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector."  Pet. 31; Ex. 1010, 86.  Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode."  Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'" Pet. 31–32 (quoting Ex. 1010, 86).  Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different

wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue. Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue' of a subject[]." Pet. 32 (quoting Ex. 1010, 86). Petitioner argues, and we agree, that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between absorbance of arterial blood and other absorbers." Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

We find Petitioner's contentions set forth above supported by a preponderance of the evidence on the final record.

## ii. "[a] at least one light emission device;"

Based on the final record, the cited evidence supports Petitioner's undisputed contention that Webster discloses this limitation. Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit light at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84. We find Petitioner's contentions supported by the final record.

### iii. "[b] a light sensitive detector; and;"

Based on the final record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (citing Ex. 1010, 95)).

> iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the

IPR2020-01526
Patent 6,771,994 B2

> *louvers accept the light when the sensor is properly*
> *applied to tissue of a patient."*

<u>Petitioner's Contentions</u>

Petitioner contends that Webster and Melby teach these limitations. Pet. 38–45. Petitioner first notes that Webster proposes the use of a light filter to be placed over the detector to minimize the effects from light other than the optical signals of interest. Pet. 39 ("Webster proposes that, in order to 'minimize the effects from light other than the optical signals of interest,' some type of ***light filter***' can be placed over the detector.") (quoting Ex. 1010, 79). Specifically, "[u]sing a light filter allows 'light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter.'" *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring that light reaching the photodiode must pass through tissue containing arterial blood in order for the pulse oximeter to function effectively. *Id.* Petitioner relies on Webster's disclosure that in order to "minimize errors, the pulse oximeter designer must attempt to ***limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood***" and suggests the use of "***[l]ight impervious barriers [that] should be placed between LEDs and the photodiode*** in all areas where the emitted light could reach the photodiode without passing through tissue." Pet. 39 (quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of ordinary skill in the art would have recognized the advantages of using a light filter, such as the type taught by Melby and as suggested by Webster. Ex. 1003 ¶¶ 92–96. Dr. Anthony testifies that Melby's louvered plastic film could be used with the combined Webster system as the "light filter" to

IPR2020-01526
Patent 6,771,994 B2

control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* ¶¶ 96–100; Ex. 1010, 79.  Petitioner relies on Melby's teaching of "a 'louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction.'"  Pet. 40 (alterations in original) (quoting Ex. 1008, code (57)).  Further, "Melby teaches '***a louvered plastic film has a plurality of clear regions separated by louvers***,'" where each louver has 'a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction.'"  *Id.* (quoting Ex. 1008, 3:1–8).  Petitioner points out that Melby's louvered film includes "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and ***louvers, such as louver 14***," that "includes outer layers 16 and 18 and inner layer 20."  Pet. 41 (quoting Ex. 1008, 3:46–4:25).

Petitioner relies on Melby's teaching that when "***[a] light ray 22 enters transparent layer 12[,] [i]t then strikes layer 16 at surface 24***."  Pet. 41 (quoting Ex. 1008, 3:66–67).  Petitioner also notes that "very little of the light is reflected by layer 24," instead, "***[m]ost of the light will enter layer 16 and be refracted.***"  *Id.* (quoting Ex. 1008, 3:66–67).  According to Petitioner, Melby's "advantage lies with 'the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence."  Pet. 41–42 (quoting Ex. 1008, 3:46–4:25).  "Thus," according to Petitioner, a person of ordinary skill in the art "viewing the disclosure of Webster would have recognized that Melby's film could be used in the

IPR2020-01526
Patent 6,771,994 B2

Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector." Pet. 42 (citing Ex. 1010, 79; Ex. 1003, 92–100).

According to Petitioner, a person of ordinary skill in the art "would have been motivated by Melby to include a light control film in the sensor described by Webster" in order "to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood.'" Pet. 42 (alteration in original) (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium. Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

IPR2020-01526
Patent 6,771,994 B2

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby. *Id.*



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green), which is also labeled "Light Sensitive Detector." Ex. 1003 ¶ 102; Pet. 43. According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film. Ex. 1003 ¶ 104. Dr. Anthony testifies that "[i]n the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body." *Id.*

IPR2020-01526
Patent 6,771,994 B2

Patent Owner Contentions

Patent Owner contends Webster does not disclose louvers, but instead teaches an optical filter over the photodiode to remove unwanted wavelengths of light. PO Resp. 2 (citing Ex. 1010, 79). Patent Owner disagrees that a person of ordinary skill in the art would use Melby's light control film in place of Webster's optical filter, and argues that Petitioner does not identify "motivation in the references for this change." *Id.* According to Patent Owner, "[t]he optical purposes of these two components are unrelated: Webster's filter removes selected wavelengths of light, Melby's film controls the direction of light." *Id.* (emphases omitted). Patent Owner also argues that the proposed "combination would vitiate the purpose of Webster's filter because the filter would no longer remove selected wavelengths of light." *Id.* Patent Owner argues that "Webster separately teaches light impervious barriers that seek to limit all light from a certain area from reaching the photodiode," and that "[t]hese barriers are not placed over the photodiode," because doing so "would render the photodiode inoperable." *Id.* (emphasis omitted) ("with the barrier blocking all light over the photodiode, the photodiode would receive no light").

Relying on the testimony of Dr. Madisetti, Patent Owner maintains that "Webster's wavelength filter and light impervious barriers are different components in Webster's optical system, and each address different optical concerns." PO Resp. 42 (citing Ex. 2001 ¶¶ 94–95). According to Patent Owner, "Webster's wavelength filter provides optical filtering 'to limit the spectral response of the photodiode.'" *Id.* (quoting Ex. 1010, 79) (citing Ex. 2003, 3–7). Patent Owner notes that "Webster places its wavelength filter 'over the detector,'" but "Webster's light impervious barriers are

IPR2020-01526
Patent 6,771,994 B2

supposed to block light that has not passed through tissue." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 95). Patent Owner relies on a portion of Webster that states its barriers may be placed "in all areas where the emitted light could reach the photodiode without passing through tissue." *Id.* (quoting Ex. 1010, 79). Patent Owner argues that "[w]ere Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative." *Id.* (citing Ex. 2001 ¶ 97).

Patent Owner argues that Petitioner "conflates Webster's wavelength filter, one component, with the optical effect of the barrier, a different component," and a person of ordinary skill in the art "would have had no motivation to position Melby's light film over the detector, which like Webster's barrier blocks light from reaching the detector." PO Resp. 43 (emphasis omitted). Patent Owner further contends that "Webster's light impervious barriers—*not* Webster's light filters—'limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood,'" but the "barriers are not *over* the detector, putting them over the detector would make the detector non-functional." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶¶ 94–99). Patent Owner relies on prior art cited by Webster to support the argument that this art also "fail[s] to disclose a light impervious barrier over the detector." *Id.* at 43–44 (citing Ex. 2003, 238:9–13, Fig. 6).

Next, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Webster to include Melby's light control film because "Melby's light control film is *not* used in the same way as Webster's light filter." PO Resp. 44. Patent Owner contrasts the

teachings of Webster and Melby, arguing that "Webster explains that its light filter 'allows light of *wavelengths* of interest to pass through the filter but does not allow light of other *wavelengths* to pass through the filter,'" and "[i]n contrast, the light control film in Melby controls the direction of light transmitted through the film." *Id.* (emphasis omitted) (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 103).  According to Dr. Madisetti, filtering specific wavelengths of light is not the same as controlling the directionality of light and replacing Webster's light filter with Melby's light control film would remove the ability to filter specific wavelengths of light.  Ex. 2001 ¶ 103.

Patent Owner next alleges that there is no support for a person of ordinary skill in the art to minimize errors by limiting the light reaching the photodiode to that which has traveled through tissue containing arterial blood because "Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode."  PO Resp. 45 (citing Ex. 1010, 79).  Patent Owner surmises that "Melby's film would minimize errors better than the light impervious barriers already provided by Webster," and "the light control film would have made it more difficult to obtain accurate results compared to Webster's light impervious barriers." *Id.* at 46 (citing Ex. 2001 ¶ 106).

<u>Petitioner's Reply</u>

Petitioner addresses Patent Owner's position by first arguing that "the Petition merely relies on the explicit disclosure of Webster," such as Webster's disclosure "that 'it is important to minimize the effects from light other than the optical signals of interest,'" and "'[o]ne way to minimize unwanted light incident upon the detector is to place *some type of light filter*

over the detector.'"  Pet. Reply 4 (quoting Ex. 1010, 79).  According to
Petitioner, "Webster describes that one type of 'unwanted light' that should
be minimized is 'ambient light'—which is the type of light the light control
film of Melby is designed to minimize."  *Id.* (citing Ex. 1008, code (57),
3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

"Thus," according to Petitioner, "Webster recognizes the need to
minimize unwanted light reaching the detector, and recognizes that light
filters can be used for this purpose."  *Id.* (citing Ex. 1010, 79).  With these
motivations expressly disclosed, Petitioner reasons that a person of ordinary
skill in the art "would have been motivated to use Melby's light control film
as such a light filter in Webster's system, and that the results of the
combination would have been predictable."  *Id.* at 4–5 (Ex. 1003 ¶¶ 92–
105).

As for Patent Owner's arguments that suggest Webster requires a
wavelength filter, Petitioner responds that Webster only notes this is one
option of an exemplary mechanism for limiting unwanted light.  Pet. Reply 5
(citing Ex. 1010, 79).  Petitioner notes that "Webster even makes clear that it
requires no such thing, stating that such wavelength filters 'do not appear to
be used much in actual pulse oximetry designs.'"  *Id.* (quoting Ex. 1010, 79).
"Thus," Petitioner contends that Patent Owner's "arguments mischaracterize
Webster's disclosure and fail to address the Petition arguments."  *Id.*

Patent Owner's Sur-reply

In its Sur-reply, Patent Owner contends that Petitioner does not
dispute "that light filters that filter specific wavelengths of light are not the
same as Melby's light control film that controls the directionality of light,"
and further, "that light impervious barriers that block light are not the same

IPR2020-01526
Patent 6,771,994 B2

as Melby's light control film that controls the directionality of light." Sur-reply 12. Patent Owner repeats its argument that Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. *Id.*

Analysis

Based on the totality of the evidence before us, and considering the scope of element 15[c], Petitioner has persuasively shown that the combination of Webster and Melby teach these limitations and that the combination would have been both predictable and supported by the references. Webster is a Medical Sciences Series text book that provides insight as to the design of several distinct embodiments of potential pulse oximeters. Ex. 1010, vi–xiv. Patent Owner's arguments rely on certain potential embodiments of Webster, but Patent Owner suggests that other embodiments, and specifically the combination proposed by Petitioner, would not have been contemplated by the person of ordinary skill in the art. Petitioner has persuasively shown, however, that a person of ordinary skill in the art would have been motivated to create its proposed combination because the combination would have been both reasonable and predictable to achieve the design goals set forth in Webster.

We determine that Petitioner has persuasively shown that Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector. Ex. 1010, 79 ("the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood"); Ex. 1003 ¶¶ 93–95. Petitioner demonstrates that at least one

embodiment of Webster contemplates that one type of "unwanted light" to be minimized is "ambient light," which is the type of light the light control film of Melby is designed to minimize.  Ex. 1010, 79 ("There are two types of optical interference that may cause problems for the photodiode.  The first is excessive ambient light."); *see* Pet. Reply 4 (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

Based on this evidence, Petitioner demonstrates that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster, as depicted below.  *See* Ex. 1003 ¶¶ 96, 99, 100 ("Melby's film could be used in the Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector."), 101–103.



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green),

IPR2020-01526
Patent 6,771,994 B2

which is also labeled "Light Sensitive Detector."  Ex. 1003 ¶ 102; Pet. 43.

We find persuasive Dr. Anthony's testimony that one of ordinary skill would

have understood that a light control film placed over the detector would thus

accept light from the light emission device from a particular direction based

on the angle of the louvers within the light control film.  Ex. 1003 ¶ 104.

We also find persuasive the testimony that "[i]n the combination, one of

ordinary skill would have understood the light control film to restrict the

amount of light that reaches the detector from a particular direction, and

therefore that the louvers accept the light when the sensor is properly applied

to the patient's body."  *Id.*  Petitioner's combination of Webster and Melby

depicted above adds a light control film atop the photodiode and such a

placement would have been reasonable and predictable for a person of

ordinary skill in the art.  The proposed combination recognizes that although

the LEDs are transmitting light through the finger and toward the photodiode

not all of the light from the LEDs is actually to go through that finger and

light that has not gone through the finger would then be a source of noise.

To limit that noise, Dr. Anthony persuasively testifies that Melby's light

control film placed above Webster's photodiode would reduce noise by

accepting light from the light emission device from a particular direction

based on the angle of the louvers within the light control film.  Ex. 1003

¶¶ 102–104.  This would in turn help minimize light that has not otherwise

travelled through the finger.  *Id.*

Examining the limitations of claim element 15[c], the plurality of

louvers must be "positioned over the light sensitive detector to accept light

from the at least one light emission device originating from a general

direction of the at least one light emission device and then transmitting

through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Ex. 1001, 8:29–36. Although Patent Owner recognizes that Webster teaches use of light filters, and Melby teaches louvers, Patent Owner contends that it is only Webster's light impervious barriers that limit the light and these barriers cannot be over the detector, because doing so would make the detector non-functional. PO Resp. 42–43. Further, Patent Owner believes that Webster's discussion of a filter over the detectors "[c]ould not be clearer[,] [t]he discussion of a filter has to do with wavelengths." Tr. 28:2–11. Patent's Owner's contentions, however, are based on an overly narrow reading of the combination of references and ignore other likely embodiments. We determine that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors. Based on the combined teachings of Webster and Melby, a person of ordinary skill in the art would have found the combination a reasonable solution to the problems identified by Webster.

Melby teaches a louvered plastic film that collimates light and reduces the influence of ambient light. Ex. 1008, 3:63–4:25. Webster teaches the benefits of using such a plastic film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light. Ex. 1010, 79. Specifically, Webster is clear that to minimize unwanted light upon the detector, one could "place some type of light filter *over* the detector." *Id.* There is no indication that this "some type of light filter" should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light. Notably, such filters

seem to be discouraged by Webster because they "do not appear to be used much in actual pulse oximetry designs." *Id.*

Considering the teachings of Webster as a whole, Webster further recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode (*id.*), which also happens to be one of the goals of Melby (Ex. 1008, 3:63–4:25). *See also* Ex. 1003 ¶ 104 ("[O]ne of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film."). A person of ordinary skill in the art would have recognized that based on these combined teachings, Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster. Ex. 1003 ¶¶ 99, 104. That similar objective being a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector. *Id.*

Dr. Anthony persuasively testifies that one of ordinary skill would have been motivated to combine Webster and Melby to provide a pulse oximeter that minimizes errors by limiting the light reaching the photodiode to that which has travelled through tissue containing arterial blood. *See* Ex. 1003 ¶¶ 100–104. Webster recognizes this same problem and proposes various solutions such as "plac[ing] some type of light filter over the detector." *See* Ex. 1010, 79, 95 (recognizing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue); Ex. 1003 ¶ 93. We find Dr. Anthony's

reasoning persuasive that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster and the combination would have been obvious to a person of ordinary skill in the art. *See, e.g.*, Ex. 1003 ¶ 104. Petitioner has persuasively shown that the light control film or louvers from the combination of Webster and Melby would prevent sources of noise in the form of light emitted from ambient sources, or light from LEDs that has not travelled through the user tissue, from striking the photodetectors and in that way, it would improve the optical signal-to-noise ratio. *See id.* ¶¶ 100–104.

### *v. Summary*

Based on the final record before us, Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have found the combination of Webster and Melby renders obvious claim 15. *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate by a preponderance of the evidence that claim 15 is unpatentable.

### E.     *Remaining Grounds of Obviousness*

As discussed in detail above, Petitioner has demonstrated by a preponderance of the evidence that claim 15 would have been obvious over Webster and Melby. Petitioner argues that claim 15 of the '994 patent would have also been obvious over three other grounds, including: (i) Diab, Benjamin, and Melby; (ii) Fine; and, (iii) Fine, Benjamin, and Melby. Pet. 3. Because we have already determined that claim 15 is unpatentable based on Webster and Melby, we need not reach these additional grounds applied to claim 15. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809

IPR2020-01526
Patent 6,771,994 B2

F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

### III.    CONCLUSION

In summary:[3]

| Claim | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15 | 103 | Webster, Melby | 15 | |
| 15 | 103[4] | Diab, Benjamin, Melby | | |
| 15 | 103 | Fine | | |
| 15 | 103 | Fine, Benjamin, Melby | | |
| **Overall Outcome** | | | 15 | |

---

[3] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding. See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[4] As explained above, because we conclude that claim 15 is unpatentable based on the grounds of Webster and Melby, we do not reach the merits of these remaining grounds.

IPR2020-01526
Patent 6,771,994 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claim 15 of the '994 patent has been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Andrew Patrick
Vivian Lu
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com
vlu@fr.com


FOR PATENT OWNER:

John Grove
Ben Katzenellenbogen
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Shannon Lam
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2bak@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2sxl@knobbe.com

Trials@uspto.gov                                          Paper 7
571-272-7822                                    Entered: April 16, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01526
Patent 6,771,994 B2

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2020-01526
Patent 6,771,994 B2

# I.    INTRODUCTION

## A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent"). Paper 2 ("Pet."). Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6 ("PO Waiver").

We have authority to determine whether to institute an *inter partes* review, under 35 U.S.C. § 314 and 37 C.F.R. § 42.4. An *inter partes* review may not be instituted unless it is determined that "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition." 35 U.S.C. § 314 (2018); *see also* 37 C.F.R § 42.4(a) ("The Board institutes the trial on behalf of the Director.").

For the reasons provided below and based on the record before us, we determine that Petitioner has demonstrated a reasonable likelihood that Petitioner would prevail in showing the unpatentability of claim 15. Accordingly, we institute an *inter partes* review on all grounds set forth in the Petition.

## B.    Related Matters

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

IPR2020-01526
Patent 6,771,994 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '994 patent. Paper 3, 1.

## C.    The '994 Patent

The '994 patent is titled "Pulse Oximeter Probe-Off Detection System," and issued on August 3, 2004, from U.S. Patent Application No. 10/374,303, filed February 24, 2003. Ex. 1001, codes (21), (22), (45), (54). The '994 patent claims priority through a series of applications to Provisional Application No. 60/140,000, filed June 18, 1999. *Id.* at codes (60), (62).

IPR2020-01526
Patent 6,771,994 B2

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition. Ex. 1001, code (57). The '994 patent relies on electrical contacts that contact the skin of a patient when the probe is properly attached and a number of louvers placed in front of a sensor's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. *Id.* According to one aspect of the invention, if the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter, which may trigger an alarm or warning. *Id.*

As depicted in Figure 1 below, pulse oximeter 140 is attached through connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which are "preferably configured to produce different wavelengths of light." *Id.* at 3:21–55, Fig. 1.



*FIG. 1*

Figure 1 illustrates a schematic of a pulse oximeter system. *Id.* at 2:30–31. The wavelengths of light pass through the flesh of a patient to be detected by

photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain embodiments where the photodetector is placed opposite the light emitters to detect transmitted light as it emerges from the user's body tissue. *See id.*, 1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



*FIG.5B*

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

IPR2020-01526
Patent 6,771,994 B2

### D.    Claim 15

Claim 15 is the only challenged claim and it is reproduced below.

1. A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers a–c added).

### E.    Applied References

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

IPR2020-01526
Patent 6,771,994 B2

Pet. 3-4.

Petitioner also submits, *inter alia*, the Declaration of Brian W. Anthony, Ph.D. (Ex. 1003).

### *F.    Asserted Grounds*

Petitioner asserts that claim 15 is unpatentable based upon the following grounds:

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

### II.    DISCUSSION

### *A.    Claim Construction*

For petitions filed on or after November 13, 2018, a claim shall be construed using the same claim construction standard that would be used to construe the claim in a civil action under 35 U.S.C. § 282(b), including construing the claim in accordance with the ordinary and customary meaning of such claim as understood by one of ordinary skill in the art and the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b) (2019).

Petitioner submits that the entirety of clause 1[c] requires construction.  Pet. 8.  As noted above, Patent Owner did not file a Preliminary Response.  *See generally* PO Waiver.

Clause 1[c] (set forth above), requires in part, "a plurality of louvers *positioned over* the light sensitive detector to accept light from the at least

one light emission device *originating from a general direction* of the at least
one light emission device and then transmitting through body tissue."
Ex. 1001, 8:29–35 (emphases added).  Petitioner contends that this limitation
requires that the light sensitive detector must "be positioned opposite the at
least one light emission device."  Pet. 8–9.  Petitioner seemingly bases this
interpretation on one embodiment in the Specification, "which only depict[s]
and describe the placement of the body tissue carrying pulsing blood
between the at least one light emission device and the light sensitive
detector."  Pet. 9 (citing Ex. 1001, 1:41–43 ("The photodiode is positioned
opposite the LED so as to detect the LED transmitted light as it emerges
from the [body] tissue.")).

    Although Petitioner describes one embodiment of the invention that
may be encompassed by the claim scope, this one embodiment is narrower
in scope than the claim language of clause 1[c].  For example, the claim
requires the louvers positioned over the detector to accept light originating
from a general direction of the at least one light emission device, while the
light also passes through tissue.  Petitioner contends that for this to occur the
detector must be positioned opposite the light emission device, as depicted
in Figure 5B.  Pet. 9.

    Petitioner's position is understandable because the claim also requires
that the louvers accept the light when the sensor is properly applied to tissue
of a patient, which as Petitioner notes encompasses the embodiment of
Figure 5B.  Petitioner does not explain, however, why it is even necessary to
adopt its proposed claim construction.  For purposes of our analysis, we
accept that the embodiment Petitioner relies upon (positioned opposite) is
within the claim scope of clause 1[c], but we are not prepared to limit the

IPR2020-01526
Patent 6,771,994 B2

claim to just this embodiment without further explanation and evidence. Indeed, clause 1[c] provides sufficient detail as to the positioning of elements such that further defining the limitation does not seem necessary based on the limited record before us.[1]

The parties should also bring to the Board's attention any arguments or decisions in related proceedings or the related district court litigation that impact the claim interpretation of any claim term in the '994 patent. *See Facebook, Inc. v. Sound View Innovations, LLC*, IPR2017-00998, Paper 13 (PTAB Sept. 5, 2017); *see also* 37 C.F.R. § 42.100(b) ("Any prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the *inter partes* review proceeding will be considered.").

## B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

---

[1] We understand that Petitioner's grounds based upon the "Fine" reference rely on an interpretation of the elements of 15[c] that encompasses "reflectance pulse oximeters, in which the emitters and detectors are positioned on the same side of the body tissue carrying pulsing blood." Pet. 45. Petitioner should clarify in its reply which grounds are dependent on which claim interpretation, and further explain which interpretation it contends is proper, after considering Patent Owner's response. Petitioner's proposed interpretation would seemingly exclude the grounds based on "Fine."

IPR2020-01526
Patent 6,771,994 B2

factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[2] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

## C.     *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information,

---

[2]  At this stage of the proceeding, neither party has introduced objective evidence of non-obviousness.

including but not limited to physiological monitoring technologies." Pet. 7–8 (citing Ex. 1003 ¶¶ 1–15, 36–37). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the POSITA characteristics stated above." *Id.*

For purposes of this Decision, we generally adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.     Obviousness over Diab, Benjamin, and Melby

Petitioner presents undisputed contentions that claim 15 of the '994 patent would have been obvious over the teachings of Diab, Benjamin, and Melby. Pet. 10–29.

### 1.     Overview of Diab (Ex. 1006)

Diab is titled "Low Noise Optical Probe." Ex. 1006, code (54). Diab describes an "optical probe for measurements" for use in "non-invasive energy absorption (or reflection)" detection methods such as pulse oximetry. *Id.* at 3:12–14, Fig. 24, 17:66–67. The device includes a "light source, such as an LED" and a "detector, such as a photodetector." *Id.* at 3:19–21, 3:30–31. Diab's light source includes, for example, two "LEDs 430a and 430b," one which emits "red wavelengths" and one which emits "infrared wavelengths." *Id.* at 18:8–22.

Petitioner provides the following annotated figure highlighting Diab's LEDs 430a and 430b as well as photodetector 426.



Petitioner's partial view of Figure 24 of Diab shows a schematic employing a probe with Petitioner's annotations of LEDs 430a and 430b (blue) and photodetector 426 (green).  Pet. 11; Ex. 1006, 5:25–26.  Finger probe 400 is employed to measure a red and infrared signal that are alternatively passed through finger 428.  Ex. 1006, 18:1–4.  Signals measured at photodetector 426 are then processed to determine the amount of oxygen available to the body.  *Id.* at 18:4–6.  LED 430a emits red wavelengths and LED 430b emits infrared wavelengths and both are placed adjacent finger 428.  *Id.* at 18:9–14.  Finger probe 400 is placed underneath finger 428, aperture 420, and chamber 422, which is located directly adjacent finger pad 404.  *Id.*

Non-invasive methods, as described by Diab, are "often desirable" in order to "monitor a patient without unnecessary drawing of blood or tissue."  Ex. 1006, 5:49–59.  For example, "in the medical field, instead of extracting material from a patient's body for testing," non-invasive techniques often

IPR2020-01526
Patent 6,771,994 B2

use "light or sound energy . . . incident on the patient's body" that is transmitted or reflected. *Id.* at 1:13–22.

### 2. Overview of Benjamin (Ex. 1007)

Benjamin is titled "Photoplethysmographs." Ex. 1007, code (54). According to Benjamin, a "photoplethysmograph," is a device that uses a "light source and a specifically selected photo-sensitive cell that responds to light absorbed by the arterial blood in the peripheral vascular bed over which the sensor is placed." Ex. 1007, 1:5–15. Benjamin describes using a probe including "a light source, a photo-sensitive cell and a light control film positioned in front of the light source and photo-sensitive cell for collimating the light emitted from the light source and reflected back to the photo-sensitive cell." *Id.* at code (57).

In order to "improve the accuracy of the photoplethysmographic pickup of the blood flow pulse," Benjamin employs a "light control film" to collimate light passing through and "thereby make the photosensitive cell 20 more nearly dependent only upon the light beam directly reflected from the field being measured." *Id.* at 2:53–57. Benjamin states that such light films were "known in the art and . . . commercially available." *Id.* at 2:50–52. As illustrated below, light source 18 directs light through window 16 and photo-sensitive cell 20 responds to light reflected from the field. *Id.* at 2:26–38.

IPR2020-01526
Patent 6,771,994 B2



Figure 1 of Benjamin is a sectional view of a photoplethysmographic probe. Ex. 1007, 2:16–17. Benjamin describes mounting light control film 22 within casing 12 to extend across window 16. Light emitted from light source 18 passes through light control film 22 to the field to be measured and light is reflected from this field back through light control film 22 to photo-sensitive cell 20. *Id.* at 42–50.

### 3.    *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images." Ex. 1008, code (54). Melby discloses a light control film, or a "louvered plastic film." *Id.* at code (57). Melby describes a film that includes "louver elements," and Melby acknowledges that it was known to cant louver elements with respect to a louvered plastic film, which produces a film that transmits light in a direction other than perpendicular to the surface of the film. *Id.* at 1:9–22, 3:46–62. Melby describes using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. *Id.* at 3:21–22.

IPR2020-01526
Patent 6,771,994 B2

### 4.    Independent Claim 15

Petitioner contends that claim 15 would have been obvious over Diab, Benjamin, and Melby.  Pet. 10–29.  Petitioner has established a reasonable likelihood of prevailing on this asserted ground.

> *i. [15 pre]  "A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"*

On this record, the cited evidence supports Petitioner's undisputed contention that Diab, Benjamin, and Melby satisfy the subject matter of the preamble.[3]  Pet. 13–15.  According to Petitioner, Diab teaches a sensor having a detector that detects "attenuated light energy signal [that] emerges from" a section of a subject's body, "such as a finger, an earlobe, a toe, an organ, or a portion of tissue."  Pet. 13; Ex. 1006, 3:12–43.  Notably, Diab's sensor includes "a probe for use in both invasive and non-invasive energy absorption (or reflection) measurements," and the probe includes a "detector, such as a photodetector" and a "light source, such as an LED" that is affixed "opposite the photodetector."  *Id.* at 3:11–47.  Diab's LED "emits light energy which propagates through and is absorbed by the material along the optical path length" and "an attenuated light energy signal emerges from the material."  *Id.*  Diab's "photodetector produces an electrical signal indicative of the intensity of the signal transmitted by the material," such as a subject's "finger 428."  *Id.*  Petitioner explains that "[t]he subject's finger, for

---

[3] Whether the preamble is limiting need not be resolved at this stage of the proceeding, because Petitioner shows sufficiently for purposes of institution that the recitation in the preamble is satisfied by the prior art.

example, contains body tissue carrying pulsing blood." Pet. 14 (citing Ex. 1003 ¶¶ 45–48).

As shown above in Figure 24, Diab's device includes two "LEDs 430a and 430b" that "alternately emit[] energy which is absorbed by the finger 428 and received by the photodetector 426" such that the photodetector "produces an electrical signal which corresponds to the intensity of the light energy striking the photodetector 426 surface." Ex. 1006, 18:43–47. Petitioner contends that "Diab's probe is 'coupled to an oximeter. . . known in the art which utilizes light attenuation measurements,' such as a '*pulse oximeter*' that measures signals from '*two measured signals at different wavelengths*, one of which is typically red and the other of which is typically infrared, [that] are alternately passed through the finger 428.'" Pet. 15 (quoting Ex. 1006, 17:62–18:8). These signals are used to determine the amount of oxygen available to the body and are generated by "[t]wo LEDs 430a and 430b, one LED 430a emitting red wavelengths and another LED 430b emitting infrared wavelengths" that are placed adjacent to the subject's finger. Ex. 1006, 17:62–18:8; Pet. 15.

### ii. "[a] at least one light emission device;"

On this record, the cited evidence supports Petitioner's undisputed contention that Diab discloses this limitation. Pet. 16–17. Specifically, Diab discloses two light emitting diodes (LEDs) that emit at two different wavelengths, as discussed in detail above. *See* Ex. 1006, Fig. 24 (LEDs 430a, 430b), 3:11–47, 17:62–18:22.

*iii. "[b] a light sensitive detector; and;"*

On this record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 17–18. Specifically, Petitioner contends that Diab describes a sensor that measures first and second intensity signals using a photodetector to detect light from at least two LEDs emitting at two different wavelengths. Pet. 17–18 (citing Ex. 1006, 3:11–47, 17:62–18:22, Fig. 24; Ex. 1003 ¶¶ 45–52). "Diab's photodetector produces signals that can be 'processed to determine the amount of oxygen available to the body' as part of a pulse oximeter." *Id.* at 18 (quoting Ex. 1006, 18:4–6) (emphasis omitted).

> *iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient."*

On this record, the cited evidence supports Petitioner's undisputed contentions regarding these limitations. Pet. 19–29. Petitioner relies on the combined teachings of Diab, Benjamin, and Melby for teaching these limitations. *Id.*

Diab teaches using a scattering medium positioned over the photodetector to provide an "improved optical signal-to-noise ratio" by minimizing the effects of local artifacts resulting from scattering as a result of motion. Ex. 1006, 3:63–4:5. Further, the scattering medium may be located between the material being tested and the photodetector, which results in an improved optical signal-to-noise ratio. *Id.* at 4:6–12; Pet. 19. Petitioner relies further on Diab's disclosure that the film has the effect of

collimating the light passing through to make the photosensitive cell more nearly dependent only upon the light beam directly reflected from the field being measured. *Id.* at 2:50–57.

Petitioner, relying on the testimony of Dr. Anthony, contends that a person of ordinary skill in the art "would have been motivated by the disclosure of Benjamin to modify Diab's sensor to include a light control film in place of Diab's scattering medium." Pet. 21 (citing Ex. 1003 ¶ 62). Benjamin recognizes that "variations in the amount of scattered light reaching the photocell cause variations in the operating point of the photocell," which "adversely affects the accuracy of the measurement." Ex. 1007, 1:35–40; Ex. 1003 ¶¶ 57–59. Petitioner relies on Benjamin's improvement of adding a light control film to stabilize the amount of scattered light that reaches the detector. Pet. 20 (quoting Ex. 1007, 1:56–66 ("[T]he amount of scattered light reaching the photocell can be made closer to constant by placing in front of the photocell and light source a small piece of light control film. This film has the effect of collimating the light thereby to make the sensor more nearly dependent only upon the light beam directly reflected from the pulsating blood field.")).

On the current record, Petitioner argues persuasively that a person of ordinary skill in the art would have been motivated to combine Diab and Benjamin to provide an optical physiological sensor that reduces variations in the amount of light detected by the photodetectors of the sensor in order to collimate the light emitted from the light source and reflected back to the photo-sensitive cell. Pet. 22 (citing Ex. 1003 ¶¶ 57–62; Ex. 1007, code (57)). The references describe these advantages as leading to a more consistent and accurate measurement of blood oxygen saturation. *Id.*

Petitioner next relies on Melby as teaching the use of a louvered plastic film in the Diab/Benjamin combination. Pet. 25. Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). Petitioner notes that Melby is a patent assigned to Minnesota Mining and Manufacturing Company (3M) that describes a commercially available louvered light film made of "cellulose acetate butyrate (CAB)." *Id.* at 2:19–23, code (57); Pet. 13. Petitioner contends that a person of ordinary skill in the art would have considered the Melby louvered plastic film well known and the '994 patent itself notes that its "louvers" can be "created from commercially available '3M Light Control Film,'" such as that described in Melby. Ex. 1001, 6:39–41; Ex. 1003 ¶¶ 44, 69.

Dr. Anthony testifies that "Melby describes a light control film that can be used with the combined Diab/Benjamin system" and "[a] POSITA would have been motivated to make this modification to further increase the directionality of the light signal received in the combined device, thereby leading to a device that is less susceptible to the influence of ambient light and thus provides more accurate readings." Ex. 1003 ¶ 69. Petitioner relies on Melby's teaching that "the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." Pet. 27 (quoting Ex. 1008, 4:11–17) (citing Ex. 1003 ¶¶ 69–72). Petitioner contends that based on these disclosures, a person of ordinary skill in the art "would have recognized that Melby's film could be used in the

IPR2020-01526
Patent 6,771,994 B2

Diab/Benjamin device to control light such that only light originating from the direction of the light emitters reaches the detector. Pet. 27–28. Further, Dr. Anthony testifies that incorporating Melby's details regarding the implementation of Benjamin's light control film would have been obvious to a person of ordinary skill in the art because doing so entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 73. Petitioner sufficiently shows on this record that it would have been obvious to a person of ordinary skill in the art to combine the specified teachings of Melby, Bejamin, and Diab for the reasons set forth above.

### v. Summary

Petitioner sufficiently shows on this record, based on the uncontroverted testimony of Dr. Anthony, that a person of ordinary skill in the art would have found the sensor resulting from the combination of Diab, Benjamin, and Melby to render obvious the requirements of limitation 15[c], as well as claim 15 as a whole. *See* Ex. 1003 ¶¶ 57–74. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrates a reasonable likelihood that Petitioner would prevail in its contentions regarding claim 15.

### E.    *Obviousness over Webster and Melby*

Petitioner presents undisputed contentions that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby. Pet. 29–44.

IPR2020-01526
Patent 6,771,994 B2

### 1.    Overview of Webster (Ex. 1010)

Webster is a book that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood." Ex. 1010, xv[4].  The book details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods." *Id.*  Petitioner relies on Webster for its comprehensive summary of the state of the art as of 1997, and its description of the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components.  Pet. 30; Ex. 1003 ¶ 75.  *See generally* Ex. 1010, Chs. 2, 5–7.

### 2.    Independent Claim 15

Petitioner contends that claim 15 would have been obvious over Webster and Melby.  Pet. 29–44.  Petitioner has established a reasonable likelihood of prevailing on this asserted ground.

---

[4] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book. We adopt Petitioner's citations for clarity.  But even still, Petitioner quotes from page xv, but cites to page xvi.  For future reference, Petitioner should have cited to its added page numbering for such a reference.  *See* 37 C.F.R. § 42.63(d)(2)(i).

IPR2020-01526
Patent 6,771,994 B2

> i. [15 pre] *"A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"*

On this record, the cited evidence supports Petitioner's undisputed contention that Webster and Melby satisfy the subject matter of the preamble.  Pet. 29–32.  According to Petitioner, Webster describes devices known as "pulse oximeters," which provide "an empirical measure of arterial saturation."  Pet. 30 (quoting Ex. 1010, 13).  Webster describes the operation of the devices as shining "light of two wavelengths through a tissue bed such as the finger or earlobe and measures the transmitted light signal."  *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the probe of a pulse oximeter.



Petitioner's annotated and highlighted Figure 7.1 of Webster shows a probe using transmittance of light from two LEDs (blue) passing alternately through the tissue of the finger such that it is detected by a photodiode (green).  Pet. 31; Ex. 1010, 87.  Petitioner relies on Webster's teaching of

how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Pet. 31; Ex. 1010, 86. Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'" Pet. 31–32 (quoting Ex. 1010, 86). Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue. Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue" of a subject.'" Pet. 32 (quoting Ex. 1010, 86). Petitioner argues that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between

absorbance of arterial blood and other absorbers." Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

### ii. "[a] at least one light emission device;"

On this record, the cited evidence supports Petitioner's undisputed contention that Webster and Melby disclose this limitation. Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84.

### iii. "[b] a light sensitive detector; and;"

On this record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is

"placed in line with the LEDs so that the maximum amount of transmitted light is detected."  Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (Ex. 1010, 95)).

> *iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient."*

On this record, the cited evidence supports Petitioner's undisputed contentions that Webster and Melby teach these limitations.  Pet. 38–45.

Petitioner first notes that Webster proposes the use of a light filter to be placed over the detector to minimize the effects from light other than the optical signals of interest.  Pet. 39 (citing Ex. 1010, 79).  Specifically, "[u]sing a light filter allows 'light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter.'"  *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring that light reaching the photodiode must pass through tissue containing arterial blood in order for the pulse oximeter to function effectively.  *Id.*  Petitioner relies on Webster's disclosure that in order to "minimize errors, the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests the use of "[l]ight impervious barriers [that] should be placed between LEDs and the photodiode in all areas where the emitted light

could reach the photodiode without passing through tissue." Pet. 39 (emphasis omitted) (quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of ordinary skill in the art would have recognized the advantages of using a light filter, such as the type taught by Melby and as suggested by Webster. Ex. 1003 ¶¶ 92–96. Dr. Anthony testifies that Melby's louvered plastic film could be used with the combined Webster system as the "light filter" to control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* at ¶¶ 96–100; Ex. 1010, 79.

According to Petitioner, a person of ordinary skill in the art would have been motivated by Melby to include a light control film in the sensor described by Webster to provide a pulse oximeter that "minimize[s] errors" by limiting "the light reaching the photodiode to that which has traveled through tissue containing arterial blood." Pet. 42 (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium. Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby. *Id.*

IPR2020-01526
Patent 6,771,994 B2



Petitioner's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green). Pet. 43; Ex. 1003 ¶¶ 102–103.  According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film. Ex. 1003 ¶ 104.  We are persuaded by this undisputed reasoning.

> *v. Summary*

Petitioner sufficiently shows on this record, based on the uncontroverted testimony of Dr. Anthony, that a person of ordinary skill in the art would have found the sensor resulting from the combination of Webster and Melby to render obvious claim 15.  *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate a reasonable likelihood that Petitioner would prevail in its contentions regarding claim 15.

IPR2020-01526
Patent 6,771,994 B2

### F.    Remaining Grounds of Obviousness

As discussed in detail above, Petitioner has demonstrated a reasonable likelihood of prevailing on the challenge to claim 15 as having been obvious over Diab, Benjamin, and Melby, as well as, Webster and Melby. Therefore, pursuant to USPTO policy implementing the decision in *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ("*SAS*"), we institute as to claim 15 (the only challenged claim) based on all grounds in the petition. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"), 5–6, 64.  Further, at this stage of the proceeding, Patent Owner has not offered any response to Petitioner's contentions for the remaining grounds.

### III.    CONCLUSION

After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that claim 15 of the '994 patent is unpatentable.  Accordingly, we institute an *inter partes* review of grounds challenging claim 15 set forth in the Petition.[5]

At this stage of the proceeding, we have not made a final determination as to the patentability of any challenged claim or as to the construction of any claim term.

---

[5] The Petition addresses the Board's discretion under 35 U.S.C. § 314(a). *See* Pet. 69–73.  Patent Owner does not argue that we should exercise discretion to deny institution of *inter partes* review.  Accordingly, we do not consider exercising discretion to deny institution of *inter partes* review under 35 U.S.C. § 314(a) any further.

IPR2020-01526
Patent 6,771,994 B2

## IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claim 15 of the '994 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '994 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

IPR2020-01526
Patent 6,771,994 B2

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

Filed: June 8, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:  John M. Grover (Reg. No. 42,610)
     Joseph R. Re (Reg. No. 31,291)
     Stephen W. Larson (Reg. No. 69,133)
     Jarom D. Kesler (Reg. No. 57,046)
     Benjamin A. Katzenellenbogen (Reg. No. 53,102)
     Shannon H. Lam (Reg. No. 65,614)
     KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1526-994@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01526
U.S. Patent 6,771,994

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319, 37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the United States Court of Appeals for the Federal Circuit from the Judgment – Final Written Decision (Paper No. 31) entered on April 12, 2022 (Attachment A) and from all underlying orders, decisions, rulings, and opinions that are adverse to Masimo related thereto and included therein, including those within the Decision Granting Institution of *Inter Partes* Review, entered April 16, 2021 (Paper 7). Masimo appeals the Patent Trial and Appeal Board's determination that claim 15 of U.S. Patent 6,771,994 is unpatentable, and all other findings and determinations, including but not limited to claim construction, as well as all other issues decided adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-01526 involving U.S. Patent 6,771,994.

Masimo is concurrently providing true and correct copies of this Notice of Appeal, along with the required fees, with the Director of the United States Patent and Trademark Office and the Clerk of the United States Court of Appeals for the Federal Circuit.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 8, 2022

/John M. Grover/
John M. Grover (Reg. No. 42,610)
Customer No. 42,610

# CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on June 8, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on June 8, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner
Andrew B. Patrick
Daniel D. Smith
Fish & Richardson P.C.
3200 RBC Plaza

60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0005IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


                              KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 8, 2022          /John M. Grover/
                              John M. Grover (Reg. No. 42,610)
                              Customer No. 42,610

55746635