No. 22-1894

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

_____

MASIMO CORPORATION,

*Appellant,*

*v.*

APPLE INC.,

*Appellee,*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01526

**BRIEF OF APPELLANT MASIMO CORPORATION**

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON &**
**BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON &**
**BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

November 7, 2022

## U.S. Patent No. 6,771,994, Claim 15

15.      A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Appx0133.

## <u>CERTIFICATE OF INTEREST</u>

Counsel for Appellant Masimo Corporation certifies the following:

1.     The full name of every party represented by me is:

Masimo Corporation.

2.     The name of the real party-in-interest represented by me is:

Masimo Corporation.

3.     All parent corporations and any publicly held companies that own more than 10 percent or more of the stock of the party represented by me are:

BlackRock Inc.

4.     The name of all law firms and the partners or associates that appeared for the party in the lower tribunal or are expected to appear for the party in this court and who are not listed on the docket for the current case:

Knobbe, Martens, Olson & Bear, LLP: Jarom D. Kesler, Benjamin A. Katzenellenbogen, and Stephen W. Larson.

5.     The case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal:

*Masimo Corp. et al. v. Apple Inc*., Civil Action No. 8:20-cv-00048-JVS-JDE.

6.     Information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees):

None.

# **TABLE OF CONTENTS**

**Page No.**

STATEMENT OF RELATED CASES ................................................................ 1

JURISDICTIONAL STATEMENT .................................................................. 2

I.     INTRODUCTION ................................................................................ 3

II.    STATEMENT OF THE ISSUES ....................................................... 6

III.   STATEMENT OF THE CASE .......................................................... 7

       A.     The '994 Patent ..................................................................... 7

       B.     The Petition and Cited Art ................................................. 10

              1.     Webster ....................................................................... 10

              2.     Melby ........................................................................... 13

       C.     Masimo's Argument............................................................. 15

       D.     The Board's Final Written Decision ................................. 18

IV.    SUMMARY OF THE ARGUMENT ............................................... 19

V.     STANDARD OF REVIEW ............................................................... 21

VI.    ARGUMENT....................................................................................... 22

       A.     The Board Erred By Not Reading the Prior Art As a
              Whole and Instead Speculating On Possible Undisclosed
              Embodiments........................................................................... 22

       B.     The Board's Findings Are Not Supported by Substantial
              Evidence ................................................................................... 27

# TABLE OF CONTENTS
## (cont'd)

Page No.

1.  No Reference Teaches or Suggests Placing
    Louvers Over a Detector .......................................................... 28

2.  A Skilled Artisan Would Not Have Been
    Motivated to Apply Melby's Car Dashboard
    Display Film Over the Detector of Webster's Pulse
    Oximeter .................................................................................. 30

    a.  The Board's finding that Melby's film is
        designed to minimize ambient light is not
        supported by substantial evidence ................................ 31

    b.  The Board's finding that that it would have
        been "reasonable" for a person of ordinary
        skill in the art to look to Melby to provide a
        light control film to help control ambient
        light and further to place that film over the
        photodiode detectors of Webster is
        unsupported by substantial evidence ............................ 34

    c.  The Board's finding that Webster teaches
        light filters, such as those found in Melby,
        could be used above the detectors is not
        supported by substantial evidence ................................ 38

        i.   Substantial evidence does not support
             the Board's finding that Webster
             discloses optical films other than
             wavelength filters ................................................ 38

        ii.  The Board's finding that Webster
             discloses optical films could be used
             to reduce ambient light is not
             supported by substantial evidence ...................... 42

# TABLE OF CONTENTS
## (*cont'd*)

**Page No.**

       d.     The Board's finding that Webster and Melby teach the same goals, and work in precisely the same manner to achieve precisely the same end is unsupported by substantial evidence ....................................................................... 47

VII.   CONCLUSION ............................................................................. 52

CERTIFICATE OF COMPLIANCE ......................................................Addendum-2

# <u>TABLE OF AUTHORITIES</u>

**Page No(s).**

*Consol. Edison Co. v. N.L.R.B.*,
   305 U.S. 197 (1938)................................................................21

*DSS Tech. Mgmt., Inc. v. Apple Inc.*,
   885 F.3d 1367 (Fed. Cir. 2018) ................................................30, 38

*In re Enhanced Sec. Rsch., LLC*,
   739 F.3d 1347 (Fed. Cir. 2014) ................................................22

*Ericsson Inc. v. Intellectual Ventures I LLC*,
   890 F.3d 1336 (Fed. Cir. 2018) ................................................37, 52

*In re Fine*,
   837 F.2d 1071 (Fed. Cir. 8) ................................................24

*In re Gartside*,
   203 F.3d 1305 (Fed. Cir. 2000) ................................................21

*Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*,
   655 F.3d 1291 (Fed. Cir. 2011) ................................................22

*Harmonic Inc. v. Avid Tech., Inc.*,
   815 F.3d 1356 (Fed. Cir. 2016) ................................................20, 26

*Henny Penny Corp. v. Frymaster LLC*,
   938 F.3d 1324 (Fed. Cir. 2019) ................................................22

*Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*,
   688 F.3d 1342 (Fed. Cir. 2012) ................................................46

*In re Magnum Oil Tools Int'l, Ltd.*,
   829 F.3d 1364 (Fed. Cir. 2016) ................................................36

*Mallinckrodt, Inc. v. Masimo Corp.*,
   147 F. App'x. 158 (Fed. Cir. 2005) ................................................3

# TABLE OF AUTHORITIES
### (*cont'd*)

**Page No(s).**

*Masimo Corp. v. Philips Elec. N., Am. Corp.*,
  2015 WL 2379485 (D. Del. May 18, 2015) ..........................................3

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
  520 F.3d 1358 (Fed. Cir. 2008) ...........................................25

*OSI Pharms., LLC v. Apotex Inc.*,
  939 F.3d 1375 (Fed. Cir. 2019) .......................................21, 22, 34, 41

*Panduit Corp. v. Dennison Mfg. Co.*,
  810 F.2d 1561 (Fed. Cir. 1987) ...........................................22

*PAR Pharms., Inc. v. TWI Pharms., Inc.*,
  773 F.3d 1186 (Fed. Cir. 2014) .................................................28, 30

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*,
  655 F.3d 1364 (Fed. Cir. 2011) .................................................25, 26

*TQ Delta, LLC v. Cisco Sys., Inc.*,
  942 F.3d 1352 (Fed. Cir. 2019) ........................................22

# <u>STATEMENT OF RELATED CASES</u>

Pursuant to Federal Circuit Rule 47.5, Masimo Corporation states as follows:

1.  *Masimo Corp. et al. v. Apple Inc.*, Civil Action No. 8:20-cv-00048-JVS-JDE.

# **JURISDICTIONAL STATEMENT**

The Board issued a final written decision on April 12, 2022. Appx0001.

Masimo timely appealed on June 8, 2022. Appx0110. The Court has jurisdiction

under 35 U.S.C. §§ 141(c), 319 and 28 U.S.C. § 1295(a)(4)(A).

# I. <u>INTRODUCTION</u>

In 1989, Masimo was a small startup run out of an inventor's condo.  Today, Masimo is a publicly traded company that employs 6,300 people worldwide, and has annual revenues of medical devices exceeding one billion dollars.  Over the years, Masimo developed a range of technologies that revolutionized the field of noninvasive monitoring.[1]  The patent at issue in this appeal describes and claims one of those technologies.

The invention at issue here, embodied in U.S. Patent No. 6,771,994 claim 15, is an unconventional approach to optical sensor design.  At the time of the invention, optical physiological monitors were known.  One specific type of optical physiological monitor was the pulse oximeter, which non-invasively measured blood oxygen saturation.  Typically, optical sensor design focused on increasing the signal reaching the detectors.  But the '994 inventors had an important insight.  The inventors realized that the monitored signal included more information than just the physiological parameter being monitored.  The direction of the light also conveyed important information, for example that the probe was no longer properly positioned at the measurement site.

---

[1] *See Mallinckrodt, Inc. v. Masimo Corp.*, 147 F. App'x. 158, 163 (Fed. Cir. 2005) (nonprecedential); *Masimo Corp. v. Philips Elec. N., Am. Corp.*, 2015 WL 2379485 at *1 (D. Del. May 18, 2015).

With this insight, the inventors took the unusual step of positioning louvers above the detector of an optical sensor. A louvered structure—like venetian blinds—accepts light only from a particular direction. Depending on the louver's orientation, the louvered structure blocks relatively more or less "off-axis" light passing through it. But a louvered structure also substantially reduces the light transmitted, even from the "on-axis" direction. The result is less light reaching the sensor's optical detector, even from the desired direction. This approach contradicted conventional wisdom.

The Masimo inventors found a louvered structure's ability to discriminate between different directions of light outweighed the loss in signal strength at the detector. For example, one problem with optical sensors is that the probe can shift during use. A probe dislodged from the measurement site may still register a signal unrelated to the measured parameter. The result is that a monitor could measure a patient's physiological parameter within a normal range even as the patient's actual vital sign drops precipitously. Such missed events are serious problems that could lead to poor outcomes or even death.

The inventors found that a louvered structure over a physiological sensor's detector, although reducing the overall light, helped solve the problem of specious signals by accepting light only from the general direction of the emitter. If the relative position of the emitter and detector changed, for example when the probe

dislodged from the measurement site, the signal measured through the louvers also changes in a distinct way.  The system identifies the change in orientation between emitter and detector using the relevant change in light orientation measured through the louvers.  Thus, despite the decrease in signal stemming from placing louvers over the detector, the Masimo inventors nevertheless found that louvers positioned over a detector in an appropriate orientation beneficially block light rays that could otherwise be misinterpreted by the system.

Masimo's invention is a departure and distinct improvement over prior physiological monitors, solving existing problems with a new and creative sensor design.  The sole claim at issue in this appeal requires "a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Appx0133.  No reference recognizes the benefits of louvers positioned over a light sensitive detector.  No reference discloses louvers positioned over a detector that accept light originating from the direction of an emitter.  And no reference suggests that reducing the optical signal using a louvered structure over the detector would provide the beneficial result of accepting light when the sensor is properly applied to the tissue of a patient.

The Board nevertheless held claim 15 obvious based on the combination of two dramatically different references. One reference, Webster, is a textbook about pulse oximeter design that the Board viewed as "a comprehensive summary of the state of the art as of 1997." Appx0012. Webster neither mentions louvers nor suggests putting an opaque barrier over a pulse oximeter's detector. The other reference, Melby, is a patent for a louvered film that reduces "ghost images" from car dashboard displays or computer privacy screens. Melby does not mention either physiological monitors or pulse oximeters as a potential application for its film. Melby never mentions or suggests placing its louvered film over a photodetector. The Board, however, applied an erroneous legal approach, made unsupported factual findings, and concluded '994 patent claim 15 would have been obvious. The Board's judgment should be reversed.

## II. <u>STATEMENT OF THE ISSUES</u>

1.      Did the Board commit legal error by (1) relying on isolated statements taken out of context instead of reading the cited art as a whole, (2) relying on speculation about what "***could***" have been done instead of what ***would*** have been obvious to a skilled artisan at the time, and (3) using a reference's criticism of one approach as an affirmative teaching of other, undisclosed, approaches?

2.      Did the Board err by holding '994 Patent claim 15 obvious when no prior art reference teaches or suggests the limitation: "a plurality of louvers

positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient."

      3.     Are the Board's findings supported by substantial evidence?

## III.  STATEMENT OF THE CASE

### A.  The '994 Patent

The '994 patent (Appx0114-0134) stems from a utility application filed June 16, 2000, and claims priority to a provisional application filed in 1999.  The '994 Patent describes a sensor design that positions louvers in front of the detector in an optical physiological monitor.  Appx0130 2:9-24; Appx0132 6:25-59; Appx0126-0127 (Fig. 5A, Fig. 5B).  The '994 Patent explains that when louvers are placed in front of a detector, the sensor can distinguish between light originating from the emitter and passing through tissue and light from other sources.  Appx0132 6:25-34.  If the emitter and detector are positioned appropriately, the louvers will accept light passing through tissue.  Appx0132 6:30-34.  Otherwise, the louvers block light that does not originate from the direction of the emitter.  Appx0132 6:28-30.

Figures 5A and 5B illustrate the '994 Patent's general approach.  In Figure 5B (Appx0127, below), the sensor has louvers (502) positioned over the detector (235). The louvers are aligned so they accept light originating from the general direction of

the emitter (220). As a result, there is a path (510) through the tissue and past the louvers to the underlying detector.



*FIG.5B*

In contrast, Figure 5A (Appx0126, below) illustrates a situation where the louvers are not aligned in the general direction of the emitter. Appx0132 6:25-30. In Figure 5A, the light does not come from the expected location opposite the detector and thus enters at an oblique angle. Appx0132 6:25-30. Without the louvers, the light would hit the detector and produce an optical signal even though it did not pass through tissue. The louvers, however, block light entering at an oblique angle. Appx0132 6:25-30. Thus, the louvers block light rays coming from unexpected angles that might otherwise create a false signal for the physiological monitor. Appx0132 6:53-55.



*FIG.5A*

The '994 Patent explains that a louvered structure above the light sensitive detector can also identify a dislodged or improperly secured probe based on a reduced signal. Appx0132 6:42-53. As a result, the louvered structure can reduce or eliminate the possibility of a "probe-off" signal.

Claim 15 is the only claim at issue in this appeal. Claim 15 reads:

15.    A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light

emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Appx0133 Claim 15.

## B.    The Petition and Cited Art

The petition proposed four different grounds of obviousness over a variety of references. Ground 2 is the only basis for the Judgement and therefore, the only ground on appeal. Ground 2 proposes that claim 15 would have been obvious over the combination of two references: Webster (Appx0950-0951) in view of Melby (Appx0814-0821). Appx0035.

### 1.    Webster

Webster is a textbook entitled "Design of Pulse Oximeters." The petition describes Webster as "an overview of the history and design of pulse oximeters." Appx0168-0169. Among other things, the petition asserts that pulse oximeters typically use a photodiode to detect light transmitted through tissue, and that "the photodiode should be placed as close as possible to the skin without exerting force on the tissue." Appx0175-0176 (quoting Appx0958). The petition states that "Webster warns that a phenomenon known as optical shunting can occur 'when light from the sensor's LEDs reaches the photodiode without passing through the tissue.'" Appx0176 (citing Appx0950). The petition acknowledges that Webster already

-10-

teaches solutions:  optical shunting "can be eliminated by choosing an appropriate sensor for the patient's size and by ensuring that the sensor remains securely in position."  Appx0176 (citing Appx0950).

A separate chapter in Webster discusses "optical considerations" and states "it is important to minimize the effects from light other than the optical signals of interest."  Appx0950.  Webster then identifies two possible ways to minimize unwanted light.  First, Webster states "[o]ne way to minimize unwanted light incident upon the detector is to place some type of light filter over the detector."  Appx0950.  Webster explains that this light filter "allows light of ***wavelengths*** of interest to pass through the filter but does not allow light of ***other wavelengths*** to pass through the filter."  Appx0950 (emphasis added).

Webster subsequently addresses optical filtering under a distinct heading "6.3.1 Optical filtering."  Appx0950.  Webster indicates that "[o]ptical filtering…is used to limit the spectral response of the photodiode."  Webster states "[a] number of optical filter types can be used," including "a red Kodak No. 29 wratten gel filter."  Appx0950.  But Webster warns that these external wavelength-filtering films "do not appear to be used much in actual pulse oximetry designs."  Instead, Webster states that a photodiode "mounted in clear plastic which absorbs UV wavelengths…is useful to filter out some of the unwanted effects of fluorescent lighting."  Appx0950.  Webster explains that "photodiodes are available in a variety

of packaging types each of which filters out selected wavelengths of light."
Appx0950.

Under a different heading (6.3.2) Webster discusses a different phenomenon,
"Optical interference." Appx0950. Under this heading, Webster explains that "the
pulse oximeter designer must attempt to limit the light reaching the photodiode to
that which has traveled through tissue containing arterial blood." Appx0950.
Webster indicates "[t]his can be accomplished through thoughtful LED/photodiode
placement." Appx0950. In specific, "[l]ight impervious barriers should be placed
between LEDs and the photodiode in all areas where the emitted light could reach
the photodiode without passing through the tissue." Appx0950. In support of this
statement, Webster cites another reference, "New and Corenman 1987." Appx0950
(citing New and Corenman, 1987). Webster notes "[t]wo additional measures" for
reducing optical interference. First, "decrease the angle of incidence to the
photodetector." Appx0950. Second, "coat the housing around the photodiode with
a material that does not scatter or reflect light." Appx0950. The figure below shows
these "[t]wo additional measures." Appx0950-0951.



**Figure 6.6** Minimizing photodiode optical interference (adapted from Marktech International 1993).

Webster does not identify an optical filter or film as a solution to optical interference, much less optical interference from the very wavelengths of interest.  Appx0950. The only film or filter identified in Webster is a ***wavelength*** filter.  Appx0950. Webster does not suggest that his solutions are not viable or further work would be beneficial on the issue of optical interference.  Webster certainly never mentions any louvers over the detector.

###   2.   Melby

U.S. Patent No. 5,254,388 ("Melby") is entitled "Light Control Film With Reduced Ghost Images."  Appx0814 at [54].  Melby discusses a louvered film used "to prevent light from automobile control panels from reaching the windshield and causing distracting and dangerous reflections at night."  Appx0817 2:9-12.  Melby

notes "[a]nother use" for a louvered film "is to cover the screen of a CRT or other display to prevent persons other than the operator from reading data displayed thereon." Appx0817 2:12-15.

Melby explains its disclosed film "will produce a dramatically reduced ghost image while covering a back-lit display" such as those used in cars at the time. Appx0818 4:42-47. A "ghost" image is a shifted or blurred image produced by light emitted from the screen or display passing through a film. Appx0817 2:27-45. Ghost images are "aesthetically displeasing," and "can cause misinterpretation of data and significantly contribute to operator fatigue." Appx0817 2:41-45. Melby notes "[g]host images could be further reduced" by adding more layers of film and that "the preferred construction will be determined by the acceptable amount of ghosting, the minimum acceptable on-axis transmission and acceptable difficulty of construction." Appx0818 4:47-52. Melby also indicates its film could be used as a "privacy filter" for a CRT screen. Appx0819 6:7-25.

Melby's film reduces both on-axis and off-axis light: although Melby's film provides "slightly reduced on-axis transmission as compared to a film of the prior art," its "clear regions" only make up only about 86 percent of the film. Appx0818 4:38-42.

Melby thus only applies its louvered film to large screens—a CRT screen or a car control panel display—that emit light. Melby's primary concern is "ghost"

images formed on those displays. *See, e.g.*, Appx0814 (Abstract). Melby's extended use is for privacy. Appx0819 6:7-25. Melby does not have any disclosure of photodiodes or optical detectors. Melby's louvers are not over a photodetector, and Melby does not discuss physiological sensors or physiological measurements at all.

## C.    **Masimo's Argument**

After institution, Masimo submitted a Response explaining why the claimed invention would not have been obvious based on Webster and Melby. Appx0284-0350. Masimo supported its response with an expert declaration from Dr. Vijay Madisetti. Appx1441-Apppx1519.

Masimo explained that the petition improperly conflated two different teachings from Webster. As Masimo explained, Webster discussed limiting the spectral response of the photodiode using a wavelength filter. Appx0333. A wavelength filter is the only filter disclosed in Webster, and the only feature placed "over the detector." Appx0333 (quoting Appx0950).

In contrast, Webster blocks light that did not pass through tissue using light impermeable barriers. Masimo explained that Webster has no teaching of light impermeable barriers placed over a detector. Instead, Webster indicates that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue." Appx0950 (citing New and Corenman). Masimo noted that the reference Webster

cites as disclosing "impervious barriers," New and Corenman (Appx1916-1926), likewise illustrates a light impervious barrier (136) between the photosensor (138) and the light paths from the LEDs (130, 132) that do not pass through tissue (below).



New and Corenman Fig. 6 (Appx1920, partial view, annotated)

Inserting "a light impervious barrier 136…between photosensor 138 and the paths to the light emitting diodes 130 and 132 which are not through finger 14" maximizes the amount of light passing through tissue.  Appx1922 3:27-35.  Masimo explained that that neither Webster nor the underlying New and Corenman reference place a barrier over the detector, which would have undesirably blocked light from the measurement site.  Appx0334-0335.  None of these references places any louvers over the photodetector either.

Masimo also pointed out that Melby's film is not used in the same way as Webster's wavelength filter. Appx0335. Melby's film prevents light emitted from a display such as a car dashboard display or CRT screen from forming ghost images. *See, e.g.*, Appx0814 (Abstract); Appx0817 2:39-45, Appx0818 4:41-48. In contrast, Webster's light filter blocks certain wavelengths of light regardless of directionality, leaving the remaining wavelengths of light free to pass through to the detector. Masimo explained these two different functions were not substitutes, and produced completely different effects. Appx0333-0335.

Likewise, Masimo explained that Webster's light impermeable barriers served a completely different function in a completely different way compared to Melby's ghost-image-reducing film. Among many differences, Masimo explained that Webster's barriers surrounded the detector and blocked light from the sides from reaching the detector. In contrast, Melby positions its film on a display screen such as a car automobile control panel or CRT screen and reduces ghost images caused by the emitted light passing through the film. Appx0817 2:9-15, *see also* Appx0817 2:27-45, Appx0818 4:11-46.

Apple did not submit a reply expert declaration, and did not dispute many of Masimo's arguments. For example, Apple did not dispute that the light impervious barriers discussed in Webster and exemplified by New and Corenman are not the same as Melby's film. Appx0381-0412 at Appx0398. Nor did Apple dispute that

Webster already disclosed light impervious barriers as the solution for limiting light reaching the photodiode.  Appx0398.

## D.    **The Board's Final Written Decision**

The Board's final written decision held claim 15 obvious based on the combination of Webster and Melby.  The Board found "that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors."  Appx0032.  The Board further found that "Webster is clear that to minimize unwanted light upon the detector, one could 'place some type of light filter over the detector.'"  Appx0032.  The Board suggested Masimo's assertion that Webster only disclosed wavelength filters was "an overly narrow reading" and "ignore[d] other likely embodiments."  Appx0032.  Instead, the Board found that "[t]here is no indication that this 'some type of light filter' should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light. Notably, such filters seem to be discouraged by Webster because they 'do not appear to be used much in actual pulse oximetry designs.'"  Appx0032-0033 (quoting Webster).

The Board also found "reduc[ing] excessive ambient light, such as decreasing the angle of incidence of light to the photodiode…happens to be one of the goals of Melby…."  Appx0033.  The Board further found that "Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the

manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster." Appx0033 *citing* Ex. 1003 ¶¶ 99, 104 (Appx0657, Appx0659-0660). The Board identified the "similar objective" as "a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector." Appx0033. The Board also found that "the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster." Appx0033-0034.

These findings do not address the claimed invention.

## IV.  **SUMMARY OF THE ARGUMENT**

1.  The Board repeatedly read individual sentences in isolation and combined unrelated statements together in a way that fundamentally changed the cited art's disclosure.  The Board's pick-and-choose approach is legally erroneous.  Not considering the references as a whole resulted in factual findings unsupported by substantial evidence.  Moreover, the Board's focus on what an artisan "could" have done, or what would have been "reasonable" to do, applied the wrong standard. Instead of asking what would have been obvious to an artisan at the time of the invention, in view of the prior art's disclosure, the Board worked backwards from the claimed invention and concluded it would have been "reasonable."  For example, the Board's finding that "[t]here is no indication that this 'some type of light filter'

should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light" says nothing about what the reference actually teaches. Far from determining whether the cited references establish obviousness, the Board's speculative approach improperly shifted the burden to Masimo to disprove obviousness. *See Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016) ("In an IPR, the petitioner has the burden from the onset to show with particularity why the patent it challenges is unpatentable."). The Board's flawed obviousness analysis is reversible error.

2. Claim 15's invention requires "a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." No reference teaches or suggests a louvered structure positioned over a light sensitive detector. Webster never mentions louvers or suggests placing any structure that blocks light over its pulse oximeter's *detector*. Melby never mentions physiological sensors, much less a pulse oximeter, as an application for its film. Melby applies its film to computer displays or car dashboards—structures that emit light, not detect it. Thus, neither Melby nor Webster teach or suggest claim 15's louvers positioned over a light sensitive detector, designed to accept light from the general direction of the

light emission device, and that accept light when the sensor is properly applied to a patient's tissue. The Board erred by holding claim 15 obvious when even if they were to be combined, not every element is disclosed by Melby and Webster.

3. The Board's finding that an artisan would have been motivated to combine Melby and Webster is not supported by substantial evidence. Webster only discloses a wavelength filter used with its pulse oximeter. The Board incorrectly found Webster's *criticism* of a wavelength filtering film somehow *expanded* Webster's disclosure into a teaching of *any* optical film. Likewise, the Board incorrectly found Melby's goal for its film was to reduce ambient light despite Melby's repeatedly-expressed goal of reducing ghost images generated by a computer screen or car dashboard display. The Board's findings are not supported by substantial evidence, and there would have been no motivation to combine Melby and Webster.

## V.  <u>STANDARD OF REVIEW</u>

This Court reviews the "Board's legal conclusions de novo and its fact findings for substantial evidence." *OSI Pharms., LLC v. Apotex Inc.*, 939 F.3d 1375, 1381 (Fed. Cir. 2019). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence review "involves examination of the record as a whole, taking into account evidence that both justifies and detracts from an agency's decision." *In re Gartside*, 203 F.3d 1305, 1312 (Fed.

Cir. 2000); *see also TQ Delta, LLC v. Cisco Sys., Inc.*, 942 F.3d 1352, 1358 (Fed. Cir. 2019). "'Mere speculation' is not substantial evidence." *OSI*, 939 F.3d at 1382.

## VI.  ARGUMENT

### A.    The Board Erred By Not Reading the Prior Art As a Whole and Instead Speculating On Possible Undisclosed Embodiments

It is a "longstanding principle that the prior art must be considered for all its teachings, not selectively." *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1332 (Fed. Cir. 2019). Indeed, it is legal error to "select[] bits and pieces" from the prior art "that might be modified" to fit the claim. *Panduit Corp. v. Dennison Mfg. Co.*, 810 F.2d 1561, 1578 (Fed. Cir. 1987); *see also In re Enhanced Sec. Rsch., LLC*, 739 F.3d 1347, 1355 (Fed. Cir. 2014) ("*Panduit* explains that § 103 does not permit a court to stitch together an obviousness finding from discrete portions of prior art references without considering the references as a whole."). An adjudicator cannot "selectively parse[] the prior art disclosure with impermissible hindsight" and must instead view the prior art "as a whole." *Genetics Inst., LLC v. Novartis Vaccines & Diagnostics, Inc.*, 655 F.3d 1291, 1305 (Fed. Cir. 2011).

A fundamental problem with the Board's obviousness analysis is that neither Webster nor Melby teaches or suggests louvers above any detector that accept light originating from a general direction of an emitter, much less for a physiological sensor. The Board committed legal error in its obviousness analysis by selecting bits and pieces from the references while ignoring the surrounding disclosure and

ignoring that even if the references were combined, the bits and pieces do not yield the claimed invention. The Board's errors resulted in unsupported factual findings.

One example of this error is in the Board's analysis of Webster. The Board found "that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors." Appx0032.[2] In support of that finding, the Board found that "Webster teaches the benefits of using such a plastic film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light." Appx0032 (citing Webster at 79, Appx0950). The Board further found "no indication that this 'some type of light filter' should be limited to just wavelength filters." Appx0032. But the Board erred by picking out an isolated sentence while ignoring the context provided by Webster as a whole. The next sentence following Webster's reference to "some type of light filter" indicates "***[t]his allows light of wavelengths of interest*** to pass through the filter but does not allow ***light of other wavelengths*** to pass through the filter." Appx0950 (emphasis added). The following subsection on "Optical filtering" is the only other discussion of "optical filters" and likewise confirms Webster's disclosure is limited to wavelength filtering. Appx0950.

---

[2] The Board's erroneous factual findings are discussed in detail below. See Section VI.B.

The Board also relied on Webster's statement that wavelength filters "do not appear to be used much in actual pulse oximetry designs" as evidence that Webster broadly teaches other (unidentified) light filters, including Melby's louvered film. Appx0032-0033. Yet again, the Board ignored Webster's surrounding disclosure. While Webster criticizes external gel film wavelength filters as not "used much in actual pulse oximetry designs," that criticism is in contrast to the commonly used "photodiode mounting package," which "may contain filtering material." Appx0950. As Webster explains, "[m]any photodiodes are mounted in clear plastic," which provides the same function of eliminating unwanted effects of fluorescent lighting. Appx0950. "One cannot use hindsight reconstruction to pick and choose among isolated disclosures in the prior art to deprecate the claimed invention." *In re Fine*, 837 F.2d 1071, 1075 (Fed. Cir. 1988).

Moreover, the Board applied the wrong legal analysis. Instead of considering whether the claimed invention would have been obvious in view of the references' disclosure, the Board instead asked whether the combination was "reasonable," and whether Melby's film "could" be used. The Board found (1) that "it would have been *reasonable* for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light"; (2) that "Melby's film *could* be used in the Webster device"; (3) that light filters "*could* be used above the detectors"; and (4) that the combination of Webster and Melby was "a *reasonable* solution to

the problems identified by Webster."  The Board further erred by focusing on what the references did not exclude instead of what the references actually disclosed.  Thus, the Board found that "[t]here is no indication" that Webster's "'some type of light filter' should be limited to just wavelength filters."  Appx0032-0033.

But whether a feature *could* be used in a device or whether the resulting combination is *reasonable* is the wrong approach to obviousness.  Such "speculative and tentative disclosure of what might or may [cause a desired effect] does not sufficiently direct or instruct one of skill in this art."  *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1376 (Fed. Cir. 2011).  Likewise, while Webster may not have excluded the possibility of a louvered structure, it certainly does not teach or suggest a louvered structure.  And, Webster already does disclose two solutions.  The Board's finding that everything not specifically excluded is included turns the obviousness analysis on its head.  There are an infinite number of options not excluded by Webster's disclosure, but only one gives the claimed invention.  One may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and conclude[] that the invention…was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).  The Board's speculative analysis effectively and improperly shifted the burden to Masimo to disprove obviousness even though "the petitioner

has the burden from the onset to show with particularity why the patent it challenges is unpatentable." *Harmonic*, 815 F.3d at 1363.

Nothing illustrates this improper hindsight-based approach like the Board's finding that Webster's disparagement of "external filters" for wavelength filtering as not "used much in actual pulse oximetry designs" was somehow an affirmative teaching that an artisan should use other undisclosed non-wavelength filtering films instead. Appx0032-0033. As discussed below (Section VI.B.2), the Board's interpretation of Webster is factually wrong: Webster actually distinguished wavelength filtering films (which were not used with pulse oximeters) from wavelength filtering photodiode packages (which were used with pulse oximeters). Regardless, speculating on what might not be excluded by Webster is the wrong analysis and completely different from determining what Webster would have taught a skilled artisan. *Star Sci.,* 655 F.3d. at 1376.

In this case, no reference or combination of references includes a louvered structure over detectors, much less any of the other claimed features. The Board's finding "that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors" (Appx0032) picks isolated and ambiguous statements from Webster ("some type of light filter"; "external filters do not appear to be used much") while ignoring the surrounding clarifying context ("This allows light of wavelengths of interest to pass through the filter"; "photodiode

mounting package may contain filtering material"). Appx0950. Nothing in Webster suggests using a louvered film, which has a very different effect than a wavelength filter. Appx0950-0951; Appx1477-1479; Appx1497-1503. As discussed in detail below, the Board's legally erroneous approach resulted in unsupported factual findings.

**B.** **The Board's Findings Are Not Supported by Substantial Evidence**

The Board's obviousness holding relies on two unrelated references, Webster and Melby. The Board points to no link between them. Webster is a textbook discussing pulse oximetry. The Board found Webster is "a comprehensive summary of the state of the art as of 1997." Appx0012. Despite the Board identifying Webster as "a comprehensive summary of the state of the art," the petition cites nothing in Webster discussing or disclosing a louvered structure nor any need for such a structure. Melby is a patent for a film applied to large display screens such as a car control panel or CRT computer screen. Melby's film helps reduce ghost images caused by light emitted from the display passing through a film. Webster and Melby deal with different devices (small physiological sensors versus large display screens), in different fields (physiological sensors versus car or computer screens), with different problems (incoming light detected at a photodiode versus ghost images caused by light emitted from a display). Webster has no hint of a "ghost image" problem for its pulse oximeter, and Melby has no hint of a light detection

issue for its privacy film. Excepting hindsight, there is no reason why an artisan would have looked to Melby's ghost-image reducing display film and placed it on the detector in Webster's pulse oximeter.

### 1. No Reference Teaches or Suggests Placing Louvers Over a Detector

The Board should "consider motivation to combine and reasonable expectation of success only 'if all the elements of an invention are found in a combination of prior art references.'" *PAR Pharms., Inc. v. TWI Pharms., Inc.*, 773 F.3d 1186, 1194 (Fed. Cir. 2014). Claim 15 requires "a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Ex. 1001 Claim 15. This limitation is not found in the combination of Melby and Webster.

First, the combination of Melby and Webster does not disclose a plurality of louvers positioned over a light sensitive detector. Melby positions a film of louvers over a display *emitting* light (a car dashboard or CRT display), not a detector sensing incoming light. Appx0817 2:9-45; Appx08184:11-52. Melby's louvers reduce ghost images from the light emitted by the display passing through a film. Appx0817 2:9-45; Appx08184:11-52. Melby does not mention a light sensitive detector or

suggest louvers positioned over a light sensitive detector. Webster does not mention louvers at all. Neither Melby nor Webster, individually or in combination, include louvers positioned over a light sensitive detector. Appx0814-0821 at, *e.g.*, Abstract (ghost-images); 2:9-15 ("automobile control panels" or "CRT or other display"); Appx0950-0951.

Second, no reference discloses louvers that accept light originating from an emission device and in the general direction of that emission device that is transmitted through body tissue carrying pulsing blood. Melby applies its film directly to the surface of the emitting display device, with nothing in between the film and the surface of the display. Appx0817 2:9-45; Appx08184:11-52. Webster does not include any discussion of a structure positioned above a detector that accepts light from the general direction of the emitter but blocks light from other angles. Appx0959. Webster's only disclosure of light-blocking structures is to the side of a detector, not over the detector. Appx0950-0951.

Third, no reference includes louvers that accept light when a sensor is properly applied to tissue of a patient. Melby's louvers transmit light emitted from a display and reduce ghost images, but Melby includes nothing about positioning louvers to **accept** light when a sensor is properly applied to the tissue of a patient. Appx0817 2:9-45; Appx08184:11-52. Webster likewise includes nothing explaining how a

louvered structure above the detector might accept light when a sensor is properly applied to the tissue of a patient. Appx0950-0951.

The Board erred in its analysis because not all elements of claim 15 are in Webster and Melby. It appears that the Board relied on "ordinary creativity" for the missing limitation. *See* Appx0030 ("Petitioner demonstrates that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster…."). "Ordinary creativity," however, cannot satisfy "a limitation missing from the prior art references specified." *DSS Tech. Mgmt., Inc. v. Apple Inc.*, 885 F.3d 1367, 1377 (Fed. Cir. 2018).

The Board's analysis amounts to finding that (1) optical sensors were known; (2) optical films could be used with optical sensors; and (3) a louvered film was known. The crucial element of a louvered film positioned over a detector so that it accepts light from the general direction of an emitter after passing through the body is not in Webster, Melby, or the combination of references. The Board thus erred in its obviousness analysis. *PAR Pharms.*, 773 F.3d at 1194.

### 2. A Skilled Artisan Would Not Have Been Motivated to Apply Melby's Car Dashboard Display Film Over the Detector of Webster's Pulse Oximeter

Webster does not disclose a louvered film or suggest a louvered film be positioned over a pulse oximeter's detector. Webster's only discussion of any type

of optical filtering is filtering specific wavelengths of light using either an external wavelength filter (such as a red Kodak No. 29 wratten gel film filter) or filtering specific wavelengths using the plastic of the photodiode mounting package. Appx0950. Melby does not disclose a louvered film over a detector, nor does Melby disclose any type of physiological monitor. The Board, however, made a series of unsupported factual findings that built upon each other and culminated with a holding of obviousness based on Webster and Melby. The Board's findings are not supported by substantial evidence.

a.    **The Board's finding that Melby's film is designed to minimize ambient light is not supported by substantial evidence**

One of the Board's initial premises that underlies its obviousness determination is that "ambient light" "is the type of light the light control film of Melby is designed to minimize." Appx0029-0030. This finding lacks any evidence, but was key to the Board's obviousness analysis. The Board subsequently found "it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster." Appx0030.

Melby, however, does not disclose, teach, or suggest that "ambient light" "is the type of light the light control film of Melby is designed to minimize." The support cited for the Board's findings are portions of Melby that have nothing to do

with ambient light.  Appx0030 (citing Melby code (57), 3:1–8, 3:46–4:25, Figs. 1–2).  Indeed, Melby's Abstract (code (57)) indicates that its film "provides a dramatic reduction in ghost images."  Appx0814.  Ghost images are formed when light emitted from a screen passes through a film.  Appx0817 2:27-55.  Ghost images are from the emitted light from the screen, not ambient light.

The remaining citations describe Melby's film, but likewise do not mention ambient light.  Instead, the remaining citations generally describe the structure of Melby's louvered film.  *See* Appx0818 3:1–8, 3:46–4:25 (describing louvered structure).  Melby's Figures 1 and 2 (below), also cited by the Board, likewise illustrate Melby's film.  But Melby's Figures 1 and 2 (Appx0815) provide no support for the Board's finding that "ambient light" "is the type of light the light control film of Melby is designed to minimize" as the Board found.



In contrast, in the paragraph following the disclosure cited by the Board, Melby again indicates that its film "will produce a dramatically reduced ghost image while

covering a back-lit display….." Appx0818 4:42-47. Once again, Melby specifies its film reduces images formed by emitted light, not ambient light.

The Board also cited over a dozen paragraphs from petitioner's expert's declaration. Appx0030 (citing Ex. 1003 ¶¶92–105 (Appx0653-0660)). None of these paragraphs suggest that "ambient light" "is the type of light the light control film of Melby is designed to minimize." In fact, the cited declaration paragraphs do not even acknowledge Melby's stated goal of preventing "ghost images" from the emitted light. Instead, the cited paragraphs generally describe Melby's structure and claim it "could be used" in Webster's device. *See, e.g.*, Appx0657 ¶100.

There is no evidence, much less substantial evidence, to support the Board's finding that "ambient light" "is the type of light the light control film of Melby is designed to minimize."[3] Instead, Melby repeatedly indicates its louvered film is designed to minimize ghost images produced by displays such as automobile control panels or CRT computer screens. *See, e.g.*, Melby Abstract; Title; 2:9-45; 4:42-48; 5:37-40. Where, as here, "the Board misinterpreted the asserted references to teach

---

[3] Melby includes a brief discussion of ambient light that creates glare when it reflects off a computer screen. The Board does not cite or discuss this part of Melby. Notably, Melby indicates that it reduces this ambient light with an "antireflection coating" and "neutral density layer"—not a louvered structure. Appx0819 6:7-52. Melby's ambient light reduction depends on light passing through the filter multiple times, and also substantially decreases the non-ambient light as well. Appx0819 6:39-52.

more than substantial evidence supports," its obviousness holding must be reversed. *OSI*, 939 F.3d at 1382-83.

> **b.    The Board's finding that that it would have been "reasonable" for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster is unsupported by substantial evidence**

The Board found "that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster." Appx0030.   The Board's finding is "[b]ased on" its unsupported finding that "ambient light" is "the type of light the light control film of Melby is designed to minimize."  Appx0029-0030.  Because the Board's finding that Melby's louvers are designed to minimize ambient light is unsupported, the Board's finding that an artisan would have "look[ed] to Melby to provide a light control film to help control ambient light" is likewise unsupported.

Regardless, the support cited for the Board's finding—a series of paragraphs from petitioner's expert's declaration—do not bridge the gap between Webster's optical physiological monitor and Melby's film, which reduces ghost images when applied to an automobile control panel or CRT computer display.  *See* Appx0030 (*citing* Ex. 1003 ¶¶ 96, 99, 100, 101–103 (Appx0655-0659)).  Instead, the cited testimony discusses Melby's film's structure (¶¶96, 99) and concludes it "could be

used" (¶100) with Webster's sensor. But "could be used" is a hindsight reconstruction that does not demonstrate that a skilled artisan would have been motivated to use Melby's film structure, designed for reducing ghost images on computer or car displays, with Webster's pulse oximeter.

The declaration's only support are general statements from Webster. *See* Appx0657-0659 ¶¶100-103.[4] But key portions of the declaration cite no supporting evidence at all. For example, the declaration makes the conclusory and bald assertion that an artisan "would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster's system" without citation. Appx0658-0659 ¶102. Likewise, the declaration asserts it would have been obvious "to modify Webster to include a light control film as described by Melby placing a light control film over the photodetector *in place of a scattering medium* because doing so entails the use of known solutions to improve similar systems and methods in the same way," again without cited support. Appx0658-0659 ¶102 (emphasis added). The cited Webster sensor, however, does not even have a "scattering medium," so the expert's simple substitution theory swapping a "scattering medium" for a louvered film makes no sense. Appx0658-0659 ¶102. The Board's reliance on petitioner's expert's

---

[4] As discussed below, the Board's findings regarding Webster are also flawed.

conclusory assertions is particularly suspect because Webster's sensor does not even include a "scattering medium."  Appx0950-Appx0951.

Melby and Webster do not deal with "similar systems and methods."  Webster involves pulse oximeters, a type of optical physiological monitor that detects incoming light with photodiodes.  Appx0950-0951.  Melby involves car displays or CRT computer screens and reduces ghost images from emitted light passing through a film.  Appx0817 2:9-15.  These are completely different systems and methods, with different goals.  Melby and Webster are not even in the same field.  There is no basis for Melby providing "known solutions to improve similar systems and methods in the same way" when the proposed modification of using Melby's film "in place of a scattering medium" is not even part of Webster's sensor in the first place. *Compare* Appx0658 ¶102 *with* Appx0950, Appx0958 (Fig. 7.1).  The expert's conclusory and unsupported testimony cannot support obviousness.  *See In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("conclusory statements cannot satisfy the petitioner's burden of demonstrating obviousness").

The Board did not address Melby's disclosure, or Masimo's expert's testimony, that the louvered film decreases on-axis transmission (as illustrated below).  *See* Appx0818 4:41-47 (noting "clear regions make up about 86 percent of the film"); Appx1502-1503 ¶106 ("in Melby, even if the light was approaching from the appropriate direction, e.g., from directly above the film, the louvers 14 would

limit some portion of the light coming from that direction"). The louvered structure blocks the light represented by the left arrow (below) even though that light comes from the same angle and direction as the light represented by the right arrow (which passes through the louvered structure).



*Fig. 1*

A skilled artisan would have understood that Melby's louvered film blocks incoming light and results in a reduced optical signal at the detector, thus making physiological measurements more difficult. Appx1502-1503 ¶106. This is a significant hindrance. Appx1497-1503 ¶¶94-97, ¶¶103-107.

The Board's repeated reliance on unsupported expert testimony conflicts with the cited art, which teaches louvers would have decreased the optical signal from the measurement site. Unsupported expert testimony that contradicts the prior art is not substantial evidence. *Ericsson Inc. v. Intellectual Ventures I LLC*, 890 F.3d 1336,

1346 (Fed. Cir. 2018).  Conclusory expert testimony, like that relied on by the Board, cannot support the Board's findings.  *DSS*, 885 F.3d at 1376.

### c.    The Board's finding that Webster teaches light filters, such as those found in Melby, could be used above the detectors is not supported by substantial evidence

The Board also erred in its interpretation of Webster.  The Board found that "Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors," and therefore that "a person of ordinary skill in the art would have found the combination a reasonable solution to the problems identified by Webster."  Appx0032.  The Board also found that "Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector."  Appx0029.  Substantial evidence does not support the Board's findings about Webster.

### i.    Substantial evidence does not support the Board's finding that Webster discloses optical films other than wavelength filters

The Board's obviousness analysis repeatedly relied on Webster's statement that "[o]ne way to minimize unwanted light incident upon the detector is to place *some type of light filter* over the detector."    Appx0950 (emphasis added); Appx0027-28; Appx0032-0033.  The Board found that the reference to "some type of light filter" was a broad disclosure that taught "the benefits of using such a plastic

film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light." Appx0032-0033. The Board further found that "[t]here is no indication that this 'some type of light filter' should be limited to just wavelength filters…." Appx0032-0033. Instead, the Board found, wavelength "filters seem to be discouraged by Webster because they 'do not appear to be used much in actual pulse oximetry designs.'" Appx0032-0033 (quoting Appx0950). The Board's findings regarding Webster's light filter conflict with the reference and are not supported by substantial evidence.

Webster does not generally teach light filters used with pulse oximeters. Instead, Webster consistently identifies only one type of light filer—a wavelength filter—that is used with pulse oximeters. For example, after the sentence noting "some type of light filter," Webster immediately clarifies "***[t]his*** allows light of ***wavelengths of interest to pass through the filter*** but does ***not allow light of other wavelengths to pass through the filter***." Appx0950 (emphasis added). Read in context, the "some type of light filter" is some type of wavelength filter. Webster provides no suggestion that other types of filters should be used.

Webster further explains such optical filtering in a section with its own heading. *See* Appx0950 ("6.3.1 Optical filtering"). Webster's discussion of optical filtering is the only other disclosure of any type of optical filter. Appx0950. Webster specifies that "[o]ptical filtering, placed between sources of light and the photodiode,

is used to limit the **spectral response** of the photodiode." Appx0950 (emphasis added). Webster thus confirms again that the disclosed light filters prevent different wavelengths of light from reaching the photodiode ("limit the spectral response"). Again, Webster's discussion of "optical filtering" includes no teaching or suggestion that anything other than a wavelength filter would be used with a pulse oximeter. The Board's finding that "[t]here is **no indication** that [Webster's] 'some type of light filter' should be limited to just wavelength filters" (Appx0032, emphasis added) flips the inquiry on its head and improperly relies on picking bits and pieces of Webster while ignoring the surrounding context.

Indeed, the Board found that "some type of light filter" must necessarily include other filters beside wavelength filters because wavelength filters "seem to be discouraged by Webster." Appx0032-0033. The Board is correct that Webster discourages using gel film wavelength filters above a detector in a pulse oximeter. But the Board is wrong that Webster's disparagement of gel films used as wavelength filters expresses a preference for some other speculative type of light filter. Instead, Webster's statement indicates a preference for a **non-film wavelength filter**.

Immediately after criticizing the use of a wavelength-filtering film as not "used much in actual pulse oximetry designs," Webster explains that "the photodiode mounting package may contain filtering material," and that "[m]any

photodiodes are mounted in clear plastic which absorbs UV *wavelengths*." Appx0950 (emphasis added). Thus, Webster indicates that the photodiode *packaging* is a better way to "filter[] out selected *wavelengths* of light" than a film. Appx0950 (emphasis added). Webster's criticism of *films* for wavelength filtering does not teach the use of other optical films; it teaches an entirely different approach to filtering—the use of plastic photodiode packaging for the same wavelength filtering function. If anything, Webster would have discouraged an artisan from implementing Melby's louvered film since Webster teaches that even wavelength-filtering films were not typically used in pulse oximetry design. Appx0950. The Board pointed to no teaching in Webster of other filtering films that would be used.

Substantial evidence does not support the Board's finding that, among "other likely embodiments," Webster teaches "light filters, such as those found in Melby, could be used above the detectors." Appx0032. Webster only discloses wavelength filters used above detectors, and does not teach or suggest any other type of light filters much less the specific louvered film in Melby. Appx0950. The Board's findings rely solely on Webster's "some kind of light filter" and criticism of gel film wavelength filters. Appx0032-0033. Invalidity findings cannot stand where, as here, "the Board misinterpreted the asserted references to teach more than substantial evidence supports." *OSI*, 939 F.3d at 1382-83.

ii.    **The Board's finding that Webster discloses optical films could be used to reduce ambient light is not supported by substantial evidence**

The Board also found that "Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector," and that "one type of 'unwanted light' to be minimized is 'ambient light.'" Appx0029-0030.    The Board later found that Webster "recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode." Appx0033.    But the Board incorrectly conflates the teachings of different sections of Webster, which deal with different problems and different solutions.

The portions of Webster quoted by the Board ("must attempt to limit the light reaching the photodiode to that which has traveled through tissue"; "There are two types of optical interference….The first is excessive ambient light.") are from Webster's discussion of "Optical interference." Appx0950.    Webster's "Optical interference" section identifies several approaches that a designer could use "to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood." Appx0950.    One such approach is "thoughtful LED/photodiode placement" with "[l]ight impervious barriers…placed between LEDs and the

photodiode in all areas where the emitted light could reach the photodiode without passing through tissue." Appx0950 (citing New and Corenman, Appx1916-1926).

New and Corenman—the reference cited in Webster—dispels any confusion about whether Webster's discussion of optical interference involves optical films. New and Corenman maximizes the amount of light passing through tissue by inserting "a light impervious barrier 136…between photosensor 138 and the paths to the light emitting diodes 130 and 132 which are not through finger 14." Appx1922 3:27-32. The barrier makes "the path between the respective light emitting diodes 130, 132 and the light receiving diode 138 *occur only through the flesh* of finger 14." Appx1922 3:32-35 (emphasis added). New and Corenman Figure 6 (Appx1920, below) generally illustrates this approach of maximizing the amount of light passing through tissue.



New and Corenman Fig. 6 (Appx1920, partial view, annotated)

Webster's "Optical interference" section also identifies "[t]wo additional measures" that can minimize optical interference. First, the angle of incidence to the photodiode can be decreased. Second, "the housing **around** the photodiode" can be coated "with a material that does not scatter or reflect light." Appx0950 (emphasis added). Webster illustrates these two approaches (below). Appx0950-0951.



**Figure 6.6** Minimizing photodiode optical interference (adapted from Marktech International 1993).

Excessive ambient light and optical cross-talk with other probes in close proximity are two kinds of optical interference addressed by light impervious barriers, decreased angle of incidence, and light absorbing coatings. Appx0950. Neither light impervious barriers, nor decreased angle of incidence, nor light absorbing coatings involves an optical film. Appx0950-0951; Appx1922-1923 3:27-35; 5:48-56.

The Board erred by conflating Webster's discussion of optical interference with its separate discussion of optical filtering. Webster's discussion of optical filtering using wavelength filters is presented in its own section. Appx0950. Webster discusses the problem of limiting "the light reaching the photodiode to that which has traveled through tissue" in a different "Optical interference" section. Appx0950. Webster does not teach or suggests an optical filter as the solution for limiting "the light reaching the photodiode to that which has traveled through

tissue." Appx0950.  Instead, Webster expressly teaches light impervious barriers, recessed photodiodes, and non-reflective coatings around the photodiode, with **nothing** above the photodiode that would block incoming light.  Appx0950-0951; Fig. 6.6.  Moving Webster's light impervious barriers above the photodiode would block incoming light from the measurement site and result in an inoperable sensor.

The Board relies on "minimiz[ing] light that has not otherwise travelled through the finger" as a motivation for adding Melby's louvered film to Webster's pulse oximeter.  Appx0031.  But none of the prior art provides such a motivation. Webster teaches that the goal of "limit[ing] the light reaching the photodiode to that which has traveled through tissue containing blood" is **already** "accomplished though thoughtful LED/photodiode placement" using "[l]ight impervious barriers." Appx0950.  The Board gives no reason why an artisan would have added Melby's louvered film—used on large display surfaces to prevent ghost images—to Webster's pulse oximeter that already "accomplished" the goal of limiting light to the photodiode using light impervious barriers.  Where "each device independently operates effectively, a person having ordinary skill in the art, who was merely seeking to create a better device … would have no reason to combine the features of both devices into a single device." *Kinetic Concepts, Inc. v. Smith & Nephew, Inc.*, 688 F.3d 1342, 1369 (Fed. Cir. 2012).  Indeed, the prior art does not even teach Melby's louvered film would be useful for this purpose.

**d.    The Board's finding that Webster and Melby teach the same goals, and work in precisely the same manner to achieve precisely the same end is unsupported by substantial evidence**

The Board further found that Webster "recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode…, which also happens to be one of the goals of Melby." Appx0033.  The Board also found that "Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in *precisely* the manner that Webster contemplates in order to achieve *precisely* the end contemplated by each of Melby and Webster."  Appx0033 (emphasis added).  The Board concluded "that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster and the combination would have been obvious."  Appx0033-0034.  The Board's findings are not supported by substantial evidence.

As an initial point, no substantial evidence supports the Board's finding that reducing excessive ambient light, specifically at a photodiode, "happens to be one of the goals of Melby."  Appx0033.  Melby clearly states its goal is preventing the ghost images that result from *emitted* light passing through a film.  Appx0814 (Abstract, Title);  Appx0817 2:30-55;  Appx0818 4:41-52;  Appx0819 5:37-40.  Melby's film is not used above a photodiode (there is no mention of a photodiode in Melby at all).  Instead, Melby positions its film on large surfaces that emit light, such

as a car control panel or a CRT computer display. Appx0817 2:9-15; 2:27-45. The Board's cited support from Melby does not mention ambient light, nor does it articulate any particular goal for Melby's structure. The following paragraph, however, confirms that Melby's goal is "a dramatically reduced ghost image." Appx0818 4:42-48.

Moreover, the cited testimony only discusses what a skilled artisan "could" discern from the combination *after it was made*. *See* Appx0659-0660 ¶104 ("a light control film placed over the detector could thus accept light from the light emission device"). Petitioner's expert does not suggest—as the Board found—that preventing ambient light at a photodiode "happens to be one of the goals of Melby." Appx0033 (*citing* Appx0659-0660 ¶104). Starting with the finished structure and then working backwards to justify its existence is the epitome of hindsight. Nothing in the references provides any reason to put Melby's light control film over Webster's detector in the first place.

Also, no substantial evidence supports the Board's finding that "Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster." Appx0033 (citing Ex. 1003 ¶¶ 99, 104 (Appx0657, Appx0659-0660)). The cited expert declaration, which alternately discusses Melby's structure generally (¶99) and provides conclusory and

unsupported assertions (¶104), is not substantial evidence supporting the Board's finding.

Webster and Melby do not work in the same manner or achieve the same end. Webster teaches barriers *surrounding* the photodiode decrease the angle of incidence for incoming light (below, left). Appx0950-0951. Webster does not teach a film that reduces the angle of incidence of light, or any optical film besides a wavelength filter. Appx0950. In contrast, Melby uses a film that changes the direction of light *emitted* from a large screen (below, right) to reduce ghost images. Appx0815 (Fig. 1), Appx0817 2:9-15 ("automobile control panels" or "CRT or other display"); Appx0818 4:42-52 ("ghost image while covering a back-lit display").



Webster's recessed photodiode and Melby's louvered film work in different ways to achieve different ends. Webster reduces the angle of incidence by surrounding a recessed photodiode with a barrier, while Melby reduces ghost images with a louvered film placed directly on the surface of a screen emitting light. A recessed photodiode decreases the angle of incidence, so some angled light from the side does not make it to the photodiode. Appx0950-0951. But the recessed

photodiode does not otherwise block the incoming light that enters the cavity (the "on-axis" transmission). Appx0950-0951. In contrast, Melby's film reduces the amount of light that passes through it, even if that light is "on-axis" and aligned with the direction of the louvers. *See, e.g.*, Appx0818 4:41-42 ("clear regions make up about 86 percent of the film").



Appx0815

A louvered structure decreases ***all*** light passing through it, including light from the desired direction (as shown by the left arrow, above, illustrating on-axis light blocked by the louvered structure). Appx0815. This is a substantial effect. *See, e.g.,* Appx1502-1503 ¶106, Appx1505 ¶111, Appx1932 (discussing reduced light transmission). Dr. Madisetti's unrebutted testimony established that the physical structure of the louvers causes a substantial decrease in the optical signal even for light emitted at the desired angle. Appx1502-1503 ¶106. This is a meaningfully different result than Webster's recessed photodiode, which includes no structure above the photodetector that would block light from the measurement site.

Webster and Melby thus use different structures (barriers versus film), positioned in different ways (surrounding versus attached above), that have different results (no reduced on-axis transmission versus significantly reduced on-axis transmission). The Board's finding that "Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates" (Appx0033) is not supported by substantial evidence.

In addition, the Board's finding that Melby and Webster "achieve precisely the end contemplated by each of Melby and Webster" (Appx0033) is likewise unsupported by substantial evidence. The Board explains that the "similar objective" of both Melby and Webster is "a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector." Appx0033.

As discussed above, Melby does not use its louvered structure to reduce "optical interference in the form of excessive ambient light" and does not place its film "over a light sensitive detector." *See, e.g.*, Appx0814 (Abstract); Appx0818 4:42-52. Instead, Melby has the objective of reducing ghost images caused by light *emitted* from a display such as a car control panel or CRT computer screen. *See, e.g.*, Appx0814 (Abstract); Appx0817 2:9-15; Appx0818 4:42-52. Further, Webster does not generally teach reducing "optical interference in the form of excessive ambient light" using a light control film. Appx0950. Instead, Webster only teaches

wavelength filters and suggests reducing ambient light using opaque barriers. Appx0950-0951.

Finally, the Board found "that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster," and therefore held "the combination would have been obvious." Appx0033-0034. Once again, the Board's finding that Webster "contemplate[s]" a pulse oximeter with Melby's louvered film positioned above a photodiode detector is not supported by substantial evidence. Webster has no mention of louvers whatsoever, let alone Melby's louvered film positioned over a photodiode. The Board's cited support is the same paragraph of conclusory expert testimony that works backwards from the claimed device. *See* Appx0034 (citing Ex. 1003 ¶104 (Appx0659-0660)). Unsupported expert testimony that contradicts the prior art is not substantial evidence. *Ericsson Inc. v. Intellectual Ventures I LLC*, 890 F.3d 1336, 1346 (Fed. Cir. 2018).

## VII. <u>CONCLUSION</u>

The Board's findings use a legally erroneous approach and are not supported by substantial evidence. Accordingly, the Board's obviousness determination should be reversed and the case remanded.

Respectfully submitted,

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>November 7, 2022</u>    By: <u>/s/ Jeremiah S. Helm</u>
         Joseph R. Re, *Principal Counsel*
         Stephen C. Jensen
         John M. Grover
         Shannon Lam
         Jeremiah S. Helm

         *Attorneys for Appellant*
         *Masimo Corporation*

# ADDENDUM

# Table of Contents

| No. | Description | Appx Nos. |
|-----|-------------|-----------|
| 1. | April 12, 2022 Judgment: Final Written Decision | Appx1 – Appx37 |
| 2. | U.S. Patent No. 6,771,994 | Appx114 – Appx134 |

56580502

Trials@uspto.gov                                             Paper 31
571-272-7822                                    Entered: April 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

_____

IPR2020-01526
Patent 6,771,994 B2

_____

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining the Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01526
Patent 6,771,994 B2

# I.    INTRODUCTION

## A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent"). Paper 2 ("Pet."). Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6. We instituted an *inter partes* review of the challenged claim on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314. Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 12, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 17, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply"). An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record. Paper 30 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Based on the record before us and for the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that claim 15 of the '994 patent is unpatentable.

## B.    Related Matters

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

IPR2020-01526
Patent 6,771,994 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '994 patent. Paper 3, 1.

## C.    *The '994 Patent*

The '994 patent is titled "Pulse Oximeter Probe-Off Detection System," and issued on August 3, 2004, from U.S. Patent Application No. 10/374,303, filed February 24, 2003. Ex. 1001, codes (21), (22), (45), (54). The '994 patent claims priority through a series of applications to Provisional Application No. 60/140,000, filed June 18, 1999. *Id.* at codes (60), (62).

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition. Ex. 1001, code (57). The '994 patent relies on

3

IPR2020-01526
Patent 6,771,994 B2

electrical contacts that contact the skin of a patient when the probe is properly attached and a number of louvers placed in front of a sensor's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. *Id.* According to one aspect of the invention, if the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter, which may trigger an alarm or warning. *Id.*

As depicted in Figure 1 below, pulse oximeter 140 is attached through connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which are "preferably configured to produce different wavelengths of light." *Id.* at 3:21–55, Fig. 1.



*FIG. 1*

Figure 1 illustrates a schematic of a pulse oximeter system. *Id.* at 2:30–31. The wavelengths of light pass through the flesh of a patient to be detected by photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain embodiments where the photodetector is placed opposite the light emitters to detect transmitted light as it emerges from the user's body tissue. *See id.* at

4

IPR2020-01526
Patent 6,771,994 B2

1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



## FIG.5B

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

5

IPR2020-01526
Patent 6,771,994 B2

### D.    Claim 15

Claim 15 is the only challenged claim and it is reproduced below.

15. [pre] A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers pre–c added).

### E.    Applied References

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

Pet. 3–4.

IPR2020-01526
Patent 6,771,994 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W.

Anthony, Ph.D. (Ex. 1003).  Patent Owner submits, *inter alia*, the

Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).  The parties also

provide deposition testimony from Dr. Anthony and Dr. Madisetti.

Exs. 1038, 2003.

### F.    Asserted Grounds

We instituted an *inter partes* review based on the following grounds.

Inst. Dec. 7, 29.

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

## II.    DISCUSSION

### A.    Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be

construed using the same claim construction standard that would be used to

construe the claim in a civil action under 35 U.S.C. § 282(b), including

construing the claim in accordance with the ordinary and customary

meaning of such claim as understood by one of ordinary skill in the art and

the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b)

(2019).

Petitioner submits that the entirety of clause 15[c] requires

construction.  Pet. 8.  Clause 15[c] (set forth above), requires in part, "a

plurality of louvers *positioned over* the light sensitive detector to accept light

from the at least one light emission device *originating from a general*

IPR2020-01526
Patent 6,771,994 B2

*direction* of the at least one light emission device and then transmitting through body tissue." Ex. 1001, 8:29–35 (emphases added). Petitioner contends that this limitation requires that the light sensitive detector must "be positioned opposite the at least one light emission device." Pet. 8–9. Petitioner seemingly bases this interpretation on one embodiment in the Specification, "which only depict[s] and describe[s] the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. 9 (citing Ex. 1001, 1:41–43 ("[T]he 'photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [body] tissue.'" (second alteration in original))).

Although Petitioner describes one embodiment of the invention that may be encompassed by the claim scope, this one embodiment is narrower in scope than the claim language of clause 15[c]. For example, the claim requires the louvers positioned over the detector to accept light originating from a general direction of the at least one light emission device, while the light also passes through tissue. Petitioner contends that for this to occur the detector must be positioned opposite the light emission device, as depicted in Figure 5B. Pet. 9.

In the Institution Decision, we noted that Petitioner does not explain why it is even necessary to adopt its proposed claim construction. Inst. Dec. 8–9. We noted that for purposes of our analysis, we accept that the embodiment Petitioner relies upon (positioned opposite) is within the claim scope of clause 15[c], but we were not prepared to limit the claim to just this embodiment without further explanation and evidence. *Id.* We determined that clause 15[c] provides sufficient detail as to the positioning of elements

8

IPR2020-01526
Patent 6,771,994 B2

such that further defining the limitation did not seem necessary. We invited the parties to further explain why these terms would require construction for this proceeding. *Id.* at 9.

In its Response, Patent Owner argued that further defining the limitations of clause 15[c] is not necessary. PO Resp. 22. Patent Owner contends that "Apple's attempt to inject the non-claimed requirement of the detector being opposite the light emission device is unnecessary and inappropriate." *Id.* Patent Owner provides several reasons in support of this position. *Id.* at 22–26. Likewise, at oral argument Patent Owner maintained it was unnecessary to reach the claim construction issue in this proceeding. *See* Tr. 38:3–19.

In its Reply, Petitioner did not provide any justification as to why it would be necessary in this proceeding to construe the limitations of clause 15[c]. *See generally* Pet. Reply.

Based on the final record, it is unnecessary for us to construe the limitations of clause 15[c] as requested by Petitioner. We determine that clause 15[c] provides sufficient detail as to the positioning of elements such that further defining the limitation is not necessary to resolve this proceeding. Further, no other terms require construction.

### B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

IPR2020-01526
Patent 6,771,994 B2

factual determinations, including (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) objective evidence of non-
obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When
evaluating a combination of teachings, we must also "determine whether
there was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art
elements would have produced a predictable result weighs in the ultimate
determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The
burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## C.    *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information,
including but not limited to physiological monitoring technologies." Pet. 7–

---

[1] Neither party has introduced objective evidence of non-obviousness.

IPR2020-01526
Patent 6,771,994 B2

8 (citing Ex. 1003 ¶¶ 1–15, 36–37). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the [person of ordinary skill in the art] POSITA characteristics stated above." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, Masimo nonetheless applies Apple's asserted level of skill." PO Resp. 21.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.    Obviousness over Webster and Melby

Petitioner contends that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby. Pet. 29–44; *see also* Pet. Reply 4–5. Patent Owner disagrees. PO Resp. 42–46; *see also* Sur-reply 12–15.

Based on our review of the parties' arguments and the cited evidence in the final record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 15 is unpatentable.

### 1.    Overview of Webster (Ex. 1010)

Webster is a book titled "Design of Pulse Oximeters" that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood." Ex. 1010, xv[2]. Webster

---

[2] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book. We adopt Petitioner's citations for clarity.

IPR2020-01526
Patent 6,771,994 B2

details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods." *Id.* Webster provides a comprehensive summary of the state of the art as of 1997, and also describes the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components. *See generally* Ex. 1010, Chs. 2, 5–7.

As shown in FIG. 7.1 of Webster, reproduced below, Webster explains that the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Ex. 1010, 86.



Figure 7.1 of Webster depicts a probe using a transmittance principle such that light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode. *Id.* at 87. The LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." *Id.* at 86. Webster explains that its "photodiode has to detect the light transmitted through the tissue" and is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." *Id.* at

12

IPR2020-01526
Patent 6,771,994 B2

87.  Because light from the LEDs "is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector," reducing the amount of light that eventually reaches the detector, the assembly "must be protected from the ambient light for the wavelengths to which the photodiode is sensitive." *Id.* at 86.  Because the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered." *Id.* at 71 (emphasis omitted).

Webster describes how the LEDs can be "powered alternately so that light of one particular wavelength will pass through the tissue, and the transmitted light will be detected by the photodiode" before light of the other wavelength is emitted.  Ex. 1010, 86.  Webster notes that the "intensity of the light emerging from the tissue is attenuated by the amount of blood present in the tissue." *Id.*  Because this intensity "varies with the arterial pulse," it can be used "as a measure to indicate the pulse rate." *Id.*

As seen in Figure 7.13 below, Webster describes the importance of preventing light other than the actual signals of interest (e.g., light that has passed through the tissue carrying pulsing blood) from reaching the detector. *See* Ex. 1010, 95 (describing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue).

13

IPR2020-01526
Patent 6,771,994 B2



Figure 7.13 of Webster depicts light that does not pass through arterioles causing optical shunting. *Id.* Webster states that optical shunting can occur "when light from the sensor's LEDs reaches the photodiode without passing through the tissue" and "leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting." *Id.*

Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of light filter" can be placed over the detector. *Id.* at 79. Using a light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood." *Id.* Indeed, Webster discloses that in order to "minimize errors, the pulse oximeter designer must

14

IPR2020-01526
Patent 6,771,994 B2

attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue" containing arterial blood. *Id.*

### 2. *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images." Ex. 1008, code (54). Melby discloses a light control film, or a "louvered plastic film." *Id.* at code (57). Melby describes a film that includes "louver elements," and Melby acknowledges that it was known to cant louver elements with respect to a louvered plastic film, which produces a film that transmits light in a direction other than perpendicular to the surface of the film. *Id.* at 1:9–22, 3:46–62. Melby describes using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. *Id.* at 3:21–22.

Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). As shown in Figures 1 and 2 of Melby, reproduced below, Melby discloses "a louvered plastic film has a plurality of clear regions separated by louvers," where each louver has "a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction." *Id.* at 3:1–8.

15

IPR2020-01526
Patent 6,771,994 B2



Figure 1 of Melby depicts a schematic cross section of a louvered
plastic film and Figure 2 depicts an enlarged drawing of a portion of the
louvered plastic film. Ex. 1008, 3:10–14. Melby describes its louvered film
as including "cover sheets 11 provided for clarification and includes
alternating clear layers, such as layer 12 and louvers, such as louver 14," that
"includes outer layers 16 and 18 and inner layer 20." *Id.* at 3:46–4:25.

Referring to Figure 2, Melby describes the operation of the louvers:

A light ray 22 enters transparent layer 12. It then strikes layer 16
at surface 24. Because layer 16 has only a low concentration of
carbon black, there is not a large difference in index of refraction
between it and layer 12. Therefore very little of the light is
reflected by layer 24. Most of the light will enter layer 16 and be
refracted. As the light traverses layer 16, some will be absorbed.
Some, however, will strike layer 20 on surface 26. Some of light
beam 22 will enter layer 20 where, due to the relatively high
concentration of carbon black, it will be absorbed. Some of light

16

IPR2020-01526
Patent 6,771,994 B2

> beam 22 will be reflected at surface 26 due to the large difference
> in index of refraction between layer 16 and layer 20.

Ex. 1008, 3:63–4:10.

### 3.    Independent Claim 15

Petitioner contends that claim 15 would have been obvious over
Webster and Melby.  Pet. 29–44.  Below, we set forth how the combination
of prior art references teaches or suggests the claim limitations that are not
disputed by the parties.  For those limitations and reasons for combining the
references that are disputed, we examine each of the parties' contentions and
then provide our analysis.

> i. [15 pre] *"A sensor which generates at least first and
> second intensity signals from a light-sensitive detector
> which detects light of at least first and second wavelengths
> transmitted through body tissue carrying pulsing blood;
> the sensor comprising:"*

The cited evidence and argument supports Petitioner's undisputed
contention that Webster and Melby satisfy the subject matter of the
preamble.  Pet. 30–32.  According to Petitioner, Webster describes devices
known as "pulse oximeters," which provide "an empirical measure of
arterial saturation."  Pet. 30 (quoting Ex. 1010, 13).  Webster describes the
operation of the devices as shining "light of two wavelengths through a
tissue bed such as the finger or earlobe and measures the transmitted light
signal."  *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the
probe of a pulse oximeter.

17

IPR2020-01526
Patent 6,771,994 B2



Petitioner's annotated and highlighted Figure 7.1 of Webster depicts a probe using transmittance of light from two LEDs (blue labeled as "Light Emission Device") passing alternately through the tissue of the finger such that it is detected by a photodiode (green labeled as "Light Sensitive Detector"). Pet. 31; Ex. 1010, 87.  Petitioner persuasively relies on Webster's teaching of how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector."  Pet. 31; Ex. 1010, 86.  Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode."  Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'" Pet. 31–32 (quoting Ex. 1010, 86).  Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different

18

wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue.  Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue' of a subject[]."  Pet. 32 (quoting Ex. 1010, 86).  Petitioner argues, and we agree, that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between absorbance of arterial blood and other absorbers."  Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

We find Petitioner's contentions set forth above supported by a preponderance of the evidence on the final record.

### ii. "[a] at least one light emission device;"

Based on the final record, the cited evidence supports Petitioner's undisputed contention that Webster discloses this limitation.  Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths.  *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

IPR2020-01526
Patent 6,771,994 B2

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit light at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84. We find Petitioner's contentions supported by the final record.

### iii. "[b] a light sensitive detector; and;"

Based on the final record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (citing Ex. 1010, 95)).

*iv.* *"[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the*

20

> *louvers accept the light when the sensor is properly applied to tissue of a patient."*

Petitioner's Contentions

Petitioner contends that Webster and Melby teach these limitations. Pet. 38–45.  Petitioner first notes that Webster proposes the use of a light filter to be placed over the detector to minimize the effects from light other than the optical signals of interest.  Pet. 39 ("Webster proposes that, in order to 'minimize the effects from light other than the optical signals of interest,' some type of ***light filter***' can be placed over the detector.") (quoting Ex. 1010, 79).  Specifically, "[u]sing a light filter allows 'light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter.'"  *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring that light reaching the photodiode must pass through tissue containing arterial blood in order for the pulse oximeter to function effectively.  *Id.* Petitioner relies on Webster's disclosure that in order to "minimize errors, the pulse oximeter designer must attempt to ***limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood***" and suggests the use of "***[l]ight impervious barriers [that] should be placed between LEDs and the photodiode*** in all areas where the emitted light could reach the photodiode without passing through tissue."  Pet. 39 (quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of ordinary skill in the art would have recognized the advantages of using a light filter, such as the type taught by Melby and as suggested by Webster.  Ex. 1003 ¶¶ 92–96.  Dr. Anthony testifies that Melby's louvered plastic film could be used with the combined Webster system as the "light filter" to

control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* ¶¶ 96–100; Ex. 1010, 79. Petitioner relies on Melby's teaching of "a 'louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction.'" Pet. 40 (alterations in original) (quoting Ex. 1008, code (57)). Further, "Melby teaches '***a louvered plastic film has a plurality of clear regions separated by louvers***,'" where each louver has 'a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction.'" *Id.* (quoting Ex. 1008, 3:1–8). Petitioner points out that Melby's louvered film includes "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and ***louvers, such as louver 14***," that "includes outer layers 16 and 18 and inner layer 20." Pet. 41 (quoting Ex. 1008, 3:46–4:25).

Petitioner relies on Melby's teaching that when "***[a] light ray 22 enters transparent layer 12[,] [i]t then strikes layer 16 at surface 24***." Pet. 41 (quoting Ex. 1008, 3:66–67). Petitioner also notes that "very little of the light is reflected by layer 24," instead, "***[m]ost of the light will enter layer 16 and be refracted.***" *Id.* (quoting Ex. 1008, 3:66–67). According to Petitioner, Melby's "advantage lies with 'the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." Pet. 41–42 (quoting Ex. 1008, 3:46–4:25). "Thus," according to Petitioner, a person of ordinary skill in the art "viewing the disclosure of Webster would have recognized that Melby's film could be used in the

IPR2020-01526
Patent 6,771,994 B2

Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector." Pet. 42 (citing Ex. 1010, 79; Ex. 1003, 92–100).

According to Petitioner, a person of ordinary skill in the art "would have been motivated by Melby to include a light control film in the sensor described by Webster" in order "to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood.'" Pet. 42 (alteration in original) (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium. Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

23

IPR2020-01526
Patent 6,771,994 B2

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby.  *Id.*



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green), which is also labeled "Light Sensitive Detector."  Ex. 1003 ¶ 102; Pet. 43. According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film.  Ex. 1003 ¶ 104.  Dr. Anthony testifies that "[i]n the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body."  *Id.*

24

IPR2020-01526
Patent 6,771,994 B2

<u>Patent Owner Contentions</u>

Patent Owner contends Webster does not disclose louvers, but instead teaches an optical filter over the photodiode to remove unwanted wavelengths of light. PO Resp. 2 (citing Ex. 1010, 79). Patent Owner disagrees that a person of ordinary skill in the art would use Melby's light control film in place of Webster's optical filter, and argues that Petitioner does not identify "motivation in the references for this change." *Id.* According to Patent Owner, "[t]he optical purposes of these two components are unrelated: Webster's filter removes selected wavelengths of light, Melby's film controls the direction of light." *Id.* (emphases omitted). Patent Owner also argues that the proposed "combination would vitiate the purpose of Webster's filter because the filter would no longer remove selected wavelengths of light." *Id.* Patent Owner argues that "Webster separately teaches light impervious barriers that seek to limit all light from a certain area from reaching the photodiode," and that "[t]hese barriers are not placed over the photodiode," because doing so "would render the photodiode inoperable." *Id.* (emphasis omitted) ("with the barrier blocking all light over the photodiode, the photodiode would receive no light").

Relying on the testimony of Dr. Madisetti, Patent Owner maintains that "Webster's wavelength filter and light impervious barriers are different components in Webster's optical system, and each address different optical concerns." PO Resp. 42 (citing Ex. 2001 ¶¶ 94–95). According to Patent Owner, "Webster's wavelength filter provides optical filtering 'to limit the spectral response of the photodiode.'" *Id.* (quoting Ex. 1010, 79) (citing Ex. 2003, 3–7). Patent Owner notes that "Webster places its wavelength filter 'over the detector,'" but "Webster's light impervious barriers are

IPR2020-01526
Patent 6,771,994 B2

supposed to block light that has not passed through tissue." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 95). Patent Owner relies on a portion of Webster that states its barriers may be placed "in all areas where the emitted light could reach the photodiode without passing through tissue." *Id.* (quoting Ex. 1010, 79). Patent Owner argues that "[w]ere Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative." *Id.* (citing Ex. 2001 ¶ 97).

Patent Owner argues that Petitioner "conflates Webster's wavelength filter, one component, with the optical effect of the barrier, a different component," and a person of ordinary skill in the art "would have had no motivation to position Melby's light film over the detector, which like Webster's barrier blocks light from reaching the detector." PO Resp. 43 (emphasis omitted). Patent Owner further contends that "Webster's light impervious barriers—***not*** Webster's light filters—'limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood,'" but the "barriers are not ***over*** the detector, putting them over the detector would make the detector non-functional." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶¶ 94–99). Patent Owner relies on prior art cited by Webster to support the argument that this art also "fail[s] to disclose a light impervious barrier over the detector." *Id.* at 43–44 (citing Ex. 2003, 238:9–13, Fig. 6).

Next, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Webster to include Melby's light control film because "Melby's light control film is ***not*** used in the same way as Webster's light filter." PO Resp. 44. Patent Owner contrasts the

teachings of Webster and Melby, arguing that "Webster explains that its light filter 'allows light of **wavelengths** of interest to pass through the filter but does not allow light of other **wavelengths** to pass through the filter,'" and "[i]n contrast, the light control film in Melby controls the direction of light transmitted through the film." *Id.* (emphasis omitted) (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 103). According to Dr. Madisetti, filtering specific wavelengths of light is not the same as controlling the directionality of light and replacing Webster's light filter with Melby's light control film would remove the ability to filter specific wavelengths of light. Ex. 2001 ¶ 103.

Patent Owner next alleges that there is no support for a person of ordinary skill in the art to minimize errors by limiting the light reaching the photodiode to that which has traveled through tissue containing arterial blood because "Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode." PO Resp. 45 (citing Ex. 1010, 79). Patent Owner surmises that "Melby's film would minimize errors better than the light impervious barriers already provided by Webster," and "the light control film would have made it more difficult to obtain accurate results compared to Webster's light impervious barriers." *Id.* at 46 (citing Ex. 2001 ¶ 106).

<u>Petitioner's Reply</u>

Petitioner addresses Patent Owner's position by first arguing that "the Petition merely relies on the explicit disclosure of Webster," such as Webster's disclosure "that 'it is important to minimize the effects from light other than the optical signals of interest,'" and "'[o]ne way to minimize unwanted light incident upon the detector is to place **some type of light filter**

over the detector.'" Pet. Reply 4 (quoting Ex. 1010, 79). According to Petitioner, "Webster describes that one type of 'unwanted light' that should be minimized is 'ambient light'—which is the type of light the light control film of Melby is designed to minimize." *Id.* (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

"Thus," according to Petitioner, "Webster recognizes the need to minimize unwanted light reaching the detector, and recognizes that light filters can be used for this purpose." *Id.* (citing Ex. 1010, 79). With these motivations expressly disclosed, Petitioner reasons that a person of ordinary skill in the art "would have been motivated to use Melby's light control film as such a light filter in Webster's system, and that the results of the combination would have been predictable." *Id.* at 4–5 (Ex. 1003 ¶¶ 92–105).

As for Patent Owner's arguments that suggest Webster requires a wavelength filter, Petitioner responds that Webster only notes this is one option of an exemplary mechanism for limiting unwanted light. Pet. Reply 5 (citing Ex. 1010, 79). Petitioner notes that "Webster even makes clear that it requires no such thing, stating that such wavelength filters 'do not appear to be used much in actual pulse oximetry designs.'" *Id.* (quoting Ex. 1010, 79). "Thus," Petitioner contends that Patent Owner's "arguments mischaracterize Webster's disclosure and fail to address the Petition arguments." *Id.*

<u>Patent Owner's Sur-reply</u>

In its Sur-reply, Patent Owner contends that Petitioner does not dispute "that light filters that filter specific wavelengths of light are not the same as Melby's light control film that controls the directionality of light," and further, "that light impervious barriers that block light are not the same

as Melby's light control film that controls the directionality of light." Sur-reply 12. Patent Owner repeats its argument that Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. *Id.*

Analysis

Based on the totality of the evidence before us, and considering the scope of element 15[c], Petitioner has persuasively shown that the combination of Webster and Melby teach these limitations and that the combination would have been both predictable and supported by the references. Webster is a Medical Sciences Series text book that provides insight as to the design of several distinct embodiments of potential pulse oximeters. Ex. 1010, vi–xiv. Patent Owner's arguments rely on certain potential embodiments of Webster, but Patent Owner suggests that other embodiments, and specifically the combination proposed by Petitioner, would not have been contemplated by the person of ordinary skill in the art. Petitioner has persuasively shown, however, that a person of ordinary skill in the art would have been motivated to create its proposed combination because the combination would have been both reasonable and predictable to achieve the design goals set forth in Webster.

We determine that Petitioner has persuasively shown that Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector. Ex. 1010, 79 ("the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood"); Ex. 1003 ¶¶ 93–95. Petitioner demonstrates that at least one

29

embodiment of Webster contemplates that one type of "unwanted light" to be minimized is "ambient light," which is the type of light the light control film of Melby is designed to minimize.  Ex. 1010, 79 ("There are two types of optical interference that may cause problems for the photodiode.  The first is excessive ambient light."); *see* Pet. Reply 4 (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

Based on this evidence, Petitioner demonstrates that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster, as depicted below.  *See* Ex. 1003 ¶¶ 96, 99, 100 ("Melby's film could be used in the Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector."), 101–103.



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green),

which is also labeled "Light Sensitive Detector." Ex. 1003 ¶ 102; Pet. 43.
We find persuasive Dr. Anthony's testimony that one of ordinary skill would
have understood that a light control film placed over the detector would thus
accept light from the light emission device from a particular direction based
on the angle of the louvers within the light control film. Ex. 1003 ¶ 104.
We also find persuasive the testimony that "[i]n the combination, one of
ordinary skill would have understood the light control film to restrict the
amount of light that reaches the detector from a particular direction, and
therefore that the louvers accept the light when the sensor is properly applied
to the patient's body." *Id.* Petitioner's combination of Webster and Melby
depicted above adds a light control film atop the photodiode and such a
placement would have been reasonable and predictable for a person of
ordinary skill in the art. The proposed combination recognizes that although
the LEDs are transmitting light through the finger and toward the photodiode
not all of the light from the LEDs is actually to go through that finger and
light that has not gone through the finger would then be a source of noise.
To limit that noise, Dr. Anthony persuasively testifies that Melby's light
control film placed above Webster's photodiode would reduce noise by
accepting light from the light emission device from a particular direction
based on the angle of the louvers within the light control film. Ex. 1003
¶¶ 102–104. This would in turn help minimize light that has not otherwise
travelled through the finger. *Id.*

Examining the limitations of claim element 15[c], the plurality of
louvers must be "positioned over the light sensitive detector to accept light
from the at least one light emission device originating from a general
direction of the at least one light emission device and then transmitting

31

IPR2020-01526
Patent 6,771,994 B2

through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Ex. 1001, 8:29–36. Although Patent Owner recognizes that Webster teaches use of light filters, and Melby teaches louvers, Patent Owner contends that it is only Webster's light impervious barriers that limit the light and these barriers cannot be over the detector, because doing so would make the detector non-functional. PO Resp. 42–43. Further, Patent Owner believes that Webster's discussion of a filter over the detectors "[c]ould not be clearer[,] [t]he discussion of a filter has to do with wavelengths." Tr. 28:2–11. Patent's Owner's contentions, however, are based on an overly narrow reading of the combination of references and ignore other likely embodiments. We determine that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors. Based on the combined teachings of Webster and Melby, a person of ordinary skill in the art would have found the combination a reasonable solution to the problems identified by Webster.

Melby teaches a louvered plastic film that collimates light and reduces the influence of ambient light. Ex. 1008, 3:63–4:25. Webster teaches the benefits of using such a plastic film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light. Ex. 1010, 79. Specifically, Webster is clear that to minimize unwanted light upon the detector, one could "place some type of light filter *over* the detector." *Id.* There is no indication that this "some type of light filter" should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light. Notably, such filters

32

seem to be discouraged by Webster because they "do not appear to be used much in actual pulse oximetry designs." *Id.*

Considering the teachings of Webster as a whole, Webster further recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode (*id.*), which also happens to be one of the goals of Melby (Ex. 1008, 3:63–4:25). *See also* Ex. 1003 ¶ 104 ("[O]ne of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film."). A person of ordinary skill in the art would have recognized that based on these combined teachings, Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster. Ex. 1003 ¶¶ 99, 104. That similar objective being a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector. *Id.*

Dr. Anthony persuasively testifies that one of ordinary skill would have been motivated to combine Webster and Melby to provide a pulse oximeter that minimizes errors by limiting the light reaching the photodiode to that which has travelled through tissue containing arterial blood. *See* Ex. 1003 ¶¶ 100–104. Webster recognizes this same problem and proposes various solutions such as "plac[ing] some type of light filter over the detector." *See* Ex. 1010, 79, 95 (recognizing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue); Ex. 1003 ¶ 93. We find Dr. Anthony's

IPR2020-01526
Patent 6,771,994 B2

reasoning persuasive that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster and the combination would have been obvious to a person of ordinary skill in the art. *See, e.g.*, Ex. 1003 ¶ 104. Petitioner has persuasively shown that the light control film or louvers from the combination of Webster and Melby would prevent sources of noise in the form of light emitted from ambient sources, or light from LEDs that has not travelled through the user tissue, from striking the photodetectors and in that way, it would improve the optical signal-to-noise ratio. *See id.* ¶¶ 100–104.

### v. Summary

Based on the final record before us, Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have found the combination of Webster and Melby renders obvious claim 15. *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate by a preponderance of the evidence that claim 15 is unpatentable.

### E.    Remaining Grounds of Obviousness

As discussed in detail above, Petitioner has demonstrated by a preponderance of the evidence that claim 15 would have been obvious over Webster and Melby. Petitioner argues that claim 15 of the '994 patent would have also been obvious over three other grounds, including: (i) Diab, Benjamin, and Melby; (ii) Fine; and, (iii) Fine, Benjamin, and Melby. Pet. 3. Because we have already determined that claim 15 is unpatentable based on Webster and Melby, we need not reach these additional grounds applied to claim 15. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809

34

IPR2020-01526
Patent 6,771,994 B2

F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

### III.    CONCLUSION

In summary:[3]

| Claim | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15 | 103 | Webster, Melby | 15 | |
| 15 | 103[4] | Diab, Benjamin, Melby | | |
| 15 | 103 | Fine | | |
| 15 | 103 | Fine, Benjamin, Melby | | |
| **Overall Outcome** | | | 15 | |

---

[3] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[4] As explained above, because we conclude that claim 15 is unpatentable based on the grounds of Webster and Melby, we do not reach the merits of these remaining grounds.

35

IPR2020-01526
Patent 6,771,994 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claim 15 of the '994 patent has been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

36

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Andrew Patrick
Vivian Lu
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com
vlu@fr.com

FOR PATENT OWNER:

John Grove
Ben Katzenellenbogen
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Shannon Lam
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2bak@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2sxl@knobbe.com



US006771994B2

(12) **United States Patent**                     (10) **Patent No.:**     **US 6,771,994 B2**
Kiani et al.                                        (45) **Date of Patent:**         **Aug. 3, 2004**

(54) **PULSE OXIMETER PROBE-OFF DETECTION SYSTEM**

(75) Inventors: **Massi E. Kiani**, Laguna Niguel, CA (US); **Mohamed K. Diab**, Mission Viejo, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/374,303**

(22) Filed: **Feb. 24, 2003**

(65) **Prior Publication Data**

US 2003/0139656 A1 Jul. 24, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/595,081, filed on Jun. 16, 2000, now Pat. No. 6,526,300.

(60) Provisional application No. 60/140,000, filed on Jun. 18, 1999.

(51) **Int. Cl.**[7] ............................................... **A61B 5/00**
(52) **U.S. Cl.** ....................................... **600/323**; 600/344
(58) **Field of Search** ................................ 600/309–310, 600/322–324, 316, 344, 473, 476

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,295,475 A | 10/1981 | Torzala | |
| 4,331,161 A | 5/1982 | Patel | |
| 4,561,440 A | 12/1985 | Kubo et al. | |
| 4,603,700 A | 8/1986 | Nichols et al. | |
| 4,945,239 A * | 7/1990 | Wist et al. | ................... 600/473 |
| 5,226,417 A | 7/1993 | Swedlow et al. | |
| 5,370,114 A | 12/1994 | Wong et al. | |
| 5,469,845 A | 11/1995 | DeLonzor et al. | |
| 5,503,148 A | 4/1996 | Pologe et al. | |

| | | | |
|---|---|---|---|
| 5,635,700 A * | 6/1997 | Fazekas | ................. 235/462.06 |
| 5,758,644 A | 6/1998 | Diab et al. | |
| 5,761,540 A * | 6/1998 | White | ............................ 396/4 |
| 5,782,757 A | 7/1998 | Diab et al. | |
| 5,823,950 A | 10/1998 | Diab et al. | |
| 5,923,021 A * | 7/1999 | Dvorkis et al. | ............. 235/455 |
| 6,035,223 A * | 3/2000 | Baker, Jr. | ................... 600/323 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 197 28 902 A1 | 11/1999 |
| EP | 0182 197 A2 | 5/1986 |
| EP | 0315 040 A1 | 10/1989 |
| GB | 2061 496 A | 5/1981 |

* cited by examiner

*Primary Examiner*—Mary Beth Jones
*Assistant Examiner*—Matthew Kremer
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson, & Bear, LLP

(57) **ABSTRACT**

The present invention provides a number of improvements that can be incorporated into a pulse oximeter probe to detect when a probe has become dislodged from a patient and/or to prevent a probe-off condition. A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but continues to detect an AC signal within the operating region of the pulse oximeter. In one aspect, the present invention provides electrical contacts that contact the skin of a patient when the probe is properly attached. In another aspect, the present invention provides a number of louvers placed in front of the sensor's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. Accordingly, if the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter. In accordance with a method of the present invention the pulse oximeter can sound an alarm or display a warning if it determines that the probe is not properly attached to the patient.

**18 Claims, 15 Drawing Sheets**





# FIG.1

Appx0115



*FIG.2A*



*FIG.2B*



**FIG.3A**



*FIG.3B*



*FIG.3C*



**FIG.3D**



*FIG.3E*



*FIG.3F*



*FIG.3G*



*FIG.3H*



*FIG. 4*



*FIG.5A*



*FIG.5B*



*FIG.5C*



*FIG.6*

US 6,771,994 B2

1

# PULSE OXIMETER PROBE-OFF DETECTION SYSTEM

## REFERENCE TO RELATED APPLICATIONS

The present application claims priority benefit under 35 U.S.C. § 120 to, and is a divisional of, U.S. patent application Ser. No. 09/595,081, filed Jun. 16, 2000, now U.S. Pat. No. 6,526,300, entitled "Pulse Oximeter Probe-Off Detection System," which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 60/140,000, filed Jun. 18, 1999, entitled "Pulse Oximeter Probe-Off Detection System." The present application also incorporates the foregoing utility disclosure herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to optical probes that can be attached to the finger, toe, or appendage of a patient. More particularly, the present invention relates to devices and methods for identifying when a probe has become dislodged from a patient.

## DESCRIPTION OF THE RELATED ART

Oximetry is the measurement of the oxygen status of blood. Early detection of low blood oxygen is critical in the medical field, for example in critical care and surgical applications, because an insufficient oxygen supply can result in brain damage and death in a matter of minutes. Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of arterial blood, an indicator of oxygen supply. A pulse oximetry system generally consists of a probe attached to a patient, a monitor, and a cable connecting the probe and monitor. Conventionally, a pulse oximetry probe has both red and infrared (IR) light-emitting diode (LED) emitters and a photodiode detector. The probe is typically attached to a patient's finger or toe, or a very young patient's foot. For a finger, the probe is configured so that the emitters project light through the fingernail, the arteries, vessels, capillaries, tissue and bone. The photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the finger tissues.

The pulse oximetry monitor (pulse oximeter) determines oxygen saturation by analyzing the differential absorption by arterial blood of the two wavelengths emitted by the probe. The pulse oximeter alternately activates the probe LED emitters and reads the resulting current generated by the photodiode detector. This current is proportional to the intensity of the detected light. The pulse oximeter calculates a ratio of detected red and infrared intensities, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The pulse oximeter contains circuitry for controlling the probe, processing the probe signals and displaying the patient's oxygen saturation and pulse rate. A pulse oximeter is described in U.S. Pat. No. 5,632,272 assigned to the assignee of the present invention.

## SUMMARY OF THE INVENTION

The present invention provides a number of improvements that can be incorporated into a pulse oximeter probe to detect when a probe has become dislodged from a patient and/or to prevent a probe-off condition. A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but may continue to detect an AC signal within the operating region of the pulse oximeter.

2

In one aspect, the present invention provides a number of electrical contacts that contact the skin of a patient when the probe is properly attached. The pulse oximeter can check the continuity through the contacts to determine whether the probe is properly attached. If the probe is not properly attached, the pulse oximeter can identify a probe-off condition even though the oximeter measures an AC signal that appears like the probe is still attached.

In another aspect, the present invention provides a number of louvers placed in front of the probe's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. If the probe becomes dislodged, the emitter will not likely remain in front of the photodetector. If the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter. The louvers prevent light from an oblique angle from reaching the photodetector and creating a false signal that might be interpreted by the pulse oximeter as a physiological signal. Accordingly, the pulse oximeter can determine that a probe has become dislodged when the photodetector does not produce a valid signal. Furthermore, probe-off conditions can avoided since oblique light rays are not able to reach the photodetector to produce an apparently valid signal.

## BRIEF DESCRIPTION OF THE DRAWINGS

Referring now to the drawings in which like reference numbers represent corresponding components throughout:

FIG. 1 illustrates a schematic of one embodiment of a pulse oximeter system;

FIGS. 2A–B depict an optical probe and the attachment of the optical probe on the fingertip of an adult patient;

FIG. 3A illustrates a schematic of a pulse oximeter system that incorporates electrical contacts to the skin of a patient, in accordance with one embodiment of the present invention;

FIG. 3B illustrates a perspective view of an optical probe incorporating electrical contacts to the skin of a patient;

FIG. 3C illustrates a schematic of one embodiment of a pulse oximeter system that incorporates electrical contacts to the skin of a patient;

FIG. 3D illustrates a schematic of a preferred embodiment of a pulse oximeter system that incorporates a number of electrical contacts to the skin of a patient;

FIG. 3E depicts a generalized schematic of a pulse oximeter that incorporates another embodiment of a contact on a pulse oximeter probe;

FIG. 3F depicts a perspective view an optical probe incorporating the embodiment of FIG. 3E;

FIG. 3G depicts a generalized schematic of a pulse oximeter system that incorporates another embodiment of a contact sensor in accordance with the present invention;

FIG. 3H depicts a perspective view of an optical probe incorporating the contact sensor of FIG. 3G;

FIG. 4 illustrates a probe that has become unfastened;

FIG. 5A illustrates a probe wherein a number of louvers are placed in front of the detector assembly;

FIG. 5B illustrates a properly attached probe wherein a number of louvers are placed in front of the detector assembly;

FIG. 5C illustrates a top plan view of a preferred embodiment of a probe wherein a number of louvers are placed in front of the detector assembly

FIG. 6 illustrates a flow chart of the method of detecting a dislodged probe.

17

US 6,771,994 B2

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

To compute peripheral arterial oxygen saturation, denoted $Sp_xO_2$, pulse oximetry relies on the differential light absorption of oxygenated hemoglobin, $HbO_2$, and deoxygenated hemoglobin, Hb. This differential absorption is measured at the red and infrared wavelengths of the probe. In addition, pulse oximetry relies on the pulsatile nature of arterial blood to differentiate hemoglobin absorption from absorption of other constituents in the surrounding tissues. Light absorption between systole and diastole varies due to the blood volume change from the inflow and outflow of arterial blood at a peripheral tissue site. The tissue site might also comprise skin, muscle, bone, venous blood, fat, pigment, etc., each of which absorbs light. Blood oxygen saturation measurements are based upon a ratio of the time-varying or AC portion of the detected red and infrared signals with respect to the time-invariant or DC portion. This AC/DC ratio normalizes the signals and accounts for variations in light pathlengths through the measured tissue.

As reproduced in FIG. **1**, a schematic of one embodiment of a pulse oximeter system **100** is disclosed in U.S. Pat. No. 5,758,644 (the '644 patent), assigned to the assignee of the present application and incorporated herein by reference. The system **100** comprises a pulse oximeter **140**, which is attached through a connector **142** to a probe **110**. The probe **110** comprises a first LED **112**, a second LED **114** and a photodetector **116**. The first and second LEDs **112** and **114** are connected back-to-back and share a common electrical connection **118**. The photodetector **116** has its own electrical connection **122**. Each of the LEDs **112** and **114** and the photodetector **116** are connected at their outputs to a common ground electrical connection **130**. The two LEDs **112** and **114** are preferably configured to produce different wavelengths of light, which pass through the flesh of a patient to be detected by the photodetector **116**. The oximeter **140** can select the LED to be driven by applying either a positive or negative voltage to the connection **118**. A coding resistor **132** has a resistance that can measured by the pulse oximeter **140** to determine the particular characteristics of the probe **110**. The coding resistor **132** is coupled in parallel with the first LED **112** or the second LED **114**. The resistor **132** can be used to indicate the operating wavelength of the first and second LEDs **112** and **114**, or to indicate the type of probe. In order to read the coding resistor **132**, the pulse oximeter **140** drives the first LED **112**/coding resistor **132** combination at a level that is low enough that the LED draws insignificant current. At this level, significantly all of the current flows through the coding resistor **132** and the pulse oximeter **140** can determine the value of the resistor in accordance with Ohm's law. By configuring the coding resistor **132** in parallel with one of the LEDs **112**, **114**, the added expense of an additional lead connecting the pulse oximeter **140** to the probe **110** can be saved.

One embodiment of a disposable probe for use with pulse oximetry systems is disclosed in U.S. Pat. No. 5,782,757, assigned to the assignee of the present application and incorporated herein by reference. FIGS. **2A–B** depict the optical probe **202** and the attachment of the optical probe **202** on the fingertip **250** of an adult patient. The disposable optical probe **202** is designed to fit comfortably onto a patient's fingertip. As illustrated in FIG. **2A**, the probe **202** includes a central portion **204**, a pair of adhesive flanges **205** extending from the central portion **204**, a connector portion **210** situated between the flanges **205**, and a pair of smaller adhesive flaps **215** extending from the central portion **204** on

4

the end of the optical probe **202** opposite from a connector tab **210**. The probe **202** further includes an emitter aperture **220** with a number of emitters (e.g., a light-emitting diodes) positioned within the central portion **204** close to the connector portion **210**, and a detector aperture **230** which allows light to pass through the detector aperture **230** to a detector assembly **235**. An adult fingertip **250** is shown in phantom in FIG. **2A** to illustrate the position at which the fingertip **250** is placed when the probe **202** is to be fastened onto the fingertip **250** for use. Although not depicted specifically in FIGS. **2A–2B**, the probe **202** is typically fabricated from multiple layers.

FIG. **2B** illustrates the probe **202** fastened onto the fingertip **250**. As shown in FIG. **2B**, the probe **202** folds to conform to the very end of the fingertip. The adhesive flaps **205** fold downward (in the illustration of FIG. **2B**) to wrap around the fingertip **250** while the adhesive flaps **215** fold upward (in the illustration of FIG. **2B**) about a portion of the circumference of the fingertip **250** to provide support. As shown in FIG. **2B**, when the probe **202** is folded about the fingertip **250**, the emitters located within the probe are spaced opposite the detector assembly **235** such that light from the emitters passes through the emitter aperture **220**, through the finger **250** and is incident upon the detector assembly **235** through the detector aperture **230**.

FIG. **2B** depicts a receiving connector portion **260** which engages with contacts **252** on the connector **210** to provide an electrical connection between the optical probe **202** and the pulse oximeter **140**. Once the optical probe **202** is securely fastened to the fingertip **250** and the connector **210** provides an electrical connection between the optical probe **202** and digital signal processing circuitry, signals are detected from the detector **235** and transmitted to the processing circuitry via the connector **260**.

A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but continues to detect an AC signal within the operating region of the pulse oximeter. Probe-off errors are serious because the pulse oximeter may display a normal saturation when, in fact, the probe is not properly attached to the patient, potentially leading to missed desaturation events. Failure to detect a probe-off condition is the result of the probe detector receiving light directly from the emitters without transmission through the patient's tissue.

As illustrated in the schematic of FIG. **3A**, a first aspect of the present invention involves an optical probe **202** which incorporates a number of electrical contacts **341** and **342** that make contact to the skin of the patient when the probe **202** is properly secured. In order to detect a probe-off condition, a probe-off detector module **138** of the pulse oximeter **140** periodically applies a voltage across the contacts **341** and **342** or drives a current. A non-zero current indicates that the patient's skin **344** has closed the circuit between the contacts **341** and **342** and the probe **202** is properly secured. If the probe becomes dislodged, the patient's skin **344** is no longer be in contact with the contacts **341** and **342**, resulting in an open circuit.

FIG. **3B** illustrates one preferred embodiment of an optical probe **202** incorporating one embodiment of the present invention. The present embodiment incorporates a first electrical contact **341** and a second electrical contact **342** in the surface **306** of the central portion **306** of the probe **202**. The electrical contacts **341** and **342** are positioned in a location such that contact to a finger or flesh portion of the patient is ensured when the probe **202** is properly attached. In the illustrated embodiment, the contacts **341** and **342** are located

US 6,771,994 B2

5

proximate the detector aperture **203**. In another embodiment, contacts **341** and **342** are on opposite sides of the detector aperture **203**. The optical probe **202** also has an emitter aperture **220** through which light of at least two wavelengths passes from LEDs.

As illustrated in the schematic diagram of FIG. **3C**, the pulse oximeter system **100** of FIG. **1** can be modified to incorporate the first aspect of the present invention by extending an additional lead **324** through the connector **142** to the probe **202**. The additional lead can be connected to one contact **341** while the second contact **342** can be wired to the common ground lead **130**.

A schematic diagram of another embodiment of the present invention is illustrated in FIG. **3D**. The contacts **341** and **342** can be installed in line within the path of the coding resistor **132**. When the patient's skin **344** is in contact with the contacts **341** and **342**, the circuit through the coding resistor **132** will be closed; when the patient's skin **344** is not in contact with the contacts **341** and **342**, the circuit through the coding resistor **132** will be open. The skin **344** will have some finite resistance between the contacts **341** and **342** that will affect the measured resistance of the coding resistor. As the contacts **341** and **342** are installed in series with the coding resistor **132**, any resistance across the contacts **341** and **342** will be added to the resistance of the coding resistor **132** when the pulse oximeter **140** attempts to measure the resistance of the coding resistor **132**. The resistance of the skin **344** can effectively be ignored in the measurement of the coding resistor **132**, however, by choosing the value of the coding resistor **132** to be substantially larger than the resistance of a patient's skin **344** between the contacts **341** and **342**. Alternatively, the acceptable resistance for the coding resistor can be specified as in a range that includes the likely added resistance of the skin in the circuit. In the present configuration, the probe-off detector module **138** of the pulse oximeter **140** can verify that the optical probe **202** is properly secured simultaneously with checking the resistance of the coding resistor **132**. An open circuit indicates that the probe has become dislodged, whereas a valid resistance of a coding resistor **132** indicates a proper attachment of the probe **202**. If the probe has become dislodged, the pulse oximeter **140** can sound an alarm, display a warning message, or both.

The pulse oximeter **140** is particularly vulnerable to probe-off errors when operating at its highest sensitivity, where even small induced variations in light directly detected from the emitters have sufficient signal strength to be processed as a physiological signal. In a probe-off condition, a detector AC signal can be induced by slight changes in the direct light path between the emitters and the detector. For example, small amounts of patient motion, such as chest movement from breathing, can induce a probe-off AC signal. As another example, "creep" in the probe configuration, such as a folded probe gradually returning to its original unfolded shape after becoming dislodged can also induce a probe-off AC signal.

FIGS. **3E** and **3F** depict a generalized embodiment of the present invention with the same features as described in **3A** and **3B**, except that the electrical contacts **341**, **342** are replaced with a contact sensor **343**. The electrical contacts **341** and **342** comprise a specialized case of a contact sensor **343** where skin is involved. The contact sensor **343** may also comprise a piezoelectric sensor, a conductive contact sensor, or any other contact sensors which detect the contact of the tissue material.

FIGS. **3G** and **3H** depict yet another embodiment of the electrical contact based contact sensor of FIGS. **3A** and **3B**.

6

FIG. **3G** depicts a schematic form with a pulse oximeter **140** and a probe off detector module. FIG. **3H** depicts a perspective view of the optical pulse oximeter probe haveing optical emitters and at least one detector. However, in this embodiment, electrical contact **341**A and electrical contact **342** are positioned opposite each other. The electrical contact **341**A is positioned near the emitter aperture **220**, so as to contact the portion of the tissue material near the emitter **220**. The electrical contact **342** is positioned near the detector aperture **203**. Similarly, other contact sensors could be positioned, one near the emitter aperture **220** and one near the detector aperture **203**.

In one embodiment the electrical contacts **341**, **342**, **341**A are metallic. In another embodiment, these contacts comprise conductive adhesive, or gel based contacts.

FIG. **4** illustrates a probe **202** that has become unfastened. The illustrated probe **202** is shown in a partially unfolded shape that provides an oblique path **410** from the emitter aperture **220** to the detector assembly **235**. As a patient moves, or as the probe **202** unfolds, rays of light travelling along the oblique light path **410** may generate an AC signal that could be interpreted by the pulse oximeter **140** as a physiological signal.

As illustrated in the cross section of FIG. **5A**, a number of louvers **502** are placed in front of the detector assembly **235** within the detector aperture **203** in accordance with a second aspect of the present invention. The louvers **502** block light rays travelling along an oblique path **410** (i.e., light that does not originate from in front of the detector assembly **235**). As illustrated in FIG. **5B**, if the probe **202** is properly attached, the emitter aperture **220** will be directly in front of the detector assembly **235** and light rays will pass directly through the louvers **502** along a direct path **510**.

FIG. **5C** illustrates a top plan view of a preferred embodiment of this aspect of the present invention. The detector aperture **2o3** is formed in a plastic body **504** having slots **506** to hold the louvers **502** in place across the detector aperture **203**. In a preferred embodiment of the present aspect, the louvers **502** can be created from commercially available "3M Light Control Film."

The louvers **502** of the present aspect advantageously provide a separate or improved method for the pulse oximeter **140** to determine when a probe has become dislodged through monitoring the signal produced by the photodetector **116**. If the probe **202** becomes improperly secured, the emitter aperture will likely move from its proper location directly above the detector assembly **235**, which will cause any oblique light rays to be blocked by the louvers **502**. With no light rays reaching the detector assembly **235**, the detector will produce no signal. The probe-off detector **138** of the pulse oximeter **140** can detect the lack of signal and sound an alarm. The louvers **502** also advantageously block oblique light rays that might create a false signal that could be interpreted by the pulse oximeter **140** to be a physiological signal. Accordingly, the louvers **502** reduce or eliminate the possibility of a probe-off condition. The louvers **502** may be used alone or in combination with the contacts described herein.

FIG. **6** illustrates one embodiment of a method **600** by which a pulse oximeter **140** detects a dislodged probe and/or a probe-off condition. At a step **604**, the probe off detector module **138** checks for continuity between the skin contacts **341** and **342**. If, at a step **608**, there is continuity between the contacts **341** and **342**, the oximeter **140** passes control to a step **612**. If, on the other hand, there is no continuity at the step **608**, the oximeter **140** passes control to a step **620**. At

US 6,771,994 B2

7

step **620** the oximeter **140** sounds an alarm to alert a condition necessitating attention. At the step **612**, the oximeter **140** checks for a valid AC signal from the photodetector. If, at a step **616**, there is a valid signal, the oximeter **140** passes control back to the step **604** to start the cycle over again. If, on the other hand, there is no valid AC signal at the step **616** the oximeter sounds an alarm at the step **620**. Accordingly, the pulse oximeter checks for and detects dislodgment of a probe and/or a probe-off condition.

While certain exemplary preferred embodiments have been described and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative of and not restrictive on the broad invention. Further, it is to be understood that this invention shall not be limited to the specific construction and arrangements shown and described since various modifications or changes may occur without departing from the spirit and scope of the invention as claimed. It is intended that the scope of the invention be limited not by this detailed description but by the claims appended hereto.

What is claimed is:

1. A pulse oximetry probe comprising:

a flexible probe body configured to contact the skin of a patient on opposing surfaces of a body member of the patient when the probe body is properly affixed to the patient;

light emitting diodes incorporated into the probe body;

a light sensitive detector which detects light from a first direction originally emitted by the light emitting diodes, wherein the light comprises at least first and second wavelengths and has been transmitted through body tissue carrying pulsing blood; and

at least one structure positioned approximately parallel to the first direction and is configured to filter out light from reaching the light sensitive detector from a direction substantially different from the first direction.

2. The pulse oximetry probe of claim **1**, wherein the structure comprises one or more louvers.

3. The pulse oximetry probe of claim **1**, wherein the structure comprises a plurality of louvers.

4. The pulse oximetry probe of claim **1**, further comprising a coding resistor.

5. The pulse oximetry probe of claim **1**, further comprising an circuit configured to contact at least a portion of the body tissue.

6. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises a reusable optical probe.

7. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises a disposable optical probe.

8. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises reusable and disposable portions of an optical probe.

9. A pulse oximeter for processing signals received from an optical probe, the pulse oximeter comprising:

an input for receiving at least first and second intensity signals from a light-sensitive detector which detects

8

light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; and

a signal processor which determines a probe-off condition when at least one of the first and second intensity signals is substantially attenuated.

10. The pulse oximeter of claim **9**, wherein the attenuation is caused by improper application an optical probe to the body tissue.

11. The pulse oximeter of claim **9**, further comprising an audio alarm indicating when the probe-off condition is determined.

12. The pulse oximeter of claim **9**, further comprising an visual alarm indicating when the probe-off condition is determined.

13. The pulse oximeter of claim **9**, further comprising a coding resistor.

14. The pulse oximeter of claim **9**, further comprising an circuit configured to contact at least a portion of the body tissue.

15. A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

16. A method of processing one or more signals to detect a condition of improper positioning of an optical probe, the method comprising:

expecting to receive at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood;

blocking light originating from an angle oblique to a proximate relationship between the detector and a light source; and

receiving one of an un-interpretable signal or signal other than the expected first and second intensity signals because the light is blocked; and

indicating a probe off condition.

17. The method of claim **16**, wherein the indicating comprises at least one of an audible or visual alarm.

18. The method of claim **16**, wherein blocking light comprises positioning a plurality of louvers between the light source and the light-sensitive detector.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 6,771,994 B2                                    Page 1 of  1
APPLICATION NO. : 10/374303
DATED                   : August 3, 2004
INVENTOR(S)       : Massi E. Kiani

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At column 2, line 36, delete "embodimet" and insert -- embodiment --, therefore.

At column 6, line 3, delete "haveing" and insert -- having --, therefore.

Signed and Sealed this

Seventeenth Day of July, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned counsel hereby certifies that on November 7, 2022, the foregoing **BRIEF OF APPELLANT MASIMO CORPORATION** was filed using the Court's CM/ECF system, which will send notice of such filing to all registered CM/ECF users.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>November 7, 2022</u>          By: <u>/s/ Jeremiah S. Helm</u>
                                        Joseph R. Re, *Principal Counsel*
                                        Stephen C. Jensen
                                        John M. Grover
                                        Shannon Lam
                                        Jeremiah S. Helm

                                        *Attorneys for Appellant*
                                        *Masimo Corporation*

                                        *Attorneys for Appellant*
                                        *Masimo Corporation*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a).  This brief contains 10,385 words, excluding the parts of the brief exempt by Federal Rule of Appellate Procedure 32(f) and Federal Circuit Rule 32(b)(2).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  This brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point font Times New Roman.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated: <u>November 7, 2022</u>    By: <u>/s/ Jeremiah S. Helm</u>
    Joseph R. Re, *Principal Counsel*
    Stephen C. Jensen
    John M. Grover
    Shannon Lam
    Jeremiah S. Helm

    *Attorneys for Appellant*
    *Masimo Corporation*

    *Attorneys for Appellant*
    *Masimo Corporation*

56054978