**[Volume I, Appx0001 – Appx0968]**

**No. 22-1894**

IN THE

# United States Court of Appeals

## FOR THE FEDERAL CIRCUIT

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01526

## JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant
Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
W. Karl Renner
Michael J. Ballanco
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Robert Courtney
**FISH & RICHARDSON P.C.**
60 South 6th Street
Suite 3200
Minneapolis, MN 55402
Tel: (612) 335-5070

*Attorneys for Appellee Apple Inc.*

April 14, 2023

## Table of Contents

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|------|------|
| **VOLUME I** | | | |
| 4/12/2022 | 31 | Final Written Decision | Appx0001-Appx0037 |
| 7/26/2022 | 14 | Notice Forwarding Certified List | Appx0038-Appx0113 |
| n/a | Ex. 1001 | U.S. Patent No. 6,771,994 (Kiani et al.) | Appx0114-Appx0134 |
| 8/31/2020 | 2 | Petition for Inter Partes Review | Appx0136; Appx0142; Appx0146; Appx0168-0169; Appx0175-0176; Appx0181-0182 |
| 7/20/2021 | 12 | Patent Owner's Response | Appx0284-Appx0350 |
| 12/03/2021 | 19 | Patent Owner's Sur-Reply | Appx0381-0412 |
| 2/16/2022 | 30 | January 19, 2022 Hearing Transcript | Appx0453; Appx0460-0461; Appx0463; Appx0465-0468; Appx0470-0471 |
| n/a | Ex. 1003 | Declaration of Dr. Brian W. Anthony | Appx0603; Appx0638; Appx0640; Appx0646; Appx0653-0660 |
| n/a | Ex. 1008 | U.S. Patent No. 5,254,388 (Melby) | Appx0814-0821 |
| n/a | Ex. 1010 | Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 | Appx0855; Appx0884-0891; Appx0905; Appx0917; Appx0927-0968 |
| **VOLUME II** | | | |
| n/a | Ex. 1039 | Petitioner's Demonstratives | Appx1393; Appx1412; Appx1420; |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|------|------|
| | | | Appx1424 |
| n/a | Ex. 2001 | Declaration of Vijay K. Madisetti, Ph.D. | Appx1441-Appx1519 |
| n/a | Ex. 2003 | 6/1/2021 Deposition Transcript of Dr. Brian Anthony in connection with IPR2020-01526 | Appx1547; Appx1731-1733; Appx1741-1744 |
| n/a | Ex. 2007 | U.S. Patent No. 4,700,708 (New, Jr. et al.) | Appx1916-1926 |
| n/a | Ex. 2008 | Verploegh, "Light Control Systems for Automotive Instrumentation," SAE Technical Paper Series (February 24-28, 1986) | Appx1927; Appx1932 |

57271465

Trials@uspto.gov                                         Paper 31
571-272-7822                                    Entered: April 12, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01526
Patent 6,771,994 B2

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining the Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01526
Patent 6,771,994 B2

# I.    INTRODUCTION

## A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent"). Paper 2 ("Pet."). Masimo Corporation ("Patent Owner") waived filing a Preliminary Response. Paper 6. We instituted an *inter partes* review of the challenged claim on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314. Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 12, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 17, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply"). An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record. Paper 30 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73. Based on the record before us and for the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that claim 15 of the '994 patent is unpatentable.

## B.    Related Matters

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

2

IPR2020-01526
Patent 6,771,994 B2

> *Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

> *Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

> *Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

> *Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

> *Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

> *Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '994 patent. Paper 3, 1.

## C.    The '994 Patent

The '994 patent is titled "Pulse Oximeter Probe-Off Detection System," and issued on August 3, 2004, from U.S. Patent Application No. 10/374,303, filed February 24, 2003. Ex. 1001, codes (21), (22), (45), (54). The '994 patent claims priority through a series of applications to Provisional Application No. 60/140,000, filed June 18, 1999. *Id.* at codes (60), (62).

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition. Ex. 1001, code (57). The '994 patent relies on

electrical contacts that contact the skin of a patient when the probe is
properly attached and a number of louvers placed in front of a sensor's
photodetector to filter out oblique light rays that do not originate from a
point in front of the detector. *Id.* According to one aspect of the invention,
if the emitter and photodetector are not properly aligned, the photodetector
will not produce a signal within the valid operating range of the pulse
oximeter, which may trigger an alarm or warning. *Id.*

As depicted in Figure 1 below, pulse oximeter 140 is attached through
connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which
are "preferably configured to produce different wavelengths of light." *Id.* at
3:21–55, Fig. 1.



*FIG.1*

Figure 1 illustrates a schematic of a pulse oximeter system. *Id.* at 2:30–31.
The wavelengths of light pass through the flesh of a patient to be detected by
photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain
embodiments where the photodetector is placed opposite the light emitters to
detect transmitted light as it emerges from the user's body tissue. *See id.* at

4

IPR2020-01526
Patent 6,771,994 B2

1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



### FIG.5B

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

IPR2020-01526
Patent 6,771,994 B2

### D.    Claim 15

Claim 15 is the only challenged claim and it is reproduced below.

15. [pre] A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers pre–c added).

### E.    Applied References

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

Pet. 3–4.

6

IPR2020-01526
Patent 6,771,994 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W.

Anthony, Ph.D. (Ex. 1003).  Patent Owner submits, *inter alia*, the

Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).  The parties also

provide deposition testimony from Dr. Anthony and Dr. Madisetti.

Exs. 1038, 2003.

### F.    Asserted Grounds

We instituted an *inter partes* review based on the following grounds.

Inst. Dec. 7, 29.

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

## II.    DISCUSSION

### A.    Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be

construed using the same claim construction standard that would be used to

construe the claim in a civil action under 35 U.S.C. § 282(b), including

construing the claim in accordance with the ordinary and customary

meaning of such claim as understood by one of ordinary skill in the art and

the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b)

(2019).

Petitioner submits that the entirety of clause 15[c] requires

construction.  Pet. 8.  Clause 15[c] (set forth above), requires in part, "a

plurality of louvers *positioned over* the light sensitive detector to accept light

from the at least one light emission device *originating from a general*

7

IPR2020-01526
Patent 6,771,994 B2

*direction* of the at least one light emission device and then transmitting through body tissue." Ex. 1001, 8:29–35 (emphases added). Petitioner contends that this limitation requires that the light sensitive detector must "be positioned opposite the at least one light emission device." Pet. 8–9. Petitioner seemingly bases this interpretation on one embodiment in the Specification, "which only depict[s] and describe[s] the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. 9 (citing Ex. 1001, 1:41–43 ("[T]he 'photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [body] tissue.'" (second alteration in original))).

Although Petitioner describes one embodiment of the invention that may be encompassed by the claim scope, this one embodiment is narrower in scope than the claim language of clause 15[c]. For example, the claim requires the louvers positioned over the detector to accept light originating from a general direction of the at least one light emission device, while the light also passes through tissue. Petitioner contends that for this to occur the detector must be positioned opposite the light emission device, as depicted in Figure 5B. Pet. 9.

In the Institution Decision, we noted that Petitioner does not explain why it is even necessary to adopt its proposed claim construction. Inst. Dec. 8–9. We noted that for purposes of our analysis, we accept that the embodiment Petitioner relies upon (positioned opposite) is within the claim scope of clause 15[c], but we were not prepared to limit the claim to just this embodiment without further explanation and evidence. *Id.* We determined that clause 15[c] provides sufficient detail as to the positioning of elements

8

IPR2020-01526
Patent 6,771,994 B2

such that further defining the limitation did not seem necessary. We invited the parties to further explain why these terms would require construction for this proceeding. *Id.* at 9.

In its Response, Patent Owner argued that further defining the limitations of clause 15[c] is not necessary. PO Resp. 22. Patent Owner contends that "Apple's attempt to inject the non-claimed requirement of the detector being opposite the light emission device is unnecessary and inappropriate." *Id.* Patent Owner provides several reasons in support of this position. *Id.* at 22–26. Likewise, at oral argument Patent Owner maintained it was unnecessary to reach the claim construction issue in this proceeding. *See* Tr. 38:3–19.

In its Reply, Petitioner did not provide any justification as to why it would be necessary in this proceeding to construe the limitations of clause 15[c]. *See generally* Pet. Reply.

Based on the final record, it is unnecessary for us to construe the limitations of clause 15[c] as requested by Petitioner. We determine that clause 15[c] provides sufficient detail as to the positioning of elements such that further defining the limitation is not necessary to resolve this proceeding. Further, no other terms require construction.

## B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

IPR2020-01526
Patent 6,771,994 B2

factual determinations, including (1) the scope and content of the prior art; (2) any differences between the claimed subject matter and the prior art; (3) the level of skill in the art; and (4) objective evidence of non-obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When evaluating a combination of teachings, we must also "determine whether there was an apparent reason to combine the known elements in the fashion claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art elements would have produced a predictable result weighs in the ultimate determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech., Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance with the above-stated principles.

### C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that possessed by a person having "a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies." Pet. 7–

---

[1] Neither party has introduced objective evidence of non-obviousness.

IPR2020-01526
Patent 6,771,994 B2

8 (citing Ex. 1003 ¶¶ 1–15, 36–37).  "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the [person of ordinary skill in the art] POSITA characteristics stated above." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, Masimo nonetheless applies Apple's asserted level of skill."  PO Resp. 21.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.    Obviousness over Webster and Melby

Petitioner contends that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby.  Pet. 29–44; *see also* Pet. Reply 4–5.  Patent Owner disagrees.  PO Resp. 42–46; *see also* Sur-reply 12–15.

Based on our review of the parties' arguments and the cited evidence in the final record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 15 is unpatentable.

### 1.    Overview of Webster (Ex. 1010)

Webster is a book titled "Design of Pulse Oximeters" that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood."  Ex. 1010, xv[2].  Webster

---

[2] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book.  We adopt Petitioner's citations for clarity.

IPR2020-01526
Patent 6,771,994 B2

details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods." *Id.* Webster provides a comprehensive summary of the state of the art as of 1997, and also describes the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components. *See generally* Ex. 1010, Chs. 2, 5–7.

As shown in FIG. 7.1 of Webster, reproduced below, Webster explains that the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Ex. 1010, 86.



Figure 7.1 of Webster depicts a probe using a transmittance principle such that light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode. *Id.* at 87. The LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." *Id.* at 86. Webster explains that its "photodiode has to detect the light transmitted through the tissue" and is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." *Id.* at

IPR2020-01526
Patent 6,771,994 B2

87. Because light from the LEDs "is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector," reducing the amount of light that eventually reaches the detector, the assembly "must be protected from the ambient light for the wavelengths to which the photodiode is sensitive." *Id.* at 86. Because the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered." *Id.* at 71 (emphasis omitted).

Webster describes how the LEDs can be "powered alternately so that light of one particular wavelength will pass through the tissue, and the transmitted light will be detected by the photodiode" before light of the other wavelength is emitted. Ex. 1010, 86. Webster notes that the "intensity of the light emerging from the tissue is attenuated by the amount of blood present in the tissue." *Id.* Because this intensity "varies with the arterial pulse," it can be used "as a measure to indicate the pulse rate." *Id.*

As seen in Figure 7.13 below, Webster describes the importance of preventing light other than the actual signals of interest (e.g., light that has passed through the tissue carrying pulsing blood) from reaching the detector. *See* Ex. 1010, 95 (describing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue).

13

IPR2020-01526
Patent 6,771,994 B2



Figure 7.13 of Webster depicts light that does not pass through arterioles causing optical shunting. *Id.* Webster states that optical shunting can occur "when light from the sensor's LEDs reaches the photodiode without passing through the tissue" and "leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting." *Id.*

Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of light filter" can be placed over the detector. *Id.* at 79. Using a light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood." *Id.* Indeed, Webster discloses that in order to "minimize errors, the pulse oximeter designer must

14

IPR2020-01526
Patent 6,771,994 B2

attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue" containing arterial blood. *Id.*

## 2.    *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images." Ex. 1008, code (54). Melby discloses a light control film, or a "louvered plastic film." *Id.* at code (57). Melby describes a film that includes "louver elements," and Melby acknowledges that it was known to cant louver elements with respect to a louvered plastic film, which produces a film that transmits light in a direction other than perpendicular to the surface of the film. *Id.* at 1:9–22, 3:46–62. Melby describes using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. *Id.* at 3:21–22.

Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). As shown in Figures 1 and 2 of Melby, reproduced below, Melby discloses "a louvered plastic film has a plurality of clear regions separated by louvers," where each louver has "a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction." *Id.* at 3:1–8.

15

IPR2020-01526
Patent 6,771,994 B2



Figure 1 of Melby depicts a schematic cross section of a louvered plastic film and Figure 2 depicts an enlarged drawing of a portion of the louvered plastic film. Ex. 1008, 3:10–14. Melby describes its louvered film as including "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and louvers, such as louver 14," that "includes outer layers 16 and 18 and inner layer 20." *Id.* at 3:46–4:25.

Referring to Figure 2, Melby describes the operation of the louvers:

A light ray 22 enters transparent layer 12. It then strikes layer 16 at surface 24. Because layer 16 has only a low concentration of carbon black, there is not a large difference in index of refraction between it and layer 12. Therefore very little of the light is reflected by layer 24. Most of the light will enter layer 16 and be refracted. As the light traverses layer 16, some will be absorbed. Some, however, will strike layer 20 on surface 26. Some of light beam 22 will enter layer 20 where, due to the relatively high concentration of carbon black, it will be absorbed. Some of light

16

IPR2020-01526
Patent 6,771,994 B2

beam 22 will be reflected at surface 26 due to the large difference
in index of refraction between layer 16 and layer 20.

Ex. 1008, 3:63–4:10.

### 3. Independent Claim 15

Petitioner contends that claim 15 would have been obvious over
Webster and Melby. Pet. 29–44. Below, we set forth how the combination
of prior art references teaches or suggests the claim limitations that are not
disputed by the parties. For those limitations and reasons for combining the
references that are disputed, we examine each of the parties' contentions and
then provide our analysis.

> i. [15 pre] *"A sensor which generates at least first and
> second intensity signals from a light-sensitive detector
> which detects light of at least first and second wavelengths
> transmitted through body tissue carrying pulsing blood;
> the sensor comprising:"*

The cited evidence and argument supports Petitioner's undisputed
contention that Webster and Melby satisfy the subject matter of the
preamble. Pet. 30–32. According to Petitioner, Webster describes devices
known as "pulse oximeters," which provide "an empirical measure of
arterial saturation." Pet. 30 (quoting Ex. 1010, 13). Webster describes the
operation of the devices as shining "light of two wavelengths through a
tissue bed such as the finger or earlobe and measures the transmitted light
signal." *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the
probe of a pulse oximeter.

17

IPR2020-01526
Patent 6,771,994 B2



Petitioner's annotated and highlighted Figure 7.1 of Webster depicts a probe using transmittance of light from two LEDs (blue labeled as "Light Emission Device") passing alternately through the tissue of the finger such that it is detected by a photodiode (green labeled as "Light Sensitive Detector"). Pet. 31; Ex. 1010, 87. Petitioner persuasively relies on Webster's teaching of how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Pet. 31; Ex. 1010, 86. Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'" Pet. 31–32 (quoting Ex. 1010, 86). Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different

wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue. Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue' of a subject[]." Pet. 32 (quoting Ex. 1010, 86). Petitioner argues, and we agree, that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between absorbance of arterial blood and other absorbers." Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

We find Petitioner's contentions set forth above supported by a preponderance of the evidence on the final record.

### ii. "[a] at least one light emission device;"

Based on the final record, the cited evidence supports Petitioner's undisputed contention that Webster discloses this limitation. Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

IPR2020-01526
Patent 6,771,994 B2

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit light at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84. We find Petitioner's contentions supported by the final record.

*iii. "[b] a light sensitive detector; and;"*

Based on the final record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (citing Ex. 1010, 95)).

*iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the*

20

IPR2020-01526
Patent 6,771,994 B2

> *louvers accept the light when the sensor is properly applied to tissue of a patient."*

<u>Petitioner's Contentions</u>

Petitioner contends that Webster and Melby teach these limitations. Pet. 38–45. Petitioner first notes that Webster proposes the use of a light filter to be placed over the detector to minimize the effects from light other than the optical signals of interest. Pet. 39 ("Webster proposes that, in order to 'minimize the effects from light other than the optical signals of interest,' some type of ***light filter***' can be placed over the detector.") (quoting Ex. 1010, 79). Specifically, "[u]sing a light filter allows 'light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter.'" *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring that light reaching the photodiode must pass through tissue containing arterial blood in order for the pulse oximeter to function effectively. *Id.* Petitioner relies on Webster's disclosure that in order to "minimize errors, the pulse oximeter designer must attempt to ***limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood***" and suggests the use of "***[l]ight impervious barriers [that] should be placed between LEDs and the photodiode*** in all areas where the emitted light could reach the photodiode without passing through tissue." Pet. 39 (quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of ordinary skill in the art would have recognized the advantages of using a light filter, such as the type taught by Melby and as suggested by Webster. Ex. 1003 ¶¶ 92–96. Dr. Anthony testifies that Melby's louvered plastic film could be used with the combined Webster system as the "light filter" to

21

control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* ¶¶ 96–100; Ex. 1010, 79. Petitioner relies on Melby's teaching of "a 'louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction.'" Pet. 40 (alterations in original) (quoting Ex. 1008, code (57)). Further, "Melby teaches '***a louvered plastic film has a plurality of clear regions separated by louvers***,'" where each louver has 'a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction.'" *Id.* (quoting Ex. 1008, 3:1–8). Petitioner points out that Melby's louvered film includes "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and ***louvers, such as louver 14***," that "includes outer layers 16 and 18 and inner layer 20." Pet. 41 (quoting Ex. 1008, 3:46–4:25).

Petitioner relies on Melby's teaching that when "***[a] light ray 22 enters transparent layer 12[,] [i]t then strikes layer 16 at surface 24***." Pet. 41 (quoting Ex. 1008, 3:66–67). Petitioner also notes that "very little of the light is reflected by layer 24," instead, "***[m]ost of the light will enter layer 16 and be refracted.***" *Id.* (quoting Ex. 1008, 3:66–67). According to Petitioner, Melby's "advantage lies with 'the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." Pet. 41–42 (quoting Ex. 1008, 3:46–4:25). "Thus," according to Petitioner, a person of ordinary skill in the art "viewing the disclosure of Webster would have recognized that Melby's film could be used in the

Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector." Pet. 42 (citing Ex. 1010, 79; Ex. 1003, 92–100).

According to Petitioner, a person of ordinary skill in the art "would have been motivated by Melby to include a light control film in the sensor described by Webster" in order "to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood.'"  Pet. 42 (alteration in original) (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium.  Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

23

IPR2020-01526
Patent 6,771,994 B2

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby.  *Id.*



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green), which is also labeled "Light Sensitive Detector."  Ex. 1003 ¶ 102; Pet. 43. According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film.  Ex. 1003 ¶ 104.  Dr. Anthony testifies that "[i]n the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body."  *Id.*

IPR2020-01526
Patent 6,771,994 B2

Patent Owner Contentions

Patent Owner contends Webster does not disclose louvers, but instead teaches an optical filter over the photodiode to remove unwanted wavelengths of light.  PO Resp. 2 (citing Ex. 1010, 79).  Patent Owner disagrees that a person of ordinary skill in the art would use Melby's light control film in place of Webster's optical filter, and argues that Petitioner does not identify "motivation in the references for this change."  *Id.* According to Patent Owner, "[t]he optical purposes of these two components are unrelated: Webster's filter removes selected wavelengths of light, Melby's film controls the direction of light."  *Id.* (emphases omitted).  Patent Owner also argues that the proposed "combination would vitiate the purpose of Webster's filter because the filter would no longer remove selected wavelengths of light."  *Id.*  Patent Owner argues that "Webster separately teaches light impervious barriers that seek to limit all light from a certain area from reaching the photodiode," and that "[t]hese barriers are not placed over the photodiode," because doing so "would render the photodiode inoperable."  *Id.* (emphasis omitted) ("with the barrier blocking all light over the photodiode, the photodiode would receive no light").

Relying on the testimony of Dr. Madisetti, Patent Owner maintains that "Webster's wavelength filter and light impervious barriers are different components in Webster's optical system, and each address different optical concerns."  PO Resp. 42 (citing Ex. 2001 ¶¶ 94–95).  According to Patent Owner, "Webster's wavelength filter provides optical filtering 'to limit the spectral response of the photodiode.'"  *Id.* (quoting Ex. 1010, 79) (citing Ex. 2003, 3–7).  Patent Owner notes that "Webster places its wavelength filter 'over the detector,'" but "Webster's light impervious barriers are

supposed to block light that has not passed through tissue." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 95).  Patent Owner relies on a portion of Webster that states its barriers may be placed "in all areas where the emitted light could reach the photodiode without passing through tissue." *Id.* (quoting Ex. 1010, 79).  Patent Owner argues that "[w]ere Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative." *Id.* (citing Ex. 2001 ¶ 97).

Patent Owner argues that Petitioner "conflates Webster's wavelength filter, one component, with the optical effect of the barrier, a different component," and a person of ordinary skill in the art "would have had no motivation to position Melby's light film over the detector, which like Webster's barrier blocks light from reaching the detector."  PO Resp. 43 (emphasis omitted).  Patent Owner further contends that "Webster's light impervious barriers—***not*** Webster's light filters—'limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood,'" but the "barriers are not ***over*** the detector, putting them over the detector would make the detector non-functional." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶¶ 94–99).  Patent Owner relies on prior art cited by Webster to support the argument that this art also "fail[s] to disclose a light impervious barrier over the detector." *Id.* at 43–44 (citing Ex. 2003, 238:9–13, Fig. 6).

Next, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Webster to include Melby's light control film because "Melby's light control film is ***not*** used in the same way as Webster's light filter."  PO Resp. 44.  Patent Owner contrasts the

IPR2020-01526
Patent 6,771,994 B2

teachings of Webster and Melby, arguing that "Webster explains that its light filter 'allows light of **wavelengths** of interest to pass through the filter but does not allow light of other **wavelengths** to pass through the filter,'" and "[i]n contrast, the light control film in Melby controls the direction of light transmitted through the film." *Id.* (emphasis omitted) (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 103). According to Dr. Madisetti, filtering specific wavelengths of light is not the same as controlling the directionality of light and replacing Webster's light filter with Melby's light control film would remove the ability to filter specific wavelengths of light. Ex. 2001 ¶ 103.

Patent Owner next alleges that there is no support for a person of ordinary skill in the art to minimize errors by limiting the light reaching the photodiode to that which has traveled through tissue containing arterial blood because "Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode." PO Resp. 45 (citing Ex. 1010, 79). Patent Owner surmises that "Melby's film would minimize errors better than the light impervious barriers already provided by Webster," and "the light control film would have made it more difficult to obtain accurate results compared to Webster's light impervious barriers." *Id.* at 46 (citing Ex. 2001 ¶ 106).

<u>Petitioner's Reply</u>

Petitioner addresses Patent Owner's position by first arguing that "the Petition merely relies on the explicit disclosure of Webster," such as Webster's disclosure "that 'it is important to minimize the effects from light other than the optical signals of interest,'" and "'[o]ne way to minimize unwanted light incident upon the detector is to place **some type of light filter**

27

IPR2020-01526
Patent 6,771,994 B2

over the detector.'" Pet. Reply 4 (quoting Ex. 1010, 79). According to Petitioner, "Webster describes that one type of 'unwanted light' that should be minimized is 'ambient light'—which is the type of light the light control film of Melby is designed to minimize." *Id.* (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

"Thus," according to Petitioner, "Webster recognizes the need to minimize unwanted light reaching the detector, and recognizes that light filters can be used for this purpose." *Id.* (citing Ex. 1010, 79). With these motivations expressly disclosed, Petitioner reasons that a person of ordinary skill in the art "would have been motivated to use Melby's light control film as such a light filter in Webster's system, and that the results of the combination would have been predictable." *Id.* at 4–5 (Ex. 1003 ¶¶ 92–105).

As for Patent Owner's arguments that suggest Webster requires a wavelength filter, Petitioner responds that Webster only notes this is one option of an exemplary mechanism for limiting unwanted light. Pet. Reply 5 (citing Ex. 1010, 79). Petitioner notes that "Webster even makes clear that it requires no such thing, stating that such wavelength filters 'do not appear to be used much in actual pulse oximetry designs.'" *Id.* (quoting Ex. 1010, 79). "Thus," Petitioner contends that Patent Owner's "arguments mischaracterize Webster's disclosure and fail to address the Petition arguments." *Id.*

Patent Owner's Sur-reply

In its Sur-reply, Patent Owner contends that Petitioner does not dispute "that light filters that filter specific wavelengths of light are not the same as Melby's light control film that controls the directionality of light," and further, "that light impervious barriers that block light are not the same

IPR2020-01526
Patent 6,771,994 B2

as Melby's light control film that controls the directionality of light." Sur-reply 12. Patent Owner repeats its argument that Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. *Id.*

Analysis

Based on the totality of the evidence before us, and considering the scope of element 15[c], Petitioner has persuasively shown that the combination of Webster and Melby teach these limitations and that the combination would have been both predictable and supported by the references. Webster is a Medical Sciences Series text book that provides insight as to the design of several distinct embodiments of potential pulse oximeters. Ex. 1010, vi–xiv. Patent Owner's arguments rely on certain potential embodiments of Webster, but Patent Owner suggests that other embodiments, and specifically the combination proposed by Petitioner, would not have been contemplated by the person of ordinary skill in the art. Petitioner has persuasively shown, however, that a person of ordinary skill in the art would have been motivated to create its proposed combination because the combination would have been both reasonable and predictable to achieve the design goals set forth in Webster.

We determine that Petitioner has persuasively shown that Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector. Ex. 1010, 79 ("the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood"); Ex. 1003 ¶¶ 93–95. Petitioner demonstrates that at least one

29

embodiment of Webster contemplates that one type of "unwanted light" to be minimized is "ambient light," which is the type of light the light control film of Melby is designed to minimize. Ex. 1010, 79 ("There are two types of optical interference that may cause problems for the photodiode. The first is excessive ambient light."); *see* Pet. Reply 4 (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

Based on this evidence, Petitioner demonstrates that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster, as depicted below. *See* Ex. 1003 ¶¶ 96, 99, 100 ("Melby's film could be used in the Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector."), 101–103.



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green),

IPR2020-01526
Patent 6,771,994 B2

which is also labeled "Light Sensitive Detector." Ex. 1003 ¶ 102; Pet. 43.

We find persuasive Dr. Anthony's testimony that one of ordinary skill would

have understood that a light control film placed over the detector would thus

accept light from the light emission device from a particular direction based

on the angle of the louvers within the light control film. Ex. 1003 ¶ 104.

We also find persuasive the testimony that "[i]n the combination, one of

ordinary skill would have understood the light control film to restrict the

amount of light that reaches the detector from a particular direction, and

therefore that the louvers accept the light when the sensor is properly applied

to the patient's body." *Id.* Petitioner's combination of Webster and Melby

depicted above adds a light control film atop the photodiode and such a

placement would have been reasonable and predictable for a person of

ordinary skill in the art. The proposed combination recognizes that although

the LEDs are transmitting light through the finger and toward the photodiode

not all of the light from the LEDs is actually to go through that finger and

light that has not gone through the finger would then be a source of noise.

To limit that noise, Dr. Anthony persuasively testifies that Melby's light

control film placed above Webster's photodiode would reduce noise by

accepting light from the light emission device from a particular direction

based on the angle of the louvers within the light control film. Ex. 1003

¶¶ 102–104. This would in turn help minimize light that has not otherwise

travelled through the finger. *Id.*

Examining the limitations of claim element 15[c], the plurality of

louvers must be "positioned over the light sensitive detector to accept light

from the at least one light emission device originating from a general

direction of the at least one light emission device and then transmitting

IPR2020-01526
Patent 6,771,994 B2

through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Ex. 1001, 8:29–36. Although Patent Owner recognizes that Webster teaches use of light filters, and Melby teaches louvers, Patent Owner contends that it is only Webster's light impervious barriers that limit the light and these barriers cannot be over the detector, because doing so would make the detector non-functional. PO Resp. 42–43. Further, Patent Owner believes that Webster's discussion of a filter over the detectors "[c]ould not be clearer[,] [t]he discussion of a filter has to do with wavelengths." Tr. 28:2–11. Patent's Owner's contentions, however, are based on an overly narrow reading of the combination of references and ignore other likely embodiments. We determine that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors. Based on the combined teachings of Webster and Melby, a person of ordinary skill in the art would have found the combination a reasonable solution to the problems identified by Webster.

Melby teaches a louvered plastic film that collimates light and reduces the influence of ambient light. Ex. 1008, 3:63–4:25. Webster teaches the benefits of using such a plastic film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light. Ex. 1010, 79. Specifically, Webster is clear that to minimize unwanted light upon the detector, one could "place some type of light filter *over* the detector." *Id.* There is no indication that this "some type of light filter" should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light. Notably, such filters

32

seem to be discouraged by Webster because they "do not appear to be used much in actual pulse oximetry designs." *Id.*

Considering the teachings of Webster as a whole, Webster further recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode (*id.*), which also happens to be one of the goals of Melby (Ex. 1008, 3:63–4:25). *See also* Ex. 1003 ¶ 104 ("[O]ne of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film."). A person of ordinary skill in the art would have recognized that based on these combined teachings, Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster. Ex. 1003 ¶¶ 99, 104. That similar objective being a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector. *Id.*

Dr. Anthony persuasively testifies that one of ordinary skill would have been motivated to combine Webster and Melby to provide a pulse oximeter that minimizes errors by limiting the light reaching the photodiode to that which has travelled through tissue containing arterial blood. *See* Ex. 1003 ¶¶ 100–104. Webster recognizes this same problem and proposes various solutions such as "plac[ing] some type of light filter over the detector." *See* Ex. 1010, 79, 95 (recognizing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue); Ex. 1003 ¶ 93. We find Dr. Anthony's

IPR2020-01526
Patent 6,771,994 B2

reasoning persuasive that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster and the combination would have been obvious to a person of ordinary skill in the art. *See, e.g.*, Ex. 1003 ¶ 104. Petitioner has persuasively shown that the light control film or louvers from the combination of Webster and Melby would prevent sources of noise in the form of light emitted from ambient sources, or light from LEDs that has not travelled through the user tissue, from striking the photodetectors and in that way, it would improve the optical signal-to-noise ratio. *See id.* ¶¶ 100–104.

### v. Summary

Based on the final record before us, Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have found the combination of Webster and Melby renders obvious claim 15. *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate by a preponderance of the evidence that claim 15 is unpatentable.

### E.    Remaining Grounds of Obviousness

As discussed in detail above, Petitioner has demonstrated by a preponderance of the evidence that claim 15 would have been obvious over Webster and Melby. Petitioner argues that claim 15 of the '994 patent would have also been obvious over three other grounds, including: (i) Diab, Benjamin, and Melby; (ii) Fine; and, (iii) Fine, Benjamin, and Melby. Pet. 3. Because we have already determined that claim 15 is unpatentable based on Webster and Melby, we need not reach these additional grounds applied to claim 15. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809

IPR2020-01526
Patent 6,771,994 B2

F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

### III.     CONCLUSION

In summary:[3]

| Claim | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15 | 103 | Webster, Melby | 15 | |
| 15 | 103[4] | Diab, Benjamin, Melby | | |
| 15 | 103 | Fine | | |
| 15 | 103 | Fine, Benjamin, Melby | | |
| **Overall Outcome** | | | 15 | |

---

[3] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[4] As explained above, because we conclude that claim 15 is unpatentable based on the grounds of Webster and Melby, we do not reach the merits of these remaining grounds.

35

IPR2020-01526
Patent 6,771,994 B2

## IV.   ORDER

Upon consideration of the record before us, it is:

ORDERED that claim 15 of the '994 patent has been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

36

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Andrew Patrick
Vivian Lu
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com
vlu@fr.com


FOR PATENT OWNER:

John Grove
Ben Katzenellenbogen
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Shannon Lam
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2bak@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2sxl@knobbe.com

**Appx0037**

## UNITED STATES COURT OF APPEALS
## FOR THE FEDERAL CIRCUIT

**MASIMO CORPORATION,**
**Patent Owner/Appellant**

**Appeal No. 2022-1894**

**v.**

**APPLE INC.,**
**Petitioner/Appellee**

**Proceeding No.: IPR2020-01526**

_____

### NOTICE FORWARDING CERTIFIED LIST

A Notice of Appeal to the United States Court of Appeals for the Federal Circuit was timely filed June 8, 2022, in the United States Patent and Trademark Office in connection with the above identified _Inter Partes Review_ proceeding. Pursuant to 35 U.S.C. § 143, a Certified List is this day being forwarded to the Federal Circuit.

Respectfully submitted,

Date:  July 25, 2022

By: _Macia L. Fletcher_
Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

Under Secretary of Commerce for Intellectual Property and
Director of the United States Patent and Trademark Office

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a true and correct copy of the foregoing NOTICE

FORWARDING CERTIFIED LIST has been served, via electronic mail, on counsel for Appellant

and Appellee this 25th day of July, 2022, as follows:

| PATENT OWNER: | PETITIONER: |
| --- | --- |
| Joseph R. Re<br>John M. Grover<br>Jeremiah Helm<br>Stephen C. Jensen<br>Shannon Lam<br>KNOBBE, MARTENS, OLSON & BEAR, LLP<br>joseph.re@knobbe.com<br>john.grover@kmob.com<br>jeremiah.helm@knobbe.com<br>steve.jensen@knobbe.com<br>shannon.lam@knobbe.com | Lauren Ann Degnan<br>Robert Courtney<br>Laura E. Powell<br>Walter Karl Renner<br>Ryan Teel<br>FISH & RICHARDSON PC<br>degnan@fr.com<br>courtney@fr.com<br>powell@fr.com<br>renner@fr.com<br>teel@fr.com |

By: _Macia L. Fletcher_

Macia L. Fletcher
Paralegal
Mail Stop 8
P.O. Box 1450
Alexandria, VA 22313-1450
571-272-9035

## U.S. DEPARTMENT OF COMMERCE
### United States Patent and Trademark Office

July 25, 2022

(Date)

**THIS IS TO CERTIFY** that the attached document is a list of the papers that comprise the record before the Patent Trial and Appeal Board (PTAB) for the *Inter Partes Review* proceeding identified below.

### APPLE INC.,
Petitioner,

v.

### MASIMO CORPORATION,
Patent Owner.

**Case: IPR2020-01526**
**Patent No. 6,771,994 B2**
By authority of the

### DIRECTOR OF THE UNITED STATES
### PATENT AND TRADEMARK OFFICE

*Maria L. Fletcher*

*Certifying Officer*



**Prosecution History ~ IPR2020-01526**

| Date | Document |
|---|---|
| 8/31/2020 | Petition for Inter Partes Review |
| 8/31/2020 | Petitioner's Power of Attorney |
| 9/21/2020 | Patent Owner's Mandatory Notice |
| 10/19/2020 | Notice of Filing Date Accorded to Petition |
| 1/8/2021 | Petitioner's Updated Exhibit List |
| 1/19/2021 | Patent Owner's Notice of Waiver of Preliminary Response |
| 4/16/2021 | Decision - Institution of Inter Partes Review |
| 4/16/2021 | Scheduling Order |
| 4/30/2021 | Patent Owner's Objections to Evidence |
| 5/14/2021 | Notice of Deposition - Anthony |
| 6/10/2021 | Notice of Stipulation to Modify Due Dates 1-3 |
| 7/20/2021 | Patent Owner's Response |
| 7/27/2021 | Petitioner's Objections to Evidence |
| 8/20/2021 | Notice of Deposition - Madisetti, Ph.D. |
| 8/26/2021 | Patent Owner's Updated Mandatory Notices |
| 8/30/2021 | Patent Owner's Corrected Supplemental Mandatory Notices |
| 10/22/2021 | Petitioner's Reply to Patent Owner's Response |
| 12/3/2021 | Petitioner's Oral Hearing Request |
| 12/3/2021 | Patent Owner's Sur-Reply to Reply |
| 12/3/2021 | Patent Owner's Request for Oral Argument |
| 12/17/2021 | Order - Setting Oral Argument |
| 12/21/2021 | Patent Owner's Updated Mandatory Notice Changing Lead Counsel |
| 1/10/2022 | Unopposed Motion for Pro Hac Vice Admission - Helm, Ph.D. |
| 1/10/2022 | Patent Owner's Updated Exhibit List |
| 1/14/2022 | Patent Owner's Demonstratives for Trial Hearing |
| 1/14/2022 | Patent Owner's Certificate of Service for Demonstratives for Trial Hearing |
| 1/14/2022 | Petitioner's Updated Exhibit List |
| 1/14/2022 | Patent Owner's Supplemental Power of Attorney Adding Helm, Ph.D. |
| 1/18/2022 | Order - Pro Hac Vice Admission - Helm, Ph.D. |
| 2/16/2022 | Oral Hearing Transcript |
| 4/12/2022 | Final Written Decision |

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01526
Patent 6,771,994 B2

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

JUDGMENT
Final Written Decision
Determining the Challenged Claim Unpatentable
*35 U.S.C. § 318(a)*

IPR2020-01526
Patent 6,771,994 B2

# I.    INTRODUCTION

## *A.    Background*

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 6.  We instituted an *inter partes* review of the challenged claim on all asserted grounds of unpatentability, pursuant to 35 U.S.C. § 314.  Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution, Patent Owner filed a Response (Paper 12, "PO Resp.") to the Petition, Petitioner filed a Reply (Paper 17, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 19, "Sur-reply").  An oral hearing was held on January 19, 2022, and a transcript of the hearing is included in the record.  Paper 30 ("Tr.").

We issue this Final Written Decision pursuant to 35 U.S.C. § 318(a) and 37 C.F.R. § 42.73.  Based on the record before us and for the reasons set forth below, Petitioner has met its burden of showing, by a preponderance of the evidence, that claim 15 of the '994 patent is unpatentable.

## *B.    Related Matters*

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

2

IPR2020-01526
Patent 6,771,994 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB

Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB

Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB

Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).

Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as well as other issued applications, that claim priority to, or share a priority claim with, the '994 patent. Paper 3, 1.

## C.    *The '994 Patent*

The '994 patent is titled "Pulse Oximeter Probe-Off Detection System," and issued on August 3, 2004, from U.S. Patent Application No. 10/374,303, filed February 24, 2003. Ex. 1001, codes (21), (22), (45), (54). The '994 patent claims priority through a series of applications to Provisional Application No. 60/140,000, filed June 18, 1999. *Id.* at codes (60), (62).

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition. Ex. 1001, code (57). The '994 patent relies on

3

electrical contacts that contact the skin of a patient when the probe is
properly attached and a number of louvers placed in front of a sensor's
photodetector to filter out oblique light rays that do not originate from a
point in front of the detector. *Id.* According to one aspect of the invention,
if the emitter and photodetector are not properly aligned, the photodetector
will not produce a signal within the valid operating range of the pulse
oximeter, which may trigger an alarm or warning. *Id.*

 As depicted in Figure 1 below, pulse oximeter 140 is attached through
connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which
are "preferably configured to produce different wavelengths of light." *Id.* at
3:21–55, Fig. 1.



*FIG. 1*

Figure 1 illustrates a schematic of a pulse oximeter system. *Id.* at 2:30–31.
The wavelengths of light pass through the flesh of a patient to be detected by
photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain
embodiments where the photodetector is placed opposite the light emitters to
detect transmitted light as it emerges from the user's body tissue. *See id.* at

4

IPR2020-01526
Patent 6,771,994 B2

1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



**FIG.5B**

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

5

### D. Claim 15

Claim 15 is the only challenged claim and it is reproduced below.

15. [pre] A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers pre–c added).

### E. Applied References

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

Pet. 3–4.

6

IPR2020-01526
Patent 6,771,994 B2

Petitioner also submits, *inter alia*, the Declaration of Brian W.
Anthony, Ph.D. (Ex. 1003).  Patent Owner submits, *inter alia*, the
Declaration of Vijay K. Madisetti, Ph.D. (Ex. 2001).  The parties also
provide deposition testimony from Dr. Anthony and Dr. Madisetti.
Exs. 1038, 2003.

### F.    Asserted Grounds

We instituted an *inter partes* review based on the following grounds.
Inst. Dec. 7, 29.

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

## II.    DISCUSSION

### A.    Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b), including
construing the claim in accordance with the ordinary and customary
meaning of such claim as understood by one of ordinary skill in the art and
the prosecution history pertaining to the patent.  37 C.F.R. § 42.100(b)
(2019).

Petitioner submits that the entirety of clause 15[c] requires
construction.  Pet. 8.  Clause 15[c] (set forth above), requires in part, "a
plurality of louvers *positioned over* the light sensitive detector to accept light
from the at least one light emission device *originating from a general*

7

*direction* of the at least one light emission device and then transmitting through body tissue." Ex. 1001, 8:29–35 (emphases added). Petitioner contends that this limitation requires that the light sensitive detector must "be positioned opposite the at least one light emission device." Pet. 8–9. Petitioner seemingly bases this interpretation on one embodiment in the Specification, "which only depict[s] and describe[s] the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. 9 (citing Ex. 1001, 1:41–43 ("[T]he 'photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [body] tissue.'" (second alteration in original))).

Although Petitioner describes one embodiment of the invention that may be encompassed by the claim scope, this one embodiment is narrower in scope than the claim language of clause 15[c]. For example, the claim requires the louvers positioned over the detector to accept light originating from a general direction of the at least one light emission device, while the light also passes through tissue. Petitioner contends that for this to occur the detector must be positioned opposite the light emission device, as depicted in Figure 5B. Pet. 9.

In the Institution Decision, we noted that Petitioner does not explain why it is even necessary to adopt its proposed claim construction. Inst. Dec. 8–9. We noted that for purposes of our analysis, we accept that the embodiment Petitioner relies upon (positioned opposite) is within the claim scope of clause 15[c], but we were not prepared to limit the claim to just this embodiment without further explanation and evidence. *Id.* We determined that clause 15[c] provides sufficient detail as to the positioning of elements

such that further defining the limitation did not seem necessary. We invited the parties to further explain why these terms would require construction for this proceeding. *Id.* at 9.

In its Response, Patent Owner argued that further defining the limitations of clause 15[c] is not necessary. PO Resp. 22. Patent Owner contends that "Apple's attempt to inject the non-claimed requirement of the detector being opposite the light emission device is unnecessary and inappropriate." *Id.* Patent Owner provides several reasons in support of this position. *Id.* at 22–26. Likewise, at oral argument Patent Owner maintained it was unnecessary to reach the claim construction issue in this proceeding. *See* Tr. 38:3–19.

In its Reply, Petitioner did not provide any justification as to why it would be necessary in this proceeding to construe the limitations of clause 15[c]. *See generally* Pet. Reply.

Based on the final record, it is unnecessary for us to construe the limitations of clause 15[c] as requested by Petitioner. We determine that clause 15[c] provides sufficient detail as to the positioning of elements such that further defining the limitation is not necessary to resolve this proceeding. Further, no other terms require construction.

## *B.     Principles of Law*

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

factual determinations, including (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) objective evidence of non-obviousness.[1] *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966). When
evaluating a combination of teachings, we must also "determine whether
there was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue." *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)). Whether a combination of prior art
elements would have produced a predictable result weighs in the ultimate
determination of obviousness. *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable. *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b). The
burden of persuasion never shifts to Patent Owner. *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## C. Level of Ordinary Skill in the Art

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information,
including but not limited to physiological monitoring technologies." Pet. 7–

---

[1] Neither party has introduced objective evidence of non-obviousness.

IPR2020-01526
Patent 6,771,994 B2

8 (citing Ex. 1003 ¶¶ 1–15, 36–37). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the [person of ordinary skill in the art] POSITA characteristics stated above." *Id.*

Patent Owner makes several observations regarding Petitioner's identified level of skill in the art but, "for this proceeding, Masimo nonetheless applies Apple's asserted level of skill." PO Resp. 21.

We adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D.    *Obviousness over Webster and Melby*

Petitioner contends that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby. Pet. 29–44; *see also* Pet. Reply 4–5. Patent Owner disagrees. PO Resp. 42–46; *see also* Sur-reply 12–15.

Based on our review of the parties' arguments and the cited evidence in the final record, we determine that Petitioner has met its burden of showing by a preponderance of the evidence that claim 15 is unpatentable.

### 1.    *Overview of Webster (Ex. 1010)*

Webster is a book titled "Design of Pulse Oximeters" that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood." Ex. 1010, xv[2]. Webster

---

[2] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book. We adopt Petitioner's citations for clarity.

IPR2020-01526
Patent 6,771,994 B2

details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods." *Id.* Webster provides a comprehensive summary of the state of the art as of 1997, and also describes the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components. *See generally* Ex. 1010, Chs. 2, 5–7.

As shown in FIG. 7.1 of Webster, reproduced below, Webster explains that the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Ex. 1010, 86.



Figure 7.1 of Webster depicts a probe using a transmittance principle such that light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode. *Id.* at 87. The LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." *Id.* at 86. Webster explains that its "photodiode has to detect the light transmitted through the tissue" and is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." *Id.* at

12

87. Because light from the LEDs "is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector," reducing the amount of light that eventually reaches the detector, the assembly "must be protected from the ambient light for the wavelengths to which the photodiode is sensitive." *Id.* at 86. Because the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered." *Id.* at 71 (emphasis omitted).

Webster describes how the LEDs can be "powered alternately so that light of one particular wavelength will pass through the tissue, and the transmitted light will be detected by the photodiode" before light of the other wavelength is emitted. Ex. 1010, 86. Webster notes that the "intensity of the light emerging from the tissue is attenuated by the amount of blood present in the tissue." *Id.* Because this intensity "varies with the arterial pulse," it can be used "as a measure to indicate the pulse rate." *Id.*

As seen in Figure 7.13 below, Webster describes the importance of preventing light other than the actual signals of interest (e.g., light that has passed through the tissue carrying pulsing blood) from reaching the detector. *See* Ex. 1010, 95 (describing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue).



Figure 7.13 of Webster depicts light that does not pass through arterioles causing optical shunting. *Id.* Webster states that optical shunting can occur "when light from the sensor's LEDs reaches the photodiode without passing through the tissue" and "leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting." *Id.*

Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of light filter" can be placed over the detector. *Id.* at 79. Using a light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood." *Id.* Indeed, Webster discloses that in order to "minimize errors, the pulse oximeter designer must

14

IPR2020-01526
Patent 6,771,994 B2

attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue" containing arterial blood. *Id.*

## 2. *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images." Ex. 1008, code (54). Melby discloses a light control film, or a "louvered plastic film." *Id.* at code (57). Melby describes a film that includes "louver elements," and Melby acknowledges that it was known to cant louver elements with respect to a louvered plastic film, which produces a film that transmits light in a direction other than perpendicular to the surface of the film. *Id.* at 1:9–22, 3:46–62. Melby describes using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. *Id.* at 3:21–22.

Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). As shown in Figures 1 and 2 of Melby, reproduced below, Melby discloses "a louvered plastic film has a plurality of clear regions separated by louvers," where each louver has "a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction." *Id.* at 3:1–8.

15



Figure 1 of Melby depicts a schematic cross section of a louvered

plastic film and Figure 2 depicts an enlarged drawing of a portion of the

louvered plastic film. Ex. 1008, 3:10–14. Melby describes its louvered film

as including "cover sheets 11 provided for clarification and includes

alternating clear layers, such as layer 12 and louvers, such as louver 14," that

"includes outer layers 16 and 18 and inner layer 20." *Id.* at 3:46–4:25.

Referring to Figure 2, Melby describes the operation of the louvers:

A light ray 22 enters transparent layer 12. It then strikes layer 16
at surface 24. Because layer 16 has only a low concentration of
carbon black, there is not a large difference in index of refraction
between it and layer 12. Therefore very little of the light is
reflected by layer 24. Most of the light will enter layer 16 and be
refracted. As the light traverses layer 16, some will be absorbed.
Some, however, will strike layer 20 on surface 26. Some of light
beam 22 will enter layer 20 where, due to the relatively high
concentration of carbon black, it will be absorbed. Some of light

16

Appx0057

beam 22 will be reflected at surface 26 due to the large difference in index of refraction between layer 16 and layer 20.

Ex. 1008, 3:63–4:10.

### 3.    Independent Claim 15

Petitioner contends that claim 15 would have been obvious over Webster and Melby.  Pet. 29–44.  Below, we set forth how the combination of prior art references teaches or suggests the claim limitations that are not disputed by the parties.  For those limitations and reasons for combining the references that are disputed, we examine each of the parties' contentions and then provide our analysis.

> i. [15 pre] *"A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"*

The cited evidence and argument supports Petitioner's undisputed contention that Webster and Melby satisfy the subject matter of the preamble.  Pet. 30–32.  According to Petitioner, Webster describes devices known as "pulse oximeters," which provide "an empirical measure of arterial saturation."  Pet. 30 (quoting Ex. 1010, 13).  Webster describes the operation of the devices as shining "light of two wavelengths through a tissue bed such as the finger or earlobe and measures the transmitted light signal."  *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the probe of a pulse oximeter.

17

IPR2020-01526
Patent 6,771,994 B2



Petitioner's annotated and highlighted Figure 7.1 of Webster depicts a probe using transmittance of light from two LEDs (blue labeled as "Light Emission Device") passing alternately through the tissue of the finger such that it is detected by a photodiode (green labeled as "Light Sensitive Detector"). Pet. 31; Ex. 1010, 87.  Petitioner persuasively relies on Webster's teaching of how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector."  Pet. 31; Ex. 1010, 86.  Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode."  Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'"  Pet. 31–32 (quoting Ex. 1010, 86).  Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different

18

IPR2020-01526
Patent 6,771,994 B2

wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue. Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue' of a subject[]." Pet. 32 (quoting Ex. 1010, 86). Petitioner argues, and we agree, that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between absorbance of arterial blood and other absorbers." Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

We find Petitioner's contentions set forth above supported by a preponderance of the evidence on the final record.

*ii. "[a] at least one light emission device;"*

Based on the final record, the cited evidence supports Petitioner's undisputed contention that Webster discloses this limitation. Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

19

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit light at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84. We find Petitioner's contentions supported by the final record.

### iii. "[b] a light sensitive detector; and;"

Based on the final record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is "placed in line with the LEDs so that the maximum amount of transmitted light is detected." Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (citing Ex. 1010, 95)).

> iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the

20

IPR2020-01526
Patent 6,771,994 B2

> louvers accept the light when the sensor is properly
> applied to tissue of a patient."

<u>Petitioner's Contentions</u>

Petitioner contends that Webster and Melby teach these limitations.
Pet. 38–45.  Petitioner first notes that Webster proposes the use of a light
filter to be placed over the detector to minimize the effects from light other
than the optical signals of interest.  Pet. 39 ("Webster proposes that, in order
to 'minimize the effects from light other than the optical signals of interest,'
some type of ***light filter***' can be placed over the detector.") (quoting
Ex. 1010, 79).  Specifically, "[u]sing a light filter allows 'light of
wavelengths of interest to pass through the filter but does not allow light of
other wavelengths to pass through the filter.'"  *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring
that light reaching the photodiode must pass through tissue containing
arterial blood in order for the pulse oximeter to function effectively.  *Id.*
Petitioner relies on Webster's disclosure that in order to "minimize errors,
the pulse oximeter designer must attempt to ***limit the light reaching the
photodiode to that which has traveled through tissue containing arterial
blood***" and suggests the use of "***[l]ight impervious barriers [that] should be
placed between LEDs and the photodiode*** in all areas where the emitted
light could reach the photodiode without passing through tissue."  Pet. 39
(quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of
ordinary skill in the art would have recognized the advantages of using a
light filter, such as the type taught by Melby and as suggested by Webster.
Ex. 1003 ¶¶ 92–96.  Dr. Anthony testifies that Melby's louvered plastic film
could be used with the combined Webster system as the "light filter" to

21

IPR2020-01526
Patent 6,771,994 B2

control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* ¶¶ 96–100; Ex. 1010, 79. Petitioner relies on Melby's teaching of "a 'louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction.'" Pet. 40 (alterations in original) (quoting Ex. 1008, code (57)). Further, "Melby teaches '***a louvered plastic film has a plurality of clear regions separated by louvers***,'" where each louver has 'a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction.'" *Id.* (quoting Ex. 1008, 3:1–8). Petitioner points out that Melby's louvered film includes "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and ***louvers, such as louver 14***," that "includes outer layers 16 and 18 and inner layer 20." Pet. 41 (quoting Ex. 1008, 3:46–4:25).

Petitioner relies on Melby's teaching that when "***[a] light ray 22 enters transparent layer 12[,] [i]t then strikes layer 16 at surface 24***." Pet. 41 (quoting Ex. 1008, 3:66–67). Petitioner also notes that "very little of the light is reflected by layer 24," instead, "***[m]ost of the light will enter layer 16 and be refracted.***" *Id.* (quoting Ex. 1008, 3:66–67). According to Petitioner, Melby's "advantage lies with 'the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." Pet. 41–42 (quoting Ex. 1008, 3:46–4:25). "Thus," according to Petitioner, a person of ordinary skill in the art "viewing the disclosure of Webster would have recognized that Melby's film could be used in the

22

IPR2020-01526
Patent 6,771,994 B2

Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector." Pet. 42 (citing Ex. 1010, 79; Ex. 1003, 92–100).

According to Petitioner, a person of ordinary skill in the art "would have been motivated by Melby to include a light control film in the sensor described by Webster" in order "to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood.'" Pet. 42 (alteration in original) (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium. Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

IPR2020-01526
Patent 6,771,994 B2

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby. *Id.*



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green), which is also labeled "Light Sensitive Detector." Ex. 1003 ¶ 102; Pet. 43. According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film. Ex. 1003 ¶ 104. Dr. Anthony testifies that "[i]n the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body." *Id.*

24

IPR2020-01526
Patent 6,771,994 B2

Patent Owner Contentions

Patent Owner contends Webster does not disclose louvers, but instead teaches an optical filter over the photodiode to remove unwanted wavelengths of light.  PO Resp. 2 (citing Ex. 1010, 79).  Patent Owner disagrees that a person of ordinary skill in the art would use Melby's light control film in place of Webster's optical filter, and argues that Petitioner does not identify "motivation in the references for this change."  *Id.* According to Patent Owner, "[t]he optical purposes of these two components are unrelated: Webster's filter removes selected wavelengths of light, Melby's film controls the direction of light."  *Id.* (emphases omitted).  Patent Owner also argues that the proposed "combination would vitiate the purpose of Webster's filter because the filter would no longer remove selected wavelengths of light."  *Id.*  Patent Owner argues that "Webster separately teaches light impervious barriers that seek to limit all light from a certain area from reaching the photodiode," and that "[t]hese barriers are not placed over the photodiode," because doing so "would render the photodiode inoperable."  *Id.* (emphasis omitted) ("with the barrier blocking all light over the photodiode, the photodiode would receive no light").

Relying on the testimony of Dr. Madisetti, Patent Owner maintains that "Webster's wavelength filter and light impervious barriers are different components in Webster's optical system, and each address different optical concerns."  PO Resp. 42 (citing Ex. 2001 ¶¶ 94–95).  According to Patent Owner, "Webster's wavelength filter provides optical filtering 'to limit the spectral response of the photodiode.'"  *Id.* (quoting Ex. 1010, 79) (citing Ex. 2003, 3–7).  Patent Owner notes that "Webster places its wavelength filter 'over the detector,'" but "Webster's light impervious barriers are

25

supposed to block light that has not passed through tissue." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶ 95). Patent Owner relies on a portion of Webster that states its barriers may be placed "in all areas where the emitted light could reach the photodiode without passing through tissue." *Id.* (quoting Ex. 1010, 79). Patent Owner argues that "[w]ere Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative." *Id.* (citing Ex. 2001 ¶ 97).

Patent Owner argues that Petitioner "conflates Webster's wavelength filter, one component, with the optical effect of the barrier, a different component," and a person of ordinary skill in the art "would have had no motivation to position Melby's light film over the detector, which like Webster's barrier blocks light from reaching the detector." PO Resp. 43 (emphasis omitted). Patent Owner further contends that "Webster's light impervious barriers—***not*** Webster's light filters—'limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood,'" but the "barriers are not ***over*** the detector, putting them over the detector would make the detector non-functional." *Id.* (quoting Ex. 1010, 79) (citing Ex. 2001 ¶¶ 94–99). Patent Owner relies on prior art cited by Webster to support the argument that this art also "fail[s] to disclose a light impervious barrier over the detector." *Id.* at 43–44 (citing Ex. 2003, 238:9–13, Fig. 6).

Next, Patent Owner argues that a person of ordinary skill in the art would not have been motivated to modify Webster to include Melby's light control film because "Melby's light control film is ***not*** used in the same way as Webster's light filter." PO Resp. 44. Patent Owner contrasts the

IPR2020-01526
Patent 6,771,994 B2

teachings of Webster and Melby, arguing that "Webster explains that its
light filter 'allows light of **wavelengths** of interest to pass through the filter
but does not allow light of other **wavelengths** to pass through the filter,'"
and "[i]n contrast, the light control film in Melby controls the direction of
light transmitted through the film." *Id.* (emphasis omitted) (quoting Ex.
1010, 79) (citing Ex. 2001 ¶ 103). According to Dr. Madisetti, filtering
specific wavelengths of light is not the same as controlling the directionality
of light and replacing Webster's light filter with Melby's light control film
would remove the ability to filter specific wavelengths of light. Ex. 2001
¶ 103.

Patent Owner next alleges that there is no support for a person of
ordinary skill in the art to minimize errors by limiting the light reaching the
photodiode to that which has traveled through tissue containing arterial
blood because "Webster already discloses the solution of light impervious
barriers to limit the light reaching the photodiode." PO Resp. 45 (citing
Ex. 1010, 79). Patent Owner surmises that "Melby's film would minimize
errors better than the light impervious barriers already provided by
Webster," and "the light control film would have made it more difficult to
obtain accurate results compared to Webster's light impervious barriers."
*Id.* at 46 (citing Ex. 2001 ¶ 106).

Petitioner's Reply

Petitioner addresses Patent Owner's position by first arguing that "the
Petition merely relies on the explicit disclosure of Webster," such as
Webster's disclosure "that 'it is important to minimize the effects from light
other than the optical signals of interest,'" and "'[o]ne way to minimize
unwanted light incident upon the detector is to place **some type of light filter**

27

IPR2020-01526
Patent 6,771,994 B2

over the detector.'" Pet. Reply 4 (quoting Ex. 1010, 79). According to Petitioner, "Webster describes that one type of 'unwanted light' that should be minimized is 'ambient light'—which is the type of light the light control film of Melby is designed to minimize." *Id.* (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

"Thus," according to Petitioner, "Webster recognizes the need to minimize unwanted light reaching the detector, and recognizes that light filters can be used for this purpose." *Id.* (citing Ex. 1010, 79). With these motivations expressly disclosed, Petitioner reasons that a person of ordinary skill in the art "would have been motivated to use Melby's light control film as such a light filter in Webster's system, and that the results of the combination would have been predictable." *Id.* at 4–5 (Ex. 1003 ¶¶ 92–105).

As for Patent Owner's arguments that suggest Webster requires a wavelength filter, Petitioner responds that Webster only notes this is one option of an exemplary mechanism for limiting unwanted light. Pet. Reply 5 (citing Ex. 1010, 79). Petitioner notes that "Webster even makes clear that it requires no such thing, stating that such wavelength filters 'do not appear to be used much in actual pulse oximetry designs.'" *Id.* (quoting Ex. 1010, 79). "Thus," Petitioner contends that Patent Owner's "arguments mischaracterize Webster's disclosure and fail to address the Petition arguments." *Id.*

Patent Owner's Sur-reply

In its Sur-reply, Patent Owner contends that Petitioner does not dispute "that light filters that filter specific wavelengths of light are not the same as Melby's light control film that controls the directionality of light," and further, "that light impervious barriers that block light are not the same

IPR2020-01526
Patent 6,771,994 B2

as Melby's light control film that controls the directionality of light." Sur-reply 12. Patent Owner repeats its argument that Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. *Id.*

Analysis

Based on the totality of the evidence before us, and considering the scope of element 15[c], Petitioner has persuasively shown that the combination of Webster and Melby teach these limitations and that the combination would have been both predictable and supported by the references. Webster is a Medical Sciences Series text book that provides insight as to the design of several distinct embodiments of potential pulse oximeters. Ex. 1010, vi–xiv. Patent Owner's arguments rely on certain potential embodiments of Webster, but Patent Owner suggests that other embodiments, and specifically the combination proposed by Petitioner, would not have been contemplated by the person of ordinary skill in the art. Petitioner has persuasively shown, however, that a person of ordinary skill in the art would have been motivated to create its proposed combination because the combination would have been both reasonable and predictable to achieve the design goals set forth in Webster.

We determine that Petitioner has persuasively shown that Webster teaches the importance of minimizing the effects of light other than the optical signals of interest, including unwanted light incident upon the detector, by placing some type of light filter over the detector. Ex. 1010, 79 ("the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood"); Ex. 1003 ¶¶ 93–95. Petitioner demonstrates that at least one

IPR2020-01526
Patent 6,771,994 B2

embodiment of Webster contemplates that one type of "unwanted light" to be minimized is "ambient light," which is the type of light the light control film of Melby is designed to minimize. Ex. 1010, 79 ("There are two types of optical interference that may cause problems for the photodiode. The first is excessive ambient light."); *see* Pet. Reply 4 (citing Ex. 1008, code (57), 3:1–8, 3:46–4:25, Figs. 1–2; Ex. 1003 ¶¶ 92–105).

Based on this evidence, Petitioner demonstrates that it would have been reasonable for a person of ordinary skill in the art to look to Melby to provide a light control film to help control ambient light and further to place that film over the photodiode detectors of Webster, as depicted below. *See* Ex. 1003 ¶¶ 96, 99, 100 ("Melby's film could be used in the Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector."), 101–103.



Dr. Anthony's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green),

Appx0071

IPR2020-01526
Patent 6,771,994 B2

which is also labeled "Light Sensitive Detector." Ex. 1003 ¶ 102; Pet. 43.

We find persuasive Dr. Anthony's testimony that one of ordinary skill would

have understood that a light control film placed over the detector would thus

accept light from the light emission device from a particular direction based

on the angle of the louvers within the light control film. Ex. 1003 ¶ 104.

We also find persuasive the testimony that "[i]n the combination, one of

ordinary skill would have understood the light control film to restrict the

amount of light that reaches the detector from a particular direction, and

therefore that the louvers accept the light when the sensor is properly applied

to the patient's body." *Id.* Petitioner's combination of Webster and Melby

depicted above adds a light control film atop the photodiode and such a

placement would have been reasonable and predictable for a person of

ordinary skill in the art. The proposed combination recognizes that although

the LEDs are transmitting light through the finger and toward the photodiode

not all of the light from the LEDs is actually to go through that finger and

light that has not gone through the finger would then be a source of noise.

To limit that noise, Dr. Anthony persuasively testifies that Melby's light

control film placed above Webster's photodiode would reduce noise by

accepting light from the light emission device from a particular direction

based on the angle of the louvers within the light control film. Ex. 1003

¶¶ 102–104. This would in turn help minimize light that has not otherwise

travelled through the finger. *Id.*

Examining the limitations of claim element 15[c], the plurality of

louvers must be "positioned over the light sensitive detector to accept light

from the at least one light emission device originating from a general

direction of the at least one light emission device and then transmitting

31

through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient." Ex. 1001, 8:29–36.  Although Patent Owner recognizes that Webster teaches use of light filters, and Melby teaches louvers, Patent Owner contends that it is only Webster's light impervious barriers that limit the light and these barriers cannot be over the detector, because doing so would make the detector non-functional.  PO Resp. 42–43.  Further, Patent Owner believes that Webster's discussion of a filter over the detectors "[c]ould not be clearer[,] [t]he discussion of a filter has to do with wavelengths."  Tr. 28:2–11.  Patent's Owner's contentions, however, are based on an overly narrow reading of the combination of references and ignore other likely embodiments.  We determine that Webster teaches that in one embodiment light filters, such as those found in Melby, could be used above the detectors.  Based on the combined teachings of Webster and Melby, a person of ordinary skill in the art would have found the combination a reasonable solution to the problems identified by Webster.

Melby teaches a louvered plastic film that collimates light and reduces the influence of ambient light.  Ex. 1008, 3:63–4:25.  Webster teaches the benefits of using such a plastic film, identified broadly as some type of light filter, atop its photodiode to help minimize unwanted incident light.  Ex. 1010, 79.  Specifically, Webster is clear that to minimize unwanted light upon the detector, one could "place some type of light filter **over** the detector."  *Id.*  There is no indication that this "some type of light filter" should be limited to just wavelength filters, which are certainly provided as one example mechanism for limiting unwanted light.  Notably, such filters

IPR2020-01526
Patent 6,771,994 B2

seem to be discouraged by Webster because they "do not appear to be used much in actual pulse oximetry designs." *Id.*

Considering the teachings of Webster as a whole, Webster further recognizes additional measures that would reduce excessive ambient light, such as decreasing the angle of incidence of light to the photodiode (*id.*), which also happens to be one of the goals of Melby (Ex. 1008, 3:63–4:25). *See also* Ex. 1003 ¶ 104 ("[O]ne of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film."). A person of ordinary skill in the art would have recognized that based on these combined teachings, Melby's film would, by reducing the angle of incidence for light of all wavelengths, work in precisely the manner that Webster contemplates in order to achieve precisely the end contemplated by each of Melby and Webster. Ex. 1003 ¶¶ 99, 104. That similar objective being a reduction of optical interference in the form of excessive ambient light with a light control film being placed over a light sensitive detector. *Id.*

Dr. Anthony persuasively testifies that one of ordinary skill would have been motivated to combine Webster and Melby to provide a pulse oximeter that minimizes errors by limiting the light reaching the photodiode to that which has travelled through tissue containing arterial blood. *See* Ex. 1003 ¶¶ 100–104. Webster recognizes this same problem and proposes various solutions such as "plac[ing] some type of light filter over the detector." *See* Ex. 1010, 79, 95 (recognizing optical shunting as the condition when light from the sensor's LEDs reaches the photodiode without passing through the tissue); Ex. 1003 ¶ 93. We find Dr. Anthony's

33

reasoning persuasive that the pulse oximeter resulting from the proposed combination of Webster and Melby would have been a solution contemplated by Webster and the combination would have been obvious to a person of ordinary skill in the art. *See, e.g.*, Ex. 1003 ¶ 104. Petitioner has persuasively shown that the light control film or louvers from the combination of Webster and Melby would prevent sources of noise in the form of light emitted from ambient sources, or light from LEDs that has not travelled through the user tissue, from striking the photodetectors and in that way, it would improve the optical signal-to-noise ratio. *See id.* ¶¶ 100–104.

### v. Summary

Based on the final record before us, Petitioner has demonstrated by a preponderance of the evidence that a person of ordinary skill in the art would have found the combination of Webster and Melby renders obvious claim 15. *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate by a preponderance of the evidence that claim 15 is unpatentable.

### E.     Remaining Grounds of Obviousness

As discussed in detail above, Petitioner has demonstrated by a preponderance of the evidence that claim 15 would have been obvious over Webster and Melby. Petitioner argues that claim 15 of the '994 patent would have also been obvious over three other grounds, including: (i) Diab, Benjamin, and Melby; (ii) Fine; and, (iii) Fine, Benjamin, and Melby. Pet. 3. Because we have already determined that claim 15 is unpatentable based on Webster and Melby, we need not reach these additional grounds applied to claim 15. *See Boston Sci. Scimed, Inc. v. Cook Grp. Inc.*, 809

34

IPR2020-01526
Patent 6,771,994 B2

F. App'x 984, 990 (Fed. Cir. 2020) ("[T]he Board need not address issues that are not necessary to the resolution of the proceeding.").

### III.  CONCLUSION

In summary:[3]

| Claim | 35 U.S.C. § | Reference(s)/ Basis | Claims Shown Unpatentable | Claims Not Shown Unpatentable |
|---|---|---|---|---|
| 15 | 103 | Webster, Melby | 15 | |
| 15 | 103[4] | Diab, Benjamin, Melby | | |
| 15 | 103 | Fine | | |
| 15 | 103 | Fine, Benjamin, Melby | | |
| **Overall Outcome** | | | 15 | |

---

[3] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019).  If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices.  *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

[4] As explained above, because we conclude that claim 15 is unpatentable based on the grounds of Webster and Melby, we do not reach the merits of these remaining grounds.

IPR2020-01526
Patent 6,771,994 B2

## IV.    ORDER

Upon consideration of the record before us, it is:

ORDERED that claim 15 of the '994 patent has been shown to be unpatentable; and

FURTHER ORDERED that, because this is a final written decision, parties to the proceeding seeking judicial review of the decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

36

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Dan Smith
Andrew Patrick
Vivian Lu
FISH & RICHARDSON P.C.
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com
vlu@fr.com


FOR PATENT OWNER:

John Grove
Ben Katzenellenbogen
Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Shannon Lam
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jmg@knobbe.com
2bak@knobbe.com
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2sxl@knobbe.com

Appx0078

Trials@uspto.gov                                                                              Paper 7
571-272-7822                                                              Entered: April 16, 2021

UNITED STATES PATENT AND TRADEMARK OFFICE

———————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD

———————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

———————————

IPR2020-01526
Patent 6,771,994 B2

———————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

KINDER, *Administrative Patent Judge.*

DECISION
Granting Institution of *Inter Partes* Review
*35 U.S.C. § 314, 37 C.F.R. § 42.4*

IPR2020-01526
Patent 6,771,994 B2

## I.    INTRODUCTION

### A.    Background

Apple Inc. ("Petitioner") filed a Petition requesting an *inter partes* review of claim 15 of U.S. Patent No. 6,771,994 B2 (Ex. 1001, "the '994 patent").  Paper 2 ("Pet.").  Masimo Corporation ("Patent Owner") waived filing a Preliminary Response.  Paper 6 ("PO Waiver").

We have authority to determine whether to institute an *inter partes* review, under 35 U.S.C. § 314 and 37 C.F.R. § 42.4.  An *inter partes* review may not be instituted unless it is determined that "the information presented in the petition filed under section 311 and any response filed under section 313 shows that there is a reasonable likelihood that the petitioner would prevail with respect to at least 1 of the claims challenged in the petition."  35 U.S.C. § 314 (2018); *see also* 37 C.F.R § 42.4(a) ("The Board institutes the trial on behalf of the Director.").

For the reasons provided below and based on the record before us, we determine that Petitioner has demonstrated a reasonable likelihood that Petitioner would prevail in showing the unpatentability of claim 15.  Accordingly, we institute an *inter partes* review on all grounds set forth in the Petition.

### B.    Related Matters

The parties identify the following matters related to the '994 patent:

*Masimo Corporation v. Apple Inc.*, Civil Action No. 8:20-cv-00048 (C.D. Cal.) (filed Jan. 9, 2020);

*Apple Inc. v. Masimo Corporation*, IPR2020-01520 (PTAB Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,258,265 B1);

2

IPR2020-01526
Patent 6,771,994 B2

*Apple Inc. v. Masimo Corporation*, IPR2020-01521 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,292,628 B1);

*Apple Inc. v. Masimo Corporation*, IPR2020-01523 (PTAB
Sept. 9, 2020) (challenging claims of U.S. Patent No. 8,457,703 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01524 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,433,776 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01536 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01537 (PTAB
Aug. 31, 2020) (challenging claims of U.S. Patent No. 10,588,553 B2);

*Apple Inc. v. Masimo Corporation*, IPR2020-01538 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2); and

*Apple Inc. v. Masimo Corporation*, IPR2020-01539 (PTAB
Sept. 2, 2020) (challenging claims of U.S. Patent No. 10,588,554 B2).
Pet. 68; Paper 3, 2.

The parties further identify certain pending patent applications, as
well as other issued applications, that claim priority to, or share a priority
claim with, the '994 patent. Paper 3, 1.

## C. *The '994 Patent*

The '994 patent is titled "Pulse Oximeter Probe-Off Detection
System," and issued on August 3, 2004, from U.S. Patent Application
No. 10/374,303, filed February 24, 2003. Ex. 1001, codes (21), (22), (45),
(54). The '994 patent claims priority through a series of applications to
Provisional Application No. 60/140,000, filed June 18, 1999. *Id.* at
codes (60), (62).

3

The '994 patent relates to a pulse oximeter probe that detects when a probe has become dislodged from a patient or that acts to prevent a potential probe-off condition.  Ex. 1001, code (57).  The '994 patent relies on electrical contacts that contact the skin of a patient when the probe is properly attached and a number of louvers placed in front of a sensor's photodetector to filter out oblique light rays that do not originate from a point in front of the detector.  *Id.*  According to one aspect of the invention, if the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter, which may trigger an alarm or warning.  *Id.*

As depicted in Figure 1 below, pulse oximeter 140 is attached through connector 142 to probe 110 and probe 110 comprises LEDs 112, 114, which are "preferably configured to produce different wavelengths of light."  *Id.* at 3:21–55, Fig. 1.



*FIG.1*

Figure 1 illustrates a schematic of a pulse oximeter system.  *Id.* at 2:30–31.  The wavelengths of light pass through the flesh of a patient to be detected by

4

photodetector 116. *Id.* at 3:34–37, Fig. 1. The '994 patent describes certain embodiments where the photodetector is placed opposite the light emitters to detect transmitted light as it emerges from the user's body tissue. *See id.*, 1:41–43 (describing the configuration of known pulse oximetry probes as positioning the detector "opposite the LED"), 4:19–25 ("the emitters located within the probe are spaced opposite the detector assembly 235 . . . such that the light from the emitters passes . . . through the finger 250 and is incident upon the detector assembly 235"), Figs. 2A–B, 4, 5A–B.

As illustrated in Figure 5B below, if probe 202 is properly attached emitter aperture 220 will be directly in front of detector assembly 235 and light rays will pass directly through louvers 502 along direct path 510. *Id.* at 6:29–33.



### FIG.5B

Figure 5B illustrates a properly attached probe wherein a number of louvers (502) are placed in front of the detector assembly. Ex. 1001, 2:60–62.

### D. Claim 15

Claim 15 is the only challenged claim and it is reproduced below.

1. A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

[a] at least one light emission device;

[b] a light sensitive detector; and

[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

Ex. 1001, 8:21–35 (bracketed identifiers a–c added).

### E. Applied References

Petitioner relies upon the following references:

Diab et al., U.S. Patent No. 5,638,818, filed November 1, 1994, issued June 17, 1997 (Ex. 1006, "Diab");

Benjamin et al., U.S. Patent No. 4,015,595, filed September 15, 1975, issued April 5, 1977 (Ex. 1007, "Benjamin");

Melby et al., U.S. Patent No. 5,254,388, filed December 20, 1991, issued October 19, 1993 (Ex. 1008, "Melby");

Fine, WO Pub. No. 1996/41566, filed June 6, 1995, published December 27, 1996 (Ex. 1009, "Fine"); and,

Webster, Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 (Ex. 1010, "Webster").

IPR2020-01526
Patent 6,771,994 B2

Pet. 3-4.

Petitioner also submits, *inter alia*, the Declaration of Brian W.
Anthony, Ph.D. (Ex. 1003).

## F. Asserted Grounds

Petitioner asserts that claim 15 is unpatentable based upon the
following grounds:

| Claim Challenged | 35 U.S.C. § | Reference(s)/Basis |
|---|---|---|
| 15 | 103 | Diab, Benjamin, Melby |
| 15 | 103 | Webster, Melby |
| 15 | 103 | Fine |
| 15 | 103 | Fine, Benjamin, Melby |

## II. DISCUSSION

### A. Claim Construction

For petitions filed on or after November 13, 2018, a claim shall be
construed using the same claim construction standard that would be used to
construe the claim in a civil action under 35 U.S.C. § 282(b), including
construing the claim in accordance with the ordinary and customary
meaning of such claim as understood by one of ordinary skill in the art and
the prosecution history pertaining to the patent. 37 C.F.R. § 42.100(b)
(2019).

Petitioner submits that the entirety of clause 1[c] requires
construction. Pet. 8. As noted above, Patent Owner did not file a
Preliminary Response. *See generally* PO Waiver.

Clause 1[c] (set forth above), requires in part, "a plurality of louvers
*positioned over* the light sensitive detector to accept light from the at least

7

one light emission device *originating from a general direction* of the at least one light emission device and then transmitting through body tissue." Ex. 1001, 8:29–35 (emphases added). Petitioner contends that this limitation requires that the light sensitive detector must "be positioned opposite the at least one light emission device." Pet. 8–9. Petitioner seemingly bases this interpretation on one embodiment in the Specification, "which only depict[s] and describe the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. 9 (citing Ex. 1001, 1:41–43 ("The photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [body] tissue.")).

Although Petitioner describes one embodiment of the invention that may be encompassed by the claim scope, this one embodiment is narrower in scope than the claim language of clause 1[c]. For example, the claim requires the louvers positioned over the detector to accept light originating from a general direction of the at least one light emission device, while the light also passes through tissue. Petitioner contends that for this to occur the detector must be positioned opposite the light emission device, as depicted in Figure 5B. Pet. 9.

Petitioner's position is understandable because the claim also requires that the louvers accept the light when the sensor is properly applied to tissue of a patient, which as Petitioner notes encompasses the embodiment of Figure 5B. Petitioner does not explain, however, why it is even necessary to adopt its proposed claim construction. For purposes of our analysis, we accept that the embodiment Petitioner relies upon (positioned opposite) is within the claim scope of clause 1[c], but we are not prepared to limit the

IPR2020-01526
Patent 6,771,994 B2

claim to just this embodiment without further explanation and evidence. Indeed, clause 1[c] provides sufficient detail as to the positioning of elements such that further defining the limitation does not seem necessary based on the limited record before us.[1]

The parties should also bring to the Board's attention any arguments or decisions in related proceedings or the related district court litigation that impact the claim interpretation of any claim term in the '994 patent. *See Facebook, Inc. v. Sound View Innovations, LLC*, IPR2017-00998, Paper 13 (PTAB Sept. 5, 2017); *see also* 37 C.F.R. § 42.100(b) ("Any prior claim construction determination concerning a term of the claim in a civil action, or a proceeding before the International Trade Commission, that is timely made of record in the *inter partes* review proceeding will be considered.").

## B.    Principles of Law

A claim is unpatentable under 35 U.S.C. § 103 if "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 406 (2007). The question of obviousness is resolved on the basis of underlying

---

[1] We understand that Petitioner's grounds based upon the "Fine" reference rely on an interpretation of the elements of 15[c] that encompasses "reflectance pulse oximeters, in which the emitters and detectors are positioned on the same side of the body tissue carrying pulsing blood." Pet. 45. Petitioner should clarify in its reply which grounds are dependent on which claim interpretation, and further explain which interpretation it contends is proper, after considering Patent Owner's response. Petitioner's proposed interpretation would seemingly exclude the grounds based on "Fine."

IPR2020-01526
Patent 6,771,994 B2

factual determinations, including (1) the scope and content of the prior art;
(2) any differences between the claimed subject matter and the prior art;
(3) the level of skill in the art; and (4) objective evidence of non-
obviousness.[2]  *Graham v. John Deere Co.*, 383 U.S. 1, 17–18 (1966).  When
evaluating a combination of teachings, we must also "determine whether
there was an apparent reason to combine the known elements in the fashion
claimed by the patent at issue."  *KSR*, 550 U.S. at 418 (citing *In re Kahn*,
441 F.3d 977, 988 (Fed. Cir. 2006)).  Whether a combination of prior art
elements would have produced a predictable result weighs in the ultimate
determination of obviousness.  *Id.* at 416–417.

In an *inter partes* review, the petitioner must show with particularity
why each challenged claim is unpatentable.  *Harmonic Inc. v. Avid Tech.,
Inc.*, 815 F.3d 1356, 1363 (Fed. Cir. 2016); 37 C.F.R. § 42.104(b).  The
burden of persuasion never shifts to Patent Owner.  *Dynamic Drinkware,
LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378 (Fed. Cir. 2015).

We analyze the challenges presented in the Petition in accordance
with the above-stated principles.

## C.    *Level of Ordinary Skill in the Art*

Petitioner identifies the appropriate level of skill in the art as that
possessed by a person having "a Bachelor of Science degree in an academic
discipline emphasizing the design of electrical, computer, or software
technologies, in combination with training or at least one to two years of
related work experience with capture and processing of data or information,

---

[2]  At this stage of the proceeding, neither party has introduced objective
evidence of non-obviousness.

IPR2020-01526
Patent 6,771,994 B2

including but not limited to physiological monitoring technologies." Pet. 7–8 (citing Ex. 1003 ¶¶ 1–15, 36–37). "Additional education in a relevant field or industry experience may compensate for one of the other aspects of the POSITA characteristics stated above." *Id.*

For purposes of this Decision, we generally adopt Petitioner's assessment as set forth above, which appears consistent with the level of skill reflected in the Specification and prior art.

### D. Obviousness over Diab, Benjamin, and Melby

Petitioner presents undisputed contentions that claim 15 of the '994 patent would have been obvious over the teachings of Diab, Benjamin, and Melby. Pet. 10–29.

### 1. Overview of Diab (Ex. 1006)

Diab is titled "Low Noise Optical Probe." Ex. 1006, code (54). Diab describes an "optical probe for measurements" for use in "non-invasive energy absorption (or reflection)" detection methods such as pulse oximetry. *Id.* at 3:12–14, Fig. 24, 17:66–67. The device includes a "light source, such as an LED" and a "detector, such as a photodetector." *Id.* at 3:19–21, 3:30–31. Diab's light source includes, for example, two "LEDs 430a and 430b," one which emits "red wavelengths" and one which emits "infrared wavelengths." *Id.* at 18:8–22.

Petitioner provides the following annotated figure highlighting Diab's LEDs 430a and 430b as well as photodetector 426.

11



Petitioner's partial view of Figure 24 of Diab shows a schematic employing a probe with Petitioner's annotations of LEDs 430a and 430b (blue) and photodetector 426 (green).  Pet. 11; Ex. 1006, 5:25–26.  Finger probe 400 is employed to measure a red and infrared signal that are alternatively passed through finger 428.  Ex. 1006, 18:1–4.  Signals measured at photodetector 426 are then processed to determine the amount of oxygen available to the body.  *Id.* at 18:4–6.  LED 430a emits red wavelengths and LED 430b emits infrared wavelengths and both are placed adjacent finger 428.  *Id.* at 18:9– 14.  Finger probe 400 is placed underneath finger 428, aperture 420, and chamber 422, which is located directly adjacent finger pad 404.  *Id.*

Non-invasive methods, as described by Diab, are "often desirable" in order to "monitor a patient without unnecessary drawing of blood or tissue." Ex. 1006, 5:49–59.  For example, "in the medical field, instead of extracting material from a patient's body for testing," non-invasive techniques often

12

IPR2020-01526
Patent 6,771,994 B2

use "light or sound energy . . . incident on the patient's body" that is transmitted or reflected.  *Id.* at 1:13–22.

2.    *Overview of Benjamin (Ex. 1007)*

Benjamin is titled "Photoplethysmographs."  Ex. 1007, code (54). According to Benjamin, a "photoplethysmograph," is a device that uses a "light source and a specifically selected photo-sensitive cell that responds to light absorbed by the arterial blood in the peripheral vascular bed over which the sensor is placed."  Ex. 1007, 1:5–15.  Benjamin describes using a probe including "a light source, a photo-sensitive cell and a light control film positioned in front of the light source and photo-sensitive cell for collimating the light emitted from the light source and reflected back to the photo-sensitive cell."  *Id.* at code (57).

In order to "improve the accuracy of the photoplethysmographic pickup of the blood flow pulse," Benjamin employs a "light control film" to collimate light passing through and "thereby make the photosensitive cell 20 more nearly dependent only upon the light beam directly reflected from the field being measured."  *Id.* at 2:53–57.  Benjamin states that such light films were "known in the art and . . . commercially available."  *Id.* at 2:50–52.  As illustrated below, light source 18 directs light through window 16 and photo-sensitive cell 20 responds to light reflected from the field.  *Id.* at 2:26–38.

13

IPR2020-01526
Patent 6,771,994 B2



Figure 1 of Benjamin is a sectional view of a photoplethysmographic probe.
Ex. 1007, 2:16–17.  Benjamin describes mounting light control film 22
within casing 12 to extend across window 16.  Light emitted from light
source 18 passes through light control film 22 to the field to be measured
and light is reflected from this field back through light control film 22 to
photo-sensitive cell 20.  *Id.* at 42–50.

### 3. *Overview of Melby (Ex. 1008)*

Melby is titled "Light Control Film with Reduced Ghost Images."
Ex. 1008, code (54).  Melby discloses a light control film, or a "louvered
plastic film."  *Id.* at code (57).  Melby describes a film that includes "louver
elements," and Melby acknowledges that it was known to cant louver
elements with respect to a louvered plastic film, which produces a film that
transmits light in a direction other than perpendicular to the surface of the
film.  *Id.* at 1:9–22, 3:46–62.  Melby describes using louvers having an outer
portion with a relatively low optical density and an inner portion having a
relatively high optical density.  *Id.* at 3:21–22.

14

Appx0092

### 4. *Independent Claim 15*

Petitioner contends that claim 15 would have been obvious over Diab, Benjamin, and Melby. Pet. 10–29. Petitioner has established a reasonable likelihood of prevailing on this asserted ground.

> i. [15 pre] *"A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"*

On this record, the cited evidence supports Petitioner's undisputed contention that Diab, Benjamin, and Melby satisfy the subject matter of the preamble.[3] Pet. 13–15. According to Petitioner, Diab teaches a sensor having a detector that detects "attenuated light energy signal [that] emerges from" a section of a subject's body, "such as a finger, an earlobe, a toe, an organ, or a portion of tissue." Pet. 13; Ex. 1006, 3:12–43. Notably, Diab's sensor includes "a probe for use in both invasive and non-invasive energy absorption (or reflection) measurements," and the probe includes a "detector, such as a photodetector" and a "light source, such as an LED" that is affixed "opposite the photodetector." *Id.* at 3:11–47. Diab's LED "emits light energy which propagates through and is absorbed by the material along the optical path length" and "an attenuated light energy signal emerges from the material." *Id.* Diab's "photodetector produces an electrical signal indicative of the intensity of the signal transmitted by the material," such as a subject's "finger 428." *Id.* Petitioner explains that "[t]he subject's finger, for

---

[3] Whether the preamble is limiting need not be resolved at this stage of the proceeding, because Petitioner shows sufficiently for purposes of institution that the recitation in the preamble is satisfied by the prior art.

15

IPR2020-01526
Patent 6,771,994 B2

example, contains body tissue carrying pulsing blood." Pet. 14 (citing Ex. 1003 ¶¶ 45–48).

As shown above in Figure 24, Diab's device includes two "LEDs 430a and 430b" that "alternately emit[] energy which is absorbed by the finger 428 and received by the photodetector 426" such that the photodetector "produces an electrical signal which corresponds to the intensity of the light energy striking the photodetector 426 surface." Ex. 1006, 18:43–47. Petitioner contends that "Diab's probe is 'coupled to an oximeter. . . known in the art which utilizes light attenuation measurements,' such as a '*pulse oximeter*' that measures signals from '*two measured signals at different wavelengths*, one of which is typically red and the other of which is typically infrared, [that] are alternately passed through the finger 428.'" Pet. 15 (quoting Ex. 1006, 17:62–18:8). These signals are used to determine the amount of oxygen available to the body and are generated by "[t]wo LEDs 430a and 430b, one LED 430a emitting red wavelengths and another LED 430b emitting infrared wavelengths" that are placed adjacent to the subject's finger. Ex. 1006, 17:62–18:8; Pet. 15.

### ii. "[a] at least one light emission device;"

On this record, the cited evidence supports Petitioner's undisputed contention that Diab discloses this limitation. Pet. 16–17. Specifically, Diab discloses two light emitting diodes (LEDs) that emit at two different wavelengths, as discussed in detail above. *See* Ex. 1006, Fig. 24 (LEDs 430a, 430b), 3:11–47, 17:62–18:22.

16

**Appx0094**

*iii. "[b] a light sensitive detector; and;"*

On this record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 17–18. Specifically, Petitioner contends that Diab describes a sensor that measures first and second intensity signals using a photodetector to detect light from at least two LEDs emitting at two different wavelengths. Pet. 17–18 (citing Ex. 1006, 3:11–47, 17:62–18:22, Fig. 24; Ex. 1003 ¶¶ 45–52). "Diab's photodetector produces signals that can be 'processed to determine the amount of oxygen available to the body' as part of a pulse oximeter." *Id.* at 18 (quoting Ex. 1006, 18:4–6) (emphasis omitted).

> *iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient."*

On this record, the cited evidence supports Petitioner's undisputed contentions regarding these limitations. Pet. 19–29. Petitioner relies on the combined teachings of Diab, Benjamin, and Melby for teaching these limitations. *Id.*

Diab teaches using a scattering medium positioned over the photodetector to provide an "improved optical signal-to-noise ratio" by minimizing the effects of local artifacts resulting from scattering as a result of motion. Ex. 1006, 3:63–4:5. Further, the scattering medium may be located between the material being tested and the photodetector, which results in an improved optical signal-to-noise ratio. *Id.* at 4:6–12; Pet. 19. Petitioner relies further on Diab's disclosure that the film has the effect of

17

IPR2020-01526
Patent 6,771,994 B2

collimating the light passing through to make the photosensitive cell more nearly dependent only upon the light beam directly reflected from the field being measured. *Id.* at 2:50–57.

Petitioner, relying on the testimony of Dr. Anthony, contends that a person of ordinary skill in the art "would have been motivated by the disclosure of Benjamin to modify Diab's sensor to include a light control film in place of Diab's scattering medium." Pet. 21 (citing Ex. 1003 ¶ 62). Benjamin recognizes that "variations in the amount of scattered light reaching the photocell cause variations in the operating point of the photocell," which "adversely affects the accuracy of the measurement." Ex. 1007, 1:35–40; Ex. 1003 ¶¶ 57–59. Petitioner relies on Benjamin's improvement of adding a light control film to stabilize the amount of scattered light that reaches the detector. Pet. 20 (quoting Ex. 1007, 1:56–66 ("[T]he amount of scattered light reaching the photocell can be made closer to constant by placing in front of the photocell and light source a small piece of light control film. This film has the effect of collimating the light thereby to make the sensor more nearly dependent only upon the light beam directly reflected from the pulsating blood field.")).

On the current record, Petitioner argues persuasively that a person of ordinary skill in the art would have been motivated to combine Diab and Benjamin to provide an optical physiological sensor that reduces variations in the amount of light detected by the photodetectors of the sensor in order to collimate the light emitted from the light source and reflected back to the photo-sensitive cell. Pet. 22 (citing Ex. 1003 ¶¶ 57–62; Ex. 1007, code (57)). The references describe these advantages as leading to a more consistent and accurate measurement of blood oxygen saturation. *Id.*

18

Petitioner next relies on Melby as teaching the use of a louvered plastic film in the Diab/Benjamin combination. Pet. 25. Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." Ex. 1008, code (57). Petitioner notes that Melby is a patent assigned to Minnesota Mining and Manufacturing Company (3M) that describes a commercially available louvered light film made of "cellulose acetate butyrate (CAB)." *Id.* at 2:19–23, code (57); Pet. 13. Petitioner contends that a person of ordinary skill in the art would have considered the Melby louvered plastic film well known and the '994 patent itself notes that its "louvers" can be "created from commercially available '3M Light Control Film,'" such as that described in Melby. Ex. 1001, 6:39–41; Ex. 1003 ¶¶ 44, 69.

Dr. Anthony testifies that "Melby describes a light control film that can be used with the combined Diab/Benjamin system" and "[a] POSITA would have been motivated to make this modification to further increase the directionality of the light signal received in the combined device, thereby leading to a device that is less susceptible to the influence of ambient light and thus provides more accurate readings." Ex. 1003 ¶ 69. Petitioner relies on Melby's teaching that "the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." Pet. 27 (quoting Ex. 1008, 4:11–17) (citing Ex. 1003 ¶¶ 69–72). Petitioner contends that based on these disclosures, a person of ordinary skill in the art "would have recognized that Melby's film could be used in the

Appx0097

IPR2020-01526
Patent 6,771,994 B2

Diab/Benjamin device to control light such that only light originating from the direction of the light emitters reaches the detector. Pet. 27–28. Further, Dr. Anthony testifies that incorporating Melby's details regarding the implementation of Benjamin's light control film would have been obvious to a person of ordinary skill in the art because doing so entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 73. Petitioner sufficiently shows on this record that it would have been obvious to a person of ordinary skill in the art to combine the specified teachings of Melby, Bejamin, and Diab for the reasons set forth above.

### v. Summary

Petitioner sufficiently shows on this record, based on the uncontroverted testimony of Dr. Anthony, that a person of ordinary skill in the art would have found the sensor resulting from the combination of Diab, Benjamin, and Melby to render obvious the requirements of limitation 15[c], as well as claim 15 as a whole. *See* Ex. 1003 ¶¶ 57–74. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrates a reasonable likelihood that Petitioner would prevail in its contentions regarding claim 15.

### E.    *Obviousness over Webster and Melby*

Petitioner presents undisputed contentions that claim 15 of the '994 patent would have been obvious over the teachings of Webster and Melby. Pet. 29–44.

**Appx0098**

IPR2020-01526
Patent 6,771,994 B2

*1.     Overview of Webster (Ex. 1010)*

Webster is a book that provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for monitoring the arterial oxygen saturation of a patient's blood."  Ex. 1010, xv[4].  The book details "both the hardware and software required to fabricate a pulse oximeter as well as the equations, methods, and software required for effective functioning" in addition to "testing methods."  *Id.*  Petitioner relies on Webster for its comprehensive summary of the state of the art as of 1997, and its description of the purpose of components of a pulse oximeter as well as the design process and selection criteria for particular components.  Pet. 30; Ex. 1003 ¶ 75.  *See generally* Ex. 1010, Chs. 2, 5–7.

*2.     Independent Claim 15*

Petitioner contends that claim 15 would have been obvious over Webster and Melby.  Pet. 29–44.  Petitioner has established a reasonable likelihood of prevailing on this asserted ground.

---

[4] Although Petitioner has added page numbering to the bottom of Exhibit 1010, Petitioner cites to the original page numbers at the top of the book. We adopt Petitioner's citations for clarity.  But even still, Petitioner quotes from page xv, but cites to page xvi.  For future reference, Petitioner should have cited to its added page numbering for such a reference.  *See* 37 C.F.R. § 42.63(d)(2)(i).

21

> *i. [15 pre]* *"A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"*

On this record, the cited evidence supports Petitioner's undisputed contention that Webster and Melby satisfy the subject matter of the preamble. Pet. 29–32. According to Petitioner, Webster describes devices known as "pulse oximeters," which provide "an empirical measure of arterial saturation." Pet. 30 (quoting Ex. 1010, 13). Webster describes the operation of the devices as shining "light of two wavelengths through a tissue bed such as the finger or earlobe and measures the transmitted light signal." *Id.* (quoting Ex. 1010, 13).

Petitioner relies on Webster's Figure 7.1 as providing detail as to the probe of a pulse oximeter.



Petitioner's annotated and highlighted Figure 7.1 of Webster shows a probe using transmittance of light from two LEDs (blue) passing alternately through the tissue of the finger such that it is detected by a photodiode (green). Pet. 31; Ex. 1010, 87. Petitioner relies on Webster's teaching of

how the "probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector." Pet. 31; Ex. 1010, 86. Webster describes how the LEDs can emit wavelengths of, for example, "660 nm and 940 nm," and "the detector used is a photodiode." Ex. 1010, 86.

Petitioner contends that "[b]ecause light from the LEDs 'is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector,' reducing the amount of light that eventually reaches the detector, the assembly 'must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.'" Pet. 31–32 (quoting Ex. 1010, 86). Petitioner additionally relies on Webster's teaching that the pulse oximeter "uses two specific wavelengths, spectral response, or the relative response of the device to different wavelengths must be considered," as well as Webster's teaching that the intensity of light emerging from the tissue is attenuated by the amount of blood present in the tissue. Ex. 1010, 71; Pet. 32.

Relying on the testimony of Dr. Anthony (Ex. 1003 ¶¶ 76–82), Petitioner contends that a person of ordinary skill in the art "would have recognized Webster to teach a sensor that generates first and second intensity signals from a detector, such as a photodiode," and further, "[t]he photodiode is able to detect, and therefore is sensitive to, light of a first wavelength, such as 660 nm, and light of a second wavelength, such as 940 nm, and such light has been 'attenuated by the amount of blood present in the tissue" of a subject.'" Pet. 32 (quoting Ex. 1010, 86). Petitioner argues that Webster explains the advantages of using two different wavelengths to allow pulse oximeters to "determine the oxygen saturation of arterial blood" by "using the arterial pulsation to differentiate between

23

absorbance of arterial blood and other absorbers." Pet. 32–33 (quoting Ex. 1010, 13–14, 44).

### ii. "[a] at least one light emission device;"

On this record, the cited evidence supports Petitioner's undisputed contention that Webster and Melby disclose this limitation. Pet. 33–34. Specifically, Webster teaches a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. *Id.* (citing Ex. 1010, 13–14, 44, 86, Fig. 7.1).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches two light emitting diodes (LEDs highlighted in blue) that emit at two different wavelengths. Thus, we agree with Petitioner that Webster teaches at least one light emission device. Ex. 1010, 79 (Fig. 7.1), 13–14; Ex. 1003 ¶ 84.

### iii. "[b] a light sensitive detector; and;"

On this record, the cited evidence supports Petitioner's undisputed contentions regarding this limitation. Pet. 35–36. Specifically, Petitioner contends that Webster describes a sensor that measures first and second intensity signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. Pet. 35 (citing Ex. 1010, 13–14, 44, 56, 86, Fig. 7.1; Ex. 1003 ¶¶ 76–87).

As shown in Figure 7.1 of Webster, reproduced above, Webster teaches a light sensitive photodiode detector (highlighted in green). Pet. 36 (citing Ex. 1003 ¶ 88). Petitioner relies on Webster's disclosure that the "photodiode has to detect the light transmitted through the tissue" and it is

24

"placed in line with the LEDs so that the maximum amount of transmitted light is detected." Ex. 1010, 87; Pet. 36–37 (also discussing Webster's disclosure of "optical shunting" to increase the amount of light detected by the photodiode (Ex. 1010, 95)).

> iv. "[c] a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient."

On this record, the cited evidence supports Petitioner's undisputed contentions that Webster and Melby teach these limitations. Pet. 38–45.

Petitioner first notes that Webster proposes the use of a light filter to be placed over the detector to minimize the effects from light other than the optical signals of interest. Pet. 39 (citing Ex. 1010, 79). Specifically, "[u]sing a light filter allows 'light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter.'" *Id.* (quoting Ex. 1010, 79).

Petitioner contends that Webster teaches the importance of ensuring that light reaching the photodiode must pass through tissue containing arterial blood in order for the pulse oximeter to function effectively. *Id.* Petitioner relies on Webster's disclosure that in order to "minimize errors, the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood" and suggests the use of "[l]ight impervious barriers [that] should be placed between LEDs and the photodiode in all areas where the emitted light

could reach the photodiode without passing through tissue." Pet. 39 (emphasis omitted) (quoting Ex. 1010, 79).

Based on these disclosures, Dr. Anthony testifies that a person of ordinary skill in the art would have recognized the advantages of using a light filter, such as the type taught by Melby and as suggested by Webster. Ex. 1003 ¶¶ 92–96. Dr. Anthony testifies that Melby's louvered plastic film could be used with the combined Webster system as the "light filter" to control light such that only light originating from the direction of the light emitters reaches the detector. *Id.* at ¶¶ 96–100; Ex. 1010, 79.

According to Petitioner, a person of ordinary skill in the art would have been motivated by Melby to include a light control film in the sensor described by Webster to provide a pulse oximeter that "minimize[s] errors" by limiting "the light reaching the photodiode to that which has traveled through tissue containing arterial blood." Pet. 42 (quoting Ex. 1010, 79); Ex. 1003 ¶¶ 101–102. Similarly, a person of ordinary skill in the art would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster by placing a light control film over the photodetector in place of a scattering medium. Pet. 42. Dr. Anthony testifies that such a modification entails the use of known solutions to improve similar systems and methods in the same way. Ex. 1003 ¶ 102.

Dr. Anthony proposes the following modified system of Webster based on the teachings of Melby. *Id.*

IPR2020-01526
Patent 6,771,994 B2



Petitioner's modified and annotated version of Webster Figure 7.1 depicts an added light control film (red) over Webster's existing photodiode (green). Pet. 43; Ex. 1003 ¶¶ 102–103. According to Dr. Anthony, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission device from a particular direction based on the angle of the louvers within the light control film. Ex. 1003 ¶ 104. We are persuaded by this undisputed reasoning.

*v. Summary*

Petitioner sufficiently shows on this record, based on the uncontroverted testimony of Dr. Anthony, that a person of ordinary skill in the art would have found the sensor resulting from the combination of Webster and Melby to render obvious claim 15. *See* Ex. 1003 ¶¶ 92–105. For the foregoing reasons, we are persuaded that Petitioner's cited evidence and reasoning demonstrate a reasonable likelihood that Petitioner would prevail in its contentions regarding claim 15.

27

IPR2020-01526
Patent 6,771,994 B2

*F.    Remaining Grounds of Obviousness*

As discussed in detail above, Petitioner has demonstrated a reasonable likelihood of prevailing on the challenge to claim 15 as having been obvious over Diab, Benjamin, and Melby, as well as, Webster and Melby. Therefore, pursuant to USPTO policy implementing the decision in *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348 (2018) ("*SAS*"), we institute as to claim 15 (the only challenged claim) based on all grounds in the petition. *See* PTAB Consolidated Trial Practice Guide (Nov. 2019) ("Consolidated Guide"), 5–6, 64.  Further, at this stage of the proceeding, Patent Owner has not offered any response to Petitioner's contentions for the remaining grounds.

## III.    CONCLUSION

After considering the evidence and arguments presented in the Petition, we determine that Petitioner has demonstrated a reasonable likelihood of success in proving that claim 15 of the '994 patent is unpatentable.  Accordingly, we institute an *inter partes* review of grounds challenging claim 15 set forth in the Petition.[5]

At this stage of the proceeding, we have not made a final determination as to the patentability of any challenged claim or as to the construction of any claim term.

---

[5] The Petition addresses the Board's discretion under 35 U.S.C. § 314(a). *See* Pet. 69–73.  Patent Owner does not argue that we should exercise discretion to deny institution of *inter partes* review.  Accordingly, we do not consider exercising discretion to deny institution of *inter partes* review under 35 U.S.C. § 314(a) any further.

Appx0106

IPR2020-01526
Patent 6,771,994 B2

IV.    ORDER

In consideration of the foregoing, it is hereby:

ORDERED that, pursuant to 35 U.S.C. § 314(a), an *inter partes* review of claim 15 of the '994 patent is instituted with respect to all grounds set forth in the Petition; and

FURTHER ORDERED that, pursuant to 35 U.S.C. § 314(c) and 37 C.F.R. § 42.4(b), *inter partes* review of the '994 patent shall commence on the entry date of this Order, and notice is hereby given of the institution of a trial.

29

IPR2020-01526
Patent 6,771,994 B2

Appx0108

IPR2020-01526
Patent 6,771,994 B2

FOR PETITIONER:

W. Karl Renner
Roberto Devoto
Hyun Jin In
FISH & RICHARDSON P.C.
axf-ptab@fr.com
devoto@fr.com
in@fr.com

FOR PATENT OWNER:

Joseph R. Re
Stephen W. Larson
Jarom D. Kesler
Jacob L. Peterson
KNOBBE, MARTENS, OLSON, & BEAR, LLP
2jrr@knobbe.com
2swl@knobbe.com
2jzk@knobbe.com
2jup@knobbe.com

Appx0109

Filed: June 8, 2022

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   John M. Grover (Reg. No. 42,610)
      Joseph R. Re (Reg. No. 31,291)
      Stephen W. Larson (Reg. No. 69,133)
      Jarom D. Kesler (Reg. No. 57,046)
      Benjamin A. Katzenellenbogen (Reg. No. 53,102)
      Shannon H. Lam (Reg. No. 65,614)
      KNOBBE, MARTENS, OLSON & BEAR, LLP
      2040 Main Street, Fourteenth Floor
      Irvine, CA 92614
      Tel.:  (949) 760-0404
      Fax:  (949) 760-9502
      E-mail:  AppleIPR2020-1526-994@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01526
U.S. Patent 6,771,994

---

**PATENT OWNER'S NOTICE OF APPEAL TO THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

Pursuant to 28 U.S.C. § 1295(a)(4)(A), 35 U.S.C. §§ 141(c), 142, and 319,

37 C.F.R. §§ 90.2(a) and 90.3, and Rule 4(a) of the Federal Rules of Appellate

Procedure, Patent Owner Masimo Corporation ("Masimo") hereby appeals to the

United States Court of Appeals for the Federal Circuit from the Judgment – Final

Written Decision (Paper No. 31) entered on April 12, 2022 (Attachment A) and

from all underlying orders, decisions, rulings, and opinions that are adverse to

Masimo related thereto and included therein, including those within the Decision

Granting Institution of *Inter Partes* Review, entered April 16, 2021 (Paper 7).

Masimo appeals the Patent Trial and Appeal Board's determination that claim 15

of U.S. Patent 6,771,994 is unpatentable, and all other findings and determinations,

including but not limited to claim construction, as well as all other issues decided

adverse to Masimo's position or as to which Masimo is dissatisfied in IPR2020-

01526 involving U.S. Patent 6,771,994.

Masimo is concurrently providing true and correct copies of this Notice of

Appeal, along with the required fees, with the Director of the United States Patent

and Trademark Office and the Clerk of the United States Court of Appeals for the

Federal Circuit.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 8, 2022          /John M. Grover/
                              John M. Grover (Reg. No. 42,610)
                              Customer No. 42,610

-1-

## CERTIFICATE OF SERVICE

I hereby certify that the original of this Notice of Appeal was filed via U.S.P.S. Priority Mail Express on June 8, 2022 with the Director of the United States Patent and Trademark Office at the address below:

Office of the Solicitor
United States Patent and Trademark Office
Mail Stop 8, Post Office Box 1450
Alexandria, VA 22313-1450

A copy of this Notice of Appeal is being filed and served on June 8, 2022 as follows:

**To the USPTO Patent Trial and Appeal Board:**
Patent Trial and Appeal Board
Madison Building East
600 Dulany Street
Alexandria, VA 22313

(*via PTAB E2E – as authorized by the Board*)

**To the U.S. Court of Appeals for the Federal Circuit:**
Clerk of Court
U.S. Court of Appeals for the Federal Circuit
717 Madison Place, N.W.
Washington, DC 20439

(*via CM/ECF – with filing fee*)

**Counsel for Petitioner Apple, Inc.**

W. Karl Renner
Andrew B. Patrick
Daniel D. Smith
Fish & Richardson P.C.
3200 RBC Plaza

-2-

60 South Sixth Street
Minneapolis, MN 55402
IPR50095-0005IP1@fr.com
PTABInbound@fr.com
axf-ptab@fr.com
dsmith@fr.com
patrick@fr.com

(*via email pursuant to 37 C.F.R. § 42.6(e)*)


                          KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  June 8, 2022         /John M. Grover/
                             John M. Grover (Reg. No. 42,610)
55746635                     Customer No. 42,610

-3-

**Appx0113**

US006771994B2

(12) **United States Patent**        (10) **Patent No.:**        **US 6,771,994 B2**
Kiani et al.                         (45) **Date of Patent:**        **Aug. 3, 2004**

(54) **PULSE OXIMETER PROBE-OFF DETECTION SYSTEM**

(75) Inventors: **Massi E. Kiani**, Laguna Niguel, CA (US); **Mohamed K. Diab**, Mission Viejo, CA (US)

(73) Assignee: **Masimo Corporation**, Irvine, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **10/374,303**

(22) Filed: **Feb. 24, 2003**

(65) **Prior Publication Data**

US 2003/0139656 A1 Jul. 24, 2003

**Related U.S. Application Data**

(62) Division of application No. 09/595,081, filed on Jun. 16, 2000, now Pat. No. 6,526,300.

(60) Provisional application No. 60/140,000, filed on Jun. 18, 1999.

(51) **Int. Cl.**$^7$ ................................................. **A61B 5/00**

(52) **U.S. Cl.** ....................................... **600/323**; 600/344

(58) **Field of Search** ................................. 600/309–310, 600/322–324, 316, 344, 473, 476

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,295,475 A | 10/1981 | Torzala | |
| 4,331,161 A | 5/1982 | Patel | |
| 4,561,440 A | 12/1985 | Kubo et al. | |
| 4,603,700 A | 8/1986 | Nichols et al. | |
| 4,945,239 A * | 7/1990 | Wist et al. | 600/473 |
| 5,226,417 A | 7/1993 | Swedlow et al. | |
| 5,370,114 A | 12/1994 | Wong et al. | |
| 5,469,845 A | 11/1995 | DeLonzor et al. | |
| 5,503,148 A | 4/1996 | Pologe et al. | |

| | | | |
|---|---|---|---|
| 5,635,700 A * | 6/1997 | Fazekas | 235/462.06 |
| 5,758,644 A | 6/1998 | Diab et al. | |
| 5,761,540 A * | 6/1998 | White | 396/4 |
| 5,782,757 A | 7/1998 | Diab et al. | |
| 5,823,950 A | 10/1998 | Diab et al. | |
| 5,923,021 A * | 7/1999 | Dvorkis et al. | 235/455 |
| 6,035,223 A * | 3/2000 | Baker, Jr. | 600/323 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 197 28 902 A1 | 11/1999 |
| EP | 0182 197 A2 | 5/1986 |
| EP | 0315 040 A1 | 10/1989 |
| GB | 2061 496 A | 5/1981 |

* cited by examiner

*Primary Examiner*—Mary Beth Jones
*Assistant Examiner*—Matthew Kremer
(74) *Attorney, Agent, or Firm*—Knobbe, Martens, Olson, & Bear, LLP

(57) **ABSTRACT**

The present invention provides a number of improvements that can be incorporated into a pulse oximeter probe to detect when a probe has become dislodged from a patient and/or to prevent a probe-off condition. A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but continues to detect an AC signal within the operating region of the pulse oximeter. In one aspect, the present invention provides electrical contacts that contact the skin of a patient when the probe is properly attached. In another aspect, the present invention provides a number of louvers placed in front of the sensor's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. Accordingly, if the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter. In accordance with a method of the present invention the pulse oximeter can sound an alarm or display a warning if it determines that the probe is not properly attached to the patient.

**18 Claims, 15 Drawing Sheets**



APPLE 1001

Appx0114



## FIG.1



*FIG.2A*



*FIG.2B*



**FIG.3A**



*FIG.3B*



*FIG.3C*



*FIG.3D*



*FIG.3E*



*FIG.3F*



*FIG.3G*



*FIG.3H*



*FIG. 4*



*FIG.5A*



*FIG.5B*



*FIG.5C*



*FIG.6*

Appx0129

US 6,771,994 B2

1

# PULSE OXIMETER PROBE-OFF DETECTION SYSTEM

## REFERENCE TO RELATED APPLICATIONS

The present application claims priority benefit under 35 U.S.C. § 120 to, and is a divisional of, U.S. patent application Ser. No. 09/595,081, filed Jun. 16, 2000, now U.S. Pat. No. 6,526,300, entitled "Pulse Oximeter Probe-Off Detection System," which claims priority benefit under 35 U.S.C. § 119(e) from U.S. Provisional Application No. 60/140,000, filed Jun. 18, 1999, entitled "Pulse Oximeter Probe-Off Detection System." The present application also incorporates the foregoing utility disclosure herein by reference.

## BACKGROUND OF THE INVENTION

The present invention relates to optical probes that can be attached to the finger, toe, or appendage of a patient. More particularly, the present invention relates to devices and methods for identifying when a probe has become dislodged from a patient.

## DESCRIPTION OF THE RELATED ART

Oximetry is the measurement of the oxygen status of blood. Early detection of low blood oxygen is critical in the medical field, for example in critical care and surgical applications, because an insufficient oxygen supply can result in brain damage and death in a matter of minutes. Pulse oximetry is a widely accepted noninvasive procedure for measuring the oxygen saturation level of arterial blood, an indicator of oxygen supply. A pulse oximetry system generally consists of a probe attached to a patient, a monitor, and a cable connecting the probe and monitor. Conventionally, a pulse oximetry probe has both red and infrared (IR) light-emitting diode (LED) emitters and a photodiode detector. The probe is typically attached to a patient's finger or toe, or a very young patient's foot. For a finger, the probe is configured so that the emitters project light through the fingernail, the arteries, vessels, capillaries, tissue and bone. The photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the finger tissues.

The pulse oximetry monitor (pulse oximeter) determines oxygen saturation by analyzing the differential absorption by arterial blood of the two wavelengths emitted by the probe. The pulse oximeter alternately activates the probe LED emitters and reads the resulting current generated by the photodiode detector. This current is proportional to the intensity of the detected light. The pulse oximeter calculates a ratio of detected red and infrared intensities, and an arterial oxygen saturation value is empirically determined based on the ratio obtained. The pulse oximeter contains circuitry for controlling the probe, processing the probe signals and displaying the patient's oxygen saturation and pulse rate. A pulse oximeter is described in U.S. Pat. No. 5,632,272 assigned to the assignee of the present invention.

## SUMMARY OF THE INVENTION

The present invention provides a number of improvements that can be incorporated into a pulse oximeter probe to detect when a probe has become dislodged from a patient and/or to prevent a probe-off condition. A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but may continue to detect an AC signal within the operating region of the pulse oximeter.

2

In one aspect, the present invention provides a number of electrical contacts that contact the skin of a patient when the probe is properly attached. The pulse oximeter can check the continuity through the contacts to determine whether the probe is properly attached. If the probe is not properly attached, the pulse oximeter can identify a probe-off condition even though the oximeter measures an AC signal that appears like the probe is still attached.

In another aspect, the present invention provides a number of louvers placed in front of the probe's photodetector to filter out oblique light rays that do not originate from a point in front of the detector. If the probe becomes dislodged, the emitter will not likely remain in front of the photodetector. If the emitter and photodetector are not properly aligned, the photodetector will not produce a signal within the valid operating range of the pulse oximeter. The louvers prevent light from an oblique angle from reaching the photodetector and creating a false signal that might be interpreted by the pulse oximeter as a physiological signal. Accordingly, the pulse oximeter can determine that a probe has become dislodged when the photodetector does not produce a valid signal. Furthermore, probe-off conditions can avoided since oblique light rays are not able to reach the photodetector to produce an apparently valid signal.

## BRIEF DESCRIPTION OF THE DRAWINGS

Referring now to the drawings in which like reference numbers represent corresponding components throughout:

FIG. 1 illustrates a schematic of one embodiment of a pulse oximeter system;

FIGS. 2A–B depict an optical probe and the attachment of the optical probe on the fingertip of an adult patient;

FIG. 3A illustrates a schematic of a pulse oximeter system that incorporates electrical contacts to the skin of a patient, in accordance with one embodiment of the present invention;

FIG. 3B illustrates a perspective view of an optical probe incorporating electrical contacts to the skin of a patient;

FIG. 3C illustrates a schematic of one embodiment of a pulse oximeter system that incorporates electrical contacts to the skin of a patient;

FIG. 3D illustrates a schematic of a preferred embodiment of a pulse oximeter system that incorporates a number of electrical contacts to the skin of a patient;

FIG. 3E depicts a generalized schematic of a pulse oximeter that incorporates another embodiment of a contact on a pulse oximeter probe;

FIG. 3F depicts a perspective view an optical probe incorporating the embodiment of FIG. 3E;

FIG. 3G depicts a generalized schematic of a pulse oximeter system that incorporates another embodiment of a contact sensor in accordance with the present invention;

FIG. 3H depicts a perspective view of an optical probe incorporating the contact sensor of FIG. 3G;

FIG. 4 illustrates a probe that has become unfastened;

FIG. 5A illustrates a probe wherein a number of louvers are placed in front of the detector assembly;

FIG. 5B illustrates a properly attached probe wherein a number of louvers are placed in front of the detector assembly;

FIG. 5C illustrates a top plan view of a preferred embodiment of a probe wherein a number of louvers are placed in front of the detector assembly

FIG. 6 illustrates a flow chart of the method of detecting a dislodged probe.

US 6,771,994 B2

3

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

To compute peripheral arterial oxygen saturation, denoted $Sp_xO_2$, pulse oximetry relies on the differential light absorption of oxygenated hemoglobin, $HbO_2$, and deoxygenated hemoglobin, Hb. This differential absorption is measured at the red and infrared wavelengths of the probe. In addition, pulse oximetry relies on the pulsatile nature of arterial blood to differentiate hemoglobin absorption from absorption of other constituents in the surrounding tissues. Light absorption between systole and diastole varies due to the blood volume change from the inflow and outflow of arterial blood at a peripheral tissue site. The tissue site might also comprise skin, muscle, bone, venous blood, fat, pigment, etc., each of which absorbs light. Blood oxygen saturation measurements are based upon a ratio of the time-varying or AC portion of the detected red and infrared signals with respect to the time-invariant or DC portion. This AC/DC ratio normalizes the signals and accounts for variations in light pathlengths through the measured tissue.

As reproduced in FIG. 1, a schematic of one embodiment of a pulse oximeter system 100 is disclosed in U.S. Pat. No. 5,758,644 (the '644 patent), assigned to the assignee of the present application and incorporated herein by reference. The system 100 comprises a pulse oximeter 140, which is attached through a connector 142 to a probe 110. The probe 110 comprises a first LED 112, a second LED 114 and a photodetector 116. The first and second LEDs 112 and 114 are connected back-to-back and share a common electrical connection 118. The photodetector 116 has its own electrical connection 122. Each of the LEDs 112 and 114 and the photodetector 116 are connected at their outputs to a common ground electrical connection 130. The two LEDs 112 and 114 are preferably configured to produce different wavelengths of light, which pass through the flesh of a patient to be detected by the photodetector 116. The oximeter 140 can select the LED to be driven by applying either a positive or negative voltage to the connection 118. A coding resistor 132 has a resistance that can measured by the pulse oximeter 140 to determine the particular characteristics of the probe 110. The coding resistor 132 is coupled in parallel with the first LED 112 or the second LED 114. The resistor 132 can be used to indicate the operating wavelength of the first and second LEDs 112 and 114, or to indicate the type of probe. In order to read the coding resistor 132, the pulse oximeter 140 drives the first LED 112/coding resistor 132 combination at a level that is low enough that the LED draws insignificant current. At this level, significantly all of the current flows through the coding resistor 132 and the pulse oximeter 140 can determine the value of the resistor in accordance with Ohm's law. By configuring the coding resistor 132 in parallel with one of the LEDs 112, 114, the added expense of an additional lead connecting the pulse oximeter 140 to the probe 110 can be saved.

One embodiment of a disposable probe for use with pulse oximetry systems is disclosed in U.S. Pat. No. 5,782,757, assigned to the assignee of the present application and incorporated herein by reference. FIGS. 2A–B depict the optical probe 202 and the attachment of the optical probe 202 on the fingertip 250 of an adult patient. The disposable optical probe 202 is designed to fit comfortably onto a patient's fingertip. As illustrated in FIG. 2A, the probe 202 includes a central portion 204, a pair of adhesive flanges 205 extending from the central portion 204, a connector portion 210 situated between the flanges 205, and a pair of smaller adhesive flaps 215 extending from the central portion 204 on

4

the end of the optical probe 202 opposite from a connector tab 210. The probe 202 further includes an emitter aperture 220 with a number of emitters (e.g., a light-emitting diodes) positioned within the central portion 204 close to the connector portion 210, and a detector aperture 230 which allows light to pass through the detector aperture 230 to a detector assembly 235. An adult fingertip 250 is shown in phantom in FIG. 2A to illustrate the position at which the fingertip 250 is placed when the probe 202 is to be fastened onto the fingertip 250 for use. Although not depicted specifically in FIGS. 2A–2B, the probe 202 is typically fabricated from multiple layers.

FIG. 2B illustrates the probe 202 fastened onto the fingertip 250. As shown in FIG. 2B, the probe 202 folds to conform to the very end of the fingertip. The adhesive flaps 205 fold downward (in the illustration of FIG. 2B) to wrap around the fingertip 250 while the adhesive flaps 215 fold upward (in the illustration of FIG. 2B) about a portion of the circumference of the fingertip 250 to provide support. As shown in FIG. 2B, when the probe 202 is folded about the fingertip 250, the emitters located within the probe are spaced opposite the detector assembly 235 such that light from the emitters passes through the emitter aperture 220, through the finger 250 and is incident upon the detector assembly 235 through the detector aperture 230.

FIG. 2B depicts a receiving connector portion 260 which engages with contacts 252 on the connector 210 to provide an electrical connection between the optical probe 202 and the pulse oximeter 140. Once the optical probe 202 is securely fastened to the fingertip 250 and the connector 210 provides an electrical connection between the optical probe 202 and digital signal processing circuitry, signals are detected from the detector 235 and transmitted to the processing circuitry via the connector 260.

A probe-off condition occurs when the optical probe becomes partially or completely dislodged from the patient, but continues to detect an AC signal within the operating region of the pulse oximeter. Probe-off errors are serious because the pulse oximeter may display a normal saturation when, in fact, the probe is not properly attached to the patient, potentially leading to missed desaturation events. Failure to detect a probe-off condition is the result of the probe detector receiving light directly from the emitters without transmission through the patient's tissue.

As illustrated in the schematic of FIG. 3A, a first aspect of the present invention involves an optical probe 202 which incorporates a number of electrical contacts 341 and 342 that make contact to the skin of the patient when the probe 202 is properly secured. In order to detect a probe-off condition, a probe-off detector module 138 of the pulse oximeter 140 periodically applies a voltage across the contacts 341 and 342 or drives a current. A non-zero current indicates that the patient's skin 344 has closed the circuit between the contacts 341 and 342 and the probe 202 is properly secured. If the probe becomes dislodged, the patient's skin 344 is no longer be in contact with the contacts 341 and 342, resulting in an open circuit.

FIG. 3B illustrates one preferred embodiment of an optical probe 202 incorporating one embodiment of the present invention. The present embodiment incorporates a first electrical contact 341 and a second electrical contact 342 in the surface 306 of the central portion 204 of the probe 202. The electrical contacts 341 and 342 are positioned in a location such that contact to a finger or flesh portion of the patient is ensured when the probe 202 is properly attached. In the illustrated embodiment, the contacts 341 and 342 are located

18

US 6,771,994 B2

5

proximate the detector aperture 203. In another embodiment, contacts 341 and 342 are on opposite sides of the detector aperture 203. The optical probe 202 also has an emitter aperture 220 through which light of at least two wavelengths passes from LEDs.

As illustrated in the schematic diagram of FIG. 3C, the pulse oximeter system 100 of FIG. 1 can be modified to incorporate the first aspect of the present invention by extending an additional lead 324 through the connector 142 to the probe 202. The additional lead can be connected to one contact 341 while the second contact 342 can be wired to the common ground lead 130.

A schematic diagram of another embodiment of the present invention is illustrated in FIG. 3D. The contacts 341 and 342 can be installed in line within the path of the coding resistor 132. When the patient's skin 344 is in contact with the contacts 341 and 342, the circuit through the coding resistor 132 will be closed; when the patient's skin 344 is not in contact with the contacts 341 and 342, the circuit through the coding resistor 132 will be open. The skin 344 will have some finite resistance between the contacts 341 and 342 that will affect the measured resistance of the coding resistor. As the contacts 341 and 342 are installed in series with the coding resistor 132, any resistance across the contacts 341 and 342 will be added to the resistance of the coding resistor 132 when the pulse oximeter 140 attempts to measure the resistance of the coding resistor 132. The resistance of the skin 344 can effectively be ignored in the measurement of the coding resistor 132, however, by choosing the value of the coding resistor 132 to be substantially larger than the resistance of a patient's skin 344 between the contacts 341 and 342. Alternatively, the acceptable resistance for the coding resistor can be specified as in a range that includes the likely added resistance of the skin in the circuit. In the present configuration, the probe-off detector module 138 of the pulse oximeter 140 can verify that the optical probe 202 is properly secured simultaneously with checking the resistance of the coding resistor 132. An open circuit indicates that the probe has become dislodged, whereas a valid resistance of a coding resistor 132 indicates a proper attachment of the probe 202. If the probe has become dislodged, the pulse oximeter 140 can sound an alarm, display a warning message, or both.

The pulse oximeter 140 is particularly vulnerable to probe-off errors when operating at its highest sensitivity, where even small induced variations in light directly detected from the emitters have sufficient signal strength to be processed as a physiological signal. In a probe-off condition, a detector AC signal can be induced by slight changes in the direct light path between the emitters and the detector. For example, small amounts of patient motion, such as chest movement from breathing, can induce a probe-off AC signal. As another example, "creep" in the probe configuration, such as a folded probe gradually returning to its original unfolded shape after becoming dislodged can also induce a probe-off AC signal.

FIGS. 3E and 3F depict a generalized embodiment of the present invention with the same features as described in 3A and 3B, except that the electrical contacts 341, 342 are replaced with a contact sensor 343. The electrical contacts 341 and 342 comprise a specialized case of a contact sensor 343 where skin is involved. The contact sensor 343 may also comprise a piezoelectric sensor, a conductive contact sensor, or any other contact sensors which detect the contact of the tissue material.

FIGS. 3G and 3H depict yet another embodiment of the electrical contact based contact sensor of FIGS. 3A and 3B.

6

FIG. 3G depicts a schematic form with a pulse oximeter 140 and a probe off detector module. FIG. 3H depicts a perspective view of the optical pulse oximeter probe haveing optical emitters and at least one detector. However, in this embodiment, electrical contact 341A and electrical contact 342 are positioned opposite each other. The electrical contact 341A is positioned near the emitter aperture 220, so as to contact the portion of the tissue material near the emitter 220. The electrical contact 342 is positioned near the detector aperture 203. Similarly, other contact sensors could be positioned, one near the emitter aperture 220 and one near the detector aperture 203.

In one embodiment the electrical contacts 341, 342, 341A are metallic. In another embodiment, these contacts comprise conductive adhesive, or gel based contacts.

FIG. 4 illustrates a probe 202 that has become unfastened. The illustrated probe 202 is shown in a partially unfolded shape that provides an oblique path 410 from the emitter aperture 220 to the detector assembly 235. As a patient moves, or as the probe 202 unfolds, rays of light travelling along the oblique light path 410 may generate an AC signal that could be interpreted by the pulse oximeter 140 as a physiological signal.

As illustrated in the cross section of FIG. 5A, a number of louvers 502 are placed in front of the detector assembly 235 within the detector aperture 203 in accordance with a second aspect of the present invention. The louvers 502 block light rays travelling along an oblique path 410 (i.e., light that does not originate from in front of the detector assembly 235). As illustrated in FIG. 5B, if the probe 202 is properly attached, the emitter aperture 220 will be directly in front of the detector assembly 235 and light rays will pass directly through the louvers 502 along a direct path 510.

FIG. 5C illustrates a top plan view of a preferred embodiment of this aspect of the present invention. The detector aperture 2o3 is formed in a plastic body 504 having slots 506 to hold the louvers 502 in place across the detector aperture 203. In a preferred embodiment of the present aspect, the louvers 502 can be created from commercially available "3M Light Control Film."

The louvers 502 of the present aspect advantageously provide a separate or improved method for the pulse oximeter 140 to determine when a probe has become dislodged through monitoring the signal produced by the photodetector 116. If the probe 202 becomes improperly secured, the emitter aperture will likely move from its proper location directly above the detector assembly 235, which will cause any oblique light rays to be blocked by the louvers 502. With no light rays reaching the detector assembly 235, the detector will produce no signal. The probe-off detector 138 of the pulse oximeter 140 can detect the lack of signal and sound an alarm. The louvers 502 also advantageously block oblique light rays that might create a false signal that could be interpreted by the pulse oximeter 140 to be a physiological signal. Accordingly, the louvers 502 reduce or eliminate the possibility of a probe-off condition. The louvers 502 may be used alone or in combination with the contacts described herein.

FIG. 6 illustrates one embodiment of a method 600 by which a pulse oximeter 140 detects a dislodged probe and/or a probe-off condition. At a step 604, the probe off detector module 138 checks for continuity between the skin contacts 341 and 342. If, at a step 608, there is continuity between the contacts 341 and 342, the oximeter 140 passes control to a step 612. If, on the other hand, there is no continuity at the step 608, the oximeter 140 passes control to a step 620. At

US 6,771,994 B2

7

8

step **620** the oximeter **140** sounds an alarm to alert a condition necessitating attention. At the step **612**, the oximeter **140** checks for a valid AC signal from the photodetector. If, at a step **616**, there is a valid signal, the oximeter **140** passes control back to the step **604** to start the cycle over again. If, on the other hand, there is no valid AC signal at the step **616** the oximeter sounds an alarm at the step **620**. Accordingly, the pulse oximeter checks for and detects dislodgment of a probe and/or a probe-off condition.

While certain exemplary preferred embodiments have been described and shown in the accompanying drawings, it is to be understood that such embodiments are merely illustrative of and not restrictive on the broad invention. Further, it is to be understood that this invention shall not be limited to the specific construction and arrangements shown and described since various modifications or changes may occur without departing from the spirit and scope of the invention as claimed. It is intended that the scope of the invention be limited not by this detailed description but by the claims appended hereto.

What is claimed is:

1. A pulse oximetry probe comprising:

a flexible probe body configured to contact the skin of a patient on opposing surfaces of a body member of the patient when the probe body is properly affixed to the patient;

light emitting diodes incorporated into the probe body;

a light sensitive detector which detects light from a first direction originally emitted by the light emitting diodes, wherein the light comprises at least first and second wavelengths and has been transmitted through body tissue carrying pulsing blood; and

at least one structure positioned approximately parallel to the first direction and is configured to filter out light from reaching the light sensitive detector from a direction substantially different from the first direction.

2. The pulse oximetry probe of claim **1**, wherein the structure comprises one or more louvers.

3. The pulse oximetry probe of claim **1**, wherein the structure comprises a plurality of louvers.

4. The pulse oximetry probe of claim **1**, further comprising a coding resistor.

5. The pulse oximetry probe of claim **1**, further comprising an circuit configured to contact at least a portion of the body tissue.

6. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises a reusable optical probe.

7. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises a disposable optical probe.

8. The pulse oximetry probe of claim **1**, wherein the flexible probe body comprises reusable and disposable portions of an optical probe.

9. A pulse oximeter for processing signals received from an optical probe, the pulse oximeter comprising:

an input for receiving at least first and second intensity signals from a light-sensitive detector which detects

light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; and

a signal processor which determines a probe-off condition when at least one of the first and second intensity signals is substantially attenuated.

10. The pulse oximeter of claim **9**, wherein the attenuation is caused by improper application an optical probe to the body tissue.

11. The pulse oximeter of claim **9**, further comprising an audio alarm indicating when the probe-off condition is determined.

12. The pulse oximeter of claim **9**, further comprising an visual alarm indicating when the probe-off condition is determined.

13. The pulse oximeter of claim **9**, further comprising a coding resistor.

14. The pulse oximeter of claim **9**, further comprising an circuit configured to contact at least a portion of the body tissue.

15. A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

16. A method of processing one or more signals to detect a condition of improper positioning of an optical probe, the method comprising:

expecting to receive at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood;

blocking light originating from an angle oblique to a proximate relationship between the detector and a light source; and

receiving one of an un-interpretable signal or signal other than the expected first and second intensity signals because the light is blocked; and

indicating a probe off condition.

17. The method of claim **16**, wherein the indicating comprises at least one of an audible or visual alarm.

18. The method of claim **16**, wherein blocking light comprises positioning a plurality of louvers between the light source and the light-sensitive detector.

\* \* \* \* \*

UNITED STATES PATENT AND TRADEMARK OFFICE
# CERTIFICATE OF CORRECTION

PATENT NO.          : 6,771,994 B2                                    Page 1 of 1
APPLICATION NO. : 10/374303
DATED                  : August 3, 2004
INVENTOR(S)        : Massi E. Kiani

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

At column 2, line 36, delete "embodimet" and insert -- embodiment --, therefore.

At column 6, line 3, delete "haveing" and insert -- having --, therefore.

Signed and Sealed this

Seventeenth Day of July, 2007

JON W. DUDAS
*Director of the United States Patent and Trademark Office*

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Massi E. Kiani et al.
U.S. Patent No.:    6,771,994            Attorney Docket No.:  50095-0005IP1
Issue Date:           August 3, 2004
Appl. Serial No.:    10/374,303
Filing Date:          February 24, 2003
Title:                    PULSE OXIMETER PROBE-OFF DETECTION SYSTEM

**Mail Stop Patent Board**
Patent Trial and Appeal Board
U.S. Patent and Trademark Office
P.O. Box 1450
Alexandria, VA 22313-1450

## PETITION FOR *INTER PARTES* REVIEW OF UNITED STATES PATENT NO. 6,771,994 PURSUANT TO 35 U.S.C. §§ 311–319, 37 C.F.R. § 42

art relating to the subject matter of the '994 Patent as of the Critical Date

("POSITA.")  APPLE-1003, [0001]-[0168].

For the reasons explained below, claim 15 of the '994 Patent is eligible for

IPR.  Petitioner respectfully submits that IPR institution is warranted, and that

claim 15 should be cancelled as unpatentable.

## I.      REQUIREMENTS FOR IPR

### A.      Grounds for Standing

Apple certifies that the '994 Patent is available for IPR.  The present Petition

is being filed within one year of service of a complaint against Apple in *Masimo*

*Corporation et al. v. Apple Inc.*, Case No. 8:20-cv-00048 (C.D. Cal., served

January 13, 2020).  Apple is not barred or estopped from requesting this review on

the below-identified grounds.

### B.      Challenge and Relief Requested

Claim 15 is invalid based on the grounds noted in the table below, as further

explained in this Petition.  Accompanying explanations and support are provided in

the Declaration of Dr. Brian Anthony (APPLE-1003).  APPLE-1003, [0001]-

[0168].

| Ground | Claims | Basis |
|:------:|:------:|-------|
| 1 | 15 | Obvious over Diab in view of Benjamin and Melby |
| 2 | 15 | Obvious over Webster in view of Melby |
| 3 | 15 | Obvious over Fine |
| 4 | 15 | Obvious over Fine in view of Benjamin and Melby |

3

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994



*FIG.5B*

APPLE-1001, FIG. 5B (annotated)

## B.     The Prosecution History

The '994 Patent has not been the subject of any previous IPRs.  No Office

Actions were issued during the prosecution of the application from which the '994

Patent issued.  *See generally* APPLE-1002.

## C.     Level of Ordinary Skill in the Art

A POSITA would have been a person with a working knowledge of

physiological monitoring technologies.  The POSITA would have had a Bachelor

of Science degree in an academic discipline emphasizing the design of electrical,

computer, or software technologies, in combination with training or at least one to

two years of related work experience with capture and processing of data or

7

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994



APPLE-1006, FIG. 24 (excerpt, annotated)

From this and related disclosure, a POSITA would have found the sensor resulting from the combination of Diab, Benjamin, and Melby to render obvious "a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient" under the proposed construction. APPLE-1003, [0057]-[0074].

### B.     [GROUND 2] – Claim 15 is obvious over Webster and Melby

#### 1.     Overview of Webster

Webster provides an overview of the history and design of pulse oximeters, stating that "[p]ulse oximetry was introduced in 1983 as a noninvasive method for

29

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994

monitoring the arterial oxygen saturation of a patient's blood." APPLE-1010, xvi;

*see also* APPLE-1015. The book details "both the hardware and software required

to fabricate a pulse oximeter as well as the equations, methods, and software

required for effective functioning" in addition to "testing methods." *Id*. Webster

gives a comprehensive summary of the state of the art as of its publication, and

describes, in detail, the purpose of components of a pulse oximeter as well as the

design process and selection criteria for particular components. *See*, *generally*,

APPLE-1010, Chapters 2 and 5-7; APPLE-1003, [0075].

####    2.    Claim 15

> **(a)    [15pre]: "A sensor which generates at least first and second intensity signals from a light-sensitive detector which detects light of at least first and second wavelengths transmitted through body tissue carrying pulsing blood; the sensor comprising:"**

To the extent the preamble is limiting, in the combination, Webster describes

devices known as "pulse oximeters," which provide "an empirical measure of

arterial saturation." APPLE-1010, 13. These devices operate by shining "light of

two wavelengths through a tissue bed such as the finger or earlobe and measures

the transmitted light signal." *Id*.

30

sensitive photodiode detector.  APPLE-1003, [0088].



APPLE-1010, FIG. 7.1 (annotated)

In further detail, Webster explains that its "***photodiode*** has to ***detect the light***

***transmitted through the tissue***" and is "placed in line with the LEDs so that the

maximum amount of transmitted light is detected."  APPLE-1010, 87.  Indeed,

Webster teaches that "the photodiode should be placed as close as possible to the

36

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994

skin without exerting force on the tissue" and therefore that "the LEDs and the photodiode [should be placed] facing each other." *Id.* Examples of photodiodes that can be used include "***both the standard p-n diodes and p-i-n*** (New and Corenman 1987) ***diodes***," which are "currently in use today as the ***photodetectors of choice*** for use in pulse oximetry systems" due to "their relatively low cost and linear output current response to incident light." *Id.*, 76. Webster also contemplates the use of other light sensitive detector devices, including "photocells…phototransistors, and integrated circuit (IC) sensors." *Id.*, 71.

Webster warns that a phenomenon knowns as optical shunting can occur "when light from the sensor's LEDs reaches the photodiode without passing through the tissue" and "***leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting***." *Id.*, 95. This undesirable effect "can be eliminated by choosing an appropriate sensor for the patient's size and by ***ensuring that the sensor remains securely in position***." *Id.*; APPLE-1003, [0087]-[0091].

Appx0176

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994

incidence." APPLE-1008, 3:46-4:25.

Thus, a POSITA viewing the disclosure of Webster would have recognized that Melby's film could be used in the Webster device as the "light filter" to control light such that only light originating from the direction of the light emitters reaches the detector. APPLE-1010, 79; APPLE-1003, [0092]-[0100].

A POSITA would have been motivated by Melby to include a light control film in the sensor described by Webster. APPLE-1003, [0101]. Indeed, a POSITA would have been motivated and would have found it obvious to combine Webster and Melby to provide a pulse oximeter that "minimize[s] errors" by limiting "the light reaching the photodiode to that which has traveled through tissue containing arterial blood." APPLE-1010, 79.

A POSITA would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster's system. APPLE-1003, [0102]. Further, a POSITA would have found it obvious to modify Webster to include a light control film as described by Melby placing a light control film over the photodetector in place of a scattering medium because doing so entails the use of known solutions to improve similar systems and methods in the same way. *Id*. For example, such a modification is illustrated below.

Attorney Docket No. 50095-0005IP1
IPR of U.S. Patent No. 6,771,994



APPLE-1010, FIG. 7.1 (annotated)

A POSITA would have recognized that applying Melby's teachings to Webster's pulse oximeter would have led to predictable results without significantly altering or hindering the functions performed by the pulse wave examination apparatus. APPLE-1003, [0103]. Accordingly, implementing Melby's teachings in Webster's pulse oximeter would have been routine and straightforward to a POSITA, and it would have been clear that such a combination would predictably work and provide the expected functionality. *Id.*

Indeed, a POSITA would have understood that a light control film placed over the detector could thus accept light from the light emission device from a

43

Filed: July 20, 2021

Filed on behalf of:
  Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
      Stephen W. Larson (Reg. No. 69,133)
      Jarom D. Kesler (Reg. No. 57,046)
      Shannon H. Lam (Reg. No. 65,614)
      KNOBBE, MARTENS, OLSON & BEAR, LLP
      2040 Main Street, Fourteenth Floor
      Irvine, CA 92614
      Tel.:   (949) 760-0404
      Fax:   (949) 760-9502
      E-mail:  AppleIPR2020-1526-994@knobbe.com


## UNITED STATES PATENT AND TRADEMARK OFFICE

---

## BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

### APPLE INC.

Petitioner,

v.

### MASIMO CORPORATION,

Patent Owner.

---

Case IPR2020-01526
U.S. Patent 6,771,994

---

## PATENT OWNER RESPONSE

# TABLE OF CONTENTS

**Page No.**

I.    INTRODUCTION .................................................................1

II.   BACKGROUND ..................................................................4

      A.    The Importance of Pulse Oximeters ....................................4

      B.    How Oximetry Works ..................................................5

      C.    The '994 Patent .......................................................7

      D.    Challenged Claim 15 .................................................8

      E.    Summary of File History .............................................9

III.  OVERVIEW OF ALLEGED PRIOR ART .................................9

      A.    Diab (EX1006) .......................................................9

      B.    Benjamin (EX1007) ................................................13

      C.    Melby (EX1008).....................................................15

      D.    Webster (EX1010) .................................................16

      E.    Fine (EX1009) ......................................................18

IV.   LEVEL OF ORDINARY SKILL IN THE ART .........................21

V.    CLAIM CONSTRUCTION ...................................................21

VI.   APPLE FAILS TO ESTABLISH OBVIOUSNESS OF
      CLAIM 15 ...........................................................................26

      A.    Legal Background .................................................26

**TABLE OF CONTENTS**
(*cont'd*)

**Page No.**

B.    Ground 1: Apple Fails to Establish Obviousness
Based on Diab, Benjamin, and Melby ................................28

        1.    Apple's combination would undermine Diab's
              invention....................................................................28

        2.    Apple's unexplained modification would cause
              Diab to perform worse ............................................34

        3.    Apple's proposed modifications would not have
              yielded predictable results.......................................37

        4.    Apple's remaining Ground 1 arguments fail to
              support Apple's combination....................................38

C.    Ground 2: Apple Fails to Establish Obviousness
Based on Webster and Melby...............................................42

        1.    Apple conflates Webster's wavelength filter
              and Webster's light impervious barriers ..................42

        2.    A POSITA would not have been motivated to
              modify Webster to include Melby's light
              control film...............................................................44

D.    Ground 3: Apple Fails to Establish Obviousness
Based on Fine .....................................................................46

        1.    A POSITA would not have considered Fine ............46

        2.    Optical fibers are not louvers .................................47

E.    Ground 4: Apple Fails to Establish Obviousness
Based on Fine, Benjamin, and Melby ................................50

**TABLE OF CONTENTS**
*(cont'd)*

**Page No.**

1.  Apple's argued motivations to combine Fine, Benjamin, and Melby are conclusory and unsupported ...................................................................50

2.  Apple fails to explain how a light control film would be incorporated into Fine .............................................52

VII.    RESERVATION OF RIGHTS ........................................................57

VIII.   CONCLUSION ...............................................................................57

Appx0287

# TABLE OF AUTHORITIES

**Page No(s).**

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*,
    694 F.3d 1312 (Fed. Cir. 2012) ...........................................................25

*CCS Fitness, Inc. v. Brunswick Corp.*,
    288 F.3d 1359 (Fed. Cir. 2002) ...........................................................20

*CFMT, Inc. v. YieldUp Int'l Corp.*,
    349 F.3d 1333 (Fed. Cir. 2003) ...........................................................24

*In re Gordon*,
    733 F.2d 900 (Fed. Cir. 1984) .......................................................25, 31

*In re Kahn*,
    441 F.3d 977 (Fed. Cir. 2006) .......................................................37, 44

*In re Kotzab*,
    217 F.3d 1365 (Fed. Cir. 2000) ...........................................................25

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
    358 F.3d 898 (Fed. Cir. 2004) .............................................................23

*Masimo Corp. v. Philips Elec. N. Am. Corp.*,
    C.A. No. 09–80–LPS, 2015 WL 2379485 (D. Del. May 18, 2015)............*passim*

*In re NTP, Inc.*,
    654 F.3d 1279 (Fed. Cir. 2011) ...........................................................25

*Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*,
    520 F.3d 1358 (Fed. Cir. 2008) ...........................................................25

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ...............................................20, 23, 24

*Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*,
    600 F. App'x 755 (Fed. Cir. 2015) .......................................................31

Appx0288

# TABLE OF AUTHORITIES
## (*cont'd*)

**Page No(s).**

*Sorensen v. USITC,*
   427 F.3d 1375 (Fed. Cir. 2005) ........................................................... 22

*Star Sci., Inc. v. R.J. Reynolds Tobacco Co.,*
   655 F.3d 1364 (Fed. Cir. 2011) ........................................................... 25

*Tec Air, Inc. v. Denso Mfg. Michigan Inc.,*
   192 F.3d 1353 ...................................................................................... 30

*Thorner v. Sony Comput. Entm't Am. LLC,*
   669 F.3d 1362 (Fed. Cir. 2012) ........................................................... 23

*United States v. Arthrex, Inc.,*
   Nos. 19-1434, 19-1452 and 19-1458, 2021 WL 2519433
   (U.S. Sup. Ct. June 21, 2021) ............................................................. 57

*W.L. Gore & Assocs. v. Garlock, Inc.,*
   721 F.2d 1540 (Fed. Cir. 1983) ...................................................... 38, 39

## OTHER AUTHORITIES

37 C.F.R. § 42.100 ................................................................................. 20

IPR2020-01526
Apple Inc. v. Masimo Corporation

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration of Vijay K. Madisetti, Ph.D. |
| 2002 | Curriculum Vitae of Vijay K. Madisetti, Ph.D. |
| 2003 | Transcript of Deposition of Dr. Brian Anthony in connection with IPR2020-01526 |
| 2004 | "COVID-19 Clinical management", apps.who.int (January 25, 2021), available at https://apps.who.int/iris/bitstream/handle/10665/338882/WHO-2019-nCoV-clinical-2021.1-eng.pdf?sequence=1&isAllowed=y |
| 2005 | "Pulse Oximeters - Premarket Notification Submissions [510(k)s]: Guidance for Industry and Food and Drug Administration Staff", fda.gov (March 2013), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/pulse-oximeters-premarket-notification-submissions-510ks-guidance-industry-and-food-and-drug |
| 2006 | Tamura et al., "Wearable Photoplethysmographic Sensors—Past and Present," Electronics 3:282-302 (2014) |
| 2007 | U.S. Patent No. 4,700,708 |
| 2008 | Verploegh, "Light Control Systems for Automotive Instrumentation," SAE Technical Paper Series (February 24-28, 1986) |
| 2009 | U.S. Patent No. 3,922,440 |
| 2010 | U.S. Patent No. 4,938,218 |
| 2011 | U.S. Patent No. 5,024,226 |

Exhibit List, Page 1

IPR2020-01526
Apple Inc. v. Masimo Corporation

| Exhibit No. | Description |
|---|---|
| 2012 | Cohen et al., "A plan to save coronavirus patients from dying at home," cnn.com (April 12, 2020), available at https://www.cnn.com/2020/04/11/health/monitoring-covid19-at-home/index.html |
| 2013 | U.S. Patent No. 5,099,842 |
| 2014 | Hecht, Understanding Fiber Optics, Laser Light Press (5th ed. 2015) |
| 2015 | Definition of "louver," lexico.com (powered by Oxford) |

Exhibit List, Page 2

IPR2020-01526
Apple Inc. v. Masimo Corporation

# I.   <u>INTRODUCTION</u>

Masimo is the world leader in pulse oximeters and owns U.S. Patent No. 6,771,994 (the "'994 Patent"). As COVID 19 overwhelmed hospital capacity in 2020, Masimo's pulse oximeters allowed caregivers to monitor COVID-19 and suspected COVID-19 patients from their homes. The accuracy of Masimo's pulse oximeters is essential in such critical monitoring environments because false signals can result in complications or even death. Claim 15 of the '994 Patent recites an innovative sensor that includes louvers, which help ensure light received by a detector reflects a user's oxygen supply and not a dangerous false signal.

Apple's obviousness challenge fails because Apple uses the '994 Patent claims as a guide. In the process, Apple contorts the disclosure of Benjamin's and/or Melby's light control films into Diab's, Webster's, and Fine's different oximetry sensor designs, disregarding the specific optical system of those base sensors. Apple's combinations replace existing components with components having opposite functionality, conflate differing component objectives, and yield nonsensical results. Accordingly, a POSITA presented with Diab's, Webster's, and Fine's sensors would not have been motivated to add or replace components with Benjamin's and/or Melby's light control film.

In Ground 1, Apple relies on Diab, which does not disclose louvers. Instead, Diab discloses an innovative sensor having a recessed detector covered by a light

-1-

IPR2020-01526
Apple Inc. v. Masimo Corporation

scattering medium.   EX1006 at 5:27-28.   Apple claims that a POSITA would redesign Diab's sensor with Benjamin's and/or Melby's light control film.   But Benjamin's and/or Melby's light control film performs the *opposite* optical purpose as taught by Diab's innovative light scattering medium.   Apple's combination is classic hindsight reconstruction.

In Ground 2, Apple relies on Webster, which also does not disclose louvers. Instead, Webster discloses an optical filter *over the photodiode* to remove unwanted *wavelengths* of light.   EX1010 at 79.   Apple alleges that a POSITA would use Melby's light control film in place of Webster's optical filter, but identifies no motivation in the references for this change.   The optical purposes of these two components are unrelated: Webster's filter removes selected *wavelengths* of light, Melby's film controls the *direction* of light.   Apple's combination would vitiate the purpose of Webster's filter because the filter would no longer remove selected wavelengths of light.   Moreover, Webster separately teaches light impervious barriers that seek to limit all light from a certain area from reaching the photodiode. *Id.*   These barriers are *not* placed over the photodiode—to the contrary, they are placed anyplace but over the photodiode as placing a barrier over the photodiode would render the photodiode inoperable.   That is, with the barrier blocking all light over the photodiode, the photodiode would receive no light.   Apple cites nothing to

-2-

IPR2020-01526
Apple Inc. v. Masimo Corporation

motivate the replacement of Webster's light barriers with Melby's light film *over the photodiode*.

In Ground 3, Apple relies on Fine, yet another reference that does not disclose louvers. Instead, Fine discloses a fetal sensor that uses optical fibers. *See* EX1009 at 1:8–4:6, 6:28-32. Optical fibers are not louvers, and the fetal sensor design of Fine is for a difficult monitoring environment of use inside the birth canal during delivery. Apple ignores the context of this complex sensor and the actual purpose of the fiber light guides, to argue in Ground 4, that a POSITA would simply redesign Fine's complicated fiber-based fetal sensor with Benjamin's and/or Melby's light control film. Apple does not provide any reason why a POSITA would modify this complex fetal sensor at all, much less would make the proposed combination. None of Apple's alleged combinations of Fine's sensor with Benjamin's and/or Melby's light control film would improve Fine's sensor or address any recognized deficiency in that sensor.

In addition to the foregoing problems of Apple's combinations, none of the combinations would have led to predictable results. Both experts agree that changes to the optical system could lead to changes in the signal-to-noise ratio, thereby corrupting the signal. EX2003 at 45:17–47:7; EX2001 ¶ 31. Moreover, changes in the optical path could also degrade the accuracy of the output measurement. EX2003

-3-

IPR2020-01526
Apple Inc. v. Masimo Corporation

at 50:17–51:9; EX2001 ¶ 31.  Nowhere does Anthony explain *why* a POSITA *would*

make the proposed sensor modifications.

For at least these reasons, Apple fails to demonstrate obviousness.

Accordingly, the Board should affirm the patentability of Claim 15 of the '994

Patent.

## II.    BACKGROUND

### A.    The Importance of Pulse Oximeters

When a patient's oxygen is dropping, a caregiver has only a few minutes to

prevent brain damage, heart failure and death.  EX1001 at 1:24-28; EX2001 ¶ 26.

Pulse oximeters readily detect changes in a person's oxygen saturation, which is an

indicator of the person's oxygen levels.  EX1001 at 1:24-28; EX2001 ¶ 26.  Use of

pulse oximeters are a standard of care and an essential diagnostic tool in the U.S.

throughout clinical care settings.  EX2001 ¶ 26.  Masimo is the world leader in pulse

oximetry and revolutionized the technology by introducing the Masimo SET pulse

oximetry technology.  Courts have repeatedly recognized and credited Masimo's

innovations.  *See e.g.*, *Masimo Corp. v. Philips Elec. N. Am. Corp.*, C.A. No. 09–

80–LPS, 2015 WL 2379485, at *19 (D. Del. May 18, 2015) ("an entire industry—

other than Philips and one Chinese company—took licenses from Masimo for

innovative technology that saved thousands of lives and billions of dollars in

healthcare costs.").  Masimo's pulse oximeters provide essential monitoring to over

-4-

IPR2020-01526
Apple Inc. v. Masimo Corporation

200 million patients each year. When COVID 19 reached pandemic levels, overwhelming hospital capacity, Masimo's technology was quickly put into use by hospitals to monitor COVID-19 patients from their homes. *See generally* EX2012. Pulse oximetry is now universally recommended for at-home patients with COVID-19 symptoms. *See* EX2004 at 5.

## B. How Oximetry Works

A pulse oximeter's non-invasive sensor generally includes "red and infrared (IR) light-emitting diode (LED) emitters and a photodiode detector." EX1001 at 1:35-36. The emitters project light through a user's tissue, and the detector detects the light as it emerges from the tissues. *Id.* at 1:38-42. An oximeter device alternately activates the emitters (*id.* at 1:47-48), and the resulting light absorption varies due to the blood volume change of arterial blood." *Id.* at 3:10-15. The detector generates a current proportional to the intensity of the detected light, and the oximeter calculates a ratio of detected red and infrared intensities." *Id.* at 1:46-51. The user's arterial oxygen saturation value is empirically determined based on the ratio obtained. *Id.* at 1:51-52.

The calibration coefficients (often called a calibration curve) provide a map or lookup table for correlating measured and processed ratiometric data received from a pulse oximetry sensor with empirically determined oxygen saturation values. EX2001 ¶ 31. Calibration curves are sensitive to changes to any particular optical

Appx0296

system as such changes often affect the incoming values of the ratiometric data. *Id.* Without an accurate calibration curve, the pulse oximeter has no way of determining accurate oxygen saturation levels. *Id.* For this reason, optical system modifications often require new FDA clearance. *Id.* ¶ 32. Because calibration curves are determined by collecting clinical data, modifying an optical system is no simple task. Instead, modifying an optical system increases the potential need for new clinical data to update the calibration curves, and even potentially requiring new FDA clearances. *Id.*

All of Apple's modifications fundamentally change the alleged prior art's optical systems. Alterations in optical systems may require expensive, time consuming and clinical data collection to create the new calibration curves to avoid decreased accuracy or even malfunction. *See* EX1001 at 1:50-54; EX2001 ¶ 32. Apple's expert, Dr. Brian Anthony, has done no work specific to pulse oximeter sensors, EX2003 at 20:10-13, and apparently did not appreciate the impact of his proposed modifications and how a POSITA would have understood such sensor design. Masimo asked Anthony multiple times the very basic question of how electrical signals are converted to oxygen saturation measurements. *Id.* at 29:14–30:15. Anthony responded that "it wasn't necessary to fully articulate my understanding and all the background on how that is done," offering no further information. *Id.* at 29:14–30:15. A POSITA would readily know the answer to

-6-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Masimo's very basic question: one converts electrical signals to oxygen saturation

measurements using an empirically determined lookup table (a so-called calibration

curve). *See* EX1001 at 1:51-52. And, a POSITA would readily know that

modifications to the optical system of any sensor presents a significant change to the

overall system. EX2001 ¶¶ 31-32. Namely, calibration curves are specific to an

optical system and costly to develop. *Id.* Thus, a POSITA, understanding the cost

and complexity of optical changes, would not have been motivated to make the

proposed modifications, particularly without any perceived benefit. *Id.* ¶ 32.

### C.   The '994 Patent

The '994 Patent discloses the need to avoid a detector producing a false signal

wrongly interpreted as a signal responsive to the user's oxygen status. EX1001 at

1:18-19. One source of such errant interpretation is when a sensor "becomes

partially or completely dislodged from the patient, but . . . continue[s] to detect an

AC signal **within the operating region** of the pulse oximeter." *Id.* at Abstract, 1:64-

66 (emphasis added). False AC signals within an expected region of the oximeter

are serious because the oximeter may display a normal saturation when, in fact, the

sensor is not properly attached. *See id.* at 4:39-42; EX2001 ¶ 33. The '994 Patent

discloses an innovative solution that includes louvers placed in front of the

photodetector to filter out oblique light rays, one possible source of false AC signals.

EX1001 at Abstract, 2:9-12; EX2001 ¶ 34. The louvers "prevent light from an

oblique angle from reaching the photodetector and creating a false signal that might

be interpreted by the pulse oximeter as a physiological signal." *Id.* at 2:16-19.

For example, Fig. 5A (reproduced below) shows "[t]he louvers 502 block light

rays travelling along an oblique path 4*10*." *Id.* at 6:28-30.



*FIG.5A*

*Id.* at FIG. 5A.  When light rays from the emitter 220 follow a path 410 oblique to

an orientation of the louvers 502, the louvers 502 prevent the passage of some light

rays to the detector assembly 235.  EX2001 ¶ 35.  Reducing the oblique light rays

improves the signal, EX1001 at 6:49-5, thereby avoiding "a false signal that could

be interpreted by the pulse oximeter 140 to be a physiological signal." *Id.* at 6:53-

56.

### D.    Challenged Claim 15

Apple challenges Claim 15 only.  Claim 15 reads:

15. A sensor which generates at least first and second intensity signals
from a light-sensitive detector which detects light of at least first and
second wavelengths transmitted through body tissue carrying pulsing
blood; the sensor comprising:

IPR2020-01526
Apple Inc. v. Masimo Corporation

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light when the sensor is properly applied to tissue of a patient.

EX1001 (claim 15).

### E.    Summary of File History

The examiner issued no Office Actions during the prosecution of the '994 Patent.   *See generally* EX1002.   Patent Owner filed no amendments or arguments, and therefore, Patent Owner did not disavow any claim scope.   *Id.*

## III.    OVERVIEW OF ALLEGED PRIOR ART

Apple relies on the following printed publications:

### A.    Diab (EX1006)

Diab is another patent owned by Masimo that takes a different approach to light handling than the '994 Patent.   Diab's Background explains that non-invasive monitoring of blood oxygen saturation through reflectance and transmittance oximetry was common.   EX1006 at 1:27-32 (stating, "Measurements . . . are often performed with non-invasive techniques where assessments are made by measuring the ratio of incident to transmitted (or reflected)[] light through a portion of the body,

IPR2020-01526
Apple Inc. v. Masimo Corporation

for example a digit such as a finger, or an earlobe, or a forehead."). Diab identifies

that "[m]any prior art optical probes are designed for use only when a patient is

relatively motionless since . . . motion induced noise can grossly corrupt the

measured signal." *Id.* at 1:53-57. Diab further explains that erratic movement

"causes the change in optical path length to be erratic, making the absor[p]tion

erratic, resulting in a difficult to interpret measured signal." *Id.* at 1:44-46.

Accordingly, Diab addresses a need "for a probe which inhibits motion induced

noise, or motion artifacts, during measurement of a signal while still generating a

transmitted or reflected signal of sufficient intensity to be measured by a detector."

*Id.* at 3:4-8.

-10-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Fig. 24 of Diab "depicts one embodiment of a probe constructed in accordance
with [Diab's] invention coupled to an oximeter."  EX1006 at 17:62-65.



*Id.* at Fig. 24 (annotated).  As shown above, the finger probe 400 shows "the aperture
420 and chamber 422 located directly adjacent the finger pad 404" with "[t]he
photodetector 426 in the bottom 414 of the chamber 422." *Id.* at 18:11-17.  Chamber
422 is described in more detail in Fig. 4, reproduced below.  The monitored tissue
"12[8] may rest above or penetrate slightly into the chamber 122 . . . ." *Id.* at 7:16-

IPR2020-01526
Apple Inc. v. Masimo Corporation

19.  "[S]ome of the light is caused to be incident on the opaque walls 123 of the chamber 122 and is absorbed."  *Id.* at 7:48-50.



*Id.* at Fig. 4 (annotated).

Apple relies on Diab's discussion of a scattering medium.  Petition (Paper 2) at 19 ("Pet.").  Figure 25 of Diab shows the specific implementation of the scattering medium.  Figure 25 shows "a probe wherein the aperture is filled with a compressible scattering medium [1040]."  EX1006 at 5:27-28.



FIG. 25

-12-

*Id.* at Fig. 25 (annotated). Traditionally, "scattering was thought to degrade signal-to-noise ratios of optical signals[; therefore], previous methods have not employed optical scattering techniques." *Id.* at 20:42-44. However, with Diab's unique sensor geometry, Diab found that "[t]he scattering medium helps to minimize the effects of local artifacts and perturbations within the [tissue 1028]." *Id.* at 4:1-3. Additionally, Diab found the surprising result that light scattering improves the signal-to-noise ratio "because there appears to be a reduced effect on the signal from any particular local region of the . . . [tissue] 1028 . . . ." *Id.* at 20:3-6.

Diab further discloses that the light scattering medium 1040 is preferably reticulated foam because reticulated foams provide "contact in spots rather than across large areas of the flesh." EX1006 at 20:20-25. And "[i]f contact is made across large areas of flesh, microscopic droplets of perspiration or oil can form a layer between the flesh and the scattering medium 1040," which "creates an impedance mismatch interface which is absor[p]tive of the optical radiation." *Id.* at 20:25-29.

## B. Benjamin (EX1007)

Benjamin discloses a photoplethysmographic probe 10 with "[a] photo-sensitive cell 20 [] mounted within the casing 12 adjacent the light source 18 so that it responds to light reflected from the field to be measured and passing through the window 16." EX1007 at 2:32-36. "[A] light control film 22 is mounted within the

-13-

IPR2020-01526
Apple Inc. v. Masimo Corporation

casing 12 to extend across the window 16." *Id.* at 2:42-44. "The light control film 22

is made of a 0.030[-]inch[-]thick clear cellulose acetate butyrate film." *Id.* at 2:48-

50. "The light control film 22 has the effect of collimating the light passing

therethrough to thereby make the photo-sensitive cell 20 more nearly dependent only

upon the light beam directly reflected from the field being measured." *Id.* at 2:53-

57.



*Id.* at Fig. 1 (annotated).

Benjamin identifies two problems (1) "variations in the operating point of the

photocell" 20 and (2) "artifactual noise produced by motion of the photo-sensitive

cell [20] and light source [18] with respect to the pickup site." EX1007 at 1:35-44.

Benjamin addresses the first problem by teaching that "the amount of scattered light

reaching the photocell can be made closer to constant by placing in front of the

photocell and light source a small piece of light control film." *Id.* at 1:56-66.

Benjamin addresses the second problem by minimizing the motion artifact with light

-14-

IPR2020-01526
Apple Inc. v. Masimo Corporation

"emitted in a narrow band of wave lengths centering in the green." EX1007 at 1:67–

2:14.[1]

### C.     Melby (EX1008)

Melby discloses a light control film commonly used "to prevent light from

automobile control panels from reaching the windshield and causing distracting and

dangerous reflections at night" or "to cover the screen of a CRT or other display to

prevent persons other than the operator from reading displayed thereon." EX1008

at 2:9-15.

Melby's light control film is "a louvered plastic film [10 with] . . . a plurality

of clear regions [12] separated by louvers [20]." EX1008 at 3:3-4. Melby shows its

film 10 in cross section. Melby shows that the light (yellow arrows) that reaches

---

[1] Green light is known to be more tolerant to motion artifacts when measuring

pulse rate. EX2001 ¶ 58.

-15-

IPR2020-01526
Apple Inc. v. Masimo Corporation

clear region 12 passes through the film, but the light that approaches opaque louvers

20 is blocked.  *Id.* at 3:11-12; EX2001 ¶ 61.



*Id.* at Fig. 1 (annotated).

### D.    <u>Webster (EX1010)</u>

Webster discloses several methods "to minimize the effects from light other

than the optical signals of interest."  EX1010 at 79.

In one example, Webster explains that "optical filtering, placed between

sources of light and the photodiode, is used to limit the spectral response of the

photodiode."  *Id.*  "This allows light of wavelengths of interest to pass through the

filter but does not allow light of other wavelengths to pass through the filter."  *Id.*

In another example, Webster explains that "the pulse oximeter designer must

attempt to limit the light reaching the photodiode to that which has traveled through

tissue containing arterial blood."  *Id.* (internal citations omitted).  Webster references

-16-

IPR2020-01526
Apple Inc. v. Masimo Corporation

a different patent disclosure by New and Corenman to explain that "[l]ight

impervious barriers should be placed between LEDs and the photodiode in all areas

where the emitted light could reach the photodiode without passing through tissue

(New and Corenman 1987)." *Id.*  As illustrated below, New and Coleman 1987

places "a light impervious barrier 136" "between photosensor 138 and the paths to

the light emitting diodes 130 and 132 which are not through finger 14." EX2007 at

3:29-32.



*Id.* at Fig. 6 (partial, annotated).  "Barrier 136, terminating in contact with the flesh

of finger 14, make the path between the respective light emitting diodes 130, 132

and the light receiving diode 138 occur only through the flesh of finger 14." *Id.* at

32-35.

IPR2020-01526
Apple Inc. v. Masimo Corporation

### E.     Fine (EX1009)

Fine discloses a fetal oximetry sensor with optical fiber bundles 63, 64. EX1009 at 1:8–4:6, 6:28-32.  U.S. Patent No. 4,938,218, which is described in the background of Fine, explains that fetal sensors may be used to detect and treat hypoxia in the fetus during labor.  EX2010 at 2:37-39.  "Contact with the fetus can be made after natural rupture of the amniotic membrane by manually inserting a probe sensor into the uterus from the vagina." *Id.* at 2:39-42.  Optical fibers are used in fetal monitoring because the optical fibers can extend outside the patient's body to an external light source and/or detector.  EX2001 ¶ 66.

Fine's sensor has laser diodes producing monochromatic light at wavelengths "not available in light sources, such as LEDs used in . . . oximetry apparatuses." EX1009 at 7:10-19.  Fine discloses its laser diodes as "two point-like light emitters positioned in the center of the device in close proximity to each other and at least one and preferably two annular detector terminals concentrically surrounding the

-18-

IPR2020-01526
Apple Inc. v. Masimo Corporation

light emitters." EX1009 at Abstract. Fig. 4 illustrates an applicator block 52 having

"first and second annular slots 58 and 59 concentric with bore 54." *Id.* at 17:6-8.



F i g . 4

*Id.* at Fig. 4 (annotated). "Slots 58 and 59 accommodate the free, light-acquiring

ends of first and second optical fiber bundles 63 and 64 which constitute first and

second detector terminals and pass through the inner space of [the] body 51 to

photodetectors 65 electrically connected through wires 67 to a cable 68." *Id.* at

17:11-14.

Fig. 2 of Fine shows a plan view of an applicator block having a first annular

space 27 housing a plurality of optical fibers 32 and a second annular space 35

housing a plurality of optical fibers 39. EX1009 at 15:25–16:4. A POSITA would

-19-

IPR2020-01526
Apple Inc. v. Masimo Corporation

understand that the bottom view of Fig. 4 is likely similar to Fig. 2 of Fine.  EX2001

¶ 68.



EX1009 at Fig. 2.

IPR2020-01526
Apple Inc. v. Masimo Corporation

## IV.    LEVEL OF ORDINARY SKILL IN THE ART

Apple asserts a POSITA "would have been a person with a working knowledge of physiological monitoring technologies. The POSITA would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies." Pet. 7-8.   Apple asserts "[a]dditional education in a relevant field or industry experience may compensate for one of the other aspects of the POSITA characteristics stated above." *Id*.

Masimo notes that Apple's asserted level of skill (1) requires no coursework, training or experience with optics or optical physiological monitors; (2) requires no coursework, training or experience in physiology; and (3) focuses on data processing and not sensor design.  For this proceeding, Masimo nonetheless applies Apple's asserted level of skill.  EX2001 ¶¶ 47-49.

## V.    CLAIM CONSTRUCTION

Claim 15 recites "a plurality of louvers positioned over the light sensitive detector to accept light from the at least one light emission device originating from a general direction of the at least one light emission device and then transmitting through body tissue carrying pulsing blood, wherein the louvers accept the light

-21-

IPR2020-01526
Apple Inc. v. Masimo Corporation

when the sensor is properly applied to tissue of a patient." Apple argues Claim 15 requires "the light sensitive detector to be positioned *opposite* the at least one light emission device such that the body tissue carrying pulsing blood positioned between the light sensitive detector and the at least one light emission device." Pet. at 8-9 (emphasis added). The Board disagreed with Apple and correctly recognized that further defining the limitation is not necessary. *See* Institution Decision (Paper 7) at 8-9 ("Institution"). The Board construed this limitation according to its plain and ordinary meaning. *See Phillips v. AWH Corp.,* 415 F.3d 1303, 1312-14 (Fed. Cir. 2005); *see also* 37 C.F.R. § 42.100(b). Apple's attempt to inject the non-claimed requirement of the detector being *opposite* the light emission device is unnecessary and inappropriate for at least the following reasons.

First, the simplest technique for determining the meaning of claim terms is to assess what is, and what is not, literally recited in the claim. *See CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). Here, the claim limitation uses "positioned" for the louvers only. EX1001 at 8:29-30 ("a plurality of louvers positioned over the light sensitive detector"). The claim language itself contains no other positional requirements. EX2001 ¶ 38.

IPR2020-01526
Apple Inc. v. Masimo Corporation

Second, the plain meaning of the claim is consistent with the specification.

As shown below, FIG. 5B illustrates a properly attached probe wherein a number of

louvers are placed over the detector assembly.  *See* EX1001 at 2:60-62.



*FIG.5B*

*Id.* at Fig. 5B (annotated).  In contrast, when sensor 202 is misapplied to a user's

tissue, as shown in FIG. 5A below, the plurality of louvers 502 do not accept light

410 because the light is incident to the orientation of the louvers 502.  EX2001 ¶ 43.



*FIG.5A*

-23-

IPR2020-01526
Apple Inc. v. Masimo Corporation

EX1001 at FIG. 5A (annotated).

Third, the prosecution history reflects no disavowal of claim scope of any kind concerning the position of the light sensitive detector relative to the light emission device. *See Sorensen v. USITC*, 427 F.3d 1375, 1378-79 (Fed. Cir. 2005).

Apple nowhere supports its attempts to inject an unclaimed limitation by requiring the detector to be positioned opposite the light emission device. For example, Apple recites the plain language of the claim and concludes only a transmissive sensor can accomplish the light acceptance requirements. Pet. at 9-10. However, Madisetti and Anthony agree louvers would function in both transmittance pulse oximeters and reflectance pulse oximeters. EX1003 ¶ 65 ("Furthermore, one of ordinary skill would have understood that the louvers would function similarly in transmittance pulse oximeter as in a reflectance pulse oximeter where the light emitters and light detecting element are substantially parallel."); EX2001 ¶ 44. Even when the light sensitive detector is not positioned opposite the light emission device, such as in reflectance sensors, the louvers can be oriented consistent with the claimed limits on the light accepted by the detector. EX2001 ¶ 44.

Further, Apple argues that the '994 Patent "only depict[s] and describe[s] the placement of the body tissue carrying pulsing blood between the at least one light emission device and the light sensitive detector." Pet. at 9. As an initial matter, the term "between" is not in the claim. Additionally, the '994 Patent's description of

-24-

one embodiment with louvers does not limit the claim to the single embodiment. *See Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012) ("It is likewise not enough that the only embodiments, or all of the embodiments, contain a particular limitation."); *Phillips*, 415 F.3d at 1323 ("[E]xpressly reject[ing] the contention that if a patent describes only a single embodiment, the claims of the patent must be construed as being limited to that embodiment."); *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 906 (Fed. Cir. 2004) ("Even when the specification describes only a single embodiment, the claims of the patent will not be read restrictively unless the patentee has demonstrated a clear intention to limit the claim scope using 'words or expressions of manifest exclusion or restriction.'").

Apple also relies on col. 1:41-43 of the '994 Patent, which states that the "photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the tissue." Pet. at 9. But this language is from the "DESCRIPTION OF THE RELATED ART," and nowhere limits the invention of the '994 Patent and does not make any disavowal of claim scope. *See* EX1001 at 1:41-43. Moreover, the cited text describes a typical arrangement for a probe attached to a patient's finger. EX1001 at 1:36-43. Nowhere does Claim 15 limit the sensor to a probe attached to a patient's finger.

The Board found Apple's errant interpretation of the plain language of Claim 15 "understandable because the claim also requires that the louvers accept the

IPR2020-01526
Apple Inc. v. Masimo Corporation

light when the sensor is properly applied to tissue of a patient, which as Petitioner notes encompasses the embodiment of Figure 5B." Institution at 8. But this claim language is not limited to the sensor configuration shown in FIG. 5B. EX2001 ¶ 44. In the embodiment illustrated above, in FIG 5A, "[t]he louvers 502 block light rays travelling along an oblique path 410" because the illustrated louvers 502 are oriented in a vertical direction and into the page. *Id.* A POSITA would have understood that the louvers could be oriented differently to accept light for a correctly applied sensor based on the position of the light sensitive detector relative to the light emission device. *Id.*; *see Phillips*, 415 F.3d at 1313 ("The inquiry into how a person of ordinary skill in the art understands a claim term provides an objective baseline from which to begin claim interpretation.").

Accordingly, the Board should adopt the plain and ordinary meaning of Claim 15 and reject Apple's attempt to limit the claim scope.

## VI.    APPLE FAILS TO ESTABLISH OBVIOUSNESS OF CLAIM 15

### A.    Legal Background

A petition based on "obviousness requires a suggestion of all limitations in a claim." *CFMT, Inc. v. YieldUp Int'l Corp.*, 349 F.3d 1333, 1342 (Fed. Cir. 2003) (citing *In re Royka*, 490 F.2d 981, 985 (C.C.P.A. 1974)). A patent claim is not obvious unless "a skilled artisan would have been motivated to combine the teachings of the prior art references to achieve the claimed invention, and that the

-26-

skilled artisan would have had a reasonable expectation of success in doing so."

*ActiveVideo Networks, Inc. v. Verizon Commc'ns, Inc.*, 694 F.3d 1312, 1327 (Fed. Cir. 2012).

To prevail on any obviousness ground, a petitioner may not simply identify individual claim components—it must show *why* a "skilled artisan, with no knowledge of the claimed invention, would have selected these components for combination in the manner claimed." *In re Kotzab*, 217 F.3d 1365, 1371 (Fed. Cir. 2000) (emphasis added). The petitioner must support even simple modifications with some motivation to make the change. *See In re Gordon*, 733 F.2d 900, 902 (Fed. Cir. 1984).

An appropriate obviousness inquiry cannot involve even a "hint of hindsight." *Star Sci., Inc. v. R.J. Reynolds Tobacco Co.*, 655 F.3d 1364, 1375 (Fed. Cir. 2011). A petitioner may not "simply retrace[] the path of the inventor with hindsight, discount[] the number and complexity of the alternatives, and conclude[] that the invention . . . was obvious." *Ortho-McNeil Pharm., Inc. v. Mylan Labs., Inc.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008). Likewise, "[c]are must be taken to avoid hindsight reconstruction by using the patent in suit as a guide through the maze of prior art references, combining the right references in the right way so as to achieve the result of the claims in suit." *In re NTP, Inc.*, 654 F.3d 1279, 1299 (Fed. Cir. 2011) (internal quotations omitted).

IPR2020-01526
Apple Inc. v. Masimo Corporation

### B.    Ground 1: Apple Fails to Establish Obviousness Based on Diab, Benjamin, and Melby

Apple's combination is far more than a "hint of hindsight" and reflect slavish use of the claim language as a guide. Diab focuses his disclosure on the importance of the light scattering material that Apple claims a POSITA would simply replace with Benjamin's light control film, and then further replace Benjamin's light control film with Melby's light control film. *See* Pet. at 21, 27-28. In contrast to the claimed sensor, Melby's light control film is for automobile control panels suffering from ghost images. EX1008 at Abstract, 2:9-15; EX2003 at 175:7-10 (recognizing that Melby "does not specifically point out a photoplethysmograph [(e.g., an oximeter)] as a use").

### 1.    Apple's combination would undermine Diab's invention

Ground 1 fails because Apple identifies no credible motivation to combine Diab, Benjamin, and Melby to arrive at a sensor with a plurality of louvers.

Diab seeks to "depart from conventional methods of improving optical signal-to-noise ratios," which use lens assemblies to focus optical radiation. EX1006 at 20:33-37. Instead, Diab employs optical *scattering* techniques to improve optical signal quality. *Id.* at 20:40-44. Diab describes "the use of a scattering medium positioned over the photodetector to provide an 'improved optical signal-to-noise ratio' by minimizing the effects of local artifacts resulting from scattering as a result of motion." Pet. at 19. As explained above, Figure 25 shows the specific

-28-

IPR2020-01526
Apple Inc. v. Masimo Corporation

implementation of the scattering medium.  *See supra* § III.A.  Diab discloses a

probe 1000 in which "optical radiation is received by the photodetector 1026 after

passing through the scattering medium 1040."  EX1006 at 19:64-66.



*Id.* at Fig. 25 (annotated).  The scattering medium is "clear to optical absorption, but

still scatters light."  *Id.* at 19:59-60.  Diab uses a scattering medium because

"perturbations of a locality within the area of exposure will have less effect with a

scattered beam over a large area than with a more concentrated signal passing

through that same locality."  *Id.* at 20:9-12.

In contrast, Benjamin teaches "***stabiliz[ing]*** the amount of scattered light that

reaches the detector."  *Id.* at 20.  Benjamin's light control film 22 makes "the amount

-29-

IPR2020-01526
Apple Inc. v. Masimo Corporation

of scattered light reaching the photo-sensitive cell [] closer to **constant**." EX1007 at

2:57-59.



*Id.* at Fig. 1 (annotated). Collimating the light as taught by Benjamin, EX1007 at

1:63-66, would achieve the **opposite** result of Diab's scattering. EX2001 ¶ 74. As

Anthony explained, "collimating tends to direct the light in a **uniform** direction, and

scattering tends to have light going in potentially multiple directions." EX2003 at

153:22–154:8. Anthony acknowledged "light [that] is going in one direction and

lights going in multiple directions, those are different things." *Id.* at 155:10-18.

In combining Diab and Benjamin, the Board accepted Apple's assertion that

the combination provides "an optical physiological sensor that reduces variations in

the amount of light detected by the photodetectors of the sensor in order to collimate

the light emitted from the light source and reflected back to the photo-sensitive cell."

Institution at 18. However, neither Apple nor the Board explains why a POSITA

explicitly seeking to scatter light as the critical teaching of Diab would make

-30-

modifications to eliminate this core feature and cause the light to be uniform in direction.

Specifically, were a POSITA to replace the scattering medium in Diab with the light control film of Benjamin, the modified optical probe would no longer scatter light across the photodetector to decrease the effect of motion artifacts. *See* EX1006 at 3:4-8, 20:9-12; EX2001 ¶ 75. To the extent Apple suggests Diab and Benjamin address the same problem of motion artifacts, *see* Pet. at 19, that is irrelevant to the replacement proposed by Apple. Benjamin uses green light emissions—not its light control film 22 to decrease motion artifacts' effect. EX1007 at 1:67–2:14; EX2001 ¶ 76.

Apple also argues that a POSITA would have found it obvious to look to Melby, which is used for automobile control panels (EX1009 at 2:9-12), for details regarding the implementation of the light control film. Pet. at 28. But, similar to Benjamin, the light control film of Melby performs the ***opposite*** optical purpose as Diab's scattering medium. EX2001 ¶ 77. Indeed, Apple admits Melby "further ***increase[s] the directionality*** of the light signal received in the combined device." Pet. at 28. As Anthony explained, increasing the directionality of light "tend[s] to reduce the acceptance angle of light." EX2003 at 189:10-19. Anthony admitted that

IPR2020-01526
Apple Inc. v. Masimo Corporation

reducing the acceptance angle of light and scattering light are different things. "Light can be scattered; light can be directed." *Id.* at 189:20–190:4.

Melby's film decreases the amount of scattered light by absorbing light that enters the film at an angle. *See* EX1008 at 4:5-8, Fig. 2; EX2001 ¶ 77.



EX1008 at Fig. 2 (annotated). If a POSITA replaced the scattering medium in Diab with the light control film of Melby, the modified optical probe would no longer scatter light across the photodetector to decrease the effect of motion artifacts, thereby eliminating the core teaching of Diab. EX2001 ¶ 77. Thus, similar to Benjamin, Melby's light control film would render Diab unsuitable for its intended purpose of scattering optical radiation. *See* EX1006 at 3:4-8; EX2001 ¶ 77. A POSITA would not make such a modification. *See Tec Air, Inc. v. Denso Mfg. Michigan Inc.*, 192 F.3d 1353, 1360 (finding no suggestion to modify a prior art

-32-

IPR2020-01526
Apple Inc. v. Masimo Corporation

device where the modification would render the device inoperable for its intended purpose); *see also In re Gordon*, 733 F.2d at 902.

Indeed, Apple's proposed modifications would change the principle of operation of Diab's invention. EX2001 ¶ 78. Diab's principle of operation incorporates a "scattering medium [that] helps to minimize the effects of local artifacts and perturbations within the material." EX1006 at 4:1-3; EX2001 ¶ 78. Apple's proposed modification, which replaces Diab's scattering medium with a light control film, removes the very feature Diab teaches achieves its goal of minimizing the effects of local artifacts and perturbations within the material. EX2001 ¶ 78. Such a change in Diab's principle of operation would discourage a POSITA from making the proposed modifications. *See Plas-Pak Indus., Inc. v. Sulzer Mixpac AG*, 600 F. App'x 755, 758-60 (Fed. Cir. 2015) (finding a change in the reference's principle of operation is unlikely to motivate a person of ordinary skill to pursue a combination with that reference).

-33-

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 2. **Apple's unexplained modification would cause Diab to perform worse**

Apple provides the following annotated drawing to show its proposed modification.



Pet. at 28-29. However, Apple's proposed modification is wholly unsupported. Diab's original FIG. 24 is a block diagram showing Diab's chamber 422 between its detector 426 and the tissue 428. EX1006 at 18:11-17. Apple, without explanation or support, fills Diab's chamber 422 with a light control film. Melby's light control film is only 0.15 mm to 0.5 mm thick. EX1008 at 5:15-16. Apple does not explain how Melby's light film "fills" Diab's preferred 3-4 mm deep chamber 422. EX1006 at 7:20-22.

-34-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Additionally, Diab discloses its detector recessed within its chamber 422 as follows. "As light from the LED 130 propagates through the [finger] 128, it is scattered by the [tissue of the finger] 128 and is thus transmitted into the chamber 122 over a broad range of angles in a very complex manner. Thus, some of the light is caused to be incident on the opaque walls 123 of the chamber 122 and is absorbed." EX1006 at 7:45-50. Apple does not address why a POSITA having Diab's chamber 422 filled with light scattering material, which already absorbs incident light would include the additional complexity of Benjamin and/or Melby's light control film to block incident light.

A POSITA would have also understood that the proposed modifications would cause Diab to perform worse. EX2001 ¶ 80. For example, the combination of Diab's absorbing chamber wall and Melby's light control film would reduce the total light received by the photodetector 426. *Id.* As indicated by the arrows below, the carbon black layers absorb at least some of the light approaching Melby's film from a direction that would pass through the transparent layers 12. *Id.* Adding Melby's film to Diab would make the signal more difficult to interpret. *Id.*

-35-

IPR2020-01526
Apple Inc. v. Masimo Corporation



EX1008 at Fig. 1 (annotated).

Moreover, if the light control film were positioned in Diab as depicted in Apple's drawing above, the light control film would block the aperture 420 and compress the flesh. *Id.* ¶ 82. This compression results in patient movements changing the optical path length, making signal interpretation difficult or impossible. *See* EX1006 at Abstract, 1:40-47, 3:2-4. The contact between the light control film and the user's flesh would also "create[] an impedance mismatch interface which is absorptive of the optical radiation." *See* EX1006 at 20:25-29; EX2001 ¶ 82. Further, because the light control film is a thin sheet material, physical stress applied to the light control film would damage the light control film. EX2001 ¶ 82. Thus, Apple's proposed replacement would exacerbate the very problem Diab proposes to solve.

For at least the foregoing reasons, incorporating the light control film of Benjamin or Melby into Diab would significantly hinder the function of Diab's

-36-

optical probe and discourage a person of skill from making the proposed modifications.

### 3. **Apple's proposed modifications would not have yielded predictable results**

Contrary to Apple's arguments, applying the light control film of Benjamin or Melby to Diab would not have led to "predictable results." *See* Pet. at 24, 28. Apple and Anthony are silent about the additional changes needed to accommodate any change to the optical system. A POSITA would have understood that introducing a light control film in the light path could require a new calibration curve or lookup table. EX2001 ¶ 85. The calibration curve is used to calculate the oxygen saturation levels and is critical to the accuracy of the oxygen saturation level. *Id.*; EX1010 at 159. Because calibration curves for a sensor's optical system are determined using empirical methods, a fact apparently unknown to Anthony (*see supra* § II.B.), a POSITA would have recognized that updating the calibration curve can be a significant undertaking. EX2001 ¶ 85; EX1010 at 159.

Indeed, the FDA considers introducing a component in the light path a significant modification that should undergo further regulatory review—not a simple predictable modification as suggested by Apple. Combining Melby's light control film with Diab's sensor introduces a component in Diab's light path. EX2001 ¶ 86. FDA Guidance explains that a pulse oximeter system "that has undergone a significant change or modification *(from its currently cleared configuration)* that

-37-

IPR2020-01526
Apple Inc. v. Masimo Corporation

could significantly affect the safety or effectiveness of the device" requires a new 510(k). EX2005 at 5. Examples of significant modifications include:

- significant electro-optical sensor modifications (e.g., **component** or bandage material **in the light path**, extensive re-design where a device is miniaturized); or
- significant $SpO_2$ algorithm modifications.

*Id.*

Without a compelling motivation to modify Diab's optical system, a POSITA would not risk the costly and time-consuming drawbacks of updating the calibration curve and preparing a new 510(k) submission. EX2001 ¶ 87. As stated above, Melby's film would undermine Diab's invention and worsen Diab's configuration, which a POSITA would not consider strong motivations for modifications. *See supra* §§ VI.B.1-VI.B.2.

### 4. Apple's remaining Ground 1 arguments fail to support Apple's combination

None of Apple's remaining arguments show a POSITA would have been motivated to arrive at Apple's combination.

First, Apple claims the proposed modification "would lead to a more consistent and accurate measurement of blood oxygen saturation." Pet. at 22. But Apple's conclusory argument fails to explain why the collimated light in Benjamin or Melby would provide a more consistent and accurate measurement of blood

-38-

IPR2020-01526
Apple Inc. v. Masimo Corporation

oxygen saturation than the improved signal already provided by Diab's scattering medium. *See in re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006) ("[R]ejections on obviousness grounds cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness."). Anthony explained that Diab describes "how the scattering media is being used to improve signal-to-noise ratio." EX2003 at 136:13-17; EX1006 at 4:1-4. Anthony also explained that "improving the signal-to-noise ratio minimizes the effect of artifacts resulting from motion noise," which "can lead to more accurate measurements." EX2003 at 137:13–138:7. Thus, Diab already provides a more consistent and accurate measurement of blood oxygen saturation. EX2001 ¶ 89.

Second, Apple argues a POSITA would have understood that a pulse oximeter could be improved "by placing a light control film over the detector to reduce the amount of light that reaches the detector but has not passed through the tissue." Pet. at 22-23. But Diab's chamber already absorbs incident light. EX1006 at 7:48-50 ("some of the light is caused to be incident on the opaque walls 123 of the chamber 122 and is absorbed"). Anthony explained that Diab's recess "in some respects, acts as a single louver," and "absorbs oblique rays used as a light block from things coming at an off angle." EX2003 at 59:1-13, 130:12-16; *see also id.* at 129:20–130:5 (Anthony testifying that "the chamber is used with an opaque material on the

-39-

IPR2020-01526
Apple Inc. v. Masimo Corporation

side to absorb off-axis materials – or off-axis oblique light"). Thus, a POSITA would understand that the chamber reduces the amount of light that reaches the detector without passing through the tissue and would have no reason to modify Diab as suggested by Apple. EX2001 ¶ 90.

Third, Apple impermissibly relies on hindsight to suggest the proposed modification "would confer the benefit of reducing false readings based on misalignment of the sensor, thereby improving the accuracy and utility of the combined device." *See* Pet. at 23. Apple provides no evidence to support this assertion. *See id.* None of the asserted references focus on sensor misalignment. Thus, Apple's only basis for making the combination is the very motivation disclosed in the '994 Patent, that of reducing false readings based on misalignment between the emitter and the detector. *See* EX1001 at Abstract. Use of the '994 Patent's own innovative disclosure for motivation to combine disparate disclosure is definitional inappropriate hindsight analysis. *See W.L. Gore & Assocs. v. Garlock, Inc.*, 721 F.2d 1540, 1553 (Fed. Cir. 1983) ("To imbue one of ordinary skill in the art with knowledge of the invention in suit, when no prior art reference or references of record convey or suggest that knowledge, is to fall victim to the insidious effect of a hindsight syndrome wherein that which only the inventor taught is used against its teacher.").

-40-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Fourth, Anthony asserts that "a light control film, advantageously and as compared to other elements and devices for controlling the direction of light, is small in size and allows a device using the light control film to be small." EX1003 ¶ 68. But Anthony provides no evidence to support that assertion. When asked what the "other elements and devices" were, Anthony explained "those are other optical elements that can be used to control the direction of light: baffling material, mirrors, lenses, reflective surfaces, and other passive components." EX2003 at 167:7-17. Anthony's comparison is wrong and irrelevant to the proposed modifications. Apple suggests replacing Diab's scattering medium with a light control film, not baffling material, mirrors, lenses, or reflective surfaces. Even if compared to the scattering medium, there is no evidence that a light control film has a lower mass than Diab's scattering medium, which is preferably reticulated foam, a lightweight porous material. *See* EX1006 at 20:20-23; EX2001 ¶ 91. Further, because Diab places the scattering medium 1040 within the aperture 1020, the scattering medium 1040 does not increase the overall size of the probe 1000. EX2001 ¶ 91. Anthony has not presented any modifications that would reduce the overall size of the probe. *See* EX1003 ¶ 68. Moreover, building a smaller device does not necessarily lower the cost of production. *See* EX2001 ¶ 91. Miniaturizing the device can increase manufacturing complexity, thus increasing capital costs. *Id.* Smaller optical components can increase the cost of goods. *Id.*

-41-

IPR2020-01526
Apple Inc. v. Masimo Corporation

For at least the reasons provided above, Apple has not shown that a person of skill would have been motivated to combine the teachings of Diab, Benjamin, and Melby in the manner suggested to arrive at Claim 15 of the '994 Patent.

### C.     Ground 2: Apple Fails to Establish Obviousness Based on Webster and Melby

#### 1.     Apple conflates Webster's wavelength filter and Webster's light impervious barriers

Webster's wavelength filter and light impervious barriers are different components in Webster's optical system, and each address different optical concerns. EX2001 ¶¶ 94-95. Webster's wavelength filter provides optical filtering "to limit the spectral response of the photodiode." EX1010 at 79; *see* EX2003 at 3-7 (confirming that "spectral" means "the wavelength response," which is a way to allow only certain wavelengths of light to pass). Webster places its wavelength filter "over the detector." EX1010 at 79. In contrast, Webster's light impervious barriers are supposed to block light that has not passed through tissue. *Id.*; EX2001 ¶ 95. Webster places its barriers "in all areas where the emitted light could reach photodiode without passing through tissue." EX1010 at 79. Were Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative. EX2001 ¶ 97.

Apple argues a POSITA would have recognized that Melby's film, which is used with automobile control panels (EX1008 at 2:9-12), "could be used in the

IPR2020-01526
Apple Inc. v. Masimo Corporation

Webster device as the 'light filter' to control light such that only light originating from the direction of the light emitters reaches the detector." Pet. at 42. Accordingly, Apple conflates Webster's wavelength filter, one component, with the optical effect of the barrier, a different component. Thus, a POSITA would have had no motivation to position Melby's light film *over* the detector, which like Webster's barrier blocks light from reaching the detector.

Accordingly, Webster's light impervious barriers—***not*** Webster's light filters—"limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood." EX1010 at 79; EX2001 ¶¶ 94-99. And Webster's light impervious barriers are not ***over*** the detector, putting them over the detector would make the detector non-functional.

Webster references U.S. Patent No. 4,700,708 (New and Corenman 1987), which Anthony did not recall reviewing (EX2003 at 238:9-13), for an example of light impervious barriers. EX1010 at 79. As shown below, New and Corenman 1987 discloses a reflectance sensor where "a light impervious barrier 136 is placed between photosensor 138 and the paths to the light emitting diodes 130 and 132

-43-

IPR2020-01526
Apple Inc. v. Masimo Corporation

which are not through finger 14."  EX2007 at 3:29-32.  It is not place over the

detector, which would block all light.



*Id.* at Fig. 6 (partial, annotated).  Accordingly, New and Corenman also fail to

disclose a light impervious barrier over the detector.

### 2.    A POSITA would not have been motivated to modify Webster to include Melby's light control film

If Apple argues a POSITA would have replaced Webster's light filter with

Melby's light control film, there is no support for such an argument.  Melby's light

control film is ***not*** used in the same way as Webster's light filter and would ***not***

"entail[] the use of known solutions to improve similar systems and methods in the

*same way*."  *See* Pet. at 42 (emphasis added); EX2001 ¶ 103.  Webster explains that

its light filter "allows light of ***wavelengths*** of interest to pass through the filter but

does not allow light of other ***wavelengths*** to pass through the filter."  EX1010 at 79

(emphasis added).  In contrast, the light control film in Melby controls the ***direction***

of light transmitted through the film.  EX2001 ¶ 103.  Filtering specific wavelengths

-44-

IPR2020-01526
Apple Inc. v. Masimo Corporation

of light is not the same as controlling the directionality of light. *Id.* Moreover, replacing Webster's light filter with Melby's light control film would remove the ability to filter specific wavelengths of light. *Id.* Thus, Apple's reliance on "improv[ing] similar systems and methods in the same way" fails to provide a POSITA with a motivation to use Melby's light control film as the light filter in Webster.

Likewise, there is no support if Apple argues a POSITA would have replaced Webster's light impervious barrier, located anywhere but over the detector, with Melby's light control film. Melby's light control film is ***not*** used in the same way as Webster's light impervious barriers and would ***not*** "entail[] the use of known solutions to improve similar systems and methods in the *same way*." *See* Pet. at 42 (emphasis added); EX2001 ¶ 104. Webster's light impervious barriers are not louvers. EX2001 ¶ 104. Barriers block light, while Melby's light control film accepts light directionally. *Id.*

Apple also argues a POSITA would have been motivated "to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood." *See* Pet. at 42 (*citing* EX1010 at 79). But Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. EX1010 at 79. Apple's conclusory argument fails to present any objective evidence showing that

-45-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Melby's film would minimize errors better than the light impervious barriers already provided by Webster.  *See in re Kahn*, 441 F.3d at 988.  Indeed, the light control film would have made it more difficult to obtain accurate results compared to Webster's light impervious barriers.  EX2001 ¶ 106.

For at least the reasons provided above, Apple has not shown that a person of skill would have been motivated to combine the teachings of Webster and Melby in the manner suggested to arrive at Claim 15 of the '994 Patent.

### D.    Ground 3: Apple Fails to Establish Obviousness Based on Fine

#### 1.    A POSITA would not have considered Fine

Apple does not explain why a POSITA would have tried to modify Fine's fetal oximetry sensor.  Fetal oximetry attempts to measure the oxygen saturation of a fetus during passage through the birth canal.  EX2001 ¶ 108.  This challenging monitoring environment presents challenges that so far have prevented commercial fetal oximeters from being on the market in any meaningful way even to this day. *Id.*  For example, fluids in the birth canal challenge the use of electronic components on a sensor.  *Id*.  Fluids also create pathways for light to reach the detector without first being attenuated by tissue.  *Id*.  Additionally, contractions introduce forces on the fetus and the sensor, and movement under pressure adds additional complexity. *Id.*  Contraction pressures are believed to cause physiological disturbance that are biologically normal, but make it immensely difficult to accurately monitor the

arterial oxygen of the fetus with oximetry algorithms. *Id*. Fine's fetal sensor design includes complex and expensive optical fibers that transport light so electronic components, like the laser light source suggested in Fine, can be placed elsewhere. *Id*.

Based on at least the foregoing, Fine's expensive and complex fetal sensor design would not form the basis for a POSITA looking to design a pulse oximetry sensor. EX2001 ¶¶ 108-110.

### 2. <u>Optical fibers are not louvers</u>

Contrary to Apple's arguments, Fine's optical fibers are not a plurality of louvers. *See* Pet. at 54. Instead, louvers and optical fibers have different structures and operate under different principles. EX2001 ¶¶ 111-114. Indeed, Apple implicitly acknowledges Fine fails to disclose louvers by providing a separate ground (Ground 4) modifying Fine to include louvers.

Apple's expert repeatedly testified that "a louver is a louver." EX2003 at 176:14-21, 217:5-19, 224:5-20. He finally provided the example of louvers as being window shutters. *Id*. at 178:14–179:2 ("a person skilled in the art would understand that [window shutters] are a louvered blind"). Similarly, a POSITA would understand that one example of louvers might include "a set of angled slats or flat strips fixed or hung at regular intervals in a door, shutter, or screen to allow air or light to pass through." EX2015. The louver's orientation and length determine the

direction of light that is blocked or absorbed (incident light, e.g., FIG. 5B of the '994 Patent), and the direction of light that passes without redirection. EX2001 ¶ 111. Accordingly, desired light—as determined by the orientation of the louvers—passes through the louvers directionally unchanged.

In contrast, optical fibers are not louvers but light guides that provide a path for light to follow, including directional changes, based on the path of the fiber. Optical fibers are not structured like Anthony's window shutters or a set of angled slats. Instead, optical fibers are flexible strands that transmit light from one location to another through internal reflection. EX2001 ¶ 112. Moreover, optical fibers accept light from a three-dimensional acceptance cone. *Id.* ¶ 113. Louvers' light acceptance path does not form a cone. *Id.* Simply put, fiber light guides are not the claimed louvers.

Apple's claim construction also exposes that Fine's optical fibers are not louvers. Apple asserted that the plain language of the claim requires "the light that is accepted by the louvers must originate 'from a general direction of the at least one light emission device,' and then transmit through the body tissue before 'pass[ing] directly through the louvers 502 ***along a direct path 510***.'" Pet. at 9-10 (emphasis added; quoting EX1001 at 6:30-34, explaining that, if the probe 202 is properly attached, "light rays will pass directly through the louvers 502 ***along a direct path 510***."). Although Masimo does not adopt that proposed claim construction, Fine's

IPR2020-01526
Apple Inc. v. Masimo Corporation

optical fibers do not allow light rays to pass through the optical fiber along a direct path.   EX2001 ¶ 114.   Instead, the optical bundles 63, 64 (shaded yellow) take a tortuous path from the contact surface to the detectors 65 (shaded blue), as shown below in Fig. 4 of Fine.



Fig. 4

*See* EX1009 at Fig. 4 (annotated).   Further, Fine's fibers 63, 64 transmit light by reflecting it back and forth along the fiber boundary to reach the detectors 65. EX2001 ¶ 114.   Thus, light does not pass through the optical fibers in the sense that light passes through a louver, but along the fiber path.   *Id.*

For at least the reasons provided above, Apple has not shown that Fine discloses every element of Claim 15 of the '994 Patent.

IPR2020-01526
Apple Inc. v. Masimo Corporation

**E.    Ground 4: Apple Fails to Establish Obviousness Based on Fine, Benjamin, and Melby**

Apple's proposed modifications in Ground 4 are indecipherable, and do not result in the claimed invention.

**1.    Apple's argued motivations to combine Fine, Benjamin, and Melby are conclusory and unsupported**

Ground 4 fails because Apple cobbles together a combination of selected pieces of disparate products and identifies no valid motivation to combine the asserted references. As explained above, Fine presents a complex and expensive fetal oximetry sensor with optical fibers that provide light guides. *See supra* § VI.D. Benjamin is not presented in the fetal oximetry sensor context, and discloses a reflective sensor with a light control film positioned above both a light source and photo-sensitive cell. EX1007 at Abstract. Melby discloses a light control film for automobile control panels, totally unrelated to pulse oximetry sensors. EX1008 at 2:9-12.

Apple argues that Melby's film could be used in the Fine/Benjamin device because light control films operate in the "same way" as Fine's optical fibers. *See* Pet. 63, 67. But Apple presents no motivation why a POSITA *would* do so, and such a combination makes no sense. As explained above, Fine's optical fibers guide light to its photodetectors by bouncing around along the fiber through internal reflection until the light reaches the photodetector. *See supra* § VI.D.2. In contrast, Melby's

-50-

IPR2020-01526
Apple Inc. v. Masimo Corporation

film limits the amount of light passing through the film by absorbing light that enters

from certain directions and passing light entering from other directions. *Id.* As

shown in Melby below, "[s]ome of [the] light beam 22 will enter layer 20 where,

due to the relatively high concentration of carbon black, it will be absorbed."

EX1008 at 4:5-8.



*Id.* at Fig. 2 (annotated). Fine's fetal, optical fiber-based sensor and Melby's

automotive control panel film do not operate in the same way. EX2001 ¶ 128. The

fiber relies on internal reflections to guide the light, and Melby's film operates to

absorb internal reflections. Therefore, Apple's reliance on operation in the "same

way" fails to provide a POSITA with a motivation to make the proposed

combination.

Apple claims that Fine's fetal "pulse oximeter ***can*** be improved by placing

[Benjamin's and/or Melby's] light control film over [Fine's] detector to reduce the

-51-

IPR2020-01526
Apple Inc. v. Masimo Corporation

amount of light that reaches [Fine's] detector but has not passed through the tissue." Pet. at 63. (emphasis added) However, Apple fails to explain why a POSITA *would* make such a change. Indeed, Apple does not even explain why it claims Benjamin's and/or Melby's light control film could reduce the amount of light that reaches Fine's detector but has not passed through the tissue. Rather, once light is inside Fine's optical fibers, reduction of that light by a film will not select light that has passed through tissue. *See infra* § VI.E.2. Indeed, Apple provides no details on how to incorporate Benjamin's and/or Melby's light control film into Fine's sensor in a manner that somehow selects light that has passed through tissue to improve Fine's fetal sensor. Also, Apple points to no teaching in the references of why a POSITA would have been motivated to do this. A person of skill would have no reason to incorporate a light control film into Fine's sensor as proposed by Apple.

### 2. Apple fails to explain how a light control film would be incorporated into Fine

Apple asserts a POSITA "would have understood, from the combined disclosure of Fine and Benjamin, that [Fine's] pulse oximeter can be improved by placing [Benjamin's] light control film over [Fine's] detector to reduce the amount of light that reaches [Fine's] detector but has not passed through the tissue." Pet. at 63. This assertion is nonsense because it is incorrect. Fine's FIG. 4 (below) shows Fine's detectors 65 (blue) at the termination of Fine's optical fibers 63, 64 (yellow).

-52-

IPR2020-01526
Apple Inc. v. Masimo Corporation



Fig. 4

EX1009 at Fig. 4 (annotated). Apple is proposing a POSITA could determine how to implement a light control film over Fine's detectors 65 at the termination of the optical fibers 63, 64 (see red arrow). But, Apple provides no reason **why** the POSITA **would** do so. Indeed, Apple leaves the details of its hindsight guided creation entirely to the imagination, and the proposed light control film addition would have no beneficial effect on the accepted light. EX2001 ¶ 117. That is, once light enters Fine's fiber bundles 63, 64 at the exterior of Fine's body 51 (see green arrow), any selection of directional light has already occurred by the cone of acceptance at Fine's exterior 51 (green arrow) for each fiber. EX1009 at FIGS. 5-6; EX2001 ¶ 117. Once inside the fiber, the light will reflect off the fiber cladding

IPR2020-01526
Apple Inc. v. Masimo Corporation

(bounce along) as it transmits through the fiber and original directionality is no longer discernable. *Id.* Thus, using a light control film after such selection, as proposed by Apple, has no bearing on whether or not the light has passed through tissue. EX2001 ¶ 117. Accordingly, the light control film incorporated within Fine as proposed by Apple could not "reduce the amount of light that reaches the detector *that has not passed through the tissue*." Pet. at 63 (emphasis added); EX2001 ¶ 117.

Apple further perpetuates its hindsight combination by stating that "Benjamin's [light control film] is implemented in Fine's pulse oximeter *just as it is* in Benjamin's PPG." Pet. at 64 (emphasis added). That is not true. As shown in Fig. 1 below, Benjamin's light control film 22 is mounted inside the casing 12 and extends across the light source 18 and photo-sensitive cell 20 fields of view. EX1007 at 2:42-48. Once Benjamin's film is somehow placed inside Fine's body 51, Benjamin's film ceases to have any directional effect on the light. EX2001 ¶¶ 118-

-54-

IPR2020-01526
Apple Inc. v. Masimo Corporation

119.  Moreover, once inside Fine's body 51, Benjamin's film cannot extend across

Fine's emitter's (not shown) and detectors' 65 fields of view.  *Id.*



EX1009 at Fig. 4 (annotated); EX1007 at Fig. 1 (annotated).  Furthermore, Apple

provides no additional supportive details on how a POSITA would implement the

light control film in Fine "just as it is in Benjamin's PPG."

Further, Apple's assertions about what a POSITA would find obvious are

conclusory and unclear at best.  Apple states a person of skill "would have found it

obvious to modify Fine with Benjamin's disclosure of placing a light control film

over the photodetector ***in place of*** a scattering medium [*sic*] because doing so entails

the use of known solutions to improve similar systems and methods in the same

way."  Pet. at 63 (emphasis added).  First, Fine does not disclose a light scattering

medium.  Second, if a POSITA replaces Fine's fibers with Benjamin's (or Melby's)

IPR2020-01526
Apple Inc. v. Masimo Corporation

film, Apple fails to explain how light propagates from Fine's annular slots 58, 59 at Fine's body 51 to Fine's offset detectors 65 without Fine's fibers. EX2001 ¶ 122.

Anthony also suggests that one of ordinary skill would have understood that "one method of manufacturing a light control film *could* include slicing a thin layer from the face of [Fine's] fiber bundle," but does not explain why or how this *would* lead a POSITA to add a plurality of louvers to the complex fiber bundle fetal sensor in Fine. EX1003 ¶ 148. Anthony does not provide any examples of a "thin slice" manufacturing technique that results in a light control film. Moreover, any such imagined slice would not be a light control film that selects light based on whether it comes from a particular angle from the tissue, because, as stated above, by that point in the light guide, Fine's fiber has obscured the light's original directionality. EX2001 ¶ 123.

Without sufficient particularity, these deficiencies reveal the classic hindsight of Apple's proposed combination. Apple has the burden to prove obviousness, and Apple's conclusory following of the '994 patent teachings to pick and choose from the prior art simply do not reason why a POSITA *would* make any of Apple's proposed combinations.

-56-

IPR2020-01526
Apple Inc. v. Masimo Corporation

For at least the reasons provided above, Apple has not shown that a person of

skill would have been motivated to combine the teachings of Fine, Benjamin, and

Melby in the manner suggested to arrive at Claim 15 of the '994 Patent.

## VII.  RESERVATION OF RIGHTS

Masimo reserves the right to seek Director review of any final written decision

in this proceeding.  *United States v. Arthrex, Inc.*, Nos. 19-1434, 19-1452 and 19-

1458, 2021 WL 2519433, (U.S. Sup. Ct. June 21, 2021).

## VIII.  CONCLUSION

The Board should not find the '994 Patent obvious on the proposed grounds.


Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  July 20, 2021          /Shannon Lam/
                               Shannon H. Lam (Reg. No. 65,614)
                               Customer No. 64,735

                               Attorneys for Patent Owner
                               Masimo Corporation

IPR2020-01526
Apple Inc. v. Masimo Corporation

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), Counsel for Patent Owner Masimo Corporation hereby certifies that this document complies with the type-volume limitation of 37 C.F.R. § 42.24(b). According to Microsoft Office Word 2010's word count, this document contains approximately 10,581 words, including any statement of material facts to be admitted or denied in support, and excluding the table of contents, table of authorities, mandatory notices under § 42.8, exhibit list, certificate of service or word count, or appendix of exhibits or claim listing.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  July 20, 2021          /Shannon Lam/
                              Shannon H. Lam (Reg. No. 65,614)
                              Customer No. 64,735

                              Attorneys for Patent Owner
                              Masimo Corporation

-58-

IPR2020-01526
Apple Inc. v. Masimo Corporation

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement

of counsel for Petitioner, a true and correct copy of **PATENT OWNER**

**PRELIMIANRY RESPONSE and EXHIBITS 2001-2015** are being served

electronically on July 20, 2021, to the e-mail addresses shown below:

W. Karl Renner, Reg. No. 41,265
Andrew B. Patrick, Reg. No. 63,471
Daniel D. Smith, Reg. No. 71,278
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
Email: IPR50095-0005IP1@fr.com
Email: PTABInbound@fr.com; axf-ptab@fr.com; dsmith@fr.com;
patrick@fr.com

Dated: July 20, 2021                    /Shannon Lam/
                                        Shannon H. Lam (Reg. No. 65,614)

                                        Attorneys for Patent Owner
                                        Masimo Corporation

33638727

-59-

Filed: December 3, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:   Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Benjamin A. Katzenellenbogen (Reg. No. 53,102)
    Shannon H. Lam (Reg. No. 65,614)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:  (949) 760-0404
    Fax:  (949) 760-9502
    E-mail:  AppleIPR2020-1526-994@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

Case IPR2020-01526
U.S. Patent 6,771,994

_____

**PATENT OWNER'S SUR-REPLY TO REPLY**

# TABLE OF CONTENTS

**Page No.**

I.      INTRODUCTION ................................................................. 1

II.     CLAIM CONSTRUCTION .................................................. 3

    A.     Apple's Does Not Dispute Plain and Ordinary Meaning.............. 3

III.    GROUNDS ........................................................................... 4

    A.     Ground 1: Diab + Benjamin + Melby ............................. 4

        1.    Apple Does Not Dispute The Majority of Masimo's
            Assertions............................................................. 4

        2.    Apple Incorrectly Recasts Masimo's Argument
            Regarding Scattering and Collimating.............................. 5

        3.    Apple's Argument That Much Of The Light
            Reduction Would Be Ambient Light Is Unsupported ........ 7

        4.    Apple Ignores The Drawbacks Of Implementing Its
            Proposed Modification........................................... 10

    B.     Ground 2: Webster + Melby......................................... 12

        1.    Apple Does Not Dispute Masimo's Assertions ................ 12

        2.    Apple's Characterization of Webster Is Not
            Supported ........................................................... 13

    C.     Ground 3: Fine.......................................................... 15

        1.    A POSITA Would Not Have Considered Fine.................. 15

        2.    Optical Fibers Are Not Louvers....................... 17

    D.     Ground 4: Fine + Benjamin + Melby........................... 20

        1.    Apple Still Provides No Motivation to Incorporate a
            Light Control Film Into Fine.............................. 20

**TABLE OF CONTENTS**
**(*cont'd*)**

**Page No.**

2.   Masimo Addressed Apple's Proposed Modification ......... 21

IV.   CONCLUSION ............................................................................. 24

# TABLE OF AUTHORITIES

**Page No(s).**

*Arctic Cat Inc. v. Bombardier Rec. Prods.*,
    876 F.3d 1350 (Fed. Cir. 2017) .................................................. 10

*General Electric Company V. United Technologies Corporation*,
    IPR2017-00428, Paper No. 38 (P.T.A.B. June 22, 2018) ......................... 10

*Henny Penny Corp. v. Frymaster LLC*,
    938 F.3d 1324 (Fed. Cir. 2019) ............................................. 7, 10

*Hulu, LLC v. Sound View Innovations, LLC*,
    IPR2018-00582, Paper 34 (P.T.A.B. Aug. 5, 2019).................................. 10

*Intelligent Bio-Sys. Inc. v. Illumina Cambridge Ltd.*,
    821 F.3d 1359 (Fed. Cir. 2016) .................................................. 7

*In re Magnum Oil Tools Int'l, Ltd.*,
    829 F.3d 1364 (Fed. Cir. 2016) .................................................. 5

*WBIP, LLC v. Kohler Co.*,
    829 F.3d 1317 (Fed. Cir. 2016) ................................................. 16

*Winner Int'l Royalty Corp. v. Wang*,
    202 F.3d 1340 (Fed. Cir. 2000) ................................................. 10

## OTHER AUTHORITIES

35 U.S.C. § 316 ........................................................... 1, 2, 3

37 C.F.R. § 42.6 ............................................................. 26

37 C.F.R. § 42.8 ............................................................. 25

37 C.F.R. § 42.24 ........................................................... 25

IPR2020-01526
Apple Inc. v. Masimo Corporation

## EXHIBIT LIST

| Exhibit No. | Description |
|---|---|
| 2001 | Declaration of Vijay K. Madisetti, Ph.D. |
| 2002 | Curriculum Vitae of Vijay K. Madisetti, Ph.D. |
| 2003 | Transcript of Deposition of Dr. Brian Anthony in connection with IPR2020-01526 |
| 2004 | "COVID-19 Clinical management", apps.who.int (January 25, 2021), available at https://apps.who.int/iris/bitstream/handle/10665/338882/WHO-2019-nCoV-clinical-2021.1-eng.pdf?sequence=1&isAllowed=y |
| 2005 | "Pulse Oximeters - Premarket Notification Submissions [510(k)s]: Guidance for Industry and Food and Drug Administration Staff", fda.gov (March 2013), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/pulse-oximeters-premarket-notification-submissions-510ks-guidance-industry-and-food-and-drug |
| 2006 | Tamura et al., "Wearable Photoplethysmographic Sensors—Past and Present," Electronics 3:282-302 (2014) |
| 2007 | U.S. Patent No. 4,700,708 |
| 2008 | Verploegh, "Light Control Systems for Automotive Instrumentation," SAE Technical Paper Series (February 24-28, 1986) |
| 2009 | U.S. Patent No. 3,922,440 |
| 2010 | U.S. Patent No. 4,938,218 |
| 2011 | U.S. Patent No. 5,024,226 |

IPR2020-01526
Apple Inc. v. Masimo Corporation

| Exhibit No. | Description |
|---|---|
| 2012 | Cohen et al., "A plan to save coronavirus patients from dying at home," cnn.com (April 12, 2020), available at https://www.cnn.com/2020/04/11/health/monitoring-covid19-at-home/index.html |
| 2013 | U.S. Patent No. 5,099,842 |
| 2014 | Hecht, Understanding Fiber Optics, Laser Light Press (5th ed. 2015) |
| 2015 | Definition of "louver," lexico.com (powered by Oxford) |

IPR2020-01526
Apple Inc. v. Masimo Corporation

# I.  <u>INTRODUCTION</u>

In its reply, Apple chose obfuscation and misdirection over any clear rebuttal of Masimo's Patent Owner Response. Apple carries the burden of proving any unpatentability of Claim 15. 35 U.S.C. § 316(e). Apple's game plan of mischaracterizing Masimo's arguments, and then disputing only those mischaracterizations, does not meet its burden.

For Ground 1, Masimo explained that a POSITA would not have redesigned Diab's sensor with Benjamin's and/or Melby's light control film because Benjamin's and/or Melby's light control film causes the *opposite* optical effect from that of Diab's innovative light scattering medium. Apple does not rebut this or several other arguments in Masimo's Response. Instead, Apple recasts Masimo's Response as an argument about the position of Diab's scattering medium and cites Diab's disclosure of other positions for its scattering medium. Whether Diab discloses one or many positions for its scattering medium is irrelevant to whether a POSITA would *replace* a scattering medium with a light control film that results in the *opposite* optical effect. Masimo provided bases and evidence for why the POSITA would not make such replacement and Apple in its reply failed to dispute or rebut those bases.

In Ground 2, Masimo argued that a POSITA would not replace Webster's optical filter, designed to remove unwanted *wavelengths* of light, with Melby's

film that controls the ***direction*** of light. As Masimo explained, Melby's film would not remove selected wavelengths of light and therefore cannot perform the desired optical function of Webster's filter. Apple again does not rebut Masimo's argument. Instead, Apple's Reply mischaracterizes Webster's optical filter as minimizing ambient light. Even a cursory review of Webster, however, clarifies that Webster's discussion of ambient light involves light ***barriers***, not light wavelength ***filters***.

In Ground 3, Masimo explained that the Petition nonsensically equated a fiber with a louver. A POSITA, however, would have understood the structure of a fiber is nothing like a louver. POR (Paper 12) at 47-48. Masimo also explained that fibers operate under different principles than louvers. *Id.* Apple's Reply suggested that Masimo did not respond to Apple's argument that each of Fine's separate fibers act as a louver. But, as Masimo explained, given the distinct structures of fibers and louvers, Fine would not have led a POSITA to the claimed invention.

In Ground 4, Masimo explained that Apple's Petition lacked any description of a precise modification. Nevertheless, Masimo, through its expert Dr. Madisetti, addressed all technical possibilities, including placing the light control film at the contact surface. A POSITA would have understood that such a modification would prevent Fine's sensor from working in an operative manner because the light control film would obstruct Fine's fibers or at least a portion of the light within the

IPR2020-01526
Apple Inc. v. Masimo Corporation

acceptance cone of the fiber. EX2001 ¶¶ 120-121. Apple's conclusory assertion that Masimo did not address the Fine-Benjamin-Melby combination is wrong.

Apple failed to demonstrate obviousness. Accordingly, the Board should affirm the patentability of Claim 15 of the '994 Patent.

## II.    CLAIM CONSTRUCTION

### A.    Apple's Does Not Dispute Plain and Ordinary Meaning

Apple in its Petition argued a properly construed claim "require[s] the light sensitive detector . . . be positioned opposite the . . . light emission device." Pet. (Paper 2) at 8-10. The Board in its Institution disagreed with Apple. Institution Decision (Paper 7) at 8-9.

Masimo's Response explained why Apple's attempt to import limitations into the claim language is wrong for at least six reasons. POR at 21-26. Masimo further argued the Board should construe all elements of Claim 15 according to the plain and ordinary meaning thereof. *Id.*

The Board directed that "Petitioner should clarify in its reply which grounds are dependent on which claim interpretation, and further explain which interpretation it contends is proper, after considering Patent Owner's response." Paper 7 at 9 n.1. Apple's Reply did not address claim construction, and thus concedes Masimo's position that no construction is necessary. Accordingly, the Board should adopt the plain and ordinary meaning of all the terms of Claim 15.

IPR2020-01526
Apple Inc. v. Masimo Corporation

# III.    GROUNDS

## A.    Ground 1: Diab + Benjamin + Melby

### 1.    Apple Does Not Dispute The Majority of Masimo's Assertions

Apple in its Petition argued a POSITA would replace Diab's scattering medium with Benjamin's light control film. Pet. at 21. The Board in its Institution agreed with Apple stating the POSITA would make the replacement "to provide . . . [a] sensor that reduces variations in the amount of light detected . . . to collimate the light emitted from the light source . . . and reflected back to the [detector]." Institution Decision at 18. Masimo in its Response explained that Diab's desire to scatter (or randomize) light is the opposite of Benjamin's collimation (or organization) of light. POR at 28, 30-31. Masimo cited to Apple's expert who agreed scattering is not collimating. *Id.* at 30 (citing EX2003 at 153:22–154:8, 155:10-18). Masimo explained that replacing Diab's scattering medium with the opposite—Benjamin/Melby's light control film—would change the principle of operation of Diab's sensor and render Diab's scattering unsuitable of its intended purpose. *Id.* at 32-33. On reply, Apple did not dispute any of the foregoing explanations or assertions. Based on these undisputed argument alone, the Diab-Benjamin-Melby ground fails because a POSITA would not have been motivated to make the proposed modifications.

IPR2020-01526
Apple Inc. v. Masimo Corporation

Masimo also argued that such a combination would perform worse, block light, compress flesh and would likely ruin Benjamin's and Melby's film. *Id.* at 36-37. Apple in its Reply disputes only whether the combination blocks light, which is discussed in more detail below. *See infra* § III.A.3. All of Masimo's other assertions remain undisputed.

Further, Masimo argued that Apple provided no evidence or basis for suggesting that the proposed combination:

- leads to more consistent and accurate measurements (Pet. at 22);

- reduces an amount of light reaches the detector without going through tissue (*id.* at 22-23); and

- reduces false readings based on sensor misalignment (*id.* at 23).

Apple's own expert, Dr. Anthony, agreed that other Diab elements already provided some of these benefits. POR at 39-41. On reply, Apple still does not identify or provide any evidence to support its arguments and thus does not satisfy its burden of proving obviousness. *In re Magnum Oil Tools Int'l, Ltd.*, 829 F.3d 1364, 1380 (Fed. Cir. 2016) ("To satisfy its burden of proving obviousness, a petitioner cannot employ mere conclusory statements.").

## 2. **Apple Incorrectly Recasts Masimo's Argument Regarding Scattering and Collimating**

Masimo explained that one of Diab's critical teachings is to scatter light and that Apple's proposed modifications eliminate this core feature. Instead, the

-5-

proposed modifications cause the light to be uniform in direction. POR at 30-31.

Apple mischaracterized Masimo's argument as reliant on the ***positioning*** of Diab's

scattering medium interposed between the tissue and photodetector. Reply at 1

(citing POR at 29-31). Apple then addressed its mischaracterization arguing that

"Diab explicitly discloses examples in which the scattering medium is 'interposed'

only 'between the light source and the' the [*sic*] user tissue." Reply at 1-2 (citing

EX1006 at 4:6-12). But Apple never explained the significance of this statement or

how it would have motivated a person of skill to make the proposed combination.

Relying on its mischaracterization, Apple sidesteps whether a POSITA

would have ***replaced*** a scattering medium with a light control film. Apple does not

dispute that Diab employs optical scattering techniques to improve optical signal

quality. *See* POR at 28. Apple does not dispute that Diab's intended purpose is to

scatter optical radiation or that Diab's principle of operation incorporates a

scattering medium that helps to minimize the effects of local artifacts and

perturbations within the material. *See id.* at 32-33. Apple also does not dispute that

collimating light as taught by Benjamin or increasing the directionality of light as

taught by Melby is the ***opposite*** of Diab's scattering. *See id.* at 30-31. Thus, a

POSITA would not have been motivated to replace Diab's scattering medium with

a light control film, as suggested in the Petition. *See id.* at 32-33; EX2001 ¶¶ 74-

77.

IPR2020-01526
Apple Inc. v. Masimo Corporation

Additionally, Apple's reliance on the scattering medium being interposed between the light source and the finger is not part of the combination proposed in the Petition. *See* Pet. at 19. Nowhere did Apple previously identify the scattering medium's juxtaposition with the light source and user tissue as part of its theory for unpatentability. Apple's new theory denies Masimo the opportunity to respond with expert testimony. *Henny Penny Corp. v. Frymaster LLC*, 938 F.3d 1324, 1330-31 (Fed. Cir. 2019) (Petitioner may not raise in reply "'an entirely new rationale' for why a claim would have been obvious.") (*citing Intelligent Bio-Sys. Inc. v. Illumina Cambridge Ltd.*, 821 F.3d 1359, 1370 (Fed. Cir. 2016)).

Even if a scattering medium was only interposed between the light source and the tissue, Apple still has not provided a motivation to use a collimating film between the tissue and the detector. To the contrary, a collimating film is antithetical to the entire disclosure of Diab.

### 3.  Apple's Argument That Much Of The Light Reduction Would Be Ambient Light Is Unsupported

Masimo argued that "the combination of Diab's absorbing chamber wall and Melby's light control film would reduce the total light received by the photodetector" and "make the signal more difficult to interpret." POR at 35. Apple argued in its Reply that "even if the 'total light received by the photodetector 426' were reduced by the introduction of the light control film, much of the light constituting the reduction would be ambient light . . . . ." Reply at 2.

First, Masimo's expert, Dr. Madisetti, provided annotated Fig. 1 of Melby,
reproduced below. It shows some light (right-side yellow arrow) from a desired
direction, not ambient light, passes through Melby's film, and some light (left-side
yellow arrow) also from the desired direction, and also not ambient light, is
absorbed/blocked by opaque louvers 20. EX2001 ¶ 80.



EX1008 at FIG. 1 (as annotated at EX2001 ¶ 80.). Melby itself recognizes that its
automotive control panel film reduces on-axis transmissions. *See* EX1008 at 2:65-
68, 4:42-47. In contrast to the actual teachings of Melby, Apple provides no
objective evidence that "much of the light" reduced by the light control film would
be ambient light compared to the reduction in on-axis transmission described
above. Thus, Melby absorbs/blocks at least some of the desired light, not mostly
ambient light.

And as Dr. Madisetti explained, even small changes in received light can be
catastrophic. EX2001 ¶ 31. Specifically, Dr. Madisetti explained calibration curves
for correlating measured and processed ratiometric data received from a pulse
oximetry sensor with empirically determined oxygen saturation levels "are highly

-8-

sensitive to even small changes to any particular optical system as such changes affect the incoming values of the ratiometric data." *Id.* Thus, Melby's reduction *of desired light* would degrade the accuracy of the output measurement.

Second, Apple failed to address in its Reply why a POSITA, having Diab's chamber that already absorbs incident light, would add Melby's film to absorb incident light. As discussed and shown below, Diab discloses its detector recessed within its chamber such that "some of the light is caused to be incident on the opaque walls 123 of the chamber 122 and is absorbed." POR at 35 (citing EX1006 at 7:45-50).



EX1006 at FIG. 4 (as annotated in POR at 12). Dr. Anthony also explained that Diab's recess "absorbs oblique rays used as a light block front things coming at an off angle." *See* POR at 39; EX2003 at 59:1-13, 130:12-16. Apple does not address why a POSITA having Diab's chamber, which already absorbs incident light, would include the additional complexity of Benjamin and/or Melby's light control film to block incident light. *See* POR at 35; EX2001 ¶ 79.

Appx0395

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 4.     Apple Ignores The Drawbacks Of Implementing Its Proposed Modification

Apple argued that "Masimo cites no case law or other authority standing for its proposition that the possibility of burdensome or expensive regulatory process can dissuade a POSITA from arriving at a claimed invention." Reply at 3. Determining whether a claimed combination would have been obvious to a skilled artisan must account for "reasons not to combine." *Arctic Cat Inc. v. Bombardier Rec. Prods.*, 876 F.3d 1350, 1363 (Fed. Cir. 2017) ("Evidence suggesting reasons to combine cannot be viewed in a vacuum apart from evidence suggesting reasons not to combine."); *Henny Penny Corp.* 938 F.3d at 1332 (affirming the Board's finding of no motivation to combine where "tradeoffs [] yield an unappetizing combination" especially because the primary references already teaches a solution); *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349-50 (Fed. Cir. 2000) (no clear error in the district court's finding that a person of skill in the art, on balance, would not have made the claimed invention). Without a compelling motivation to combine, cost can certainly dissuade a POSITA from making a modification. *See Hulu, LLC v. Sound View Innovations, LLC*, IPR2018-00582, Paper 34 (P.T.A.B. Aug. 5, 2019) (finding reasons to combine inadequate when proposed modification would not have improved the primary reference and the proposed modification was costly); *General Electric Company V. United Technologies Corporation*, IPR2017-00428, Paper No. 38 (P.T.A.B. June 22,

-10-

IPR2020-01526
Apple Inc. v. Masimo Corporation

2018) (finding that modification of a one-stage turbine engine to a two-stage turbine engine was not obvious in light of various tradeoffs that exist such as reduced weight and cost of a one-turbine engine).

Additionally, the FDA Guidance cited by Masimo was not intended to be a prior art teaching. Rather, the FDA Guidance simply confirms that calibration curves are sufficiently critical to accuracy that regulatory bodies have promulgated rules to ensure changes are not treated lightly. This sensitivity was known at the critical date. For example, Webster discloses that calibration curves are critical to the accuracy of the oxygen saturation level and are empirically determined using data obtained in clinical studies. *See* EX1010 at 54, 159; *see also* EX1001 at 1:50-54. Dr. Madisetti explained that "[c]alibration curves are highly sensitive to even small changes to any particular optical system as such changes affect the incoming values of the ratiometric data." EX2001 ¶ 31. Thus, a POSITA at the time of the critical date would have recognized, and Apple does not dispute, that changes to the optical system could require an updated calibration curve, which even before overt FDA regulation was costly and time-consuming. A POSITA would not undertake this costly and time-consuming effort of updating the calibration curve, particularly with the other drawbacks discussed above. *Id.* ¶¶ 84-87; *see supra* § III.A.2, III.A.3.

-11-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Based on at least the foregoing, a POSITA would not have been motivated to combine the teachings of Diab, Benjamin, and Melby. Instead, Apple's combination relies on classic hindsight construction to arrive at Claim 15 of the '994 Patent.

## B.    Ground 2: Webster + Melby

### 1.    Apple Does Not Dispute Masimo's Assertions

Apple does not dispute that light filters that filter specific wavelengths of light are not the same as Melby's light control film that controls the directionality of light. *See* POR at 44-45. Apple also does not dispute that light impervious barriers that block light are not the same as Melby's light control film that controls the directionality of light. *See id.* at 45. Therefore, Apple's reliance on operation in the "same way" to make the proposed modifications cannot support the combination of Webster and Melby.

Apple also does not dispute that Webster already discloses the solution of light impervious barriers to limit the light reaching the photodiode. *See* POR at 45-46. Thus, Apple's argument in its Petition that a POSITA would have been motivated to combine Webster and Melby to minimize errors by limiting the light reaching the photodiode is unsupported. *See* Pet. at 42.

Accordingly, Apple's Petition failed to provide a credible motivation to combine Webster and Melby.

-12-

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 2.    Apple's Characterization of Webster Is Not Supported

Apple in its Petition argued that a POSITA "would have recognized that Melby's film could be used in the Webster device as the 'light filter' to control light . . . ." Pet. at 42. Masimo in its Response argued Apple wrongly conflates Webster's wavelength filter, which is a component over the detector, with the optical effect of a different component, Webster's light impervious barriers. *Id.* The problem for Apple is that Webster's light impervious barriers are not positioned over the detector and Claim 15 requires louvers to be over the detector.

Apple ignores Webster's clear context and cherry picks quotes as follows:

> Webster states that 'it is important to minimize the effects from light other than the optical signals of interest.' 'One way to minimize unwanted light incident upon the detector is to place some type of light filter over the detector.' Webster describes that one type of 'unwanted light' that should be minimized is 'ambient light'-which is the type of light the light control film of Melby is designed to minimize.

Reply at 4 (internal citations omitted). Unpacking Apple's argument, Apple first cites to Webster's teaching of placing a light filter (a component) over the detector (its position). Then with sleight of hand, Apple switches from light filters (the component) to the function of minimizing ambient light, which is decidedly not the function Webster associates with light filters. *See* POR at 16, 42-43; EX2001 ¶¶ 95-96. Rather, Webster's discussion of ambient light is in a different section

from its discussion of filters, refers to a different problem than wavelength filtering, and explains the optical properties of light barriers, not light filters. *See* POR at 16-17, 42-44; EX2001 ¶¶ 95, 97-99.

Webster explains that placing some type of light filter over the detector "allows light of ***wavelengths*** of interest to pass through the filter but does not allow light of other ***wavelengths*** to pass through the filter." EX1010 at 79 (emphasis added); *see also* EX2003 at 235:6-14 (Anthony confirming some type of light filter is "referring to the optical filtering [described] in Section 6.3.1"). During Dr. Madisetti's deposition, even Apple's counsel "believe[d] they call it the spectral filter in Webster" (EX1038 at 78:13-15), and thereafter, referred to the filter as Webster's "wavelength filter." *See id.* at 79:7-12, 80:7-9, 81:17-19, 82:3-5, 82:8-10. When asked whether "Webster describe[s] other types of filters that can be placed over a photodetector," Dr. Madisetti explained "none that would be applicable and none that Dr. Anthony or the petitioner has relied upon." *Id.* at 78:22–79:6.

Accordingly, a POSITA would have had no motivation to incorporate Melby's light control film based on the teachings of Webster's wavelength filter. Filtering specific wavelengths of light is not the same as limiting the direction of accepted light. EX2001 ¶¶ 96, 103-104.

-14-

IPR2020-01526
Apple Inc. v. Masimo Corporation

In a separate section, Webster describes barriers "limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood." EX1010 at 79. Instead of filters, Webster describes the use of light impervious barriers to minimize ambient light. *See* EX1010 at 79.

Apple wholly ignores Masimo's arguments and Webster's discussion of light impervious barriers. *See* POR at 42-46. Webster describes that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue." EX1010 at 79. Webster's light impervious barriers are not *over* the detector, putting the barriers over the detector would block all light from reaching the detector rendering the sensor inoperative. EX2001 ¶¶ 97-99. Apple does not identify any other structure in Webster that could minimize ambient light, much less be positioned over the detector and minimize ambient light. Thus, a POSITA would have had no motivation to position Melby's light film *over* the detector based on the teachings of Webster's barriers.

## C.    Ground 3: Fine

### 1.    A POSITA Would Not Have Considered Fine

Apple argued that "Petitioner is not aware of, any authority for disqualifying a prior art reference from an obviousness analysis due to its complexity or the cost to implement the invention it describes." Reply at 5-6. The Federal Circuit has

-15-

IPR2020-01526
Apple Inc. v. Masimo Corporation

cautioned against relying on hindsight bias in selecting a lead prior art reference. *See, e.g., WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1337 (Fed. Cir. 2016) ("The real question is whether that skilled artisan would have plucked one reference out of the sea of prior art. . ."). Apple failed to demonstrate why a POSITA would have selected Fine's complex sensor from the "sea of prior art" to design a pulse oximetry sensor as described in the Claim 15 of the '994 Patent.

Fine discloses a fetal oximetry sensor. EX1009 at 1:8–3:6, 6:28-32. Dr. Madisetti explained that "[f]etal oximetry addresses an entirely different problem from the '994 Patent because fetal oximetry is attempting to measure the oxygen saturation of a fetus during passage through the birth canal." EX2001 ¶ 108. Because of challenges with measuring oxygen saturation in the birth canal, Fine's sensor design includes complex and expensive optical fibers to transport light from a laser light source, likely placed outside the patient's body. POR at 18, 47; EX2001 ¶ 108; EX1009 at 7:9-14. Fine itself distinguishes its laser diodes from conventional, non-invasive oximetry apparatuses, for example on the finger or ear, that use LEDs. EX1009 at 7:15-17, 2:17-29. Apple's attempts to characterize Fine's optical fibers as louvers are further evidence of improper hindsight reconstruction. *See infra* § III.C.2.

-16-

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 2.    Optical Fibers Are Not Louvers

Apple incorrectly argued in its Reply that "[n]one of Masimo's arguments address the Petition's specific analysis of how a 'POSITA would have recognized that each of the separate fibers within the fiber optic bundle 57 acts as a louver positioned over a light detector of Fine's probe.'" Reply at 7-8. According to Apple, "a POSITA would have understood fibers 70 and 80 to teach separate louvers because the walls of the fibers serve to direct light and control the scope of vision of the fibers." Pet. at 57.



EX1009 at FIG. 5 (as annotated at Pet. at 56).

-17-

First, the structure of a fiber is nothing like a louver. POR at 47-48. FIG. 5 of Fine is a cross-section and does not show the annular profile of the fiber 70. Fine's optical fibers are flexible strands that take a tortuous path from the contact surface to the detectors. POR at 48-49.



Fig. 4

EX1009 at FIG. 4 (as annotated at POR at 49). This is different from the structure of any of the louver examples of record. Both experts agree that window shutters are an example of louvers. EX2003 at 178:14–179:2; EX1038 at 67:22–69:2. Masimo also provided other examples of how a POSITA would understand the term louver. *See* EX2015 (defining "louver" as "[e]ach of a set of angled slats or flat strips fixed or hung at regular intervals in a door, shutter, or screen to allow air or light to pass through"); EX2008 at 110 (explaining that the louver's orientation and length determine the direction of light that is blocked or absorbed).

IPR2020-01526
Apple Inc. v. Masimo Corporation

Second, fibers operate under different principles than louvers. POR at 47-48. Dr. Madisetti provided the figures below showing the difference between light that will be eventually transmitted through a fiber and light that passes through louvers. EX2001 ¶ 113.



*Id.* The "scope of vision" of Fine's fibers is a three-dimensional cone. *Id.* The fibers "direct light" by transmitting light from one location to another location, including directional changes, through internal reflection. *Id.* ¶¶ 112-113. In contrast, louvers have a wider field of view and allow certain planes of light to pass through the open space between individual louvers. *Id.*

Thus, Apple has not shown that Fine's optical fibers are louvers, and therefore Ground 3 fails.

Appx0405

IPR2020-01526
Apple Inc. v. Masimo Corporation

**D.    Ground 4: Fine + Benjamin + Melby**

**1.    Apple Still Provides No Motivation to Incorporate a Light Control Film Into Fine**

Apple in its Reply does not dispute the operational differences between Fine's fetal, optical fiber-based sensor and Melby's automotive control panel film. *See* POR at 50-51. Therefore, Apple's stated motivation in its Petition that Fine and Benjamin/Melby operate in the "same way" must fail. *See* Pet. at 67. Moreover, as discussed in Masimo's Response, Apple never explained why Benjamin's and/or Melby's light control film could reduce the amount of light that reaches Fine's detector but has not passed through the tissue. POR at 52. Accordingly, Apple's Petition failed to provide a motivation make the proposed Benjamin/Melby modification. Moreover, as explained below, the proposed modification would hinder the function of the proposed sensor.

-20-

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 2.     **Masimo Addressed Apple's Proposed Modification**

Apple's proposed modification in Ground 4 of its petition was indecipherable. *See* Pet. at 59-68; POR at 50-56. In an attempt to guess what Apple's Fine-Benjamin-Melby modification entailed, Masimo provided evidence about the inappropriateness of a few nonsensical combinations, one highlighted with the red arrow and one highlighted with the green arrow as shown in Masimo's annotated drawing reproduced below.



POR at 53 (EX1009 at FIG. 4, annotated). On reply, Apple asserted that "Masimo arguments mischaracterize, and thus fail to address, the Fine-Benjamin-Melby combination proposed in the Petition." Reply at 9. But other than specifying that the light control film would be incorporated at the green arrow, Apple's Reply still does not explain how the light control film could be incorporated at the green arrow, or how the light control film could be implemented without making the sensor perform worse.

-21-

IPR2020-01526
Apple Inc. v. Masimo Corporation

As Dr. Madisetti testified, Dr. Anthony's declaration "lacks any description as to the precise nature of any [Fine-Benjamin-Melby] modification that he appears to suggest," but "for all technical possibilities . . . I analyzed for all of the technical possibilities that a POSA may consider." EX1038 at 54:12-19, 55:19–56:15. For example, addressing the green arrow modification from the figure above, Dr. Madisetti explained that "[e]ven if the light control film was placed at the contact surface 53 of the cylindrical body 51 (in the region colored green above), Melby's film would prevent Fine's sensor from working in an operative manner." EX2001 ¶ 120. Fine discloses "at least one and preferably two annular detector terminals concentrically surrounding the light emitters." EX1009 at Abstract. If vertical louvers, as taught by Melby, were applied to Fine's annular detector terminals, the louvers would obstruct portions of emitter fibers and detector fibers, as shown below. *See* EX2001 ¶ 120.



EX1009 at FIG. 2 (as annotated at EX2001 ¶ 120). Even if Melby's light control film did not completely obstruct an individual fiber, the light control film would

-22-

IPR2020-01526
Apple Inc. v. Masimo Corporation

block at least a portion of the light within the acceptance cone of the fiber. EX2001

¶ 121. As shown below, at least some of the desired light received between the left-

hand ray 74 and the right-hand ray 75 would be absorbed by the louvers of

Melby's film. *Id.*



EX1009 at FIG. 5 (as annotated at EX2001 ¶ 121). Apple's proposed modification

would disrupt Fine's annular configuration of fibers and worsen the signal-to-noise

ratio because the light control film would likely block some of the light emitted

from the sensor and block desired light from reaching the photodetector. EX2001

¶ 120.

IPR2020-01526
Apple Inc. v. Masimo Corporation

# IV.     **CONCLUSION**

For the reasons discussed above, the Board should confirm the patentability

of Claim 15 of the '994 Patent.

Respectfully submitted,
KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 3, 2021          /Shannon Lam/
                                  Shannon H. Lam (Reg. No. 65,614)
                                  Customer No. 64,735

                                  Attorneys for Patent Owner
                                  Masimo Corporation

IPR2020-01526
Apple Inc. v. Masimo Corporation

## CERTIFICATE OF COMPLIANCE

Pursuant to 37 C.F.R. § 42.24(d), Counsel for Patent Owner Masimo Corporation hereby certifies that this document complies with the type-volume limitation of 37 C.F.R. § 42.24(b). According to Microsoft Office Word 2010's word count, this document contains approximately 4,500 words, including any statement of material facts to be admitted or denied in support, and excluding the table of contents, table of authorities, mandatory notices under § 42.8, exhibit list, certificate of service or word count, or appendix of exhibits or claim listing.

KNOBBE, MARTENS, OLSON & BEAR, LLP

Dated:  December 3, 2021     /Shannon Lam/
                             Shannon H. Lam (Reg. No. 65,614)
                             Customer No. 64,735

                             Attorneys for Patent Owner
                             Masimo Corporation

IPR2020-01526
Apple Inc. v. Masimo Corporation

## CERTIFICATE OF SERVICE

I hereby certify that, pursuant to 37 C.F.R. § 42.6(e) and with the agreement

of counsel for Petitioner, a true and correct copy of **PATENT OWNER'S SUR-**

**REPLY TO REPLY** are being served electronically on December 3, 2021, to the

e-mail addresses shown below:

W. Karl Renner, Reg. No. 41,265
Andrew B. Patrick, Reg. No. 63,471
Daniel D. Smith, Reg. No. 71,278
Fish & Richardson P.C.
3200 RBC Plaza
60 South Sixth Street
Minneapolis, MN 55402
Tel: 202-783-5070
Fax: 877-769-7945
Email: IPR50095-0005IP1@fr.com
Email: PTABInbound@fr.com; axf-ptab@fr.com; dsmith@fr.com;
patrick@fr.com

Dated:  December 3, 2021          /Shannon Lam/ _____
                                  Shannon H. Lam (Reg. No. 65,614)

                                  Attorneys for Patent Owner
                                  Masimo Corporation

54466135

Trials@uspto.gov
571-272-7822

Paper # 30
Entered: February 16, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE
————————

BEFORE THE PATENT TRIAL AND APPEAL BOARD
————————

APPLE INC.,
Petitioner,

v.

MASIMO CORPORATION,
Patent Owner.

————————

IPR2020-01526
Patent 6,771,994 B2

————————

Record of Oral Hearing
Held:  January 19, 2022

————————

Before JOSIAH C. COCKS, ROBERT L. KINDER, and
AMANDA F. WIEKER, *Administrative Patent Judges.*

1    from Diab -- the clipping we were just discussing a few moment ago

2    discussing its improved optical signal-to-noise ratio received through

3    various embodiments and, you know, one of those embodiments, actually

4    more than one including scattering medium between the LED and the user

5    tissue and notably as you'll see on the following slide, slide 15, an

6    embodiment in which the scattering medium is not located within Diab's

7    chamber; right?  And in that regard Diab is clear in contemplating that that

8    embodiment too without a scattering medium in the chamber improves your

9    optical signal-to-noise ratio and more specifically it does it through the

10   positioning of the scattering medium between Diab's LEDs and the user

11   tissue and so one way that you could think about this is you could say that,

12   you know, we are starting with Diab as a base reference and Dr. Anthony in

13   the declaration that accompanied the petition explained that the person of

14   skill would have found it obvious in view of the teachings of both Benjamin

15   and Melby to use light control film in place of the scattering medium if that

16   were the scattering medium that in some embodiments is located above the

17   photodetector.

18        Notably it leaves open the possibility of maintaining the scattering

19   medium between the LEDs and the user tissue and in that regard actually far

20   from being contrary to one another in terms of their effects they would work

21   in concert, each of them addressing a different problem, if you will, with

22   respect to noise in the signal-to-noise ratio and so as we were earlier

23   discussing the scattering medium reduces noise by lessening the impact of

24   local structures within the user tissue and then the light control film that

25   Benjamin and Melby describes reduces noise by actually reducing the

8

1  amount of ambient light, for example, that can leak and strike the

2  photodetector and from Diab's description, for example again at column 20,

3  lines 1 through 13, it's clear that the scattering medium would accomplish its

4  purpose if only located between the LEDs and the user tissue and in that

5  regard, again, that section of the reference itself explains to us that by

6  scattering the signal either prior to or posterior to the material interface the

7  perturbations of locality within the area of exposure will have less effect and

8  so in that regard if you think about LEDs as shown at the upper right of this

9  slide within Diab's system emitting light into the user tissue but doing so

10  through a scattering medium, Diab explains to us that the perturbations

11  caused by the local tissues would be reduced and so you would have an

12  improvement in the optical signal-to-noise ratio and then as the light

13  continues on its path toward the photodetector shown in green at the bottom,

14  you would have a further improvement in terms of the light control film and

15  collimation of light that's accomplished through the louvered nature of that

16  film as explained by both Benjamin and Melby and it may be helpful if we

17  were to look at slide --

18      JUDGE KINDER:  This is Judge Kinder.  This is Judge Kinder.  I

19  know the references don't have to have this kind of purpose but is there

20  anything in Diab that says hey, you know, something like this would

21  improve us.  I just -- I'm having a hard time, I think the Patent Owner made

22  some arguments that well, Diab kind of works as it serves its purpose, it

23  works fine.  You know, getting to the why.  I know that motivation doesn't

24  have to come from the references but is there anything in Diab that you've

25  cited that sticks out that says hey, bringing this control film would make

9

1   that I believe is addressed through the use of Benjamin's light control film as

2   well as the further description in terms of implementation detail that's

3   offered by the Melby reference in terms of being able to collimate light and

4   so acknowledging within the references that there are multiple sources of

5   noise that you would want to control in order to improve your optical signal-

6   to-noise ratio.  You know, we believe and Dr. Anthony has testified that the

7   person of skill viewing these references would have understood that the Diab

8   system could be improved through the use of a light control film.  Again,

9   that film actually addressing a problem other than the motion problem and

10  doing so by preventing ambient light from striking the photodetectors and

11  thereby creating adverse noise.

12        I don't know if that answered your question.  I hope so.  Certainly,

13  we're willing to speak in more detail to those points.

14        JUDGE KINDER:  Thank you.

15        MR. PATRICK:  Okay.  Thank you, Judge Kinder.  Now, if we were

16  to briefly go back I think it may be useful again if we were to look at the

17  description within Benjamin and the evidence of record and the form of Dr.

18  Anthony's testimony as to what Benjamin is accomplishing and in that

19  regard if I could I'd like to ask you to turn back to slide 7 and on slide 7 we

20  see at top right a depiction from Benjamin of an optical sensor device in

21  which the light control film is placed and again, the photo-sensitive cell in

22  Benjamin is set to respond to light that passes through user tissue and the

23  light control film is set to improve the accuracy of its cell's response by

24  collimating the light passing through so as to prevent scattered incident light

25  from reaching the cell and thereby making the cell more nearly dependent on

11

1    of the photodetector.  Now as the light is transmitted through this

2    transmittance-type pulse oximetry device through the user tissue by the

3    LEDs the scattering medium that Diab teaches would assist in doing what

4    Diab describes and that light would eventually pass through the tissue and

5    before striking the photodetector reach the light control film which would

6    then further collimate.

7        Now the collimation is helpful and important with respect to light not

8    emitted from the LEDs themselves for instance, but rather light coming in

9    from ambient sources surrounding the device and the light from those

10   different sources it could be the sun, it could be the, you know, the lights

11   above your head, that would be unwanted because it would include as a

12   component part wavelengths that are similar to the wavelengths to which

13   this pulse oximeter is sensitive and yet, that light striking the photodetectors

14   would not have passed through the user tissue and so it comes in as noise

15   that would end up corrupting the signal.

16       You know, another way to think about how it is that the louvers

17   within the louvered plastic film that Melby describes would assist with this

18   problem would be actually to look at the figures on slide 11 which show

19   Melby's film and there the important point to see is that in providing its

20   implementation details consistent with the teachings of Benjamin the person

21   of skill would have been motivated to incorporate the film to further increase

22   the directionality of the light and thereby make the device less susceptible to

23   the influence of noise in the form of ambient light and the manner in which

24   Melby accomplishes this, and you can see in figure 1 for instance, is that it

25   has clear regions within he film that are then separated by darker regions and

13

IPR2020-01526
Patent 6,771,994 B2

1   the dark regions serve to absorb light that is striking from undesirable

2   angles, light that very likely came from ambient sources whereas the clear

3   regions within the film allow light to pass straight through and if we were to

4   turn to slide 12, you'll see that within Diab with the LEDs having been

5   positioned directly above the user tissue and then emitting light through the

6   tissue to a detector located beneath it stands to reason that the collimation

7   accomplished through the light control film would actually allow for light

8   emitted from the LEDs, the desirable light to pass through while actually

9   preventing the undesirable noise from ambient sources and that is --

10       JUDGE KINDER:  Hi, this is Judge Kinder again.  I'm sorry to

11   interrupt.  There's like a three second lag so it's hard to get in a question.

12   Just to clarify, your proposed combination removes the scattering medium of

13   Diab or does it leave it in place?

14       MR. PATRICK:  It's a good question, Your Honor, and the way that it

15   was expressed within the petition and by Dr. Anthony in his original

16   declaration we said that the light control film would be in place of the

17   scattering medium that would have been located in the chamber of Diab and

18   so that's how it was originally expressed and that would be of course with

19   respect to an embodiment in which the scattering medium was already

20   present.  However, not addressed there is the scattering medium that is

21   between the LED and the user tissue and, you know, certainly the person of

22   skill would have understood from Diab's consistent description throughout

23   both in column 20, lines 1 through 13 and from the earlier portion that's

24   clipped into these slides that the effect of a scattering medium could still be

25   accomplished even if there were only the one scattering medium placed

14

1  between the LEDs and the user tissue and so, again, as originally expressed

2  the scattering medium would have been removed from the chamber and yet

3  there would still be scattering medium capable of improving optical signal-

4  to-noise ratio as expressed by Diab.

5      JUDGE KINDER:  Thank you.

6      MR. PATRICK:  Thank you, Your Honor.  I do appreciate that

7  question.  So interestingly enough I think through your questions we've

8  addressed a lot of what I'd intended to accomplish with slides 1 through 18

9  but it may be worth actually moving to slide 18 to address some of the

10 positions that have been raised in Patent Owner's briefing and in that regard,

11 we've called this issue 1C that incorporation of the light control film reduces

12 noise from ambient light.  The reason I'm bringing you here is that within

13 the Patent Owner's response they argued that the combination of Diab's

14 absorbing chamber wall and Melby's light control film would reduce the

15 total light received by the photodetector in a way that they claim would

16 make the signal more difficult to interpret.

17     Now, if we were to move to slide 19 frankly we think that Masimo's

18 contention ignores that Melby's light control film would have the opposite

19 effect that, as shown on slide 19 and as we've been discussing, it would

20 actually increase the signal-to-noise ratio by blocking noise in the form of

21 ambient light and turning to slide 20 Dr. Anthony's testimony on that slide

22 underscores this very point, that the person of skill would have been

23 motivated to incorporate Melby's film specifically because they would have

24 expected that film to reduce Diab's susceptibility to the influence of ambient

25 light and in the way that would produce more accurate readings and so, in

15

1    other words, even if the total light received by the photodetector were

2    reduced by the introduction of light control film, as Masimo contends, much

3    of the light constituting the reduction would be ambient light thereby on

4    balance increasing the signal-to-noise ratio and contrary to Masimo's

5    argument making the signal easier to interpret.

6          Now, if I could there was, unless there are questions on that

7    specifically, there's another argument that has been raised by Masimo that I'd

8    like to address with respect to this combination and in that regard if we

9    could turn to slide 22. This is dealing with regulatory approval processes

10    and, you know, frankly we don't think that those would have dissuaded the

11    person of skill from improving Diab and in more detail Masimo has argued

12    that without a compelling motivation to modify Diab's optical system that

13    the person of skill would not risk what they say is a costly and time-

14    consuming drawbacks of updating Diab's calibration curve and preparing a

15    new FDA submission for regulatory approval.

16          Now, a first point if we turn to slide 23 is that the document that the

17    Patent Owner is relying upon which is entered in this proceeding I believe as

18    Exhibit 2005 is an FDA guidance document that was issued on March 4th,

19    2013 and in that regard Masimo has not explained what relevance, if any,

20    purported guidance from over a decade after the '994 patent's released

21    effective filing date might possibly have. That said, even if there were

22    evidence of similar FDA guidance from a relevant time period on the record,

23    and there is not, Masimo frankly appears to wrongly conflate the issue of

24    whether the alleged difficulty of a regulatory approval process might

25    dissuade an inventor from bringing a product to market with whether an

16

1   from the LEDs ends up being partially reflected, transmitted, absorbed and

2   scattered by the user tissue prior to reaching the detector and thus less than

3   all of the light from the LEDs ultimately reaches the detector and Webster

4   explains at length in the portions that are quoted by Dr. Anthony in

5   paragraph 77, it's therefore important that the detector be protected from the

6   ambient light from the wavelengths to which the photodiode is sensitive.

7         As earlier discussed and as shown on slide 28 Melby specifically

8   offers a louvered plastic film that collimates light and that therefore reduces

9   the influence of ambient light and on slide 29 as we can see here Dr.

10  Anthony testified in paragraphs 101 and 104 of his declaration that one of

11  ordinary skill would have been motivated and would have found it obvious

12  to combine Webster and Melby to provide a pulse oximeter that minimizes

13  errors by limiting the light reaching the photodiode to that which has

14  travelled through tissue containing arterial blood.

15        Now, on slide 31 we can see that Masimo attempts to establish

16  because --

17        JUDGE KINDER:  I'm sorry.  You might be addressing it and I think

18  I was just trying to get to the heart of the Patent Owner's arguments here and

19  if you're going to address them that's fine but I believe they're talking about

20  Webster's wavelength filter and the light impervious barriers are different

21  components and different embodiments in Webster's optical system.  So, if

22  you could kind of address that argument I think that's one of Patent Owner's

23  main arguments.

24        MR. PATRICK:  Thank you, Your Honor, I do appreciate that and we

25  think that that argument is actually debunked by Webster itself and it may be

1  helpful to turn to slide 32 and there what we'll see are excerpts from page 79

2  of the Webster textbook and there Webster recognizes a benefit of

3  positioning a film or as it calls it here, some type of light filter atop its

4  photodiode to help minimize unwanted incident light, and so in the first

5  segment from Webster that's shown here there is description of an

6  exemplary wavelength specific filter that demonstrates to a person of skill

7  that a film atop a photodiode would certainly not render a diode inoperable.

8  That's one of the things that Masimo has suggested.

9       Webster goes on and explains in the second clipping from 6.3.2 of

10 Webster.  It recognizes additional measures that would reduce excessive

11 ambient light, among them it suggests decreasing the angle of incidence of

12 light to the photodiode which happens to be one of the goals of Melby and in

13 that regard Melby's film would, by reducing the angle of incidence for light

14 of all wavelengths, work in precisely the manner that Webster contemplates

15 in order to achieve precisely the end contemplated by each of Melby and

16 Webster, that in being a reduction of optical interference in the form of

17 excessive ambient light and it may actually be helpful in that regard to look

18 again actually to the figure shown on slide 29 about the combination of

19 Webster and Melby.

20      JUDGE COCKS:  Counsel, just to let you know you're through your

21 opening time.  If you wish to wrap up you may or you will be entering your

22 rebuttal time; okay?

23      MR. PATRICK:  Thank you, Your Honor.  I really appreciate that.  If

24 I could I'd like to spend just one more moment here and then briefly say

25 something with respect to issue 3 and then I think I will be good.  I just

19

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

In re Patent of:     Massi E. Kiani
U.S. Patent No.:     6,771,994          Attorney Docket No.:  50095-0005IP1
Issue Date:          August 3, 2004
Appl. Serial No.:    10/374,303
Filing Date:         February 24, 2003
Title:               PULSE OXIMETER PROBE-OFF DETECTION SYSTEM

## <u>DECLARATION OF DR. BRIAN W. ANTHONY</u>

I, Brian W. Anthony, of Cambridge, MA, declare that:

## I.    QUALIFICATIONS AND BACKGROUND INFORMATION

1.    My name is Dr. Brian W. Anthony.  I am an Associate Principal Research Scientist at the Institute of Medical Engineering & Science at Massachusetts Institute of Technology (MIT).  I am also a Principal Research Scientist at MIT's Mechanical Engineering department, Director of the Master of Engineering in Advanced Manufacturing and Design Program at MIT, a Co-Director of the Medical Electronic Device Realization Center of the Institute of Medical Engineering & Science, and Associate Director of MIT.nano.  My current *curriculum vitae* is attached and some highlights follow.

2.    I earned my B.S. in Engineering (1994) from Carnegie Mellon University.  I earned my M.S. (1998) and Ph.D. (2006) in Engineering from MIT. My research focused on high-performance computation, signal processing, and electro-mechanical system design.

1

APPLE 1003

the" portion of the patient's body. *Id.* Finally, the photodetector detects the attenuated light energy and "produces an electrical signal indicative of the intensity of the signal transmitted by" the patient's body. *Id.*, 3:34-43. Thus, one of ordinary skill would have understood that, in the combination, Diab teaches light that originated from a general direction of the light emission devices, transmitted through body tissue carrying pulsing blood. In the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body.

67. Further, one of ordinary skill would have found it obvious to modify Diab with Benjamin's disclosure of placing a light control film over the photodetector in place of a scattering medium because doing so entails the use of known solutions to improve similar systems and methods in the same way. Indeed, "when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious." *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007). One of ordinary skill would have recognized that applying Benjamin's teachings to Diab's pulse oximeter would have led to predictable results without significantly altering or hindering the functions performed by the pulse wave examination apparatus. In fact, one of ordinary skill

36

of production.  Furthermore, a smaller device has a lower mass, which reduces

motion artifacts, enabling device to be small, lowering cost and lowering mass

which also serves to reduce motion artifacts.

69.    Also in the combination, Melby describes a light control film that can

be used with the combined Diab/Benjamin system.  In further detail, Melby

describes a "***louvered plastic film [that] has louvers*** including central regions with

a relatively high coefficient[] of extinction and outer regions with relatively low

coefficients of extinction."  APPLE-1008, Abstract.  Melby is a 3M patent that

describes a commercially available louvered light film made of "cellulose acetate

butyrate (CAB)".  *See*, *e.g.*, APPLE-1007, 2:42-57 (describing light control film

made of "cellulose acetate butyrate film" and stating that "[l]ight control film of

this type is known in the art and is commercially available").  A POSITA would

have been motivated to make this modification to further increase the directionality

of the light signal received in the combined device, thereby leading to a device that

is less susceptible to the influence of ambient light and thus provides more accurate

readings.  *Id.*, 3:65-4:10.

70.    As shown in FIGS. 1 and 2 (reproduced below), Melby explains the

mechanism by which the louvers control light.  Melby teaches that "***a louvered***

***plastic film has a plurality of clear regions separated by louvers***," where each

louver has "a central region with a relatively high coefficient of extinction and

38



APPLE-1010 FIG. 7.1 (annotated) (captioned: "Probe using transmittance principle. Light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode")

77.     In further detail, and as shown in FIG. 7.1 of Webster, reproduced above, Webster explains that the "probe of a pulse oximeter consists of ***two LEDs*** of selected wavelengths and a detector." APPLE-1010, 86. The LEDs can emit wavelengths of, for example, "***660 nm and 940 nm***," and "the ***detector*** used is a photodiode." *Id*. Because light from the LEDs "is partially reflected, transmitted,



APPLE-1010, FIG. 7.13 (captioned "Light that does not pass through arterioles

causes optical shunting")

91.    Accordingly, the combination of Webster and Melby renders this

limitation obvious.

*[15c]: "a plurality of louvers positioned over the light sensitive detector to accept*

*light from the at least one light emission device originating from a general*

*direction of the at least one light emission device and then transmitting through*

*body tissue carrying pulsing blood, wherein the louvers accept the light when the*

*sensor is properly applied to tissue of a patient."*

92.    As I have explained above with respect to [15pre]-[15b], in the

combination, Webster teaches a sensor that measures first and second intensity

51

signals using a photodetector, such as a diode, to detect light from at least two LEDs emitting at two different wavelengths. APPLE-1010, 13-14, 44, 56, 71, 76, 86, FIGS. 7.1, 7.13.

93.     Webster describes the importance of preventing light other than the actual signals of interest (e.g., light that has passed through the tissue carrying pulsing blood) from reaching the detector. APPLE-1010, 95, FIG. 7.13.

94.     Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of *light filter*" can be placed over the detector. APPLE-1010, 79. Using a light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id*. Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs *must not reach the photodiode unless it has passed through tissue containing arterial blood*." *Id*. Indeed, Webster warns that in order to "minimize errors, the pulse oximeter designer must attempt to *limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood*" and suggests the use of "*[l]ight impervious barriers should be placed between LEDs and the photodiode* in all areas where the emitted light could reach the photodiode without passing through tissue." *Id*.

Appx0654

95. One of ordinary skill would have recognized the advantages of using a light filter as suggested by Webster.

96. Also in the combination, Melby describes a light control film that can be used with the combined Webster system. In further detail, Melby describes a "louvered plastic film [that] has louvers including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." APPLE-1008, Abstract.

97. As shown in FIGS. 1 and 2 of Melby, reproduced below, Melby explains the mechanism by which the louvers control light. Melby teaches "*a louvered plastic film has a plurality of clear regions separated by louvers*," where each louver has "a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction." APPLE-1008, 3:1-8.

53



APPLE-1008, FIGS. 1 and 2

98.     In further detail, Melby describes its louvered film as including "cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and ***louvers, such as louver 14***," that "includes outer layers 16 and 18 and inner layer 20." *Id.*, 3:46-4:25.  The operation of the louvers, described with reference to FIG. 2 (reproduced above), is explained as follows:

54

> *A light ray 22 enters transparent layer 12. It then strikes layer 16 at surface 24*. Because layer 16 has only a low concentration of carbon black, there is not a large difference in index of refraction between it and layer 12. Therefore very little of the light is reflected by layer 24. *Most of the light will enter layer 16 and be refracted*. As the light traverses layer 16, some will be absorbed. Some, however, will strike layer 20 on surface 26. Some of light beam 22 will enter layer 20 where, due to the relatively high concentration of carbon black, it will be absorbed. Some of light beam 22 will be reflected at surface 26 due to the large difference in index of refraction between layer 16 and layer 20.

*Id*.

99.    Melby explicitly states that its advantage lies with "the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence." APPLE-1008, 3:46-4:25.

100.    Thus, one of ordinary skill viewing the disclosure of Webster would have recognized that Melby's film could be used in the Webster device as the "light filter" to control light such that only light originating from the direction of the light emitters reaches the detector. APPLE-1010, 79.

Appx0657

101.  One of ordinary skill would have been motivated by Melby to include a light control film in the sensor described by Webster.  Indeed, one of ordinary skill would have been motivated and would have found it obvious to combine Webster and Melby to provide a pulse oximeter that "minimize[s] errors" by limiting "the light reaching the photodiode to that which has traveled through tissue containing arterial blood."  APPLE-1010, 79.

102.  One of ordinary skill would have understood that the beneficial effects of a particular component as described by Melby would have applied in a predictable manner to Webster's system.  Further, one of ordinary skill would have found it obvious to modify Webster to include a light control film as described by Melby placing a light control film over the photodetector in place of a scattering medium because doing so entails the use of known solutions to improve similar systems and methods in the same way.  For example, I have illustrated such a modification below:



APPLE-1010, FIG. 7.1 (annotated)

103.   One of ordinary skill would have recognized that applying Melby's teachings to Webster's pulse oximeter would have led to predictable results without significantly altering or hindering the functions performed by the pulse wave examination apparatus.  Accordingly, implementing Melby's teachings in Webster's pulse oximeter would have been routine and straightforward to one of ordinary skill, and it would have been clear that such a combination would predictably work and provide the expected functionality.

104.   Indeed, one of ordinary skill would have understood that a light control film placed over the detector could thus accept light from the light emission

57

device from a particular direction based on the angle of the louvers within the light control film. *Id.* As described above, the light from pulse oximeter emitters is directed at, for example, "the tissue of the finger" of a subject (APPLE-1010, 87) and "travels through the tissue, and is detected at the photodiode." *Id.*, 88. Thus, in the combination, one of ordinary skill would have understood Webster to render obvious light that originated from a general direction of the light emission devices, transmitted through body tissue carrying pulsing blood. In the combination, one of ordinary skill would have understood the light control film to restrict the amount of light that reaches the detector from a particular direction, and therefore that the louvers accept the light when the sensor is properly applied to the patient's body.

105.    Accordingly, the combination of Webster and Melby renders this limitation obvious.

## VIII. FINE

106.    In the event that claim element [15c] is interpreted more broadly than its plain and ordinary meaning as set forth in the proposed construction so as to encompass reflectance pulse oximeters, in which the emitters and detectors are positioned on the same side of the body tissue carrying pulsing blood, the following analysis also renders obvious claim 15 of the '994 Patent.

58

US005254388A

# United States Patent [19]

## Melby et al.

[11] Patent Number: 5,254,388

[45] Date of Patent: Oct. 19, 1993

[54] **LIGHT CONTROL FILM WITH REDUCED GHOST IMAGES**

[75] Inventors: **Sanford Cobb Jr.**, Saint Mary's Po, Minn.; **Leo A. Meyer; Jeffrey J. Melby; Scott G. Theirl**, all of St. Paul, Minn.

[73] Assignee: **Minnesota Mining and Manufacturing Company**, St. Paul, Minn.

[21] Appl. No.: **820,611**

[22] PCT Filed: **Dec. 20, 1991**

[86] PCT No.: **PCT/US91/09724**

§ 371 Date: **Dec. 20, 1991**

§ 102(e) Date: **Dec. 20, 1991**

### Related U.S. Application Data

[63] Continuation-in-part of Ser. No. 632,123, Dec. 21, 1990, abandoned.

[51] Int. Cl.⁵ ............................................. B32B 3/00
[52] U.S. Cl. ................................... 428/120; 428/163; 428/167; 428/168; 428/170; 428/212; 428/218; 430/12; 430/23
[58] Field of Search ............... 428/120, 163, 167, 168, 428/170, 212, 218; 430/12, 23

[56] **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| Re. 27,617 | 4/1973 | Olsen | 161/6 |
| 3,653,138 | 4/1972 | Cooper | 40/130 R |
| 3,707,416 | 12/1972 | Stevens | 156/196 |
| 3,791,722 | 2/1974 | Ahlberg et al. | 351/45 |
| 3,919,559 | 11/1975 | Stevens | 250/508 |
| 3,922,440 | 11/1975 | Wegwerth et al. | 428/437 |
| 4,342,821 | 8/1982 | Galves et al. | 428/12 |
| 4,764,410 | 8/1988 | Grzywinski | 428/120 |
| 4,766,023 | 8/1988 | Lu | 420/120 |
| 4,788,094 | 11/1988 | Morita et al. | 428/136 |
| 4,815,821 | 3/1989 | Nonogaki et al. | 350/164 |

### FOREIGN PATENT DOCUMENTS

0275205 7/1988 European Pat. Off. .

*Primary Examiner*—Patrick J. Ryan
*Assistant Examiner*—Abraham Bahta
*Attorney, Agent, or Firm*—Gary L. Griswold; Walter N. Kirn; Stephen W. Buckingham

[57] **ABSTRACT**

A louvered plastic film has louvers including central regions with a relatively high coefficients of extinction and outer regions with relatively low coefficients of extinction. Such a film provides a dramatic reduction in ghost images.

**30 Claims, 2 Drawing Sheets**





*Fig. 1*



*Fig. 2*



*Fig. 3*

1

# LIGHT CONTROL FILM WITH REDUCED GHOST IMAGES

This is a continuation-in part of application, No. 07/632,123 filed Dec. 21, 1990, now abandoned.

## BACKGROUND OF THE INVENTION

U.S. Pat. No. Re. 27,617 (Olsen) teaches a process of making a louvered light control film by skiving a billet of altercating layers of plastic having relatively lower and relatively higher optical densities. Upon skiving the billet, the pigmented layers serve as louver elements, which, as illustrated in the patent, may extend orthogonally to the resulting louvered plastic film. U.S. Pat. No. 3,707,416 (Stevens) teaches a process whereby the louver elements may be canted with respect to the surface of the louvered plastic film to provide a film which transmits light in a direction other than perpendicular to the surface of the film. U.S. Pat. No. 3,919,559 (Stevens) teaches a process for attaining a gradual change in the angle of cant of successive louver elements.

Among the uses for such louvered plastic films are lenses and goggles as shown in U.S. Pat. No. 3,791,722 (Ahlberg et al.), to be worn where high levels of illumination or glare are encountered. The film may also be used for transparent covering for a backlighted instrument panel, such as the instrument panel of an automobile, to minimize reflections from the windshield. A louvered plastic film may also be used to give a black and white photographic negative the appearance of a positive made from the negative as taught in U.S. Pat. No. 3,653,138 (Cooper).

U.S. Pat. No. 3,922,440 (Wegwerth et al.) points out that because louvered plastic films to are thin sheet materials: (1) they are not by themselves capable of structurally withstanding extreme stresses and (2) they are subject to distortion from physical stress and temperatures" (col. 1, lines 19–22). Furthermore, the skiving by which the louvered plastic films are produced results in irregular surfaces which seriously limits the optical quality of the film. Typically such films are, for practical purposes, translucent rather than transparent. Accordingly, as in Example 1 of that patent, the louvered plastic film usually is laminated under pressure between two clear plastic films of a material such as cellulose acetate butyrate, the material usually used in making louvered plastic films. Typically, the louvered plastic film is skived from the billet to a thickness between 0.1 and 0.4 mm and each of the outer plastic films has a thickness of between 0.1 and 0.3 mm. The ratio of the thickness of the skived film to the width of the clear regions will control the permitted view angle, with a greater ratio providing a narrower angle. Wegwerth's process of laminating louvered plastic films between two clear films requires an expensive press which is also expensive to operate. This is in part from the need to distribute heat uniformly and in part from the need to apply pressure with precision. Because the resulting laminates can not be larger than the platens of the press in which they are laminated, the press must be sufficiently large to produce the required size thus increasing the expense of the press.

U.S. Pat. Nos. 4,764,410 (Grzywinski) and 4,766,023 (Lu) teach alterative to the Wegwerth method. These alternative methods include the steps of (1) coating the skived louvered plastic film with a solventless monomer composition which polymerizes to an adhesive state or

2

a hard state, respectively, upon exposure to radiation, (2) overlaying the monomer composition with a plastic film, and (3) exposing the coating to radiation to polymerize the composition. After polymerization the plastic liner which was placed over the monomer composition may be left in place to serve as protection for the louvered plastic film, or may be removed, leaving the polymerized composition exposed.

Such films are used for various purposes. One common use is to prevent light from automobile control panels from reaching the windshield and causing distracting and dangerous reflections at night. Another use is to cover the screen of a CRT or other display to prevent persons other than the operator from reading data displayed thereon.

A problem that is common to all of the louvered films described above, arises from the difference between the clear and dark layers. Typically the clear and dark layers are formed of the same material. A preferred material is cellulose acetate butyrate (CAB), although other materials may be used. The louvers are, however, rendered dark by the inclusion of very fine particles of another material. A preferred material is carbon black. If carbon black is used these particles have an average diameter of less than 0.1 µm. Thus they are much smaller than the wavelength of the light.

In spite of the small size of these particles, and, in fact, in part because of that size, the presence of the particles causes the index of refraction of the composite to be different from that of the plastic alone. Since the index of refraction of the clear and dark layers are different, light is reflected at the interface between the two. The effect of this reflection is the creation of "ghost" images. The percentage of the incident light that is reflected increases with increasing angle of incidence and increasing difference of index of refraction. For these purposes the angle of incidence is the angle between the ray of light and a normal to the interface between the clear and dark layers. As a result the ghost images of a typical film are most noticeable at angles between 5° and 25° from the axis of the louvers. Such ghost images are aesthetically displeasing, at best. Furthermore, if the film is to be used to cover a CRT screen or other display, the ghost images can cause misinterpretation of data and significantly contribute to operator fatigue.

One approach to elimination of the ghosting problem is to provide a matte finish on the interface between the clear and dark layers. This tends to eliminate distinct ghost images, but does not reduce the total amount of light reflected. Thus the ghost image is replaced by a blurred, but clearly visible, glow. In addition the creation of such a matte surface is very difficult in the currently preferred coextrusion processes wherein the clear and dark layers are extruded together in a single process.

An alternative approach is to reduce the amount of carbon black incorporated into the layers forming the louvers. In this case, the difference in index of refraction between the clear and dark layers is less than in the previously described film and thus reflections are reduced. However, if the louvers remain the same width as those with higher optical density, they will no longer meet opacity requirements. Thus, such films may not be used as privacy screens. Alternatively the louvers may be made wider to meet opacity requirements. This, however, will reduce the on-axis transmission through the louvered film to unacceptably low levels and/or make the louvers individually visible.

4

5,254,388

3

4

## SUMMARY OF THE INVENTION

According to the invention, a louvered plastic film has a plurality of clear regions separated by louvers. Each louver has a central region with a relatively high coefficient of extinction and outer regions, adjacent said clear regions, having relatively low coefficients of extinction.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic cross section of a louvered plastic film according to the invention;

FIG. 2 is an enlarged drawing of a portion of the louvered plastic film of FIG. 1; and

FIG. 3 is a schematic cross section of a privacy screen for a cathode ray using a louvered plastic film of the invention.

## DETAILED DESCRIPTION OF A PREFERRED EMBODIMENT

The present invention overcomes the problems of the prior art by using louvers having an outer portion with a relatively low optical density and an inner portion having a relatively high optical density. Alternatively stated, the outer portions have a relatively lower coefficient of extinction and the inner region has a relatively higher coefficient of extinction. For these purposes the transmission through a medium is given by the formula

$$T = 10^{-xd}$$

where T is the decimal fraction of light that is transmitted, x is the coefficient of extinction and d is the optical path length through the medium. In CAB with carbon black incorporated in the percentages contemplated in the invention, the coefficient of extinction is approximately equal to 4750C where C is the decimal fraction of carbon black in the film and the coefficient of extinction is expressed in inverse millimeters. In this case, d in the equation above would be expressed in millimeters.

A desirable film would have louvers in which each louver varied continuously from clear at its edges to very dark at its center. Creation of such graded optical density films would be very difficult, however. Therefore, a preferred embodiment uses a multilayer louver construction.

FIG. 1 illustrates a louvered film 10 according to the present invention. It should be noted that FIG. 1 is an edge view of the film and that in normal use it would be viewed from an angle perpendicular to that of the Figure. Louvered film 10 has cover sheets 11 provided for clarification and includes alternating clear layers, such as layer 12 and louvers, such as louver 14. Louver 14, in turn, includes outer layers 16 and 18 and inner layer 20. Louver 14 will be described as containing carbon black, although other darkening agents could be used. Inner layer 20 includes a comparatively high concentration of carbon black in order to provide louver 14 with the required opacity. Outer layers 16 and 18 have carbon black, but in a lower concentration than that of layer 20. Thus, while they have a lower coefficient of extinction than layer 20, they also have an index of refraction that is closer to that of clear layer 12.

The operation of the louvers may be more clearly understood by reference to FIG. 2. FIG. 2 is an expanded view of a portion of clear layer 12 and louver 14. A light ray 22 enters transparent layer 12. It then strikes layer 16 at surface 24. Because layer 16 has only a low concentration of carbon black, there is not a large difference in index of refraction between it and layer 12. Therefore very little of the light is reflected by layer 24. Most of the light will enter layer 16 and be refracted. As the light traverses layer 16, some will be absorbed. Some, however, will strike layer 20 on surface 26. Some of light beam 22 will enter layer 20 where, due to the relatively high concentration of carbon black, it will be absorbed. Some of light beam 22 will be reflected at surface 26 due to the large difference in index of refraction between layer 16 and layer 20.

The advantage of the invention lies in the fact that the effective optical density of a medium is directly proportional to the distance that the light must travel through that medium and the fact that reflection at an interface between two materials with different indices of refraction increases with increasing angle of incidence. Thus, the light that is most likely to be reflected at the interface between layers 16 and 20 is the light that enters layer 16 at a grazing angle. Such light must travel a long distance through layer 16 both before and after reflection from surface 26 if it is to reemerge through surface 24. Therefore, the majority of light entering layer 16 will be absorbed even though layer 16 has only a comparatively light loading of carbon black.

To fully appreciate a film of the present invention, it should be compared with a prior art louvered film. In a typical prior art film, clear layers 0.0953 mm thick are separated by louvers with a thickness of 0.0114 mm. The clear regions and the louvers both are made primarily of CAB but the louvers further include 5 percent carbon black by weight. A simple calculation will show that the clear regions make up about 89 percent of such a film. In a preferred embodiment of the invention clear regions, such as clear region 12, are 0.0876 mm thick. The lightly loaded regions, such as layers 16 and 18, are 0.00445 mm thick, while the dark regions, such as layer 20, are 0.010 mm thick. Lightly loaded regions 16 and 18 include 0.75 percent carbon black by weight while heavily loaded region 20 includes 5 percent carbon black by weight. In such a film the clear regions make up about 86 percent of the film. Thus, such a film manufactured according to the invention will produce a dramatically reduced ghost image while covering a back-lit display, yet will provide only very slightly reduced on-axis transmission as compared to a film of the prior art. Ghost images could be further reduced by including additional intermediate layers between layers 16 and 20. For any given application the preferred construction will be determined by the acceptable amount of ghosting, the minimum acceptable on-axis transmission and acceptable difficulty of construction.

Although a wide variety of film parameters are possible within the scope of the invention, values within certain ranges are preferable in general, the lightly loaded outer portions of the louvers should be in the range of 0.12 to 1.0 percent carbon black by weight and the heavily loaded inner portion should be in the range of 1.5 to 10 percent carbon black by weight. For use with video displays the film should be between 0.08 and 0.6 mm thick. The clear regions should be between 0.05 and 0.25 mm wide, the outer regions of the louvers should be 0.0025 and 0.01 mm wide and the central regions of the louvers should be between 0.005 and 0.02 mm wide. In some situations more distant objects are to be viewed through a film. One such application is the use of a film as a sunscreen in the rear window of an automobile. In such situations thicker films with wider

5,254,388

| 5 | 6 |

clear areas and louvers may be used and are often preferable. Therefore, more generally stated, the films should be between 0.08 and 1.5 mm thick, with clear regions having widths in the range of 0.05 to 1.0 mm. The louvers should have outer regions between 0.0025 and 0.015 mm wide and central regions 0.005 and 0.03 mm wide.

One embodiment that is not optimized for any particular application, but is useful in a wide variety of applications is made of CAB and has louvers having dark heavily loaded central regions that include 3 percent by weight carbon black and are 0.01 mm wide. The lightly loaded outer layers are 0.2 percent carbon black and are 0.0075 mm wide. The clear regions are 0.09 mm wide. The film thickness is preferably in the range of 0.15 mm to 0.5 mm. Thicker films will allow a lower range of viewing angles through the film. A preferred form of carbon black is available from Cabot Corporation under the name XC72.

A film according to the invention could be manufactured in a variety of ways. The most straight forward would be to manufacture layers 12, 16, 18 and 20 separately, stack them into a billet, repeating layers in the proper order and skive them as taught by the prior art. Extremely thin layers, especially layers such as 16, 18 and 20, are difficult to handle, however. In a preferred method of manufacture the layers are co-extruded. In order to do so the extruder must have three feeds and at least four outputs. Preferably the extruder would have five outputs. The extruder would then extrude a sheet that would run from the center of layer 12 to the center of the next transparent layer. It would include, therefore, half of two transparent layers as well as the two lightly loaded layers and one heavily loaded layer. Such sheets could then be stacked into a billet, heat-pressed and skived as taught by the art.

The present invention is particularly suited for use in privacy screens for CRT's. As explained previously, the reduction of ghost images in such screens significantly reduces operator fatigue. A privacy screen utilizing the louvered film of the invention is shown in FIG. 3. The privacy screen of the FIG. 3 includes clarifying cover sheets 11, clear regions 12, lightly loaded dark regions 16 and 18, and heavily loaded dark regions 20. Preferably cover sheets 11 are polyurethane films, clear regions 12 are CAB, and dark regions 16, 18, and 20 are CAB with carbon black. In addition, glass layers 30 and 32 are provided exterior to clarifying cover sheets 11. In a preferred method of manufacture, cover sheets 11 are placed on a louvered film and glass layers 30 and 32 placed thereon. The entire structure is then autoclaved under pressure causing all five layers to heat laminate to one another. In practice, layers 34, 36, and 38, discussed below, would typically be applied to glass layers 30 and 32 prior to lamination.

A layer of an electrically conductive or semiconductive material is applied to one surface. A variety of materials may be used, but in a preferred embodiment layer 34 is a layer of indium tin oxide or a metal nitride that may be either sputtered or vacuum deposited onto glass layer 30. Preferably layer 34 has a thickness in the range of 300 to 600 angstroms. Preferably layer 34 is also a neutral density layer, although a separate neutral density layer could be provided or omitted altogether. Finally, antireflection layers 36 and 38 are provided. A detailed discussion of the theory and structure of antireflection coatings is provided by H. A. McCloud in *Thin Film optical Fibers,* Second Edition, 1986. Films that

will work well as the neutral density conductive coat and the antireflective coat are available from Viratec Thin Films Inc. under the trade names NDAR and CDAR, respectively. An alternative neutral density conductive coating is available from the same source under the trade name TDAR.

To use the structure of FIG. 3 as a privacy filter, a section the size of the screen of the CRT on which the filter is to be placed is prepared. The filter is then placed in front of the CRT screen. In operation, antireflection coating 36 prevents glare resulting from reflection of ambient room light from the front of the privacy filter. Glass layers 30 and 32 provide stability as well as providing a surface on which a hard antireflective coat may be provided. Antireflection coat 38 prevents reflection of ambient light entering the system from the back surface of the privacy filter. This is particularly important because such light will pass through the louvered film a second time and is displaced slightly from where it passed through the first time. As a result, the reflections of the louvers will not be precisely aligned with the actual louvers creating very distracting moiré patterns. By providing an efficient antireflective coating 38, such moiré patterns are avoided.

The remaining layer is conductive layer 34. It provides several functions. If it is at the lower end of the thickness range specified above, approximately 300 angstroms, it will have a resistivity of approximately 5000 ohms per square. With a resistivity in that range, it will prevent static electric build up on the privacy screen, thus helping to reduce the amount of dust collecting thereon. If the thickness is closer to the thicker range mentioned above, 600 angstroms, it will have a resistivity on the order of 500 ohms per square and will, in addition to prevent static build up, provide the terminal operator with shielding against electric fields. In addition, as mentioned above, layer 34 acts as a neutral density layer. A neutral density layer is one that absorbs a portion of the light traveling therethrough. Since the ambient light travels through the privacy filter, strikes the CRT screen and is reflected, and travels back through the privacy filter must travel through the neutral density filter twice, it will be attenuated twice. Thus, if the neutral density filter has a density of 50 percent, only 25 percent of the glare that would arise from the CRT screen itself will be present. Since the light emitted by the CRT travels through the neutral density filter only once, it is attenuated only by 50 percent. Thus, although reducing the effective output of the CRT, the neutral density filter increases the ratio of the CRT brightness to that of the glare.

One other factor that must be considered is the dot pitch of the CRT. If the width of clear regions 12 as well as the widths of the louvers are not carefully selected, moiré patterns will be visible to the user. One solution to this is to carefully adjust the width of these regions for use with a particular CRT. A problem with this is that CRT's currently available on the market have a wide variety of dot pitches and the available pitches are changing rapidly as screen resolutions are being improved. An alternative solution is to make a single set of louver spacings, but to rotate the louvered film slightly so that the louvers run 10 to 14 degrees from the vertical. Since the louvers are no longer running parallel to the rows of phosphors, the problem of moiré patterns is greatly reduced.

5,254,388

7
### EXAMPLE

In order to test the invention, a sample film was manufactured. This sample had louvers including a reduced concentration layer on one side only. Thus, the strength of the ghost image on the side without a reduced concentration layer represented those of the prior art while the ghost image on the side with the reduced concentration layer represented that of a film of the invention. Specifically, the film included a louvered film that was 0.375 mm thick. Cover sheets with a thickness of 0.25 mm were press laminated to each major surface for clarification. The clear layers were 0.175 mm wide and each louver consisted of a 0.007 mm layer that include 0.6 percent carbon black by weight and a 0.011 mm layer that included 5 percent carbon black by weight.

A light box with a 25 mm aperture was set up in a darkened room. The sample film was positioned 1.2 m from the light box. A Spectra Prichard photometer was set to have a 6 minute aperture and positioned on the opposite of the film from the light box. The film was positioned on an adjustable slide so that it could be moved perpendicular to the line connecting the light box and the photometer. The slide was mounted so that the film could be rotated about an axis parallel to the louvers. The image brightness was measured at a variety of angles to the normal to the film on both the side where the 5 percent layer was exposed and the side where the 0.6 percent layer was exposed. The measurement was made in Foot Lamberts. The results of these measurements are summarized in the table below.

| Incident Angle of Light | Ghost Image Brightness (Foot Lamberts) | |
|---|---|---|
| (Degrees) | 5% Side | 0.6% Side |
| 5 | 2.7 | 0.34 |
| 10 | 1.7 | 0.10 |
| 15 | 0.87 | 0.05 |
| 20 | 0.43 | 0.04 |
| 25 | 0.26 | 0.03 |

We claim:

1. A louvered plastic film comprising a plurality of clear regions separated by louvers wherein each of said louvers has a central region having a first coefficient of extinction and an outer region adjacent said clear region having a second coefficient of extinction, said first coefficient of extinction being at least 1.5 times said second coefficient of extinction.

2. The louvered plastic film of claim 1 wherein said louvers are of a clear material with a light absorbing material incorporated therein.

3. The louvered plastic film of claim 2 wherein said light absorbing material is carbon black.

4. The louvered plastic film of claim 2 wherein both said clear regions and said louvers are of cellulose acetate butyrate.

5. The louvered plastic film of claim 4 wherein said light absorbing material is carbon black.

6. The louvered plastic film of claim 5 wherein said outer regions of said louvers are in the range 0.12 to 1.0 percent by weight carbon black.

7. The louvered plastic film of claim 4 wherein said central regions of said louvers are in the range 1.5 to 10.0 percent by weight carbon black.

8. The louvered plastic film of claim 1 wherein said film has a thickness in the range 0.08 mm to 1.5 mm.

8
9. The louvered plastic film of claim 8 wherein said clear regions have widths in the range 0.05 mm to 1.0 mm.

10. The louvered plastic film of claim 8 wherein said outer regions of said louvers have widths in the range 0.0025 mm to 0.015 mm.

11. The louvered plastic film of claim 8 wherein said central regions of said louvers have widths in the range 0.005 mm to 0.03 mm.

12. The louvered plastic film of claim 8 wherein said louvers are of a clear material with a light absorbing material incorporated therein.

13. The louvered plastic film of claim 12 wherein both said clear regions and said louvers are of cellulose acetate butyrate.

14. The louvered plastic film of claim 13 wherein said light absorbing material is carbon black.

15. The louvered plastic film of claim 14 wherein said clear regions have widths in the range 0.05 mm to 1.0 mm, said outer regions of said louvers have widths in the range 0.0025 mm to 0.015 mm and said central regions of said louvers have widths in the range 0.005 mm to 0.03 mm.

16. The louvered plastic film of claim 15 wherein said outer regions of said louvers are in the range 0.12 to 1.0 percent by weight carbon black and said central regions of said louvers are in the range 1.5 to 10.0 percent by weight carbon black.

17. The louvered plastic film of claim 15 wherein said film has a thickness in the range 0.08 mm to 0.6 mm, said clear regions have widths in the range 0.05 mm to 0.25 mm, said outer regions of said louvers have widths in the range 0.0025 mm to 0.01 mm and said central regions of said louvers have widths in the range 0.005 mm to 0.02 mm.

18. The louvered plastic film of claim 17 wherein said outer regions of said louvers are in the range 0.12 to 1.0 percent by weight carbon black and said central regions of said louvers are in the range 1.5 to 10.0 percent by weight carbon black.

19. A louvered plastic film according to claim 1 further comprising an antireflection coating.

20. A louvered plastic film according to claim 1 wherein said film has first and second major surfaces and said first major surface has a layer of glass adhered thereto.

21. A louvered plastic film according to claim 20 wherein said glass has an antireflection coating.

22. A louvered plastic film according to claim 20 wherein said second major surface has a layer of glass adhered thereto.

23. A louvered plastic film according to claim 22 wherein said layer of glass adhered to said second major surface has a neutral density coating.

24. A louvered plastic film according to claim 22 wherein said layer of glass adhered to said second major surface has an electrically conductive coating.

25. A louvered plastic film according to claim 24 wherein said electrically conductive coating has an electrical resistivity of less than 5000 Ohms per square.

26. A louvered plastic film according to claim 25 wherein said electrically conductive coating has an electrical resistivity of less than 500 Ohms per square.

27. A louvered plastic film according to claim 24 wherein said electrically conductive coating also serves as a neutral density coating.

5,254,388

9

**28.** A louvered plastic film according to claim 24 wherein said electrically conductive coating has an antireflection coating.

**29.** A louvered plastic film according to claim 28 wherein said layer of glass adhered to said first major surface has an antireflection coating.

**30.** A privacy screen for use with a cathode ray tube

10

display said screen comprising louvered plastic film having a plurality of clear regions separated by louvers wherein each of said louvers has a central region having a relatively high coefficient of extinction and outer regions adjacent said clear regions having relatively low coefficients of extinction.

* * * * *



MEDICAL SCIENCE SERIES

# DESIGN OF PULSE OXIMETERS

EDITED BY
## J G WEBSTER

IoP

# CHAPTER 2

## MOTIVATION OF PULSE OXIMETRY

*Daniel J Sebald*

Pulse oximeters have been commercially available for a little more than the last decade and have seen a tremendous growth in popularity becoming a quasi-standard, if not standard, monitoring device in hospital critical care units and surgical theaters. The instrument transcutaneously estimates oxygen saturation of arterial blood and provides vital information about the cardiorespiratory function of the patient. Pulse oximetry provides an empirical measure of arterial saturation. However, with state-of-the-art instrumentation and proper initial calibration, the correlation between the pulse oximeter measurement, $S_pO_2$, and arterial blood's actual oxygen saturation, $S_aO_2$, is adequate—generally less than 3% discrepancy provided $S_aO_2$ is above 70% (Severinghaus and Kelleher 1992)—for medical applications where detecting hypoxemia is essential. Quick acceptance of pulse oximetry as a monitoring device for surgery, recovery, critical care and research has shown that for determining hypoxemia any reasonably small loss in accuracy that may be attributed to measuring arterial oxygen saturation transcutaneously is outweighed by the advantages of noninvasiveness and continuous, immediate availability of data. In applications where accuracy is paramount, such as in detecting hyperoxia, the use of pulse oximetry is not so clear and remains to be decided in the medical community. However, mounting evidence suggests that the pulse oximeter is not very useful in these situations. Nonetheless, the importance of detecting hypoxemia, where pulse oximetry is best suited, is so great that the instrument plays a critical role in medicine despite its limitations.

### 2.1 PULSE OXIMETER PRINCIPLES

A pulse oximeter shines light of two wavelengths through a tissue bed such as the finger or earlobe and measures the transmitted light signal. The device operates on the following principles:

1. The light absorbance of oxygenated hemoglobin and deoxygenated hemoglobin at the two wavelengths is different. To be more precise, the set of associated extinction coefficients for the absorption of light for these wavelengths is linearly independent with great enough variation for adequate sensitivity but not so large that the blood appears opaque to either of the

14          *Design of pulse oximeters*

light sources. This model assumes that only oxygenated and deoxygenated hemoglobin are present in the blood.

2.   The pulsatile nature of arterial blood results in a waveform in the transmitted signal that allows the absorbance effects of arterial blood to be identified from those of nonpulsatile venous blood and other body tissue. By using a quotient of the two effects at different wavelengths it is possible to obtain a measure requiring no absolute calibration with respect to overall tissue absorbance. This is a clear advantage of pulse oximeters over previous types of oximeters.

3.   With adequate light, scattering in blood and tissue will illuminate sufficient arterial blood, allowing reliable detection of the pulsatile signal. The scattering effect necessitates empirical calibration of the pulse oximeter. On the other hand, this effect allows a transmittance path around bone in the finger.

The principles above, associated issues and design and application of pulse oximeters comprise the better part of this text. The remainder of this chapter concentrates on the role and importance of pulse oximetry and limitations of the device.

## 2.2 $S_pO_2$ AS MONITOR OF HEMOGLOBIN OXYGENATION

Lack of oxygen can quickly lead to irreversible damage to cell tissue having a high metabolic rate, the heart and central nervous system being two examples. Although the human body is surprisingly robust in many ways, the physiological process of sustaining proper cell function via oxygen transport is a delicate and complex control system; one which if altered too significantly could become unstable and insufficient for meeting oxygen tissue demands. To emphasize the importance of proper tissue oxygenation, Table 2.1 lists survival times for different organ beds after the onset of anoxia, or cardiac arrest. Hence, it is important to safeguard against pathological conditions that might lead to improper tissue oxygenation.

**Table 2.1** Organ robustness to anoxia (cardiac arrest), a consequence of metabolic rate and cellular oxygen stores. *Survival* time is the time before cellular damage occurs after total loss of oxygen delivery. *Revival* time is the time before function of the organ can no longer be restored. Revival times are generally four times longer than survival times in most organs except the brain, which has a revival time five times longer than its survival time (adapted from Nunn 1987).

| Organ | Survival time after onset of anoxia |
|---|---|
| Cerebral cortex | less than 1 min |
| Heart | 5 min |
| Liver and kidney | 10 min |
| Skeletal muscle | 2 h |

### 2.2.1 Comprehensive approach

Arterial saturation, the variable which pulse oximetry is intended to measure, is just one of several variables a physician will consider when assessing the condition of a patient's cardiopulmonary system. In this regard, the clinician will address the fundamental issue of whether or not body tissue is being properly oxygenated (Vender 1992). This requires a comprehensive approach whereby arterial saturation plays a certain role. It is an extremely important one, but physicians typically do not use $S_aO_2$ as a sole monitor for pathological oxygenation conditions.

### 2.2.2 Arterial oxygen saturation

Arterial oxygen saturation pertains to blood in the arteries and arterioles throughout the body. This blood is of the same saturation throughout the arterial system. It is at the capillary level that saturation levels change. In a healthy adult, the normal operating range for $S_aO_2$ is greater than 90%, which corresponds to an arterial partial pressure, $P_aO_2$, of 60 to 100 mmHg (Ahrens and Rutherford 1993).

Owing to the complexity of the oxygenation process, it is difficult to address the wealth of uses for arterial saturation in critical care settings, operating rooms, and research laboratories. Physicians are interested in knowing $S_aO_2$ for a variety of reasons. Sometimes it is for quantitative assessment. Sometimes it serves as an important variable for safeguarding against, although it is not a direct indication of the dangerous condition of low cellular oxygenation. Table 2.2 gives several respiratory problems that might cause low $S_aO_2$, but this is by no means a complete list.

**Table 2.2** Respiratory problems that might result in low $S_aO_2$ (adapted from Des Jardins 1990, Cherniack and Cherniack 1983, and Selecky 1982).

| Respiratory problem | Example disease or possible source of problem |
| --- | --- |
| Poor lung compliance | Pneumonia, ARDS, fibrosis, emphysema |
| Increased airway resistance | Asthma, chronic bronchitis, cystic fibrosis |
| Low pulmonary diffusion capacity | Emphysema, pulmonary alveolar proteinosis |
| Airway obstruction | Choking, secretions from intubation, obstructive sleep apnea |
| Ventilatory muscle weakness | Lead poisoning, trauma to phrenic nerve |
| Increased true venous admixture | Congenital heart disease |
| Low inspired partial pressure of oxygen | Anesthesia equipment failure, high altitude |
| Hypoventilation | Acid-base imbalance |

### 2.2.3 Hypoxia and hypoxemia

*Hypoxia* means lower than normal tissue oxygenation. *Hypoxemia* means lower than normal blood oxygenation. These are two quite different concepts. Hypoxia refers to the critically dangerous condition where cell function is in jeopardy. Table 2.3 shows different categories of hypoxia. The first category, hypoxic hypoxia, is a consequence of low arterial saturation. Hence, hypoxemia is a dangerous condition. However, it is not necessary that hypoxia exist under conditions of hypoxemia. Likewise, as table 2.3 suggests, hypoxia may occur

Appx0886

when there is no evidence of hypoxemia. Therefore, a clinician carefully interprets results from monitoring blood oxygen content because $S_aO_2$ and, consequently, $S_pO_2$ provide *only* a measure of hypoxemia, *not* a measure of hypoxia.

**Table 2.3** Different types of hypoxia (adapted from Bredle 1989, and Des Jardins 1990).

| Type of hypoxia | Description |
|---|---|
| Hypoxic hypoxia | Arterial blood is poorly oxygenated due to low $F_IO_2$ or respiratory disease |
| Anemic hypoxia | Blood cannot transport adequate oxygen due to hemoglobin abnormalities |
| Circulatory hypoxia | Cardiac output is low or blood perfusion is inadequate |
| Histotoxic hypoxia | The tissue is incapable of using otherwise sufficient supplies of oxygen |

*2.2.4 Role of SpO$_2$ in avoiding hypoxia*

Although monitoring blood oxygen saturation provides only clues to the oxygenation of cells, there is one variable which provides better evidence of hypoxia. That is lactate content of the blood. Energy utilization may take place in an anaerobic environment, and the byproduct of such a process is lactate. However, the anaerobic process is inefficient for generating energy, and cells cannot operate for long in this situation. The presence of lactate is not a problem initially because it may be broken down if oxygen stores are replenished soon enough (Ahrens and Rutherford 1993). Lactic acidosis occurs if this is not the case. This, in turn, affects the pH of blood which influences the cardiac and pulmonary control systems. However, if cardiac output and respiratory rate cannot increase the delivered oxygen, a dangerous situation results.

Although lactic acidosis may be a better indicator of hypoxia than arterial blood saturation, the problem is that lactic acidosis is an after-the-fact occurrence. As pointed out by Vender (1992), cell damage is likely occurring upon noting an increase in lactate. Herein lies the true value of blood saturation measurement. If monitored appropriately, it can help signal dangerous pathological conditions before cell damage occurs. However, as alluded to earlier $S_pO_2$ (i.e., $S_aO_2$) alone is not as helpful as when supplemented with measures of cardiac output, functional hemoglobin, blood pressure, heart rate, respiratory rate, urine output, patient comfort and a variety of other variables.

*2.2.4.1 Anesthesiology.* Tissue oxygenation and, consequently, blood saturation are of extreme importance to the anesthesiologist because the patient's cardiopulmonary system is placed in a state where it can no longer meet oxygen demands on its own. In a sense, the anesthetist becomes the controller for the patient's respiratory system, and $S_pO_2$ provides one of the better feedback variables. As a monitoring device to assist the anesthetist, pulse oximetry has literally revolutionized the field of anesthesiology because of its noninvasive nature, fast response and affordability (Fairley 1989). Note that the transition to pulse oximetry was not without controversy (Payne and Severinghaus 1985). Cyanosis, heart rate and blood pressure were generally what was available to the anesthesiologist for detecting hypoxia before the advent of pulse oximetry (Fairley 1989). Similar to lactate, all these variables are after-the-fact

occurrences of **hypoxia**. Again, $S_pO_2$ does not give direct indication of hypoxia, which has its **drawbacks**, but it can be an early warning of its occurrence.

The most frequent use of **pulse oximeters** is by anesthesiologists during surgery and for about an hour afterwards in the recovery room. Anesthesiologists administer narcotics to the patient to suppress the central nervous system. This stops the patient's desire to breath. In addition, they administer muscle relaxants, which stops the ability to breathe and permits airways to collapse. Thus, it is necessary to restore breathing through intubation and artificial respiration. Anesthesiologists can monitor several variables, but most have limitations of late or unreliable response to an oxygenation problem.

Blood pressure declines long after oxygen declines, and the ECG indicates problems even later than blood pressure. An esophageal stethoscope indicates within one beat when the heart has stopped, but this is also long after oxygen has declined. The anesthesiologist can check for cyanosis. Again, this occurs long after oxygen has declined. Blood gas samples give an accurate measurement of oxygen, carbon dioxide, and pH but take about 5 min to process.

Pulse oximeters solved the problem of delay by continuously and noninvasively monitoring arterial oxygen saturation. Recall that adequate arterial saturation does not imply proper oxygenation. Furthermore, there is a delay between noting a drop in $S_pO_2$ and its cause. However, of the monitored variables, $S_pO_2$ is currently the best indication that an oxygenation problem exists or is about to occur, and it does so noninvasively.

The pulse oximeter probe is usually applied to the finger, since the body will decrease blood flow to the finger before more vital organs. It is more difficult to reliably secure probes to the ear, nose, and forehead. An arterial oxygen saturation drop from 98 to 96% alerts the anesthesiologist that something is going on. If the oxygen saturation drops to 90%, the default alarm sounds, which indicates that a serious problem may be at hand.

Continuously monitoring $S_pO_2$ catches several equipment malfunctions and improper placement of tracheal tubes, but naturally it does not identify the problem (Payne and Severinghaus 1985). The fact that $S_pO_2$ does not identify the source of the problem should not be viewed as a drawback to the pulse oximeter. Instead, this has implications in how to view pulse oximetry as a monitored variable. Fairley (1989) has figuratively stated the role of pulse oximetry in anesthesiology (Original metaphor attributed to Tremper and Barker (1989)):

> It was not until effective pulse oximetry became commercially available, for the first time, that large numbers of anesthesiologists could continuously monitor their patients' arterial oxygen levels. It is very important to recognize the nature of this monitoring. Since virtually every anesthetized patient breathes an oxygen enriched mixture, desaturation only occurs when there is a substantial increase in the difference between the (perceived) inspired oxygen tension and that in the arterial blood. Metaphorically, as the blindfolded anesthetist walks unknowingly towards the cliff of hypoxia—whether due to problems of inspired gas, equipment failure, underventilation, or abnormal pulmonary shunting—the protective hand of the pulse oximeter sentry stops him from falling over the edge. The oximeter will not tell him why he has been proceeding in that direction, or the direction back! On the other hand, should he start falling, the sentry functions on the vertical part of the dissociation curve and becomes an extremely

18      *Design of pulse oximeters*

sensitive (if not always accurate) indicator of progress during the drop. Interestingly, it is highly probable that many fewer blood gas samples are being drawn during anesthesia now that pulse oximeters are so universally available. Our detailed insight into our patients' pulmonary oxygen exchange is less than with $P_aO_2$ measurement but, because of the continuously available sentry, we believe our patients are safer. A prospective study to prove that important point with certainty may never be performed but, already, opinion seems overwhelmingly in favor of that belief.

Pulse oximetry has become a *de facto* standard for the American Society of Anesthesiologists (Eichhorn 1993). This means that, as alluded to in Fairley's description, although definitive statistical proof of the benefit of pulse oximetry may never be shown because of the rarity of complications due to anesthesiology in the operating theater, a large majority of those who use the device feel that it helps to reduce complications.

*2.2.4.2 Postoperative and critical care.* Pulse oximetry has proven very important to postoperative recovery because the patient's pulmonary control may still be compromised from the effects of anesthesia. For example, a randomized study by Lampe *et al.* (1990) found that of 141 patients having carotid endarterectomy 63% had episodes of $S_pO_2$ less than 90% and 21% had episodes of $S_pO_2$ less than 86% during the postoperative period. Similar studies also show large numbers of desaturation episodes, although variation in the data does exist (Severinghaus and Kelleher 1992).

The role of pulse oximetry in intensive and critical care units is similar to that for anesthesiology, although the patient's respiratory system may not be suppressed by narcotics and muscle relaxants. The instrument still acts as the sentry warning of desaturation from a variety of conditions, some of which were listed in table 2.2. In this setting, alarms and temporal records are very useful when constant surveillance of the patient is not possible.

*2.2.4.3 Exams and research studies.* The pulse oximeter is an excellent device for medical research studies such as sleep apnea and hypoxic ventilatory response (Severinghaus and Kelleher 1992). Medical exams such as stress tests also benefit from the noninvasive, continuous nature of pulse oximetry. In such cases, $S_pO_2$ may be used to catch hypoxemic events and also correlated with other variables to glean information about the patient's general health.

*2.2.5 Photoplethysmography*

Most pulse oximeters on the market feature a photoplethysmograph. The signal for the photoplethysmograph is derived from the same waveforms used to calculate $S_pO_2$. The photoplethysmograph may be used in a clinical setting in the same manner as a plethysmograph. However, the accuracy of the photoplethysmograph suffers from motion artifacts, and the patient must have adequate blood perfusion near placement of the pulse oximeter probe. Just as with the conventional plethysmogram, signal processing can derive heart rate from the photoplethysmogram waveform. Hence, most pulse oximeters also display heart rate. Similar to computing $S_pO_2$, temporal low-pass filtering abates the effect of motion artifacts on heart rate estimation.

### 2.2.6 Hyperoxia

*Hyperoxia* is the condition where blood in the system contains more than the normal amount of oxygen. Determining excessive levels of oxygen is important in many situations because of the toxic nature of oxygen radicals. Studies suggest that pulse oximetry is not useful for this type of application. For example, the role of $S_aO_2$ for determining retinopathy of prematurity in neonates is not quite clear, and furthermore the 2 to 3% inaccuracy of $S_pO_2$ for estimating $S_aO_2$ adds to this uncertainty (Severinghaus and Kelleher 1992).

## 2.3 LIMITATIONS

### 2.3.1 Instrument and operation limitations

Many of the limitations to pulse oximetry will come to light throughout the remainder of this text. However, table 2.4 summarizes some limitations given by Severinghaus and Kelleher (1992). These are described in detail in the original source.

**Table 2.4** Limitations to pulse oximetry and its application in a clinical setting. Adapted from Severinghaus and Kelleher (1992).

| Pulse oximetry limitations |
| --- |
| Instrument incidence of failure |
| Low signal-to-noise ratio |
| Light shunting and poorly applied probe |
| Vasoconstrictors |
| Low-perfusion limits |
| Motion artifacts |
| Abnormal pulses |
| Ventilator-induced and venous pulse interference |
| Response times |
| Ambient light |
| Electrosurgery |
| Interference of MRI |
| Site selection for probe placement |
| Skin pigments, dyes, and nail polish |
| Dysfunctional hemoglobins |
| Burns and other dangers |
| False alarms and false nonalarms |

### 2.3.2 Limitations in $S_aO_2$

Often in anesthesiology medical literature, articles regarding a limitation of pulse oximetry appear in which, if read more closely, what is actually meant is a limitation in monitoring arterial oxygen saturation, e.g., Hutton and Clutton-Brock (1993), and Mak (1993). Authors of such articles point out this fact. It is interesting how measuring $S_pO_2$ has become so associated with measuring $S_aO_2$.

20    *Design of pulse oximeters*

Nonetheless, it follows that any limitations associated with $S_aO_2$ as a monitored variable are also associated with $S_pO_2$.

There are some caveats to using $S_aO_2$ to assess the condition of pulmonary function. It is difficult to regard any monitoring technique as foolproof, as there are usually misleading combinations of conditions that will result in the monitored variable appearing fine when, in fact, a potentially dangerous condition could exist for the patient. For example, Hutton and Clutton-Brock (1993) and Mak (1993) point out that pulse oximetry (i.e., $S_aO_2$) is a poor measure of hypoventilation when inspired oxygen concentration is high. It is in situations like this that a comprehensive approach to oxygenation assessment using other monitored variables is imperative.

## REFERENCES

Ahrens T and Rutherford K 1993 *Essentials of Oxygenation* (Boston, MA: Jones and Bartlett)
Bredle D L 1989 Circulatory compensation as a response to hypoxia *Clinical Aspects of $O_2$ Transport and Tissue Oxygenation* ed K Reinhart and K Eyrich (New York: Springer)
Cherniack R M and Cherniack L 1983 *Respiration in Health and Disease* (Philadelphia, PA: Saunders)
Des Jardins T R 1984 *Cardiopulmonary Anatomy & Physiology: Essentials for Respiratory Care* (Albany, NY: Delmar)
Des Jardins T R 1990 *Clinical Manifestations of Respiratory Disease* (Chicago, IL: Year Book Medical)
Eichhorn J H 1993 Pulse oximetry as a standard of practice in anesthesia *Anesthesiology* **78** 423–6
Fairley H B 1989 Changing perspectives in monitoring oxygenation *Anesthesiology* **70** 2–4
Hutton P and Clutton-Brock T 1993 The benefits and pitfalls of pulse oximetry *Brit. Med. J.* **307** 457–8
Lampe G H, Wauk L Z, Whitendale P, Way W L, Kozmary S V, Donegan J H and Eger E I 1990 Postoperative hypoxemia after nonabdominal surgery: A frequent event not caused by nitrous oxide *Anesth. Analg.* **71** 597–601
Mak V 1993 False reassurance of pulse oximetry *Brit. Med. J.* **307** 732–3
Nunn J F 1987 *Applied Respiratory Physiology* (Boston, MA: Butterworths)
Payne J P and Severinghaus J W (eds) 1985 *Pulse Oximetry* (New York: Springer)
Selecky P A (ed) 1982 *Pulmonary Disease* (New York: Wiley)
Severinghaus J W and Kelleher J F 1992 Recent developments in pulse oximetry *Anesthesiology* **76** 1018–38
Tremper K K and Barker S J 1989 Pulse oximetry *Anesthesiology* **70** 98–108
Vender J S 1992 *Mixed Venous Oximetry* (video recording) (Secaucus, NJ: Network for Continuing Education)

## INSTRUCTIONAL OBJECTIVES

2.1    State the fundamental question a clinician should ask when assessing the cardiopulmonary condition of a critically ill patient.
2.2    Give the normal values for $S_aO_2$ and $P_aO_2$ in the healthy adult.
2.3    State the difference between hypoxia, hypoxemia and hyperoxia.
2.4    Give several common problems that result in hypoxemia.
2.5    Describe the role of lactate as an indicator of improper oxygen transport.
2.6    Describe the role of $S_pO_2$ as an indicator of improper oxygen transport.
2.7    List several physiologic variables that may be used in conjunction with $S_aO_2$ for assessing a patient's cardiopulmonary condition.
2.8    Describe why pulse oximetry data are of importance to anesthesiology.
2.9    State how useful pulse oximetry is in detecting hyperoxia.
2.10    List several limitations to pulse oximetry.

34    *Design of pulse oximeters*

a clinical environment. But it was found to be inaccurate for saturations less than 70%. And though it was a large improvement over previous devices, the Hewlett-Packard device was not totally immune to motion artifacts or skin pigmentation as it claimed. Also, it still required that the probe heat the skin. Devices that heat the skin put the patient at risk of burns, especially infants who have sensitive skin.

Although giving an improvement in performance, the device was huge, weighing almost 17 kg. The ear probe was also quite large and the fiber optics were fragile. Though it was the *gold standard* of oximeters in its time (Moyle 1994) it was used clinically only in sleep studies, pulmonary medicine, and physiology. The HP eight-wavelength oximeter was never used in anesthesiology or critical care as the pulse oximeter is today. Its use declined even more with improvements in the Clark transcutaneous $PO_2$ electrode (Severinghaus 1987).


## 3.7 PULSE OXIMETERS

The idea of exploiting the pulsatile nature of arterial blood in oximetry first belonged to Takuo Aoyagi while working in Japan for Nihon Kohden Corporation (Severinghaus 1987). Nihon Kohden's device used analog circuitry, had bulky fiber optic cables, and still had some of the instability problems of the Hewlett-Packard device. Other companies such as Minolta came up with similar products with similar problems (Santamaria and Williams 1994).

An anesthesiologist named William New saw the pulse oximeter marketed by Minolta and saw how to improve it. New, also an electrical engineer, teamed with Jack Lloyd to found Nellcor, Inc. Nellcor produced a microprocessor-based pulse oximeter, the N100, which was smaller, less expensive, needed no user calibration, and was accurate enough for clinical use. Nellcor is still the market leader in pulse oximetry (Santamaria and Williams, 1994). About the same time, Ohmeda came up with a similar device, the Biox II, which had similar success (Wukitsch *et al* 1988). Today, pulse oximeters exist in every intensive care unit, surgical suite, and in many emergency rooms in the United States (Santamaria and Williams 1994)

This section gives a brief description of the major parts of a pulse oximeter. Further detail of each of these parts can be found in later chapters.

### 3.7.1 Overview

By taking advantage of the pulsatile flow of blood, the pulse oximeter is able to overcome many of the problems of earlier technologies. The pulse oximeter tracks the change in light absorbance as the blood pulses. By tracking this peak-to-peak ac component, the absorbance due to venous blood or tissue does not have any effect on the measurement.

Light scattering is still a source of inaccuracy in pulse oximeters. Beer's law does not account for the scattering of light. So a direct calculation of $S_aO_2$ is not possible. The pulse oximeter measures absorbances at the two wavelengths and uses data from CO-oximeters to empirically look up a value for $S_pO_2$, an estimation of $S_aO_2$.

46      *Design of pulse oximeters*

($\varepsilon_{HbO_2}$) at the two wavelengths most commonly used in pulse oximetry (660 nm and 940 nm) have been measured by Zijlstra *et al* (1991) (see table 4.1).

**Table 4.1** Table of extinction coefficients of reduced and oxygenated hemoglobin in adults at the wavelengths of 660 nm and 940 nm (values from Zijlstra *et al* 1991).

| Wavelength, nm | Extinction coefficient, L mmol$^{-1}$ cm$^{-1}$ | |
|---|---|---|
| | Hb | HbO$_2$ |
| 660 | 0.81 | 0.08 |
| 940 | 0.18 | 0.29 |

Figure 4.3 shows the characteristics of light absorbance for a sample with a fixed concentration of total functional hemoglobin ($c_{HbO_2} + c_{Hb}$) of 1 mmol L$^{-1}$, a fixed path length $d$ of 1 cm and varying functional oxygen saturations. The two lines shown in figure 4.4 represent the properties for the two most commonly used wavelengths in pulse oximetry (660 nm and 940 nm). The absorbance of light at a wavelength of 940 nm increases with an increased oxygen saturation. At 660 nm the absorbance of light decreases rapidly with an increasing functional oxygen saturation (Pologe 1987).

It is possible to determine the concentrations of hemoglobins in hemoglobin solutions or hemolized blood by using a device such as a spectrophotometer (see section 3.3).



**Figure 4.3** Changes in light absorbance in hemoglobin solutions as a function of functional oxygen saturation for the wavelengths used in pulse oximetry. Absorbance decreases rapidly with increasing oxygen saturation at 660 nm (dashed line) but increases slightly with increasing oxygen saturation at 940 nm (solid line).

*4.3.3 Pulsation of the blood*

Light traveling through biological tissue (e.g. the finger or earlobe) is absorbed by different absorbing substances. Primary absorbers of light in the region of interest are the skin pigmentation, bones, and the arterial and venous blood. Instead of measuring the arterial oxygen saturation of the blood *in vitro* with a sample of arterial blood and a spectrophotometer, or at a wide range of different wavelengths as with the Hewlett-Packard ear oximeter, pulse oximeters take

Appx0917

# CHAPTER 5

## LIGHT-EMITTING DIODES AND THEIR CONTROL

*Brad W J Bourgeois*

In order to make pulse oximetry practical in the modern medical environment, a light source is required that is powerful enough to penetrate more than a centimeter of tissue yet diminutive enough to fit in a small probe. Chapter 4 shows that it also is desirable for the light source at each desired wavelength to have a very narrow *emission spectrum*, which minimizes error in the measurement of arterial oxygen saturation ($S_aO_2$). Fortuitously, light-emitting diodes (LEDs) fulfill all the requirements for the light source in a pulse oximeter.

However, LEDs are not without drawbacks. The primary problem faced by pulse oximeter designers is how to deal with variations and shifts in the *peak wavelength* of each LED. Because the main function of a pulse oximeter, measuring arterial oxygen saturation, is so heavily dependent upon accurate values for the two wavelengths of light, a design which does all it can to compensate for LED wavelength changes will outperform its competition.

This chapter discusses important characteristics of LEDs, a LED driver circuit in a pulse oximeter, and various problems with the use of LEDs in pulse oximetry.

## 5.1 AN INTRODUCTION TO LIGHT-EMITTING DIODES

Light–emitting diodes are the light source of choice for all pulse oximeters on the market today. Their small size, excellent drive characteristics, and large light output over a very narrow bandwidth make them the ideal choice for the source of light at both the red and infrared wavelengths used in pulse oximetry.

The fact that LEDs are available for use in pulse oximetry is due to a combination of science and luck. LEDs are only available over an approximately 700 nm range of wavelengths, from blue in the visible spectrum into the near infrared. By contrast, the electromagnetic spectrum extends over a range of $10^{14}$. Another fortuitous fact is that the window of low absorption on the hemoglobin extinction curves occurs within the range of LED availability. The common LED wavelengths of 660 and 940 nm work very well in pulse oximetry, which allows for lower cost due to the off-the-shelf availability of these LEDs.

56

### 5.1.1 Description, materials, and operation

An LED is an optoelectronic semiconductor which produces light by *electroluminescence* (D.A.T.A. Handbook 1992). LEDs are characterized by high light emitting efficiency compared to other methods of light emission such as cathode, high-temperature, and photoluminescence. The electroluminescence occurs by the injection and recombination of minority carriers in the forward-biased *p–n* junction. Most LEDs are made from III–V, II–VI, and IV semiconductors, with the most common materials being gallium arsenide phosphide (GaAsP), gallium phosphide (GaP), and gallium arsenide (GaAs). GaAsP and GaP LEDs emit light in the visible spectrum (approximately 380 to 780 nm), while GaAs is used in infrared LEDs. Another material not as commonly used to make LEDs which can produce light in both the visible and IR regions of the spectrum is gallium aluminum arsenide, GaAlAs.

Figure 5.1 shows the light emission mechanism of an LED. When an electron gains enough energy to cross the forbidden energy gap $E_g$, it enters the conduction band. When an electron in this conduction band returns to the lower energy level of the valence band, the electron releases energy in the form of a photon of light. The wavelength of light emitted from an LED is determined by

$$E_g = hc/\lambda, \tag{5.1}$$

where $E_g$ is the forbidden bandwidth in electron volts, $h$ is Planck's constant $(6.626 \times 10^{-34}$ J s$)$, $c$ is the speed of light in a vacuum $(3.00 \times 10^8$ m/s$)$, and $\lambda$ is the wavelength of the emitted photon. The value of $E_g$, which is a physical property of the LED material(s), determines the wavelength of emitted photons and is directly related to the forward voltage of an LED (see section 5.2.1).

### 5.1.2 Bandwidth considerations

Another factor considered in the use of LEDs in pulse oximetry is the emission spectrum of the LED. Because of the steep slope of the deoxyhemoglobin (Hb) extinction curve at 660 nm, it is extremely important that the red LEDs used in pulse oximeter probes emit a very narrow range of wavelengths centered at the desired 660 nm in order to minimize error in the $S_pO_2$ reading, which is the pulse oximeter's estimation of arterial oxygen saturation (New and Corenman 1987, 1988). The width of the wavelength range of the IR LED is not as important for accuracy due to the relative flatness of both the Hb and HbO$_2$ (oxyhemoglobin) extinction curves at 940 nm. LEDs again perform very well for this requirement. Typical LEDs have a *spectral bandwidth* in the range of 60 nm to less than 20 nm, with visible LEDs usually having smaller bandwidths of approximately 25 nm and IR LEDs typically having larger bandwidths near 50 nm.

## 5.2 LIGHT-EMITTING DIODE SPECIFICATIONS

Before discussing the specifications of LEDs available on the market, the performance desirable for LEDs in pulse oximetry will be given. The two predominant factors are the radiated power (or light output) and the size of the LEDs.

58          *Design of pulse oximeters*



**Figure 5.1** The light emission mechanism of an LED. Electrons gain energy moving to the conduction band. They emit light when dropping to the valence band.

The radiated power of an LED is measured in milliwatts. The typical radiated power of both the red and IR LEDs used in pulse oximetry is 1 mW at 20 mA dc. Brighter LEDs are available, but generally the radiated power does not exceed 10 mW.

Modern manufacturing techniques have shrunk LEDs to sizes smaller than a millimeter in length or diameter, while remaining bright enough to be used in devices such as pulse oximeters. LED size is not an obstacle in the design of pulse oximeter probes.

*5.2.1 Forward voltage*

The forward voltage is defined as the potential drop across the *p–n* junction of the diode from anode to cathode. While ordinary silicon diode forward voltages are near 0.7 V, LEDs forward voltages can range from 0.9 to 2.5 V typically. Equation (5.1) shows that an inverse relationship exists between a material's forbidden energy gap $E_g$ and the wavelength of emitted photons. In addition, the forward voltage of an LED is directly related to $E_g$. Therefore, an LED with a relatively small forward voltage has a small $E_g$ and a long emitted wavelength (e.g. in the infrared region). Conversely, an LED with a relatively large forward voltage has a large $E_g$ and a short emitted wavelength (e.g. in the blue–green region).

*5.2.2 Forward current*

The forward current is defined as the current flowing through the LED in the direction from anode to cathode. With sufficient current, an LED will light. A very important property of LEDs is that radiated power, to a first

Appx0929

*Light-emitting diodes and their control*      59

approximation, varies linearly with forward current over the range of current found in pulse oximeters. Typical values for forward current have a large range, from 2 to 50 mA. Figure 5.2 shows the relationship between current and voltage for a typical 660 nm LED.



**Figure 5.2** Forward current–voltage characteristic for a typical 660 nm GaP LED.

### 5.2.3 Power dissipation

Another consideration for LEDs used in pulse oximetry is power consumption. While the vast majority of pulse oximeters are used in a stationary environment where power is readily available from the nearest wall outlet, some are portable units used in a variety of emergency medical situations. These portable units may need to function for an extended period of time without a power supply recharge. It is therefore essential that LED power consumption be minimized while still providing adequate radiated power for pulse oximetry.

The maximum power dissipation rating for an LED can be defined as the largest amount of power that can be dissipated while still remaining within safe operating conditions. This power is a function of three parameters: ambient temperature, rated maximum junction temperature, and the increase in junction temperature above ambient per unit of power dissipation for the given LED's package and mounting configuration. The latter of these parameters is defined as the *thermal resistance* of the device, and is very important in reliable system design. The worst-case value for thermal resistance, that with no heat sink, can be calculated from

$$R_{TH} = (T_J - T_A)/P_D \text{ °C/W}, \tag{5.2}$$

where $R_{TH}$ is the thermal resistance, $T_J$ is the junction temperature, $T_A$ is the ambient temperature, and $P_D$ is the rated power dissipation of the LED. Another method for calculating thermal resistance is to use the negative reciprocal of the slope of the forward current versus ambient temperature graph, figure 5.3. This value is in units of °C/mA, which can be converted to the thermal resistance in °C/W by multiplying the denominator by the LED forward voltage (D.A.T.A.

60      *Design of pulse oximeters*

Handbook 1992). Because the skin is the primary sink for LED heat in pulse oximetry, the design engineer must consider power dissipation in order to prevent possible burns to the patient's skin.

Typical LEDs are 2 to 10% efficient, meaning that the majority of power dissipated by an LED becomes heat. The optical power absorbed by the tissue also becomes heat. As with forward current, a broad range of power ratings is available, typically from 20 to 300 mW. An interesting fact to note is that the typical IR LED, with its lower forward voltage (see section 5.2.1), required a greater forward current to dissipate the same optical power as a typical red LED. This is because red photons contain more energy than infrared photons.

### 5.2.4 Reverse breakdown voltage

As with all diodes, under reverse bias virtually no current will flow across the $p$–$n$ junction until the reverse breakdown voltage has been reached. Above that voltage, large currents flow and damage the diode, unless a resistor limits the current. Most LEDs have a fairly small value for this specification, usually in the range of 3 to 5 V. This specification is important in pulse oximetry due to the arrangement of the LEDs in a probe. To minimize the number of wires in each probe (and hence cost), the LEDs are wired in a parallel arrangement with polarities reversed. This means that while one LED is ON, the other LED is under reverse bias. The typical LED has a reverse breakdown voltage that is larger than the forward voltage of most LEDs, minimizing the difficulty in dealing with this specification.

### 5.2.5 Reverse current

In an ideal diode, no current flows in the reverse direction when the $p$–$n$ junction is reverse-biased. In reality, a minute amount of current actually does flow in the reverse direction. In LEDs, this current typically ranges from 0.01 to 10 µA. Since this current is extremely small compared to the forward current of the LED wired in parallel, this shunt current has a negligible effect.

### 5.2.6 Operating temperature

Pulse oximeters are usually used in a stable medical environment at room temperature. However, emergency situations may arise in which a pulse oximeter has to operate under extreme temperatures. Fortunately, LEDs are extremely rugged devices with a basic specified range of operating temperature from –40 to 85 °C. Many LEDs with an even larger operating temperature range are available.

Most LED parameters are specified at a given temperature. In addition, information is given for how some of these parameters vary over a given temperature range (see section 5.5). The most important of these parameters is maximum forward current versus temperature, which determines the thermal resistance of the LED (see section 5.2.3). Figure 5.3 shows the relationship between maximum forward current and temperature for a typical high-power 660 nm red LED.

Appx0931



**Figure 5.3** Maximum forward current versus temperature for a typical high-power red LED.

### 5.2.7 Switching times

*Switching time* is the time required for an LED to switch from its ON state to its OFF state or vice versa. Most LEDs have a switching time in the low hundreds of nanoseconds. In the application of pulse oximetry, this is much faster than required because of the extremely low frequency of the arterial pulsatile waveform (~1 Hz). For reasons which will be explained in chapter 8, in most pulse oximeters LED switching cycles occur at a rate of 480 Hz, much more slowly than the maximum switching capabilities of LEDs.

### 5.2.8 Beam angle

*Beam angle* is defined as the angular measure of radiated power measured on an axis from half-power point to half-power point. It is simply a measure of how focused the emitted light is. In LEDs on the market today, beam angles can range from a few degrees to a maximum of 180°. In pulse oximetry, the beam angle only needs to be narrow enough to ensure that the maximal light output enters the tissue. The scattering of light occurring in the tissue serves to ensure that the light spreads over the entire sensor area.

### 5.2.9 Pulse capability

*Pulse capability* is defined as the maximum allowable pulse current as a function of *duty cycle* and frequency. This parameter is important in pulse oximeters for two main reasons. The first reason is that, as discussed in chapter 8, LEDs are pulsed in pulse oximeters. The second reason is that the small LEDs used by some manufacturers in pulse oximeter probes may not be able to tolerate enough sustained current to sufficiently excite the photodiode. Since the allowable pulse current is always substantially higher than the maximum sustained current, smaller LEDs can be used than could be if the LEDs were constantly on. For

62     *Design of pulse oximeters*

example, the LEDs in Criticare pulse oximeters have a duty cycle near 5%, while in Nellcor devices it is 25%. Figure 5.4 shows the pulse capability of a typical 660 nm LED.



**Figure 5.4** Pulse capability of a typical high-power 660 nm LED. The maximal pulse current is a function of the duty cycle $d$ and frequency (from Siemens 1993).

### 5.2.10 Cost

Chapter 7 states that a disposable probe for use in pulse oximetry has some advantages over reusable probes, such as convenience and guaranteed sterility. With the widespread use of disposable probes, cost is the prohibitive factor in their manufacture. The cost of the two LEDs used in each probe is therefore important for the purpose of minimizing the overall expense of each probe. Today, both red and IR LEDs can be purchased in bulk for just a few cents each, making them a minor factor in the overall cost of a probe. (Allied Electronics, Inc. 1995, Digi-Key Corporation 1995). However, testing each LED to find its peak wavelength, as discussed in the following section, does increase the overall cost to the manufacturer.

### 5.3 MEASURING AND IDENTIFYING LED WAVELENGTHS

Chapter 4 notes that the choice of 660 and 940 nm for the light wavelengths was not arbitrary with respect to optical considerations. Because of the steep slope of the Hb extinction curve at 660 nm, it is important that the red LEDs used in pulse oximeter probes have a peak wavelength of exactly 660 nm in order to minimize error in the $S_pO_2$ reading (see chapter 11). Error in the peak wavelength of the IR LED is not as important for accuracy due to the relative flatness of both the Hb and $HbO_2$ extinction curves at 940 nm. An alternative to having LEDs with precise peak wavelengths of 660 and 940 nm is to have the pulse oximeter itself somehow compensate for any deviation from those nominal values. This section discusses these concerns.

As is the case with all mass manufacturing processes, imperfections occur in each lot of LEDs produced. For pulse oximetry, the most important of these is peak wavelength shift. Peak wavelength is defined as the wavelength at which the radiated power of the device is maximum. Although bulk LEDs theoretically all have the same peak wavelength, figure 5.5 shows that the actual peak wavelength of any LED may vary from the rated value by as much as 15 nm (Pologe 1987).

Appx0933

In order to solve this problem, pulse oximeters can compensate for a number of different LED peak wavelengths. This technique has the advantage of lowering cost by allowing probe manufacturers to buy and use LEDs in bulk instead of being able to use only LEDs with peak wavelengths of exactly 660 and 940 nm.



**Figure 5.5** Center wavelength variation of LEDs of the same type from the same lot (from Pologe 1987).

While many methods exist to solve this problem, only the one most commonly used in pulse oximeters will be explained here.

The first step in the process for the probe manufacturer is to test each individual LED to find its exact peak wavelength. This is done by testing each individual LED with a spectrophotometer to experimentally determine the wavelength of light at which the LED has its highest power output. The LEDs are then separated into a certain number of groups, with each group having a small, distinct range of wavelengths, for example 660 to 661 nm.

Knowing the center wavelengths for a particular LED pair allows the proper set of calibration curves, specific to that wavelength combination, to be chosen from the entire family of curves that exist. This is most often done by developing a two-dimensional matrix with, for example, the red LED wavelength values in the heading row and the IR LED wavelength values in the heading column. Each matrix location then identifies the appropriate set of calibration curves for the given pair of LEDs.

The final problem to be solved is to have the pulse oximeter somehow interrogate each new probe to find out which calibration curve must be used to accurately determine arterial oxygen saturation. The most common technique is to include in the probe connector a coding resistor with a specific value. Each unique resistor value represents to the pulse oximeter those pairings of LED wavelengths that correspond to one calibration curve. The microprocessor simply sends a current through the resistor and measures the voltage drop across it, in effect finding the value of the coding resistor. By finding this voltage value in a lookup table, the microprocessor can indirectly determine the proper calibration curve to be used for that probe (New and Corenman 1987, 1988).

Chapter 8 provides details of how the pulse oximeter performs this interrogation of each probe.

Kästle *et al* (1997) describes how Hewlett-Packard avoided using a coding resistor by selecting red LEDs within a ± 1 nm variation of wavelength. A later

Appx0934

64      *Design of pulse oximeters*

sensor used new high-efficiency AlGaAs red LEDs to achieve a four-fold increase in intensity, with corresponding lowered heat dissipation. They also note that the red LED may emit an undesired secondary emission peak (<4% of maximum intensity) at about 800 to 850 nm, which may interfere with the IR LED. They place the LED in an integrating sphere to diffuse the light for wavelength measurement by an optical spectrometer having a wavelength resolution of 0.2 nm.

## 5.4 LED DRIVER CIRCUIT

This section presents an overview of the operation of a specific LED driver circuit used in many pulse oximeters. Greater detail about the microprocessor control, signal processing, and other hardware or software concerns can be found in chapters 8 and 9.

Figure 5.6 shows the LED driver circuit. This circuit, and the LED driver circuits in many of the pulse oximeters on the market today, provide up to 50 mA of pulse current to each LED. The microprocessor automatically alters the amount of current supplied to the LEDs according to the absorption of the tissue on which the pulse oximeter is being used. Factors such as skin pigmentation, skin thickness, and optical path length, among many others, determine the absorption of the tissue. The microprocessor first determines if the photodiode is receiving a proper amount of light, enough to adequately excite but not saturate the photodiode. The microprocessor then supplies voltage feedback to the LED driver circuit, which allows current to the LEDs to be adjusted as needed. No complex calculations are necessary to determine current adjustments, as radiated power varies nearly linearly with drive current over the range of current utilized in pulse oximetry.

The microprocessor controls how much current is provided to each LED by dynamically adjusting the reference voltage seen at the driver amplifier, U3A. U1 supplies the reference voltage, which is switched selectively for the red and IR LEDs using U4A and U4B. The microprocessor changes the reference voltage for the red or IR LEDs by changing the data supplied to U1, which is a multiplying DAC, before the voltage is switched to the amplifier. The microprocessor attempts to achieve and keep the optimal drive current without clipping the transducer signal.

The control signals REDLED/ and IRLED/ come from the microprocessor and control the switches U4A and U4B along with the transistor network that drives the LEDs. The LEDs are never on at the same time, although during part of the LED switching cycle they are both off to allow the photodiode to detect ambient light.

When REDLED/ is low, IRLED/ is high and U4A is closed, placing the red reference voltage at pin 3 of U3A. Since REDLED/ is low, transistor Q5 is off, which allows Q3 to turn on and conduct current from the LED through R1, the sense resistor. Also with REDLED/ low, Q2 turns on, allowing current to flow from the positive supply to the red LED anode, turning on the red LED. Since IRLED/ is high, Q1 is off, with no current conduction, and Q6 is on, pulling the base of Q4 to ground, which keeps Q4 off. The current path in this case is from VCC through Q2, the red LED, Q3, and R1, the sense resistor. The voltage drop across R1 is fed back to U3A, which compares it to the reference voltage and changes the drive current of Q3 accordingly.

Appx0935

*Light-emitting diodes and their control*     65



**Figure 5.6** LED driver circuit. (From Protocol, 1994. Propaq® 100–Series Monitors *Schematics & Drawings Set*, Schematic 00950, 6 of 7, Section 2E, Protocol Systems, Inc., Beaverton, OR).

Appx0936

66    *Design of pulse oximeters*

When REDLED/ is high, IRLED/ is low and the reference voltage is applied to U3A through U4B. Having REDLED/ high causes Q2 to be off and Q5 to be on, turning off Q3. Having IRLED/ low turns Q1 on, allowing current to flow to the IR LED anode, turning on the IR LED. Q6 is also turned off, which allows the base of Q4 to be pulled up in voltage by U3A until Q4 conducts. The current path in this case is from VCC through Q1, the IR LED, Q4, and R1. The voltage drop across R1 is again fed back to U3A, which compares it to the reference voltage and changes the drive current of Q4 accordingly.

In the case when both the IRLED/ and REDLED/ control signals are high, both switches, U4A and U4B, are open and all of the drive transistors are off. The resistors R2, R4, and R3 form a voltage divider network that makes the reference input of U3A slightly negative with respect to ground. Because of this, U3A drives its output negative. However, D1 will not allow U3A's output to drop below approximately –0.6 V so that the drive transistors Q3 and Q4 can be turned on quickly when needed (Protocol 1994, pp 2E5–6).

## 5.5 LED PEAK WAVELENGTH SHIFT WITH TEMPERATURE

As discussed in section 5.3, pulse oximeter probe manufacturers could use any of a number of methods to compensate for LED peak wavelengths which vary from the nominal values of 660 and 940 nm, with the method of choice being the use of a coding resistor to indicate to the microprocessor which set of calibration curves to use for a given probe.

However, the peak wavelength of an LED can shift during operation due to a change of the *p–n* junction temperature. It is more difficult to account for this wavelength shift when determining which set of calibration curves to use. The effect that LED peak wavelength shift due to temperature has upon $S_pO_2$ will be discussed in detail in chapter 11. Lastly, two methods of minimizing the negative effects of temperature changes upon $S_pO_2$ will be discussed.

### 5.5.1 *p–n junction heating*

Equation (5.1) shows that the wavelength of emitted light in an LED depends on the forbidden energy gap $E_g$. In turn, $E_g$ is dependent upon temperature (Varshni 1967, Panish and Casey 1969). In GaAs, GaP, and most other common semiconductor materials, $E_g$ decreases as temperature increases. Therefore, the peak wavelength of an LED should increase as the *p–n* junction temperature increases. Typically, the peak wavelength will increase by 0.35 to 0.6 nm/°C (Miller and Kaminow 1988).

The main factor affecting the *p–n* junction temperature of the two LEDs is drive current, which causes ohmic heating at the *p–n* junction. Although the LEDs are sequentially pulsed with a duty cycle of 2 to 50% depending on the make of the oximeter (Reynolds *et al* 1991), the resulting average current (duty cycle multiplied by drive current) is still sufficient to substantially heat the *p–n* junction, as power dissipated is directly proportional to the drive current $I$ according to the equation $P = VI$.

### 5.5.2 *Studies*

de Kock *et al* (1991) tested the effect upon peak wavelength of driving a red and IR LED at 10% and 100% of the rated maximum drive current. The nominal

wavelengths of the tested LEDs were 660 and 950 nm, with 30 min allotted for thermal equilibrium to be reached. At 380 Hz with a 25% duty cycle, they found that the increased drive current increased the center wavelength of the red LED by 8 nm, while the center wavelength of the IR LED did not shift at all. Figures 5.7 and 5.8 show their results.



**Figure 5.7** Normalized red LED spectra at low and high forward current (from de Kock *et al* 1991).



**Figure 5.8** Normalized IR LED spectra at low and high forward current (from de Kock *et al* 1991).

The same group studied the effect of ambient temperature upon LED peak wavelength in 1991. As in the study mentioned above, the red and IR wavelengths were 660 and 950 nm. The spectrum of each LED was measured using a spectrophotometer at 2 nm intervals at ambient temperatures ranging from 0 to 50 °C in 10 °C steps. Ten minutes was given for thermal equilibrium to be established at each temperature step. The group found that over this range of ambient temperatures, the red LED had an increase of 5.5 nm in its peak wavelength, while the IR LED had an increase of 7.8 nm. In addition, no significant change was found in the spectral bandwidth of either LED over the temperature range. The measured bandwidths were found to be approximately 25 and 55 nm for the red and IR LEDs, respectively. Figures 5.9 and 5.10 show these results.

Kästle *et al* (1997) list a wavelength shift of about 0.12 nm/K but note that the red and IR LEDs tend to track temperatures, which compensates for errors in the ratio *R*.

68        *Design of pulse oximeters*



**Figure 5.9** Shift in emission spectrum of a red LED as ambient temperature is increased from 0 to 50 °C in 10 °C intervals (from Reynolds *et al* 1991).



**Figure 5.10** Shift in emission spectrum of an IR LED as ambient temperature is increased from 0 to 50 °C in 10 °C intervals (from Reynolds *et al* 1991).

*5.5.3 Two methods to compensate for LED temperature changes*

As expected, a shift in LED peak wavelength due to a change in temperature can cause erroneous $S_pO_2$ readings. A full discussion of this problem will be given in chapter 11.

One way to compensate for LED temperature changes is to have a temperature sensor built into the probe along with the LEDs and photodiode (Cheung *et al* 1993). Temperature information is fed back to the microprocessor, which then estimates how much the peak wavelength of each LED has changed from its rated value (which the microprocessor determined from the probe's coding resistor). The microprocessor then chooses the set of calibration curves to match the new set of LED wavelengths. One inherent problem with this method is that the temperature–peak wavelength relationship given as a specification by the manufacturer will not be exactly the same for each individual LED, making the microprocessor's calculation of new LED peak wavelengths potentially inaccurate. Another problem is the difference between the sensed temperature and the actual temperature of the *p–n* junctions of the LEDs. If the two LEDs are being driven with different currents, as is normally the case, they will probably be at different temperatures. The temperature sensor will read at best an average

of the two LED temperatures, and at worst an average of the two LED temperatures along with the skin and ambient temperatures. In addition, the sensor and additional wires needed will add cost to the probes, making a cost–benefit analysis of this method necessary before its inclusion in a pulse oximeter design.

A second, similar method to compensate for LED temperature changes is to measure the LED drive current directly. The microprocessor would then use that drive current value to calculate the estimated temperature change, and from that, calculate the estimated peak wavelength shift. This method eliminates the second problem listed above for the temperature sensor solution, but still leaves the problem of variations in the relationship between temperature and peak wavelength among individual LEDs. Another advantage of this method is that no extra wires or other components need to be added to a probe, making this the less expensive of the two methods discussed here.

## 5.6 PREVENTION OF BURNS IN PULSE OXIMETRY

In order to prevent burns on a patient's skin due to LED heat, the Food and Drug Administration now requires that the contact region between the skin and the oximeter probe not exceed 41 °C. Given an average body temperature of 37 °C, a pulse oximeter system should be designed to yield a maximum temperature rise of 4 °C at the skin–probe contact region, which is the primary dissipator of the LED heat. The relevant LED specification is thermal resistance, discussed in section 5.2.3. In pulse oximetry, the thermal resistance of each LED is on the order of a standard LED mounted in a PC board, which is a specification given in LED product catalogs. As previously mentioned, many pulse oximeters on the market have a maximal LED pulse current of 50 mA. This is sufficiently small to prevent dangerous LED heating, while still providing adequate light to the photodiode.

Mills and Ralph (1992) tested the heating of six pulse oximeter probes over a span of 3 h. The probes were placed in an incubator kept at a constant temperature of 36.9 to 37 °C. The working temperatures of the probes were quite similar, with a range of 39.1 to 39.7 °C over the entire 3 h. One of the probes was monitored for 24 h, and during that time its temperature remained constant within a range of ±0.1 °C.

The conditions of this test, however, did not do anything to simulate the reaction of skin to heating of a few degrees for several hours. To ensure that no burning occurs, the probe's point of application should be inspected often. In addition, the position of the probe on the patient should be changed regularly, especially if the probe application area suffers from low perfusion, which limits the skin's ability to dissipate heat.

## 5.7 LED PACKAGING

Most LED packages are made of resin, offering superior mechanical strength and the ability to withstand vibration and shock. In some of today's pulse oximeter probes, the two LEDs can be found in one package, which has the distinct advantage of keeping costs down. In the Nellcor SCP–10 reusable and Oxisensor II D–25 disposable pulse oximeter probes, the two LEDs come encased in a transparent rectangular solid with approximate dimensions of 5 mm long by 4

mm wide by 2 mm thick. The LEDs themselves are flat squares with sides of approximately 0.25 mm.

Other probes have discrete LEDs inside, with the LEDs lying side by side and a mirror to reflect light at a 90° angle to the tissue. Some probes even have three or four LEDs in them to increase light output. The details of these and many other probes will be discussed in Chapter 7.

There is no wrong choice for LED packaging as long as the LEDs are small yet powerful enough to perform the task at hand. However, there is definitely a superior choice for packaging when trying to minimize costs, and that choice is almost always a package containing both LEDs.

## REFERENCES

Allied Electronics, Inc 1995 *Catalog 956* (Fort Worth, TX: Allied Electronics)

Cheung P W, Gauglitz K F, Hunsaker S W, Prosser S J, Wagner D O and Smith R E 1993 Apparatus for the automatic calibration of signals employed in oximetry *US patent 5,259,381*

D.A.T.A. Handbook 1992 *LED Lamps and Displays* (Englewood, CO: D.A.T.A)

de Kock J P, Reynolds K J, Tarassenko L and Moyle J T B 1991 The effect of varying LED intensity on pulse oximeter accuracy *J. Med. Eng. Technol.* **15** (3) 111–6

Digi-Key Corporation 1995 *Catalog No. 956* (Thief River Falls, MN: Digi-Key)

Kästle S, Noller F, Falk S, Bukta A, Mayer E and Miller D 1997 A new family of sensors for pulse oximetry *Hewlett-Packard J.* **48** (1) 39–53

Miller S E and Kaminow I P 1988 *Optical Fibre Telecommunications* Vol II (New York: Academic) pp 487–8

Mills G H and Ralph S J 1992 Burns due to pulse oximetry *Anaesthesia* **47** 276–7

New W Jr and Corenman J E 1987 Calibrated optical oximeter probe *US patent 4,700,708*

New W Jr and Corenman J E 1988 Calibrated optical oximeter probe *US patent 4,770,179*

Panish M B and Casey H C Jr 1969 Temperature dependence of the energy gap in GaAs and GaP *J. Appl. Phys.* **40** 163–7

Pologe J A 1987 Pulse oximetry: technical aspects of machine design *Int. Anesthesiol. Clinics* **25** (3) 137–53

Protocol 1994 Propaq® 100–Series Monitors *Schematics & Drawings Set* (Beaverton OR: Protocol Systems)

Reynolds K J, de Kock J P, Tarassenko L and Moyle J T B 1991 Temperature dependence of LED and its theoretical effect on pulse oximetry *Br. J. Anaesthesia* **67** 638–43

Siemens 1993 *Optoelectronics Data Book* (Cupertino CA: Siemens)

Varshni Y P 1967 Temperature dependence of the energy gap in semiconductors *Physica* **34** 149–54

## INSTRUCTIONAL OBJECTIVES

5.1 Sketch a current–voltage curve for an LED and indicate the approximate maximal current to prevent damage to the LED.

5.2 State the maximal LED current that will not cause burns to the patient.

5.3 Sketch and describe the current control system for LEDs in a pulse oximeter.

5.4 Describe how a pulse oximeter determines the LED wavelengths in a given probe.

5.5 Explain the process by which an LED emits light. Relate the explanation to the main point of interest on an LED I–V plot.

5.6 Discuss bandwidth characteristics of red and IR LEDs, including temperature and drive current effects.

5.7 Explain how a change in LED drive current indirectly affects the output spectra of red and IR LEDs.

5.8 Explain how a change in LED temperature affects the output spectra of red and IR LEDs.

5.9 Discuss two techniques which would automatically compensate for a shift in the peak wavelength of the LEDs.

5.10 Give reasons why LEDs are convenient to use in pulse oximetry.

# CHAPTER 6

## PHOTODETECTORS AND AMPLIFIERS

*Jeffrey S Schowalter*

The photodetector is the main input device of the pulse oximeter system. These devices, found in the probe, sense the intensity of light emitted by each LED after the light passes through the tissue. The photodetector produces a current which is linearly proportional to the intensity of incident light. This current is then converted to a voltage which is passed on to the pulse oximeter unit for processing. The choice of photodetector depends on factors such as performance, packaging, size, and cost. However, most pulse oximeters currently use silicon photodiodes. Transimpedance amplifiers, which convert the photodiode current to a voltage are also discussed.

### 6.1 PHOTODETECTION DEVICES

A variety of devices can be used to sense the intensity of a light source. These include photocells, photodiodes, phototransistors, and integrated circuit (IC) sensors. When choosing a photodetection sensor, several things need to be considered. First, since the pulse oximeter uses two specific wavelengths, *spectral response*, or the relative response of the device to different wavelengths must be considered. Another important consideration is the linearity of the output signal. With the pulse oximeter, an output linearly proportional to the intensity of incident light, also known as *illumination* (*E*), is highly desirable. A third important factor is *sensitivity*, or the ratio of the electrical output signal to the intensity of incident light. A related consideration is the response time, or how quickly the output of the device is able to respond to a change in the incident light. Size also becomes a consideration since many of these devices are mounted in disposable probes (as will be discussed in chapter 7). Finally, as is the case with any commercial device, the cost must be considered. Each type of device merits consideration although the photodiode is most frequently chosen for pulse oximeter applications.

### 6.1.1 Photocells

A *photocell* exhibits a change in resistance that is proportional to light intensity. In these semiconductor devices, also referred to as *photoconductors* and *photoresistors*, the electrical conductivity of the material is dependent on the

Appx0942

number of carriers in the conduction band. Incident light increases the number of carriers generated and thus increases the conductivity. These devices have spectral responses dependent on the type(s) of materials used in their manufacture. In the visible/near infrared range (400 to 1400 nm), which includes the wavelengths used in pulse oximetry, the most common materials used are cadmium sulfide (CdS) and cadmium selenide (CdSe). Equation (6.1) shows the relationship between the resistance of a photocell and the illumination $E$:

$$R = AE^{-a} \tag{6.1}$$

where $R$ is the resistance of the device and $A$ and $\alpha$ are constants dependent on manufacturing process and material type (Pallas-Areny and Webster 1991). This equation shows that the relationship between resistance and light intensity is highly nonlinear. In addition, the resistance changes quite dramatically as a function of light intensity. For example, a typical CdS photocell can have its resistance change by a factor of $10^4$ between an illuminated condition and a dark condition. Photocells are also temperature sensitive, exhibiting a changing resistance/incident light relationship with temperature. Increased temperature also causes increased thermal noise. The response time of the photocell is relatively slow. Time constants are on the order of 100 ms and these devices exhibit light memory, making their response dependent on the previous light level. In addition, photocells are relatively large in size with typical diameters of 5 to 25 mm (Vig 1986). Photocells are widely used and are relatively inexpensive (~\$1), but are not typically used in pulse oximetry applications.

### 6.1.2 Photodiodes

A photodiode produces an output current or voltage which is proportional to the intensity of the incident light. The $p$–$n$ junction photodiode consists of one layer of $n$-type semiconductor material along side a layer of $p$-type semiconductor material (see figure 6.1). When a photon is absorbed, it creates an electron-hole pair. Electrons from the $p$-side will move across the depletion region toward the $n$-side and holes from the $n$-side will be transported to the $p$-side. As a result, an electric current is generated.

Figure 6.2 shows a simple model for the photodiode. It is made up of the parallel combination of a current source, an ideal diode, and a junction capacitance.

For this photodiode the total current supplied ($I$) can be expressed as

$$I = I_P - I_D \tag{6.2}$$

where the photocurrent $I_P$ can be expressed as

$$I_P = SE \tag{6.3}$$

and the diode current $I_D$ is expressed as

$$I_D = I_0 \left[ \exp\left(\frac{qV}{kT}\right) - 1 \right] \tag{6.4}$$

Appx0943



**Figure 6.1** *p–n* junction of a photodiode. Electrons move towards the *n* layer and holes move towards the *p* layer (adapted from Hitachi 1992).

where $S$ is the *sensitivity* or the unit of photocurrent produced per unit of input light, $E$ is the illumination, $I_0$ is the inverse saturation current, $V$ is the voltage applied to the diode, $k$ is Boltzmann's constant, and $T$ is absolute temperature.



**Figure 6.2** Simplified photodiode equivalent circuit model. The current induced by the incident light is denoted by $I_P$.

The photodiode operates in one of two modes. The photovoltaic operating mode generates a light induced voltage produced by an open-circuit photodiode. This output voltage however is not a linear function of incident light. In the open-circuit condition ($I = 0$), the output voltage is given by

$$V_{oc} = \frac{kT}{q} \ln\left(\frac{I_P}{I_D} + 1\right). \tag{6.5}$$

The photoconductive operating mode generates a light-induced current produced by a photodiode connected so that the photodiode voltage is zero or constant with varying light intensity. In this mode, output current is linearly proportional to the level of incident light. In the short-circuit condition ($V = 0$), the output current is given by

74    *Design of pulse oximeters*

$$I_{sc} = SE. \tag{6.6}$$

Figure 6.3 shows the current versus voltage characteristics of a photodiode for various levels of incident light.



**Figure 6.3** Current versus voltage characteristics for a photodiode. For an open circuit condition ($I = 0$), increasing light intensity results in a logarithmic increase in voltage. For a short circuit condition ($V = 0$), the photodiode's current varies linearly with increasing incident light intensity.

When the *p–n* photodiode is used in the photoconductive mode, a highly linear relationship exists between the incident light level and the output current. The sensitivity of a typical photodiode varies by only 0.05% over most of its range (which may span up to seven decades) but can increase to several percent at high levels of incident light/output current. Sensitivity, however, varies significantly with incident light wavelength (see figure 6.4). The spectral response is determined by the material used for fabrication and the physical depth of the *p–n* junction. The silicon photodiode, shown in figure 6.4, works well with the wavelengths of interest to pulse oximetry. Photodiodes, when used in the photoconductive mode, are also relatively insensitive to temperature variations with the typical sensitivity varying by approximately +0.2%/°C. These devices have response times much faster than that of the photocell with typical values running on the order of 20 μs. With radiant sensitive areas on the order of 1 to 7 mm², silicon photodiodes' prices are equivalent to photocells (~$1).

There are several different variants of the basic *p–n* photodiode. These include the *p–i–n* photodiode, the Shottky photodiode, the metal–semiconductor–metal photodetector and the avalanche photodiode. Of these, the *p–i–n* photodiode is frequently found in pulse oximetry applications.



**Figure 6.4** Spectral response of a Si photodiode as a function of wavelength.

*6.1.2.1 p–i–n photodiodes.* The *p–i–n* photodiode has an intrinsic (lightly doped) layer between the *n* and *p* layers. This modified structure typically results in lower junction capacitance than for *p-n* diodes of the same optical sensing area. As a result, *p–i–n* photodiode response times are faster than *p–n* junction photodiodes. Bandwidths typically run on the order of 10 MHz for these devices. Since cost and size are comparable to the *p–n* photodiode, these devices are also used in pulse oximetry applications.

*6.1.2.2 Shottky photodiodes.* In these devices, a thin metal layer deposited on a semiconductor can form a Shottky barrier and if thin enough can pass incident light. These devices are primarily used to detect ultraviolet (UV) light and have smaller junction capacitances than either *p–n* or *p–i–n* photodiodes. This results in lower response times with frequency responses exceeding 100 GHz (Sloan 1994), far exceeding the requirements of the typical pulse oximeter application. However, with a primary spectral response in the UV range, these devices are not suitable for pulse oximetry applications.

*6.1.2.3 Metal–semiconductor–metal (MSM) photodetectors.* These devices commonly use interdigitated metal fingers to form the two electrical contacts of the device. They have low capacitance because of a small active area and a relatively fast response time. These devices have lower sensitivity than *p–i–n* photodiodes due to large amounts of surface covered by metal and as such are not currently being used for pulse oximeter applications.

*6.1.2.4 Avalanche photodetectors (APDs).* Avalanche photodetectors are high speed photodetectors that make use of the avalanche multiplication effect of photons. APDs operate under large reverse bias voltage so the electric field is large. However, the multiplication effects result in increased noise, reduced bandwidth, avalanche buildup time (which slows response time), and noise multiplication. They are typically used as amplifiers for applications requiring detection of extremely low levels of light (Fraden 1997).

**Appx0946**

### 6.1.3 Phototransistors

A phototransistor can be thought of as a photodiode with a built-in current amplifier. Phototransistors typically have 100 to 500 times the sensitivity of a corresponding photodiode. In these devices, incident light on the base of the transistor induces a current. This current is then amplified by the transistor resulting in a significant increase in collector current. The sensitivity of these devices is not as linear as photodiodes with the sensitivity varying 10 to 20% over the useful range of the phototransistor (Siemens 1993). These devices do not have the light memory problems associated with photocells but sensitivity can vary as much as 50% among devices of the same type because of process and beta variations (Sprague Electric 1987). The response time for the typical phototransistor is 125 µs. Size, cost and signal-to-noise ratio (SNR) of a phototransistor are equivalent to that of a photodiode. Although early pulse oximeters used phototransistors (Schibli *et al* 1978), currently photodiodes are the sensor of choice in pulse oximetry applications.

### 6.1.4 Integrated circuit (IC) sensors

Integrated circuit sensors are becoming increasingly popular for sensing incident light levels. These devices incorporated the features of a photodiode along with a current-to-voltage converter so that the output is a voltage which is a direct function of the incident light. Since photodiodes and IC amplifiers are built out of semiconductor material, IC designers have been able to fabricate both the hybrid circuitry and the photodiode on the same silicon substrate. Combining these two devices onto one chip eliminates problems commonly encountered in discrete designs such as leakage current errors, noise pick-up, and gain peaking due to stray capacitances (Burr-Brown 1994a,b,c). These devices typically are four times as costly as equivalent photodiodes and as such do not appear to have gained much acceptance by pulse oximeter manufacturers. However, at least one manufacturer (Protocol Systems 1992) is using this integrated circuit photodiode/transimpedance amplifier configuration.

## 6.2 PHOTODIODE CHARACTERISTICS

Because of their relatively low cost and linear output current response to incident light, both the standard *p–n* diodes and *p–i–n* (New and Corenman 1987) diodes are currently in use today as the photodetectors of choice for use in pulse oximetry systems. The following sections describe several key parameters related to photodiode operation. These parameters serve as evaluation criteria for the designer when selecting a photodiode for use in a pulse oximeter.

### 6.2.1 Junction capacitance

Photodiode junction capacitance is an important parameter and is proportional to the junction area. It also decreases with increasing reverse bias voltage so it may be expressed at a specified reverse bias voltage across the photodiode. The response speed of the photodiode depends on the *RC* time constant of the junction capacitance and the load resistance. Therefore a higher response speed can be obtained by applying a larger reverse bias voltage to the photodiode. It should be

noted however, that this technique is not typically used in pulse oximetry applications.

### 6.2.2 Dark current

Dark current is the reverse leakage current that flows in a photodiode in the absence of light. Dark current is usually specified at some specified reverse bias voltage or with zero voltage bias. Although technically, no dark current should flow with zero bias, most zero bias applications have a small voltage across the photodiode such as the offset voltage of the op amp. The dark current increases as the reverse voltage or ambient temperature increases.

### 6.2.3 Sensitivity

Since the output current of the photodiode is linear, the sensitivity is normally expressed as the output current level for a known incident light level at a specified temperature. The light source used to produce this specification varies among photodiode manufacturers though and can cause some confusion. In some cases, the sensitivity is determined with an LED optical source and thus the center frequency of the LED is specified. In this case incident light is expressed in $mW/cm^2$. If the light source is an International Commission on Illumination (CIE) standard light source (normally a tungsten lamp), it is expressed in lux (lx).

### 6.2.4 Spectral response

Figure 6.4 shows that photodiodes have a spectral response and as such care should be taken when selecting a photodiode. Normally photodiode manufacturers specify the spectral response by providing the wavelength of peak sensitivity. The designer should keep in mind the wavelengths of interest in pulse oximetry (660 nm and 940 nm) when deciding on an appropriate photodiode.

### 6.2.5 Packaging

Photodiodes used in pulse oximeter probes have some unusual mounting and mechanical assembly requirements. A variety of characteristics should be considered including cost, hermetic seal, package material and package type. In general, photodiodes are available in three types of packages: the can package, the ceramic stem package and the resin mold package.

*6.2.5.1 Can package.* In the can package (figure 6.5(*a*)), the photodiode chip is mounted on a metallic stem and is sealed with a cap that has a window to allow incident light to reach the semiconductor surface.

*6.2.5.2 Ceramic stem package.* With the ceramic stem package, the photodiode chip is mounted on a ceramic stem (figure 6.5(*b*)) and is coated with resin.

*6.2.5.3 Resin mold package.* For the resin mold package (figure 6.5(*c*)), the photodiode chip is mounted on a lead frame and molded with resin. Some of these devices use molding that is transparent only to certain wavelengths of light,

Appx0948

78      *Design of pulse oximeters*

thereby limiting the wavelength sensitivity of the photodiode. This is the most common package type used in pulse oximetry today.



Figure 6.5 Typical photodiode packaging (adapted from Sharp 1988).

Table 6.1 shows the characteristics for several typical photodiodes.

**Table 6.1** Electro-optic characteristics of two *p–i–n* photodiodes.

|  | Sharp PD4663PS | TRW OP913 |
|---|---|---|
| Output current | 120 nA @ 1000 lx | 55 mA @ 5.0 mW/cm$^2$ |
| Dark current | 200 pA | 25 nA |
| Peak sensitivity wavelength | 840 nm | 875 nm |
| Junction capacitance | 2 pF | 150 pF |

### 6.3 OPTICAL CONCERNS

Since this is a system with an optical interface, it is important to minimize the effects from light other than the optical signals of interest. One way to minimize unwanted light incident upon the detector is to place some type of light filter over the detector. This allows light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter. For the pulse oximeter to work effectively, most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood.

#### 6.3.1 Optical filtering

Optical filtering, placed between sources of light and the photodiode, is used to limit the spectral response of the photodiode. A number of optical filter types can be used. Cheung *et al* (1993) recommend a red Kodak No. 29 wratten gel filter to eliminate the flickering effect of fluorescent light. However, these external filters do not appear to be used much in actual pulse oximetry designs. In addition, the photodiode mounting package may contain filtering material. Many photodiodes are mounted in clear plastic which absorbs UV wavelengths (Burr-Brown 1994a,b,c). This is useful to filter out some of the unwanted effects of fluorescent lighting on the photodiode. Many photodiodes are available in a variety of packaging types each of which filters out selected wavelengths of light.

#### 6.3.2 Optical interference

To minimize errors, the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood (Nellcor 1993). This can be accomplished through thoughtful LED/photodiode placement. Light impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue (New and Corenman 1987). Two additional measures can be taken to ensure this (figure 6.6). One is to decrease the angle of incidence to the photodiode. The second is to coat the housing around the photodiode with a material that does not scatter or reflect light.

There are two types of optical interference that may cause problems for the photodiode. The first is excessive ambient light. The source of this type of error may be surgical lamps, fluorescent lights, infrared heat lamps and direct sunlight. Usually this type of interference will saturate the photodiode so that no pulse can be distinguished, however some of these sources may result in apparently normal but inaccurate readings. The second source of interference is optical cross-talk. This type of interference typically may occur when multiple probes are used in close proximity. In this case, light from one LED probe is sensed by the photodiode of another probe.

### 6.4 AMPLIFIERS

Since photodiodes generate an output current, an amplifier must be used to translate that current into a voltage for use by the pulse oximeter. Transimpedance amplifiers, or current-to-voltage converters, are amplifiers that

Appx0950

80      *Design of pulse oximeters*

convert an input current to an output voltage. These are the most common types of amplifiers used in pulse oximetry applications today.



Decreasing angle of incidence



Adding a light absorbing coating

**Figure 6.6** Minimizing photodiode optical interference (adapted from Marktech International 1993).

*6.4.1 Standard transimpedance amplifier configuration*

Figure 6.7 shows the standard transimpedance configuration.



**Figure 6.7** Typical transimpedance amplifier used with a photodiode.

In this configuration, the current generated by the photodiode is converted to a voltage. Because of the virtual ground, the op amp maintains zero voltage across the photodiode. Current flows through the feedback resistor and creates a voltage at the output that is proportional to the light intensity as given by

$$V_0 = I_d R_f. \tag{6.7}$$

The transimpedance gain is then equal to the value of the feedback resistor. Even though standard resistor values can give substantial gains, Cysewska-Sobusiak (1995) noted that the effective transmittance of light through the finger in pulse oximetry applications never exceeds 5%. Even with the use of superbright LEDs, relative light intensity can be expected to be fairly low.

Although the transimpedance amplifier appears to be a simple and straightforward design, it is subject to a number of multidimensional constraints. These constraints have been well documented (Burr-Brown 1994a,b,c, Graeme 1992, 1994, Wang and Ehrman 1994, Kirsten 1996), and several alternative configurations have been proposed. However, because this standard configuration is frequently used in pulse oximetry applications, several general guidelines are provided.

*6.4.1.1 Photodiode capacitance.* Photodiode junction capacitance should be as low as possible. The junction capacitance affects noise and bandwidth of the circuit.

*6.4.1.2 Photodiode active area.* The photodiode active area should be as small as possible for largest signal-to-noise ratio. The area of the photodiode is directly proportional to the junction capacitance. Kästle *et al* (1997) describe an active area of 1 to 2 mm$^2$ for the Hewlett-Packard sensor.

*6.4.1.3 Feedback resistor.* The feedback resistor should be made as large as possible to minimize noise. This is because the feedback resistor is the dominant source of noise in the circuit. This thermal (Johnson) noise increases as a function of the square root of the value of the feedback resistance.

$$\text{thermal noise} = \sqrt{4kTBR} \tag{6.8}$$

where $k$ is Boltzmann's constant, $T$ is absolute temperature, $B$ is the noise bandwidth (Hz), $R$ is the feedback resistance ($\Omega$), while the signal voltage increases as a function $R$. Therefore the signal-to-noise ratio improves by the square root of the feedback resistance as the feedback resistance is increased.

In addition, a high resistor value of feedback resistance is preferred to an equivalent low resistance T network. Although the transimpedance gain is equivalent, the T network will have a lower signal-to-noise ratio due to current noise and offset voltage.

*6.4.1.4 Op amp.* An FET op amp is a requirement for this configuration. The lower the bias current of the op amp, the higher the sensitivity.

*6.4.1.5 Feedback capacitor.* The capacitor in the feedback loop minimizes gain peaking and improves stability. The choice of capacitor value is critical. Graeme (1992) analyzed this circuit configuration and provided several simplified formulas for determining the appropriate value of feedback capacitance, $C_f$. For relatively large area photodiodes, where the junction capacitance is much larger than the feedback capacitor

$$C_f = \sqrt{\frac{C_I}{2\pi R_f f_c}} \tag{6.9}$$

where $f_c$ is the unity gain frequency of the op amp, $C_I$ is the total input capacitance = photodiode junction capacitance + op amp input capacitance, $R_f$ is the feedback resistance.

A more general formula, for use with small photodiode junction capacitances is

$$C_f = \frac{1}{4\pi R_f f_c}\left(1 + \sqrt{1 + 8\pi R_f C_I f_c}\right). \tag{6.10}$$

Note that larger values of capacitance can be used but this decreases signal bandwidth where the bandwidth can be calculated by

$$BW = 1.4 f_p$$

where

$$f_p = \sqrt{\frac{f_c}{2\pi R_f \left(C_I + C_f\right)}}. \tag{6.11}$$

*6.4.1.6 Shielding.* Since this circuit configuration has high sensitivity and high input impedance, the transimpedance amplifier is sensitive to noise coupling from electrostatic, magnetic, and radio frequency sources.

Electrostatic coupling, typically from ac voltage sources, can create noise in the photodiode/transimpedance amplifier circuit. To prevent this, some pulse oximeter manufacturers have completely enclosed their photodiodes in a metallic shielding such that only the detector surface is exposed. One item of concern is that the shield produces a capacitance between amplifier and ground that may, in some cases, affect the performance of the system.

Magnetically coupled noise is somewhat more difficult to control since it is unaffected by the electrostatic shielding. Sensitive loop areas need to be minimized. High value resistors are sensitive to magnetic coupling so connections between these resistors and op amp inputs should be as short as possible.

Radio frequency interference (RFI) sources should be expected both from the main processing unit of the pulse oximeter itself (as discussed in chapter 8) as well as from other patient monitoring devices. The best prevention is through the use of shielding and filtering. Shielded twisted pair cabling is typically used to send photodiode signals back to the pulse oximeter. The desired photodiode signals of interest are not in the radio frequency range so filtering, even before input to the amplifier, is also effective.

*6.4.2 Differential transimpedance amplifier*

Since the photodiode signal of interest is a current, it is available to drive two different inputs in differential fashion as shown in figure 6.8. Since these currents are in different directions, if the feedback resistances are equal, the differential output signal will be twice what it was for the single-ended transimpedance amplifier configuration (figure 6.8). An advantage of this configuration is that for a given gain level, feedback resistor values can be half the single ended configuration shown in figure 6.7. Another benefit of this configuration is the common-mode rejection of coupled noise. By feeding the output of the current-

to-voltage conversion into a differential amplifier stage, noise will show up as a common mode signal on both inputs and have a canceling effect at the circuit output. Note however, that this configuration is not a total replacement for electrostatic shielding, but works well removing coupling that passes through shield imperfections. Several pulse oximeter manufacturers use this configuration in their pulse oximetry systems (Cheung *et al* 1993, Criticare 1990).



**Figure 6.8** Differential current sensing transimpedance configuration.

### 6.4.3 *Zeroing circuit*

The purpose of the zeroing circuit shown in figure 6.9 is to remove the ambient light signal from the photodiode output signal. To do this, an FET switch is closed, so the *RC* network of the output is active. This allows the capacitor to charge up to the voltage equivalent of the ambient light level. The only critical factor in the selection of these components is to make sure the *RC* time constant allows for complete charging of the capacitor in the time period allowed (see chapter 8). When an LED is turned on, the FET switch opens, leaving the ambient light level voltage across the capacitor. This will have the net effect of subtracting the voltage across the capacitor from any LED output signal, thereby canceling out the ambient light level. The process repeats itself at the same rate at which the LEDs are pulsing so changes in light level are immediately accounted for. Potratz (1994) presents a similar but different implementation of this circuit with the same general functionality for use in pulse oximetry application.

Appx0954

84     *Design of pulse oximeters*



**Figure 6.9** Typical zeroing circuit used in pulse oximetry applications to remove ambient light offset from the usable signal.

### 6.4.4 Future trends

At least one manufacturer (Protocol Systems 1992) provides for an electronic switching mechanism on the input to accommodate either a current input directly from a photodiode or a voltage input from an IC sensor. Burr-Brown (1994a,b,c) and Texas Instruments (1993) are two manufacturers that provide ICs that directly integrate the photodiode and transimpedance amplifier to convert a light intensity light directly to a voltage. As these devices drop in price, expect to see these ICs replace the photodiode as the photodetector of choice in future pulse oximetry applications.

### REFERENCES

Burr-Brown 1994a *OPT101 Data Sheets: Monolithic Photodiode and Single-Supply Transimpedance Amplifier* (Tucson, AZ: Burr-Brown Corporation)

Burr-Brown 1994b *Application Bulletin AB-075. Photodiode Monitoring with Op Amps* (Tucson, AZ: Burr-Brown Corporation)

Burr-Brown 1994c *Application Bulletin AB-077. Designing Photodiode Amplifier Circuits with OPA128* (Tucson, AZ: Burr-Brown Corporation)

Cheung P W, Gauglitz K F, Hunsaker S W, Prosser S J, Wagner D O and Smith R E 1993 Apparatus for the automatic calibration of signals employed in oximetry *US patent 5,259,381*

Criticare 1990 *504/504-US Service Manual* (Waukesha, WI: Criticare Systems)

Cysewska-Sobusiak A 1995 Problems of processing reliability in noninvasive measurements of blood oxygen saturation *Optoelectronic and Electronic Sensors* ed R Jachowicz and Z Jankiewicz *Proc. SPIE* **2634** 163–71

Fraden J 1997 *Handbook of Modern Sensors, Physics, Designs and Applications 2nd edn* (Woodbury, NY: American Institute of Physics)

Graeme J 1992 Phase compensation optimizes photodiode bandwidth *EDN*. 7 May: 177–84

Graeme J 1994 *Applications Bulletin AB-094. Tame Photodiodes with Op Amp Bootstrap* (Tucson, AZ: Burr-Brown Corporation)

Hitachi 1992 *Opto Data Book* (Brisbane, CA: Hitachi America)

Kästle S, Noller F, Falk S, Bukta A, Mayer E and Miller D 1997 A new family of sensors for pulse oximetry *Hewlett-Packard J.* **48** (1) 39–53

Kirsten T R 1996 Increasing photodiode transimpedance bandwidth and SNR with a bootstrap buffer *Sensors* **13** 35–8

Marktech International 1993 *Optoelectronics data book* (Mendands, NY: Marktech International)

Nellcor 1993 *Controlling External Optical Interference in Pulse Oximetry. Reference Note: Pulse Oximetry Note Number 5* (Pleasanton, CA: Nellcor)

New W and Corenman E 1987 Calibrated pulse oximetry probe *US patent 4,700,708*

Appx0955

Pallas-Areny R and Webster J G 1991 *Sensors and Signal Conditioning* (New York: Wiley)
Potratz R S 1994 Condensed oximeter system with noise reduction software *US Patent 5,351,685*
Protocol Systems 1992 *Ultra-Portable Vital Signs Monitor Technical Reference Guide* (Beaverton, OR: Protocol Systems)
Schibli E G, Yee S S and Krishnan V M 1978 An electronic circuit for red/infrared oximeters *IEEE Trans. Biomed. Eng.* **BME-25** 94–6
Sharp 1988 *Optoelectronics Data Book* (Mahwah, NJ: Sharp Corporation)
Siemens 1993 *Optoelectronics Data Book* (Cupertino, CA: Siemens Electronics Corporation)
Sloan S R 1994 Photodetectors *Photonic Devices and Systems* ed R G Hunsperger (New York: Marcel Dekker)
Sprague Electric 1987 *Hall Effect and Opto Electronic Sensors* (Concord, NH: Sprague Electric Company)
Texas Instruments 1993 *Signal Conditioning 1993, Linear Design Seminars Reference Book* (Dallas, TX: Texas Instruments)
Vig R 1986 Light sensing using optical integrated circuits *Sensors* **3** 6–15
Wang T and Ehrman B 1994 *Application Bulletin AB-050. Compensate Transimpedance Amplifiers Intuitively* (Tucson, AZ: Burr-Brown Corporation)

## INSTRUCTIONAL OBJECTIVES

6.1 Describe why photodiodes are used for light level detection in pulse oximeters.
6.2 Sketch the equivalent circuit of a photodiode and explain its operation.
6.3 Explain the difference between a *p–n* and a *p–i–n* diode.
6.4 Identify some of the most important characteristics to consider when selecting a photodiode.
6.5 Explain some of the techniques used to improve the signal-to-noise ratio when using photodiodes.
6.6 Describe some of the sources of optical interference in pulse oximeters.
6.7 Sketch a simple transimpedance amplifier configuration and explain its basic operation.
6.8 Given a light/current transfer curve of a photodiode, design a transimpedance amplifier.
6.9 Explain why the type of covering/filtering over a photodiode's exposed surface is important to the pulse oximeter designer.
6.10 Explain why photodiodes are normally configured to use current to indicate light level.
6.11 Explain the advantages of a differential amplifier configuration in a photodiode/transimpedance amplifier circuit.

Appx0956

# CHAPTER 7

## PROBES

*Moola Venkata Subba Reddy*

Light emitted by the light emitting diodes (LEDs) is partially reflected, transmitted, absorbed, and scattered by the skin and other tissues and the blood before it reaches the detector. The probe of a pulse oximeter consists of two LEDs of selected wavelengths and a detector. The wavelengths of the LEDs chosen are 660 nm and 940 nm (chapter 5) and the detector used is a photodiode (chapter 6). This assembly must be protected from the ambient light for the wavelengths to which the photodiode is sensitive.

The flexible cable connecting the probe and the pulse oximeter unit carries electric power to the LEDs and the signal from the photodiode. Depending on the design, the cable may also contain conductors for a temperature sensor, to detect the temperature of the probe and the underlying skin, and the coding resistor to compensate for the variation of the wavelengths of the emitted light from the LEDs.

## 7.1 TRANSMITTANCE PROBES

### 7.1.1 Principle

As the name suggests, a pulse oximeter with transmittance probes uses the light transmitted through the extremity to measure the arterial oxygen saturation of the blood. Figure 7.1 shows a general transmission probe.

The system employs two LEDs, with emission peak wavelengths at 660 nm in the red range and 940 nm in the infrared range. The LEDs are powered alternately so that light of one particular wavelength will pass through the tissue, and the transmitted light will be detected by the photodiode. The intensity of the light emerging from the tissue is attenuated by the amount of blood present in the tissue. This varies with the arterial pulse and is used as a measure to indicate the pulse rate. The absorption coefficient of oxyhemoglobin is different from that of deoxygenated hemoglobin for most wavelengths of light. For example, the infrared light is absorbed only by molecules made up of dissimilar atoms, because only such molecules (e.g., $CO_2$, CO, $N_2O$, $H_2O$ and volatile anesthetic agents) possess an electric dipole moment with which the electromagnetic wave can interact. Symmetric molecules (e.g., $O_2$, $N_2$, $H_2$) do not have an electric dipole

86

**Appx0957**

moment and therefore do not absorb infrared radiation (Primiano 1997). Thus differences in the amount of light absorbed by the blood at two different wavelengths can be used to indicate arterial oxygen saturation.



**Figure 7.1** Probe using transmittance principle. Light from two LEDs passes alternately through the tissue of the finger and is detected by the photodiode.

*7.1.2 Sensor placement*

In transmission probes, as the photodiode has to detect the light transmitted through the tissue, the detector is placed in line with the LEDs so that the maximum amount of the transmitted light is detected. The photodiode should be placed as close as possible to the skin without exerting force on the tissue. The amount of force applied by reusable probes is much larger than the amount of force applied by disposable probes. The force applied also depends on the materials used to manufacture a particular probe and also on the company which produces the probes, e.g., Nellcor clip type probes exert less pressure than Ohmeda clip type probes. If the force exerted by the probe is significant, the blood under the tissue, where the probe is placed, may clot due to external pressure applied. And if we increase the distance between the LEDs and the photodiode (optical path length increases), the amount of detected light decreases as seen from Beer's law (section 4.1).

Thus we should place the LEDs and photodiode facing each other. Normally transmission probes are placed on the patient's finger, toe, ear or nose. In a clip type probe, the distance between the LEDs and the photodiode can be as much as 12 mm (without requiring much pressure).

## 7.2 REFLECTANCE PROBES

To measure arterial oxygen saturation, when pulse oximeters with transmission probes cannot be used, pulse oximeters with reflectance probes are used to monitor $S_aO_2$ based on the intensity of reflected light. The idea of using light reflection instead of light transmission in clinical oximetry was first described by Brinkman and Zijlstra (1949). They showed that $S_aO_2$ can be monitored by measuring the amount of light reflected (back scattered) from the tissue. The idea of using skin reflectance spectrophotometry marked a significant advancement in the noninvasive monitoring of $S_aO_2$ from virtually any point on the skin surface.

Appx0958

88       *Design of pulse oximeters*

Even though it was a major advancement, difficulties in absolute calibration and limited accuracy were the major problems with early reflectance pulse oximeters.

### 7.2.1 Principle

The intensity of the back scattered light from the skin depends not only on the optical absorption spectrum of the blood but also on the structure and pigmentation of the skin.

$S_aO_2$ is measured by analyzing the pulsatile components of the detected red and infrared plethysmograms which make use of reflected light intensities. The light from the LEDs enters the tissue, is scattered by both the moving red blood cells and the nonmoving tissue, and a part of this back scattered light is detected by the photodiode. The output of the photodiode is processed by the pulse oximeter, and measures the $S_aO_2$ of the pulsatile blood.

### 7.2.2 Sensor placement

In reflectance pulse oximetry, the LEDs and the photodiode are placed on the same side of the skin surface as shown in figure 7.2. Normally the reflectance probe is placed on the forehead or temple, but is not restricted to only those two places. Reflectance probes can be used to measure arterial oxygen saturation at virtually any place on the human body where the probe can be placed.



**Figure 7.2** Reflectance probe. The light is transmitted into the tissue, travels through the tissue, and is detected at the photodiode.

*7.2.2.1 Optimum distance between LEDs and photodiode.* One of the major design considerations required in designing a reflectance pulse oximeter sensor is determining the optimum separation distance between the LEDs and the photodiode. This distance should be such that plethysmograms with both maximum and minimum pulsatile components can be detected. These pulsatile components depend not only on the amount of arterial blood in the illuminated tissue, but also on the systolic blood pulse in the peripheral vascular bed.

There are two techniques that can enhance the quality of the plethysmogram. One way is to use a large LED driving current, which determines the effective penetration depth of the incident light, which increases light intensity. So for a given LED/photodiode separation, using higher levels of incident light, we can illuminate a larger pulsatile vascular bed. As a result the reflected plethysmograms will contain a larger AC component. But, in practice, the LED driving current is limited by the manufacturer to a specified maximum power dissipation. The other way is to place the photodiode close to the LEDs. If we place the photodiode too close to the LEDs, the photodiode will be saturated as a result of the large DC component obtained by the multiple scattering of the

incident photons by the blood-free stratum corneum and epidermal layers in the skin.

For a constant LED intensity the light intensity detected by the photodiode decreases roughly exponentially as the radial distance between the LEDs and the photodiode is increased and the same applies to the AC and DC components of the reflected plethysmograms as shown in figure 7.3. Figure 7.4 shows the effect of LED/photodiode separation on the relative pulse amplitude of the red and infrared plethysmograms. This is expected as the probability of the number of photons reaching the photodiode is decreased with the increase in separation.



**Figure 7.3**  Effect of LED/photodiode separation on the DC (□) and AC (○) components of the reflected infrared plethysmograms. Measurements were performed at a skin temperature of 43 °C (adapted from Mendelson and Ochs 1988).



**Figure 7.4** Effect of LED/photodiode separation on the relative pulse amplitude of the red (+) and infrared(·) plethysmograms. The driving currents of the red(o) and infrared(*) LEDs required to maintain a constant DC reflectance from the skin are shown for comparison (adapted from Mendelson and Ochs 1988).

Appx0960

90      *Design of pulse oximeters*

Thus the selection of a particular separation distance involves a trade-off. We can achieve larger plethysmograms by placing the photodiode farther apart from the LEDs but we need higher LED driving currents to overcome absorption due to increased optical path length.

### 7.2.3 Effect of multiple photodiode arrangement

In a reflectance oximeter, the incident light emitted from the LEDs diffuses through the skin and the back scattered light forms a circular pattern around the LEDs. Thus if we use multiple photodiodes placed symmetrically with respect to the emitter instead of a single photodiode, a large fraction of back scattered light can be detected and therefore larger plethysmograms can be obtained.

To demonstrate this, Mendelson and Ochs (1988) used three photodiodes mounted symmetrically with respect to the red and infrared LEDs; this enabled them to triple the total active area of the photodiode and thus collect a greater fraction of the back scattered light from the skin. The same result can be obtained using a photodiode with three times the area.

### 7.2.4 Effect of skin temperature

Mendelson and Ochs (1988) studied the effect of skin temperature on the quality of signals detected by the photodiode. In their experiment, the LED/photodiode separation was kept constant and after attaching the reflectance sensor to the forearm, they increased the skin temperature to 45 °C in 1 °C step increments.

Figure 7.5 and figure 7.6 show that by increasing the skin temperature from 34 °C to 45 °C, they were able to obtain a five-fold increase in the pulse amplitude.



**Figure 7.5** Effect of skin temperature on the mean pulse amplitude (+) and the corresponding decrease in the coefficient of variation (*) of the infrared plethysmograms. Each pulse amplitude was normalized to a constant separation of 4 mm (adapted from Mendelson and Ochs 1988).

Appx0961



**Figure 7.6** Simultaneous recording of the infrared and red plethysmograms from the forearm at different skin temperatures (from Mendelson and Ochs 1988).

*7.2.5 Advantages and disadvantages of reflectance probes over transmittance probes*

The basic advantage of transmittance probes over reflectance probes is the intensity of the light detected by the photodiode. As the amount of light passing through thin tissue is greater than the amount of light reflected and as the light passing through the tissue is concentrated in a particular area, the intensity of detected light is larger for transmittance probes. The major disadvantage of the transmittance probes is that the sensor application is limited to peripheral parts of the body such as the finger tips, toes, ear and nose in the adults or on the foot or palms in the infant. Reflectance probes can be placed on virtually any place on the body where we can expect light reflection due to tissue.

### 7.3 MRI PROBES

When a pulse oximeter with either transmission or reflection probes is used in the presence of magnetic resonance imaging (MRI), it may give erroneous readings. This is due to the very high magnetic field strengths involved in MRI which makes the use of conventional electronic monitoring equipment difficult. This is due to the radio frequency magnetic pulses generated in the magnetic field. Also if there is any metal connection to the skin of the patient, this could lead to burns.

In order to solve the problems involving MRI, the manufacturers have developed special pulse oximeters for use with MRI scanners. The MR-compatible sensor of Magnetic Resonance Equipment Corporation uses low attenuation optical filter bundles. The complete pulse oximeter unit is kept beyond the field of influence of the magnetic field from MRI and the light from the LEDs is transmitted through the optical fibers and the transmitted/reflected light is brought through the optical fibers to the photodiode. The LEDs, photodiode, and all the electronic equipment required are kept in a main unit

**Appx0962**

92     *Design of pulse oximeters*

which is kept far away (approximately 3 m) from the MRI equipment. The effect of the magnetic field is minimal on optical fibers when compared to the amplitude of plethysmograph and oximetry signals.

The probes are nearly the same, but instead of LEDs and a photodiode, the MRI probes use fiber optic cables. Figure 7.7 shows a typical clip type probe of Magnetic Resonance Equipment Corporation (MR Equipment 1995).



**Figure 7.7** MRI compatible pulse oximeter probe using optical fibers.

### 7.4 PROBE CONNECTORS

The pulse oximeter may be connected to the subject through a disposable probe. The instrument is used on different subjects (adults, children and infants). The probe can be attached to the subjects by different means, for example the sensors can be attached to the subject's finger, foot, ear or forehead and these require a variety of probes. The hospital should stock a large number of different kinds of pulse oximeter disposable probes, which requires a large inventory.

In order to solve this problem, Goldberger *et al* (1995) used a probe connector, which connects the sensor elements and the cable section of the probe (which is connected to the pulse oximeter instrument). Here they used the fact that money is spent on the cable, so if we can save the cable for multiple use and still use disposable sensors, then we could save money.

The designing of the probe connector should be simple and reliable and should interconnect the sensor elements with the cable that connects the pulse oximeter instrument to the sensor element. The probe connector must be mechanically rugged and should prevent accidental disconnection between the sensor and the instrument. In order to minimize the cost, the electric contacts in the probe connector should be simple and should have low resistance. The conductors in both halves of the probe connector should be precisely aligned with each other in order to avoid susceptibility to electromagnetic interference. Figure 7.8 shows the probe connector used in Ohmeda pulse oximeter probes.



**Figure 7.8** Probe connector used in Ohmeda pulse oximeter units. The cable from the probe has 9 male pins that mate with the 9 female sockets on the cable to the main unit.

Appx0963

## 7.5 REUSABLE PROBES

Probes which can be used more than once in monitoring $S_aO_2$ are called reusable probes. Generally all probes with nonadhesive or disposable adhesive sensors are reusable probes. Figure 7.9 shows the most common of them, which is is a clip (or clamp) type sensor used over the patient's finger. Figure 7.10 shows a reusable sensor with disposable adhesive wrap) and figure 7.11 shows a reusable reflectance sensor applied over the forehead with a disposable adhesive pad.



**Figure 7.9** Clamp (or clip) type reusable probe.



**Figure 7.10** Reusable probe with disposable adhesive sensors.



**Figure 7.11** Reusable reflectance sensor.

The main advantage of the reusable probes is the low per use cost involved. By using the same probe over and over we reduce the total cost for the patient. However reusable sensors require cleaning between patients to minimize the risk of cross contamination. In the case of infected patients or patients with a high risk of infection (e.g., neonates and immunosuppressed patients) reusable probes are

Appx0964

94 *Design of pulse oximeters*

not recommended. Moreover, clip type sensors are more susceptible to signal-distorting motion artifacts.

Reusable sensors are commonly used for on the spot measurements or for short term monitoring (usually of less than four hours). Reusable sensors should be changed to another site at least every four hours.

Kästle *et al* (1997) describe design considerations for reusable probes that include functionality, performance and regulations. They used a thin, flexible probe cable to minimize movement artifacts. They designed watertight connectors to the heavier adapter cable to avoid leakage. Electrical shielding minimized electrical interference and a closed, opaque housing minimized optical interference.

## 7.6 DISPOSABLE PROBES

As the name indicates disposable probes are discarded after they have been used. Since disposable probes are used on a single patient, they eliminate the possibility of cross contamination. All adhesive sensors are disposable sensors. They decrease the effect of signal distortions as they secure the sensor in the proper position and the relative motion between the patient and the sensors is nearly zero. Adhesive sensors are most commonly used when there is a need for monitoring when the electromagnetic interference levels in the surroundings is high (or if the signal obtained is low), as the electromagnetic shielding around the sensor and cable protects the pulse oximetry signal.

Adhesive sensors are used for both short term and long term monitoring. Typically adhesive sensors are checked at least every eight hours. Figure 7.12 shows a typical disposable probe.



**Figure 7.12** Disposable probe.

## 7.7 SOURCES OF ERRORS DUE TO PROBES AND PLACEMENT

### 7.7.1 Ambient light interference

Ambient light from sources such as sunlight, surgical lamps etc may cause errors in $S_aO_2$ readings. In order to prevent this, the simple solution is to cover the sensor site with opaque material which can prevent ambient light from reaching the photodiode.

Appx0965

94      *Design of pulse oximeters*

not recommended. Moreover, clip type sensors are more susceptible to signal-distorting motion artifacts.

Reusable sensors are commonly used for on the spot measurements or for short term monitoring (usually of less than four hours). Reusable sensors should be changed to another site at least every four hours.

Kästle *et al* (1997) describe design considerations for reusable probes that include functionality, performance and regulations. They used a thin, flexible probe cable to minimize movement artifacts. They designed watertight connectors to the heavier adapter cable to avoid leakage. Electrical shielding minimized electrical interference and a closed, opaque housing minimized optical interference.

## 7.6 DISPOSABLE PROBES

As the name indicates disposable probes are discarded after they have been used. Since disposable probes are used on a single patient, they eliminate the possibility of cross contamination. All adhesive sensors are disposable sensors. They decrease the effect of signal distortions as they secure the sensor in the proper position and the relative motion between the patient and the sensors is nearly zero. Adhesive sensors are most commonly used when there is a need for monitoring when the electromagnetic interference levels in the surroundings is high (or if the signal obtained is low), as the electromagnetic shielding around the sensor and cable protects the pulse oximetry signal.

Adhesive sensors are used for both short term and long term monitoring. Typically adhesive sensors are checked at least every eight hours. Figure 7.12 shows a typical disposable probe.



**Figure 7.12** Disposable probe.

## 7.7 SOURCES OF ERRORS DUE TO PROBES AND PLACEMENT

### 7.7.1 Ambient light interference

Ambient light from sources such as sunlight, surgical lamps etc may cause errors in $S_aO_2$ readings. In order to prevent this, the simple solution is to cover the sensor site with opaque material which can prevent ambient light from reaching the photodiode.

Appx0966

### 7.7.2 Optical shunt

Optical shunting occurs when light from the sensor's LEDs reaches the photodiode without passing through the tissue. Optical shunting leads to erroneous readings in the value of $S_aO_2$ as the amount of light detected by the photodiode is greatly increased by optical shunting. This can be eliminated by choosing an appropriate sensor for the patient's size and by ensuring that the sensor remains securely in position.



**Figure 7.13** Light that does not pass through arterioles causes optical shunting.

### 7.7.3 Edema

Edema is defined as an abnormal accumulation of serous fluid in a connective tissue or in a serous cavity, in other words swelling in the body. When the probe is used over such a swelling, the resultant arterial oxygen saturation reading may not be accurate as the fluid in the swelling changes the absorbed and reflected light. This changes the intensity of light detected by the photodiode, resulting in an erroneous reading. By placing the probe on a nonedemous tissue, this error can be avoided.

### 7.7.4 Nail polish

Certain colors of nail polish, especially blues, greens, browns, and black, absorb so much light that the detected light is too small. Then the resultant $S_aO_2$ may be inaccurate. Thus nail polish of these colors should be removed.

Appx0967

96     *Design of pulse oximeters*

## REFERENCES

Brinkman R and Zijlstra 1949 Determination and continuous registration of the percentage of the percentage oxygen saturation in small amounts of blood *Arch. Chir. Neerl.* **1** 177–83

Cheung P W, Gauglitz K F, Hunsaker S W, Prosser S J, Wagner D O and Smith R E 1993 Apparatus for the automatic calibration of signals employed in oximetry *US patent 5,259,381*

Criticare 1995 *Product Catalog* (Waukesha, WI: Criticare Systems)

Delonzor R 1993 Disposable pulse oximeter sensor *US patent 5,246,003*

Goldberger D S, Turley T A and Weimer K L 1995 Pulse oximeter probe connector *US patent 5,387,122*

Kästle S, Noller F. Falk S, Bukta A, Mayer E and Miller D 1997 A new family of sensors for pulse oximetry *Hewlett-Packard J.* **48** (1) 39–53

Larsen V H, Hansen T and Nielsen S L 1993 Oxygen status determined by the photo-electric method – a circular finger probe constructed for detection of blood oxygen content, blood flow and vascular density *Lab Invest.* **53** Suppl. 214 75–81

Mannheimer P D, Chung C, Ritson C 1993 Multiple region pulse oximetry probe and oximeter *US patent 5,218,962*

Mendelson Y and Ochs B D 1988 Noninvasive pulse oximetry utilizing skin reflectance photoplethysmography *IEEE Trans. Biomed. Eng.* **35** 798–806

MR Equipment 1995 *Product Catalog* (Bay Shore, NY: Magnetic Resonance Equipment Corp)

Nellcor 1995 *Product Catalog* (Hayward, CA: Nellcor Incorporated)

Nelson D 1995 Molded pulse oximeter sensor *US patent 5,425,360*

O'Leary R J Jr, Landon M and Benumof J L 1992 Buccal pulse oximeter is more accurate than finger pulse oximeter in measuring oxygen saturation *Report* Department of Anesthesiology, University of California—San Diego

Ohmeda 1996 *Product Catalog* (Louisville, CO: Ohmeda)

Pedan C J, Daugherty M O and Zorab J S 1994 Fiberoptic pulse oximetry monitoring of anaesthetized patients during magnetic resonance imaging *Eur. J. Anaesthesiol.* **11** 111–3

Pologe J A 1987 Pulse oximetry: technical aspects of machine design *Int. Anesthesiol. Clinics* **35** 137–53

Primiano F P Jr 1998 Measurements of the respiratory system *Medical Instrumentation: Application and Design* 3rd edn J G Webster ed (New York: Wiley)

Santamaria T and Williams J S 1994 Pulse oximetry *Medical Device Research Report* **1** (2)

Sugiura K 1995 Pulse oximeter probe *US patent 5,413,101*

Young R L, Heinzelman B D and Lovejoy D A 1993 Noninvasive oximeter probe *US patent 5,217,012*

## INSTRUCTIONAL OBJECTIVES

7.1   Explain how transmission probes work.
7.2   List the main constraints in the use of transmission probes.
7.3   Explain what we need to look at, when placing the emitter and detector of the pulse oximeter probe on the patient.
7.4   Explain how the reflection probes work.
7.5   Explain when we need to use reflectance probes.
7.6   Explain the effects of skin temperature over reflectance probes.
7.7   Explain the advantages of using multiple detectors in reflectance probes.
7.8   Explain why the need to use MRI probes arises.
7.9   List the precautions that should be taken in using MRI probes.
7.10  Compare reusable and disposable probes.
7.11  Explain the common sources of error in pulse oximeters due to probes and explain how we can prevent them.

Appx0968