[Volume II, Appx1393 – Appx1932]

## No. 22-1894

IN THE

# United States Court of Appeals

### FOR THE FEDERAL CIRCUIT

───────────────

MASIMO CORPORATION,

*Appellant,*

v.

APPLE INC.,

*Appellee.*

APPEAL FROM THE PATENT TRIAL AND APPEAL BOARD
CASE NO. IPR2020-01526

### JOINT APPENDIX

Joseph R. Re, *Principal Counsel*
Stephen C. Jensen
John M. Grover
Shannon Lam
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
2040 Main Street, 14th Floor
Irvine, CA 92614
(949) 760-0404

Jeremiah S. Helm
**KNOBBE, MARTENS, OLSON & BEAR, LLP**
1717 Pennsylvania Ave., N.W.
Washington, D.C. 20006
(202) 640-6400

*Attorneys for Appellant*
*Masimo Corporation*

Lauren A. Degnan, *Principal Counsel*
W. Karl Renner
Michael J. Ballanco
**FISH & RICHARDSON P.C.**
1000 Maine Ave., Suite 1000
Washington, DC 20024
Tel: (202) 783-5070

Robert Courtney
**FISH & RICHARDSON P.C.**
60 South 6th Street
Suite 3200
Minneapolis, MN 55402
Tel: (612) 335-5070

*Attorneys for Appellee Apple Inc.*

April 14, 2023

# Table of Contents

| Date | Paper No. /Ex. No. | Document | Pages |
|---|---|---|---|
| | | **VOLUME I** | |
| 4/12/2022 | 31 | Final Written Decision | Appx0001-Appx0037 |
| 7/26/2022 | 14 | Notice Forwarding Certified List | Appx0038-Appx0113 |
| n/a | Ex. 1001 | U.S. Patent No. 6,771,994 (Kiani et al.) | Appx0114-Appx0134 |
| 8/31/2020 | 2 | Petition for Inter Partes Review | Appx0136; Appx0142; Appx0146; Appx0168-0169; Appx0175-0176; Appx0181-0182 |
| 7/20/2021 | 12 | Patent Owner's Response | Appx0284-Appx0350 |
| 12/03/2021 | 19 | Patent Owner's Sur-Reply | Appx0381-0412 |
| 2/16/2022 | 30 | January 19, 2022 Hearing Transcript | Appx0453; Appx0460-0461; Appx0463; Appx0465-0468; Appx0470-0471 |
| n/a | Ex. 1003 | Declaration of Dr. Brian W. Anthony | Appx0603; Appx0638; Appx0640; Appx0646; Appx0653-0660 |
| n/a | Ex. 1008 | U.S. Patent No. 5,254,388 (Melby) | Appx0814-0821 |
| n/a | Ex. 1010 | Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 | Appx0855; Appx0884-0891; Appx0905; Appx0917; Appx0927-0968 |
| | | **VOLUME II** | |
| n/a | Ex. 1039 | Petitioner's Demonstratives | Appx1393; Appx1412; Appx1420; |

| Date | Paper No. /Ex. No. | Document | Pages |
|------|------|------|------|
| | | | Appx1424 |
| n/a | Ex. 2001 | Declaration of Vijay K. Madisetti, Ph.D. | Appx1441-Appx1519 |
| n/a | Ex. 2003 | 6/1/2021 Deposition Transcript of Dr. Brian Anthony in connection with IPR2020-01526 | Appx1547; Appx1731-1733; Appx1741-1744 |
| n/a | Ex. 2007 | U.S. Patent No. 4,700,708 (New, Jr. et al.) | Appx1916-1926 |
| n/a | Ex. 2008 | Verploegh, "Light Control Systems for Automotive Instrumentation," SAE Technical Paper Series (February 24-28, 1986) | Appx1927; Appx1932 |

57460548

# Apple Inc. (Petitioner)
## v.
# Masimo Corporation (Patent Owner)

## Petitioner Demonstratives

Case No. IPR2020-01526
U.S. Patent No. 6,771,994
Before Hon. Josiah Cocks, Robert Kinder, Amanda Wieker
Administrative Patent Judges

**FISH.**

DEMONSTRATIVE EXHIBIT – NOT EVIDENCE     1

APPLE 1039
Apple v. Masimo
IPR2020-01526

# Light Control Film Improves Signal-to-Noise Ratio

### Dr. Anthony's Declaration

69. Also in the combination, Melby describes a light control film that can be used with the combined Diab/Benjamin system. In further detail, Melby describes a *"louvered plastic film [that] has louvers* including central regions with a relatively high coefficient[] of extinction and outer regions with relatively low coefficients of extinction." APPLE-1008, Abstract. Melby is a 3M patent that describes a commercially available louvered light film made of "cellulose acetate butyrate (CAB)". *See, e.g.*, APPLE-1007, 2:42-57 (describing light control film made of "cellulose acetate butyrate film" and stating that "[l]ight control film of this type is known in the art and is commercially available"). A POSITA would have been motivated to make this modification to further increase the directionality of the light signal received in the combined device, thereby leading to a device that is less susceptible to the influence of ambient light and thus provides more accurate readings. *Id.*, 3:65-4:10.

APPLE-1003, ¶ 69.

### Diab



APPLE-1006, FIG. 24
(as annotated at APPLE-1003, ¶ 74).

FISH.

20

# Melby's Light Control Film Controls Ambient Light

### Dr. Anthony's Declaration

94.    Webster proposes that, in order to "minimize the effects from light other than the optical signals of interest," "some type of *light filter*" can be placed over the detector.  APPLE-1010, 79.

wavelengths to pass through the filter."  *Id.*  Webster contemplates that in order for the pulse oximeter device to function effectively, "most of the light being transmitted from the LEDs *must not reach the photodiode unless it has passed through tissue containing arterial blood.*"  *Id.*

APPLE-1003, ¶ 94.

100.    Thus, one of ordinary skill viewing the disclosure of Webster would have recognized that Melby's film could be used in the Webster device as the "light filter" to control light such that only light originating from the direction of the light emitters reaches the detector.  APPLE-1010, 79.

APPLE-1003, ¶ 100.

### Melby (top) and Webster (bottom)



APPLE-1008, FIG. 1.



APPLE-1010, FIG 7.1.    28

FISH.

## Webster Proposes Decreasing Angle of Incidence to the Detector

### Webster

Since this is a system with an optical interface, it is important to minimize the effects from light other than the optical signals of interest. One way to minimize unwanted light incident upon the detector is to place some type of light filter over the detector. This allows light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter. For the pulse oximeter to work effectively, most of the light being transmitted from the LEDs must not reach the photodiode unless it has passed through tissue containing arterial blood.

*6.3.2 Optical interference*

To minimize errors, the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood (Nellcor 1993). This can be accomplished through thoughtful LED/photodiode placement. Light impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue (New and Corenman 1987). Two additional measures can be taken to ensure this (figure 6.6). One is to decrease the angle of incidence to the photodiode. The second is to coat the housing around the photodiode with a material that does not scatter or reflect light.

There are two types of optical interference that may cause problems for the photodiode. The first is excessive ambient light.

APPLE-1010 (Webster), 79
(cited and quoted at Petition, 39).

*See also* Pet. Reply, 4-5.

32

FISH.

Filed: July 20, 2021

Filed on behalf of:
    Patent Owner Masimo Corporation
By:    Joseph R. Re (Reg. No. 31,291)
    Stephen W. Larson (Reg. No. 69,133)
    Jarom D. Kesler (Reg. No. 57,046)
    Shannon H. Lam (Reg. No. 65,614)
    KNOBBE, MARTENS, OLSON & BEAR, LLP
    2040 Main Street, Fourteenth Floor
    Irvine, CA 92614
    Tel.:   (949) 760-0404
    Fax:   (949) 760-9502
    E-mail:  AppleIPR2020-1526-994@knobbe.com

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

Case IPR2020-01526
U.S. Patent 6,771,994

**DECLARATION OF VIJAY K. MADISETTI, PH.D.**

**MASIMO 2001
Apple v. Masimo
IPR2020-01526**

# TABLE OF CONTENTS

**Page No.**

I.    QUALIFICATIONS ................................................................1

II.   MATERIALS CONSIDERED ................................................8

III.  UNDERSTANDING OF PATENT LAW ...................................10

    A.    Level Of Ordinary Skill In The Art................................10

    B.    Claim Construction ................................................11

    C.    Obviousness................................................12

IV.   BACKGROUND ................................................................13

    A.    The Importance of Pulse Oximeters................................13

    B.    How Oximetry Works ................................................14

    C.    The '994 Patent ................................................17

    D.    Introduction to Claim 15 of the '994 Patent........................19

V.    CLAIM CONSTRUCTION ................................................19

VI.   LEVEL OF ORDINARY SKILL IN THE ART ...........................25

VII.  THE PETITION'S PROPOSED GROUNDS ...............................26

VIII. OVERVIEW OF ASSERTED REFERENCES ...........................27

    A.    Diab (EX1006) ................................................27

    B.    Benjamin (EX1007) ................................................30

    C.    Melby (EX1008)................................................32

# TABLE OF CONTENTS
### (cont'd)

D.    Webster (EX1010)..................................................................33

E.    Fine (EX1009)......................................................................35

IX.   THE PETITION'S PROPOSED COMBINATIONS....................................38

A.    GROUND 1: THE COMBINATION OF DIAB, BENJAMIN, AND MELBY DOES NOT TEACH THE CLAIMED INVENTION .............................................38

    1.    Apple's combination would undermine Diab's invention..............................................................38

    2.    Apple's unexplained modification would cause Diab to perform worse ............................................44

    3.    The proposed modifications would not have yielded predictable results.......................................48

    4.    Apple fails to provide a credible motivation to add louvers ...................................................50

B.    GROUND 2: THE COMBINATION OF WEBSTER AND MELBY DOES NOT TEACH THE CLAIMED INVENTION ..................................................53

    1.    Apple conflates Webster's wavelength filter and Webster's light impervious barriers....................................53

    2.    Melby does not disclose a plurality of louvers positioned over a light sensitive detector...................................57

    3.    A POSITA would not have been motivated to modify Webster to include Melby's light control film over the photodiode ..............................................57

# TABLE OF CONTENTS
### (cont'd)

**Page No.**

C.    GROUND 3: FINE DOES NOT TEACH THE
CLAIMED INVENTION ....................................................................60

1.    A POSITA would not have considered Fine ............................60

2.    Optical fibers are not louvers....................................................61

D.    GROUND 4: THE COMBINATION OF FINE,
BENJAMIN, AND MELBY DOES NOT TEACH
THE CLAIMED INVENTION ...........................................................65

1.    Dr. Anthony fails to explain how a light control
Film could be incorporated into Fine........................................65

2.    Apple's motivations to combine Fine,
Benjamin, and Melby are conclusory and
unsupported ...............................................................................73

X.    OATH ........................................................................................................75

-iii-

IPR2020-01526
Apple Inc. v. Masimo Corporation

I, Vijay K Madisetti, Ph.D, declare as follows:

1.      I have been retained by counsel for Patent Owner Masimo Corporation ("Masimo") as an independent expert witness in this proceeding.  I have been asked to provide my opinions regarding the Petition in this action and the declaration offered by Brian W. Anthony, Ph.D., (EX1003) challenging the patentability of Claim 15 of U.S. Patent No. 6,771,994 ("the '994 Patent").  I am being compensated at my usual and customary rate for the time I spend working on this proceeding, and my compensation is not affected by its outcome.

## I.      QUALIFICATIONS

2.      My qualifications are set forth in my curriculum vitae, a copy of which is included as Exhibit 2002.  A summary of my qualifications follows.

3.      I am a professor in Electrical and Computer Engineering at the Georgia Institute of Technology ("Georgia Tech").  I have worked in the area of digital signal processing, wireless communications, computer engineering, integrated circuit design, and software engineering for over 25 years, and have authored, co-authored, or edited several books and numerous peer-reviewed technical papers in these area.

4.      I obtained my Ph.D. in Electrical Engineering and Computer Science at the University of California, Berkeley, in 1989.  While there, I received the Demetri Angelakos Outstanding Graduate Student Award and the IEEE/ACM Ira M. Kay Memorial Paper Price.

IPR2020-01526
Apple Inc. v. Masimo Corporation

5.      I joined Georgia Tech in the Fall of 1989 and am now a tenured full professor in Electrical and Computer Engineering.  Among other things, I have been active in the areas of digital signal processing, wireless communications, integrated circuit design (analog & digital), system-level design methodologies and tools, and software engineering.  I have been the principal investigator ("PI") or co-PI in several active research programs in these areas, including DARPA's Rapid Prototyping of Application Specific Signal Processors, the State of Georgia's Yamacraw Initiative, the United States Army's Federated Sensors Laboratory Program, and the United States Air Force Electronics Parts Obsolescence Initiative. I have received an IBM Faculty Award and NSF's Research Initiation Award.  I have been awarded the 2006 Frederick Emmons Terman Medal by the American Society of Engineering Education for contributions to Electrical Engineering, including authoring a widely used textbook in the design of VLSI digital signal processors.

6.      During the past 20 years at Georgia Tech, I have created and taught undergraduate and graduate courses in hardware and software design for signal processing, computer engineering (software and hardware systems), computer engineering and wireless communication circuits.

7.    I have been involved in research and technology in the area of digital signal processing since the late 1980s, and I am the Editor-in-Chief of the CRC Press's 3-volume Digital Signal Processing Handbook (1998, 2010).

8.    I have founded three companies in the areas of signal processing, embedded software, military chipsets involving imaging technology, and software for computing and communications systems.  I have supervised Ph.D. dissertations of over twenty engineers in the areas of computer engineering, signal processing, communications, rapid prototyping, and system-level design methodology.

9.    I have designed several specialized computer and communication systems over the past two decades at Georgia Tech for tasks such as wireless audio and video processing and protocol processing for portable platforms, such as cell phones and PDAs.  I have designed systems that are efficient in view of performance, size, weight, area, and thermal considerations.  I have developed courses and classes for industry on these topics, and many of my lectures in advanced computer system design, developed under the sponsorship of the United States Department of Defense in the late 1990s, are available for educational use at http://www.eda.org/rassp and have been used by several U.S. and international universities as part of their course work.  Some of my recent publications in the area of design of computer engineering and wireless communications systems and associated protocols are listed in Exhibit 2005.

IPR2020-01526
Apple Inc. v. Masimo Corporation

10.    In the mid 2006-2007 timeframe, I collaborated with Professor John Scharf and his colleagues at Emory Healthcare system in developing FFT-based pulse oximetry system prototypes on FPGAs, which extended technologies developed by Prof. Scharf and his colleagues from the 1996 time frame (*See* T. Rusch, R. Sankar, J. Scharf, "Signal Processing Methods for Pulse Oximetry", Comput. Bio. Med, Vol. 26, No. 2, 1996). Some of my more recent publications in the area of biological signal processing and bioinformatics are listed in my CV and include, A. Bahga, V. Madisetti, "Healthcare Data Integration and Informatics in the Cloud", IEEE Computer, Vol. 48, Issue 2, 2015, and "Cloud-Based Information Integration Informatics Framework for Healthcare Applications", IEEE Computer, Issue 99, 2013. In addition to my signal processing experience specific to pulse oximetry, I also have experience in developing systems for other physiological signals. Beginning in the early 1990s, I worked, in particular, with ECG/EKG signals, and, in general, with biomedical signals and systems.

11.    In addition to my signal processing experience specific to pulse oximetry, I also have experience in developing algorithms and systems for other physiological signals. I worked with ECG/EKG signals in particular, and biomedical signals and systems in general, beginning in the early 1990s. In particular, I worked with graduate student Dr. Shahram Famorzadeh, in 1990 and 1991, to analyze and apply pattern recognition (a category of signal processing

-4-

algorithms that is based on correlation with a set of templates) to ECG/EKG waveforms to identify physiological conditions.

12.    I have experience with biomedical signals and devices in the field of speech and image processing since the late 1980s.  I worked on deconvolution algorithms to recover the state of the system based on observed measurements of the physiological signals in the 1993-1998 time-frame.  These signal processing techniques can be applied to pulse oximetry signals, and I have been working with these techniques since the mid-1980s.

13.    I have studied, researched and published in the area of adaptive filter signal processing for noise reduction and signal prediction, using correlation-based approaches since the mid-1980s, both in the time-domain and frequency domain, and also to ray-tracing applications, such as Seismic Migration for oil and shale gas exploration.  See for instance, V. Madisetti & D. Messerschmitt, Dynamically Reduced Complexity Implementation of Echo Cancellers, IEEE International Conference on Speech, Acoustics and Signal Processing, ICASSP 1986, Tokyo, Japan, and M. Romdhane and V. Madisetti, "All-Digital Oversampled Front-End Sensors" IEEE Signal Processing Letters, Vol 3, Issue 2, 1996, and "LMSGEN: A Prototyping Environment for Programmable Adaptive Digital Filters in VLSI", VLSI Signal processing, pp. 33-42, 1994.

14. Deconvolution of symmetric (seismic) and asymmetric (pulse oximetry) signals has gained much importance in the past two decades, and some of my early work on "Homomorphic Deconvolution of Bandpass Signals" in IEEE Transactions on Signal Processing, October 1997, established several new methods for deconvolution of such signals that had several advantages of robustness, increased accuracy, and simplicity.

15. In the past decade I have authored several peer-reviewed papers in the area of computer systems, instruments, and software design, and these include:

- V. Madisetti, et al., "The Georgia Tech Digital Signal Multiprocessor, IEEE Transactions on Signal Processing, Vol. 41, No. 7, July 1993.

- V. Madisetti et al., "Rapid Prototyping on the Georgia Tech Digital Signal Multiprocessor", IEEE Transactions on Signal Processing, Vol. 42, March 1994.

- V. Madisetti, "Reengineering legacy embedded systems", IEEE Design & Test of Computers, Vol. 16, Vol. 2, 1999.

- V. Madisetti et al., "Virtual Prototyping of Embedded Microcontroller-based DSP Systems", IEEE Micro, Vol. 15, Issue 5, 1995.

- V. Madisetti, et al., "Incorporating Cost Modeling in Embedded-System Design", IEEE Design & Test of Computers, Vol. 14, Issue 3, 1997.

IPR2020-01526
Apple Inc. v. Masimo Corporation

- V. Madisetti, et al., "Conceptual Prototyping of Scalable Embedded DSP Systems", IEEE Design & Test of Computers, Vol. 13, Issue 3, 1996.

- V. Madisetti, Electronic System, Platform & Package Codesign," IEEE Design & Test of Computers, Vol. 23, Issue 3, June 2006.

- V. Madisetti, et al., "A Dynamic Resource Management and Scheduling Environment for Embedded Multimedia and Communications Platforms", IEEE Embedded Systems Letters, Vol. 3, Issue 1, 2011.

16.     I have been active in the areas of signal processing systems and mobile device communication systems for several years, and some of my publications in this area include "Frequency Dependent Space-Interleaving of MIMO OFDM Systems" Proc. of IEEE Radio and Wireless Conference (RAWCON '03), 2003, "Embedded Alamouti Space Time Codes for High Rate and Low Decoding Complexity", Proc. IEEE Asilomar Conf. on Signals, Systems, and Computers, 2008; and "Asymmetric Golden Codes for Fast Decoding in Time Varying Channels", Wireless Personal Communications (2011).

-7-

IPR2020-01526
Apple Inc. v. Masimo Corporation

## II.    MATERIALS CONSIDERED

17.    Below is a listing of documents and materials that I considered and

reviewed in connection with providing this declaration.  In forming my opinions, I

considered those materials as well as anything cited or discussed in this declaration.

| Exhibit | Description |
|---|---|
| 1001 | U.S. Patent No. 6,771,994 |
| 1002 | File History for U.S. Patent No. 6,771,994 |
| 1003 | Declaration of Dr. Anthony |
| 1006 | U.S. Patent No. 5,638,818 ("Diab") |
| 1007 | U.S. Patent No. 4,015,595 ("Benjamin") |
| 1008 | U.S. Patent No. 5,254,388 ("Melby") |
| 1009 | WO Pub. No. 1996/41566 ("Fine") |
| 1010 | Excerpts from Design of Pulse Oximeters, J.G. Webster; Institution of Physics Publishing, 1997 ("Webster") |
| 1011 | Tremper, Pulse Oximetry, Anesthesiology, The Journal of the American Society of Anesthesiologists, Inc., Vol. 70, No. 1 (January 1989) |
| 1012 | Mendelson, Skin Reflectance Pulse Oximetry: In Vivo Measurements from the Forearm and Calf, Journal of Clinical Monitoring, Vol. 7, No. 1 (January 1991) |
| 1013 | Excerpts from Bronzino, The Biomedical Engineering Handbook, CRC Press, Inc. (1995) |
| 1014 | Konig, Reflectance Pulse Oximetry – Principles and Obstetric Application in the Zurich System, Journal of Clinical Monitoring, Vol. 14, No. 6 (August 1998) |
| 1034 | Joseph Guzman, "Fauci says second wave of coronavirus is 'inevitable'", TheHill.com (Apr. 29, 2020), available at: https://thehill.com/changing-america/resilience/naturaldisasters/495211-fauci-says-second-wave-of-coronavirus-is |

IPR2020-01526
Apple Inc. v. Masimo Corporation

| Exhibit | Description |
|---------|-------------|
| 1035 | "Tracking the coronavirus in Los Angeles County," LATimes.com (Aug. 20, 2020), available at https://www.latimes.com/projects/california-coronavirus-casestracking-outbreak/los-angeles-county/ |
| 2004 | "COVID-19 Clinical management", apps.who.int (January 25, 2021), available at https://apps.who.int/iris/bitstream/handle/10665/338882/WHO-2019-nCoV-clinical-2021.1-eng.pdf?sequence=1&isAllowed=y |
| 2005 | "Pulse Oximeters - Premarket Notification Submissions [510(k)s]: Guidance for Industry and Food and Drug Administration Staff", fda.gov (March 2013), available at https://www.fda.gov/regulatory-information/search-fda-guidance-documents/pulse-oximeters-premarket-notification-submissions-510ks-guidance-industry-and-food-and-drug |
| 2006 | Tamura et al., "Wearable Photoplethysmographic Sensors—Past and Present," Electronics 3:282-302 (2014) |
| 2007 | U.S. Patent No. 4,700,708 |
| 2008 | Verploegh, "Light Control Systems for Automotive Instrumentation," SAE Technical Paper Series (February 24-28, 1986) |
| 2009 | U.S. Patent No. 3,922,440 |
| 2010 | U.S. Patent No. 4,938,218 |
| 2011 | U.S. Patent No. 5,024,226 |
| 2012 | Cohen et al., "A plan to save coronavirus patients from dying at home," cnn.com (April 12, 2020), available at https://www.cnn.com/2020/04/11/health/monitoring-covid19-at-home/index.html |
| 2013 | U.S. Patent No. 5,099,842 |
| 2014 | Hecht, Understanding Fiber Optics, Laser Light Press (5th ed. 2015) |
| 2015 | Definition of "louver," lexico.com (powered by Oxford) |

IPR2020-01526
Apple Inc. v. Masimo Corporation

| Exhibit | Description |
|---------|-------------|
| Paper 2 | Petition for *Inter Partes* Review IPR2020-01526 |
| Paper 7 | Decision Granting Institution of *Inter Partes* Review IPR2020-01526 |

### III.    <u>UNDERSTANDING OF PATENT LAW</u>

18.    I am not an attorney and will not be offering legal conclusions. However, I have been informed of several principles concerning the legal issues relevant to analyzing the challenges to the claims of the '994 Patent, and I used these principles in arriving at my conclusions.

### A.    <u>Level Of Ordinary Skill In The Art</u>

19.    I understand that certain issues in an IPR, such as claim construction and whether a claim is invalid as obvious, are assessed from the view of a hypothetical person of ordinary skill in the relevant art at the time of the invention. I understand there are multiple factors relevant to determining the level of ordinary skill in the art, including (1) the level of education and experience of persons working in the field at the time of the invention; (2) the sophistication of the technology; (3) the types of problems encountered in the field; and (4) the prior art solutions to those problems. I understand that this hypothetical person of ordinary skill is presumed to have had knowledge from the teachings of the prior art.

-10-

IPR2020-01526
Apple Inc. v. Masimo Corporation

20.    I understand that Apple Inc. ("Apple" or "Petitioner") and its Declarant Dr. Anthony have set forth the following definition for a person of ordinary skill in the art ("POSITA"):

> [S]omeone with a working knowledge of physiological monitoring technologies. The person would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies.

EX1003 ¶ 36.  Dr. Anthony further asserts:  "Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline." *Id.*

## B.    <u>Claim Construction</u>

21.    I understand that claim construction in an IPR is a legal question for the Board to decide.  I also understand, however, that in construing claim terms, the Board asks what the terms would mean to a person of ordinary skill in the relevant art in view of the disclosures in the patent and the prosecution history of the patent. I understand that the Board may also consider external evidence, such as dictionaries. In general, however, I understand that claim terms are given the ordinary and

-11-

customary meaning one of ordinary skill in the relevant art would apply to them in the context of the patent at the time the patent was filed.

### C.    **Obviousness**

22.    I understand that a patent claim is invalid under the patent law, 35 U.S.C. § 103, if, at the time the claimed invention was made, the differences between the prior art and the claimed invention as a whole would have been obvious to a person of ordinary skill in the art.  I understand that the following facts are considered in determining whether a claimed invention is invalid as obvious in view of the prior art: (1) the scope and content of the prior art; (2) the level of ordinary skill in the art; and (3) the differences, if any, between the claimed invention and the prior art.

23.    I also understand there are additional considerations that may be used in evaluating whether a claimed invention is obvious.  These include whether the claimed invention was the result of (a) a teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art to arrive at the claimed invention; (b) a combination of prior art elements combined according to known methods to yield predictable results; (c) a simple substitution of one known element for another to obtain a predicable result; (d) the use of a known technique to improve similar things in the same way; (e) applying a known technique to a known thing ready for improvement to yield predictable results; (f) choosing from a finite

number of identified, predictable solutions, with a reasonable expectation of success;

(g) known work in one field of endeavor prompting variations of it for use in either

the same filed or a different one based on design incentives or other market forces if

the variations are predictable to one of ordinary skill in the art.

24.     I have applied this understanding in my analysis.

25.     I understand that Dr. Anthony carried out his analysis of patentability

as of June 18, 1999.  EX1003 ¶¶12, 17.  I likewise carry out my analysis of

patentability as of June 18, 1999.  I do not offer any opinions regarding priority in

this declaration.

## IV.     BACKGROUND

### A.     The Importance of Pulse Oximeters

26.     Once a person loses his or her oxygen supply, referred to as hypoxia, a

caregiver has only a few minutes to prevent brain damage, heart failure and death.

EX1010 at 14; EX1013 at 1346; EX1001 at 1:24-28.  Accordingly, there is a need to

quickly and accurately determine the amount of oxygen in blood.  EX1013 at 1346;

EX1001 at 1:24-28.  A type of physiological monitoring device, called a pulse

oximeter, readily detects changes in a person's oxygen saturation, which is an

indicator of the person's oxygen supply.  EX1001 at 1:29-31.  For at least this

relationship to oxygen supply, use of pulse oximeters are considered a standard of

care and an essential diagnostic tool in the U.S. for anesthetics, emergency patients,

IPR2020-01526
Apple Inc. v. Masimo Corporation

urgent care settings including first responders and ambulance care, surgical environments, and newborn/neonatal care, to name just a few. *See, e.g.*, EX1010 at 13, 214; EX1011 at 98; EX1013 at 1347, 1351; EX1014 at 403. Recently, ease of use and portability led to pulse oximeter monitoring to be virtually universally recommended for at home patients having COVID-19 symptoms. EX2004 at 5; *see generally* 2012.

### B. How Oximetry Works

27.    Pulse oximetry determines oxygen saturation by leveraging the light absorbance of oxygenated hemoglobin and deoxygenated hemoglobin at two different wavelengths. EX1010 at 13; EX1013 at 1349-1351. As the blood flow pulsates, it modulates the light absorption. EX1010 at 14; EX1013 at 1050. Changes in light absorbance are tracked as the blood pulses. EX1010 at 34.

28.    A noninvasive sensor of a typical pulse oximeter generally includes "red and infrared (IR) light-emitting diode (LED) emitters and a photodiode detector." EX1001 at 1:34-36. "[T]he emitters project light through . . . [a user's tissue, and the detector] detect[s] the . . . light as it emerges from the . . . [tissues]." *Id.* at 1:38-42.

29.    Because light both transmits through tissue and backscatters or reflects back after entering tissue, pulse oximeter sensors can operate either by transmittance or reflectance. That is, for pulse oximeter sensors operating by transmittance, a

-14-

detector (sometimes referred to as a photodiode) is placed on the opposite side of a tissue from emitters.   EX1010 at 36.   For pulse oximeter sensors operating by reflectance, a detector is placed on the same side as emitters.   *Id.*   The following figures show a simplified depiction of transmittance and reflectance operations:



**Figure 3.10** On the left is a transmission pulse oximeter measuring the transmission of light by two LEDs through the finger of a patient. On the right is a reflectance pulse oximeter measuring the amount of light reflected back to the probe.

*Id.* As shown above, in the reflectance configuration, when the light reflects back toward the sensor, the light may approach the photodiode at an angle.

30.    Photodiodes cannot distinguish between red and infrared light. EX1010 at 36.   Thus, an oximeter device "alternately activates the . . . emitters." EX1001 at 1:47-48.   The resulting "[l]ight absorption . . . varies due to the blood volume change . . . of arterial blood . . . ." *Id.* at 3:10-15.   The detector generates a current "proportional to the intensity of the detected light[, and the] . . . oximeter calculates a ratio of detected red and infrared intensities . . . ." *Id.* at 1:46-51; EX1010 at 100.   The scattering effects of blood and tissue necessitate the arterial oxygen

saturation value to be empirically determined based on the ratio obtained. EX1001 at 1:51-52; EX1010 at 14; EX1013 at 1351.

31.    Calibration coefficients (often called a calibration curve) provide a map or lookup table for correlating measured and processed ratiometric data received from a pulse oximetry sensor with empirically determined oxygen saturation values. EX1010 at 54, 159.  Calibration curves are highly sensitive to even small changes to any particular optical system as such changes affect the incoming values of the ratiometric data.  Any change in the optical system could throw off the gain or change the signal-to-noise ratio, neither of which is sufficiently proportional or linear that the signal processing or calibration curve could be kept the same.  If the signal processing or calibration curve were kept the same, the changes to the optical system could corrupt the signal and degrade the accuracy of the output measurement. Without an accurate calibration curve, the pulse oximeter has no way of determining oxygen saturation levels.  EX1010 at 159.

32.    For this reason, optical system modifications often require expensive clinical data collection to generate new calibration curves, even potentially requiring new FDA clearances.  EX2005 at 4-5.  Because calibration curves are empirically determined by clinical studies, optical system modifications require expensive new clinical trials to generate calibration curves to obtain the new FDA approvals. EX1010 at 54, 159-163; EX1001 at 1:50-54.  Clinical trials and FDA approvals are

significantly costly in time, resources, and expense. Without a compelling motivation to modify the optical system of a pulse oximeter, a POSITA would not risk the costly and time-consuming drawbacks of updating the calibration curve and preparing a new 510(k) submission.

### C.    The '994 Patent

33.    With the criticality of pulse oximetry monitoring in a large number of varied environments, including recent COVID-19 patient monitoring (EX2004 at 5), the '994 Patent discloses the need to avoid a detector producing "a false signal that might be interpreted . . . as a physiological signal"; that is, a false signal wrongly interpreted as a signal responsive to the user's oxygen supply. EX1001 at 1:18-19. One source of such errant interpretation is when a sensor "becomes partially or completely dislodged from the patient, but . . . continue[s] to detect an AC signal *within the operating region* of the pulse oximeter." *Id.* at Abstract, 1:64-66 (emphasis added). False AC signals within an expected region of the oximeter "are serious because the . . . oximeter may display a normal saturation when, in fact, the [sensor] . . . is not properly attached . . ., potentially leading to missed desaturation events." *Id.* at 4:38-42. This was typically avoided by choosing an appropriate sensor for the patient's size and by ensuring that the sensor remains securely in position. EX1010 at 95; *see also* EX1006 at 1:48–2:58.

IPR2020-01526
Apple Inc. v. Masimo Corporation

34.    In contrast to prior approaches, the '994 patent discloses an innovative solution that includes louvers "placed in front of the . . . photodetector to filter out oblique light rays." EX1001 at Abstract, 2:9-12. The louvers actually "prevent light from an oblique angle from reaching the photodetector and creating a false signal that might be interpreted by the pulse oximeter as a physiological signal." *Id.* at 2:16-19.

35.    For example, Fig. 5A (reproduced below) of the '994 Patent, shows "[t]he louvers 502 block light rays travelling along an oblique path 410." *Id.* at 6:28-30.



*FIG.5A*

*Id.* at FIG. 5A. That is, when light rays from the emitter 220 follow a path 410 that is oblique to an orientation of the louvers 502 (here shown as vertical), the louvers 502 prevent passage of those light rays to the detector assembly 235. "With no [oblique] light rays reaching the detector assembly 235, the detector will produce no signal" (*Id.* at 6:49-51), thereby avoiding the production of "a false signal that could be interpreted by the pulse oximeter 140 to be a physiological signal." *Id.* at 6:53-56.

-18-

### D. Introduction to Claim 15 of the '994 Patent

36.     I understand only one claim of the '994 Patent is at issue in this IPR

proceeding.  Claim 15 reads as follows:

15. A sensor which generates at least first and second intensity signals from a
light-sensitive detector which detects light of at least first and second
wavelengths transmitted through body tissue carrying pulsing blood; the
sensor comprising:

at least one light emission device;

a light sensitive detector; and

a plurality of louvers positioned over the light sensitive detector to accept
light from the at least one light emission device originating from a general
direction of the at least one light emission device and then transmitting
through body tissue carrying pulsing blood, wherein the louvers accept the
light when the sensor is properly applied to tissue of a patient.

## V.    CLAIM CONSTRUCTION

37.     I have been asked to provide my opinions regarding the construction of

"a plurality of louvers positioned over the light sensitive detector to accept light from

the at least one light emission device originating from a general direction of the at

least one light emission device and then transmitting through body tissue carrying

pulsing blood, wherein the louvers accept the light when the sensor is properly

applied to tissue of a patient," as recited by Claim 15.  It is my understanding that Dr.

Anthony believes this claim limitation requires "the light sensitive detector to be

positioned opposite the at least one light emission device such that the body tissue

carrying pulsing blood positioned between the light sensitive detector and the at least one light emission device." EX1003 ¶ 39. I disagree. In my opinion, it is unnecessary to further define this limitation.

38.     Reading the plain language of the claim, the louvers limitation supplies one positional requirement for the louvers themselves and requires the louvers to accept light under several qualifications. The only position requirement in this limitation is that the louvers must be "positioned over the light sensitive detector". EX1001 at 8:29-30. There are no other positional requirements. Nothing in the claim limits the positional arrangement between the emitter, tissue and detector. The term "positioned" only appears with respect to the louvers. *Id.* at 8:29-30 ("a plurality of louvers positioned over the light sensitive detector").

39.     The plain meaning of this sole positional requirement is consistent with the specification. As shown below, "FIG. 5B illustrates a properly attached probe

wherein a number of louvers are placed in front of the detector assembly." *Id.* at

2:60-62.



*FIG.5B*

*Id.* at Fig. 5B (annotated)

40.    The plain language of Claim 15 also places limits on the light accepted

by the detector. *Id.* at 8:29-35.  For example, the words themselves require the

louvers to accept light (1) "from the at least one light emission device"; (2)

"originating from a general direction of the at least one light emission device"; (3)

"then transmitting through body tissue carrying pulsing blood"; and (4) "when the

sensor is properly applied to tissue of a patient." *Id.* at 8:29-35.  The plain language

of each of limitations (1) – (4) create requirements for the louvers to accept light, but

fail to present any positional requirements for the emitter or tissue. *Id.*

-21-

41.    Moreover, the plain language of Claim 15 encapsulates and important purpose of the disclosure, that of avoiding light reaching the detector without first being attenuated by tissue.    EX1001 at 4:42-44 ("Failure to detect a probe-off condition is the result of the probe detector receiving light directly from the emitters without transmission through the patient's tissue.")  In the plain language, the light path is similarly defined as light from the emitter, which includes originating from the direction of the emitter, and only then can the light transmit through tissue.  *Id.* at 8:30-33.  The plain language also recognizes that such light path exists "when the sensor is properly applied to tissue of a patient."  *Id.* at 8:34-35.

42.    The plain meaning of the requirements for the louvers accepting light is also consistent with the specification.  As shown above, FIG. 5B discloses that the light 510 (1) is from the emitter 220, (2) originates from a general direction of the emitter 220; (3) then transmits through body tissue carrying pulsing blood. Moreover, this light path exists when the sensor is properly applied to tissue of a patient. *See id.* at 6:29-33.

-22-

IPR2020-01526
Apple Inc. v. Masimo Corporation

43.    In contrast, when the sensor 202 is not properly applied to tissue of a patient, as shown in FIG. 5A below, the plurality of louvers 502 do not accept light 410 because the light is incident to the orientation of the louvers 502.



*FIG.5A*

*Id.* at Fig. 5A.

44.    I understand the Board found Petitioner's position "understandable because the claim also requires that the louvers accept the light when the sensor is properly applied to tissue of a patient, which as Petitioner notes encompasses the embodiment of Figure 5B." Institution at 8.  I disagree with the Petitioner's position. In the embodiment illustrated above with reference to FIG. 5A, "[t]he louvers 502 block light rays travelling along an oblique path 410" because the illustrated louvers 502 are oriented in a vertical direction and into the page.  EX1001 at 6:28-29.  The

-23-

vertically-oriented louvers function in transmittance pulse oximeters. But the louvers could be oriented in a different direction. *See* EX2008 at 110 ("The louvers are positioned perpendicular to the film surfaces, or at an angle.); *see also* EX1008 at 6:63-68. For example, the louvers could be angled based on the position of the light sensitive detector relative to the light emission device to accept light when the sensor is properly applied to a tissue of a patient. In a reflectance sensor, the louvers could be positioned at an angle. In the reflective configuration, the louvers would not be positioned opposite the light emission device. Thus, even when the light sensitive detector is not positioned opposite the light emission device, the louvers can be positioned to accept the light when the sensor is properly applied to tissue of a patient.

45.    Dr. Anthony relies on col. 1:41-43 of the '994 Patent. The cited portion of the '994 Patent states that the "photodiode is positioned opposite the LED so as to detect the LED transmitted light as it emerges from the [] tissues." EX1001 at 1:41-43. But this language is from the "DESCRIPTION OF THE RELATED ART" and is not tied to the invention of the '994 Patent. This section of the '994 Patent describes a typical arrangement for a probe attached to a patient's finger. I do not believe Claim 15 limits the sensor to a probe attached to a patient's finger or a photodiode positioned opposite the LED.

-24-

IPR2020-01526
Apple Inc. v. Masimo Corporation

46.    To the extent Dr. Anthony's opinion limits the claim language to transmissive sensors, I disagree.  I believe the claim language applies to transmissive sensors and reflective sensors.

## VI.    <u>LEVEL OF ORDINARY SKILL IN THE ART</u>

47.    Petitioner asserts the following level of ordinary skill in the art:

A POSITA would have been a person with a working knowledge of physiological monitoring technologies. The POSITA would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies.

Pet. at 7-8.  Alternatively, Petitioner asserts a POSITA could have "[a]dditional education in a relevant field or industry experience may compensate for one of the other aspects of the POSITA characteristics stated above." *Id.* at 8.

48.    Dr. Anthony states that he applies a similar level of skill in his analysis stating:

[A] person of ordinary skill in the art relating to, and at the time of, the invention of the '994 Patent ("POSITA") would have been someone with a working knowledge of physiological monitoring technologies. The person

-25-

would have had a Bachelor of Science degree in an academic discipline emphasizing the design of electrical, computer, or software technologies, in combination with training or at least one to two years of related work experience with capture and processing of data or information, including but not limited to physiological monitoring technologies. Alternatively, the person could have also had a Master of Science degree in a relevant academic discipline with less than a year of related work experience in the same discipline.

Ex. 1003 ¶ 36.

49.     I note that the asserted level of skill (1) requires no coursework, training or experience with optics or optical physiological monitors; (2) requires no coursework, training or experience in physiology; and (3) focuses on data processing and not sensor design.  In responding to Dr. Anthony's opinions in this proceeding, I apply Dr. Anthony's and Petitioner's asserted level of skill.

## VII.   THE PETITION'S PROPOSED GROUNDS

50.     I understand the Petition challenges Claim 15 of the '994 Patent as obvious over the following grounds:

- Ground 1: Combination of Diab (EX1006), Benjamin (EX1007), and Melby (EX1008)

- Ground 2: Combination of Webster (EX1010) and Melby (EX1008)

-26-

IPR2020-01526
Apple Inc. v. Masimo Corporation

- Ground 3: Fine (EX1009) alone

- Ground 4: Combination of Fine (EX1009), Benjamin (EX1007), and Melby (EX1008)

Pet. at 3.

## VIII.  **OVERVIEW OF ASSERTED REFERENCES**

### A.    **Diab (EX1006)**

51.    Diab in its "Background" discloses that the non-invasive monitoring of blood oxygen saturation through reflectance and transmittance oximetry is common. EX1006 at 1:27-32 (stating, "Measurements . . . are often performed with non-invasive techniques where assessments are made by measuring the ratio of incident to transmitted (or reflected)[] light through a portion of the body, for example a digit such as a finger, or an earlobe, or a forehead."). Diab identifies that "[m]any prior art optical probes are designed for use only when a patient is relatively motionless since . . . motion induced noise can grossly corrupt the measured signal." *Id.* at 1:53-57. Diab further explains that erratic movement "causes the change in optical path length to be erratic, making the absor[p]tion erratic, resulting in a difficult to interpret measured signal." *Id.* at 1:44-46. Accordingly, Diab addresses a need "for a probe which inhibits motion induced noise, or motion artifacts, during measurement of a signal while still generating a transmitted or reflected signal of sufficient intensity to be measured by a detector." *Id.* at 3:4-8.

-27-

IPR2020-01526

Apple Inc. v. Masimo Corporation

52.    Fig. 24 of Diab "depicts one embodiment of a probe constructed in accordance with the present invention coupled to an oximeter."  EX1006 at 17:62-65.



FIG. 24

*Id.* at Fig. 24.  As shown above, the finger probe 400 shows "the aperture 420 and chamber 422 located directly adjacent the finger pad 404" with "[t]he photodetector 426 in the bottom 414 of the chamber 422."  *Id.* at 18:11-17.  The chamber is described in more detail with respect to Fig. 4 of Diab.  As shown below, the probe detector 126 is recessed within a chamber 122.  *Id.* at 6:63-64.

-28-

IPR2020-01526
Apple Inc. v. Masimo Corporation



FIG. 4

*Id.* at Fig. 4.  The monitored tissue "12[8] may rest above or penetrate slightly into the chamber 122 . . . ."  *Id.* at 7:16-19.  "[S]ome of the light is caused to be incident on the opaque walls 123 of the chamber 112 and is absorbed."  *Id.* at 7:48-50.

53.    Fig. 25 of Diab (reproduced below) is a probe having "the aperture . . . filled with a compressible scattering medium [1040]."  EX1006 at 5:27-28.



FIG. 25

Appx1473

*Id.* at Fig. 25 (annotated).  Traditionally, "scattering was thought to degrade signal-to-noise ratios of optical signals[; therefore], previous methods have not employed optical scattering techniques." *Id.* at 20:42-44.  However, with Diab's unique sensor geometry, Diab found that "[t]he scattering medium helps to minimize the effects of local artifacts and perturbations within the [tissue 1028]." *Id.* at 4:1-3.  Additionally, Diab found with his unique sensor design that the light scattering improves the signal-to-noise ratio "because there appears to be a reduced effect on the signal from any particular local region of the . . . [tissue] 1028 . . . ." *Id.* at 20:3-6.

54.    Diab further discloses that the light scattering medium 1140 is preferably reticulated foam because reticulated foams provide "contact in spots rather than across large areas of the flesh." *Id.* at 20:20-25.  And, "[i]f contact is made across large areas of flesh, microscopic droplets of perspiration or oil can form a layer between the flesh and the scattering medium 1040," which "creates an impedance mismatch interface which is absor[p]tive of the optical radiation." *Id.* at 20:25-29.

55.    Diab does not disclose a plurality of louvers.  Indeed, Diab does not need a plurality of louvers.  To a POSITA, Diab already solves the problem of improved signal quality by incorporating a light scattering medium.

## B.    Benjamin (EX1007)

56.    Benjamin discloses a photoplethysmographic probe 10 with "[a] photo-sensitive cell 20 [] mounted within the casing 12 adjacent the light source 18 so that

IPR2020-01526
Apple Inc. v. Masimo Corporation

it responds to light reflected from the field to be measured and passing through the window 16." EX1007 at 2:32-36. "[A] light control film 22 is mounted within the casing 12 to extend across the window 16." *Id.* at 2:42-44. As shown below in Figure 1 of Benjamin, the light control film 22 is mounted to an interior edge of the casing 12.



*Id.* at Fig. 1 (annotated). Looking at Figure 1 of Benjamin, a person of skill would understand that the casing 12 is two parts, an upper section and a lower section, likely to accommodate insertion of the light control film 22.

57.     "The light control film 22 is made of a 0.030 inch thick clear cellulose acetate butyrate film." *Id.* at 2:48-50. "The light control film 22 has the effect of collimating the light passing therethrough to thereby make the photo-sensitive cell 20 more nearly dependent only upon the light beam directly reflected from the field being measured." *Id.* at 2:53-57. Benjamin does not provide many other details of its light control film.

-31-

IPR2020-01526
Apple Inc. v. Masimo Corporation

58.    Benjamin identifies the following two problems, "variations in the operating point of the photocell" 20 and "artifactual noise produced by motion of the photo-sensitive cell [20] and light source [18] with respect to the pickup site." EX1007 at 1:35-44.  To hold the operating point of the photocell constant, Benjamin teaches "the amount of scattered light reaching the photocell can be made closer to constant by placing in front of the photocell and light source a small piece of light control film."  EX1007 at 1:56-66.  Benjamin addresses the artifactual noise with a different solution.  Benjamin minimizes the motion artifact with light "emitted in a narrow band of wave lengths centering in the green."  *Id.* at 1:67–2:14.  Use of green light for pulse rate is known to be resistant to motion artifact.  EX2006 at 284, 297.

59.    Benjamin's light control film has the opposite effect of a light scattering medium.  To the extent Dr. Anthony suggests Diab and Benjamin relate to the same problem (EX1003 ¶ 64), Benjamin's solution for reducing motion artifact is green light, not its light control film.

**C.    <u>Melby (EX1008)</u>**

60.    Melby discloses a light control film commonly used "to prevent light from automobile control panels from reaching the windshield and causing distracting and dangerous reflections at night" or "to cover the screen of a CRT or other display to prevent persons other than the operator from reading displayed thereon."  EX1008 at 2:9-15.

IPR2020-01526
Apple Inc. v. Masimo Corporation

61.    Melby's light control film is "a louvered plastic film [10 with] . . . a plurality of clear regions [12] separated by louvers [20]." EX1008 at 3:3-4. Melby's film 10 is shown in cross section, so light from above Fig. 1 can pass through clear region 12 but is blocked by opaque louvers 14. *Id.* at 3:11-12.



Fig. 1

*Id.* at Fig. 1. Melby only describes the film itself and does not explain how the film would be incorporated into particular contexts, much less optical sensors.

### D.    **Webster (EX1010)**

62.    Webster discloses several methods "to minimize the effects from light other than the optical signals of interest." EX1010 at 79. Dr. Anthony improperly conflates these different methods. *See* EX1003 ¶¶ 93-94.

63.    In one example, Webster explains that "optical filtering, placed between sources of light and the photodiode, is used to limit the spectral response of the photodiode." EX1010 at 79. "This allows light of wavelengths of interest to pass

-33-

through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* The optical wavelength filter does not block light from any particular direction.

64.     In a different example, Webster teaches that "the pulse oximeter designer must attempt to limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood." *Id.* (internal citations omitted). Webster references a different patent disclosure by New and Corenman to explain that "[l]ight impervious barriers should be placed between LEDs and the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue (New and Corenman 1987.)" *Id.* The light impervious barriers are not positioned over the photodiode.

65.     As shown in partially reproduced Fig. 6 of New and Corenman 1987, they disclose "a light impervious barrier 136 is placed between photosensor 138 and the paths to the light emitting diodes 130 and 132 which are not through finger 14." EX2007 at 3:29-32. "Barrier 136, terminating in contact with the flesh of finger 14,

IPR2020-01526
Apple Inc. v. Masimo Corporation

make the path between the respective light emitting diodes 130, 132 and the light receiving diode 138 occur only through the flesh of finger 14." *Id.* at 32-35.



*Id.* at Fig. 6 (partial, annotated).

### E.    <u>Fine (EX1009)</u>

66.    Fine discloses a fetal oximetry sensor with optical fiber bundles 63, 64. EX1009 at 1:8–4:6, 6:28-32.  U.S. Patent No. 4,938,218, which is described in the background of Fine, explains that fetal sensors may be used to detect and treat hypoxia in the fetus during labor.  EX2010 at 2:37-39.  "Contact with the fetus can be made after natural rupture of the amniotic membrane by manually inserting a probe sensor into the uterus from the vagina." *Id.* at 2:39-42.  Optical fibers are used

-35-

IPR2020-01526

Apple Inc. v. Masimo Corporation

in fetal monitoring because the optical fibers can extend outside the patient's body to an external light source and detector. *See* EX2013 at 4:3-15.

67.    Fine's sensor has "two point-like light emitters positioned in the center of the device in close proximity to each other and at least one and preferably two annular detector terminals concentrically surrounding the light emitters." EX1009 at Abstract. Fig. 4 of Fine shows an applicator block 52 having "first and second annular slots 58 and 59 concentric with bore 54." *Id.* at 17:6-8.



Fig. 4

*Id.* at Fig. 4 (annotated with photodetectors shaded blue and optical fibers shaded yellow); *see also id.* at Fig. 2 below for bottom view. "Slots 58 and 59 accommodate

-36-

IPR2020-01526
Apple Inc. v. Masimo Corporation

the free, light-acquiring ends of first and second optical fiber bundles 63 and 64

which constitute first and second detector terminals and pass through the inner space

of [the] body 51 to photodetectors 65 electrically connected through wires 67 to a

cable 68." *Id.* at 17:11-14.  When the light acquiring ends of the first and second

optical fiber bundles 63, 64 are positioned in the slots 58, 59, the light acquiring ends

are angled outward like the slots 58, 59.  As shown above, the inner ring of fibers 63

is angled at a different angle than the outer ring of fibers 64.

68.    Moreover, the optical fiber bundles 63, 64 are arranged in an annular

configuration.  Although Fine does not show the bottom view of Fig. 4, a person of

skill would understand that the bottom view of Fig. 4 is likely similar to Fig. 2 of

Fine.



-37-

69.     Fine explains that "even if a sensor according to the invention is placed on to the skin without fine adjustment, at least a portion of the annular detector will contact the skin without encountering any intervening opaque obstacles, and consequently an emitted light signal will, after passing through the tissues, be acquired by the detector terminal." *Id.* at 6:7-11.

70.     One would not understand that Fine's optical fiber bundles 63, 64 to be louvers.

## IX.    THE PETITION'S PROPOSED COMBINATIONS

### A.    GROUND 1: THE COMBINATION OF DIAB, BENJAMIN, AND MELBY DOES NOT TEACH THE CLAIMED INVENTION

71.     In my opinion, a POSITA would not have been motivated to make the proposed combinations.  A POSITA reading Diab would have no desire to replace the light scattering medium with the light control film of Benjamin or Melby.  Light control films provide the opposite effect of light scattering mediums.  The proposed modifications would remove the very feature that achieves Diab's scattering goals without providing any additional benefit.

#### 1.    Apple's combination would undermine Diab's invention

72.     Diab seeks to "depart from conventional methods of improving optical signal-to-noise ratios," which use lens assemblies to focus optical radiation.  EX1006 at 20:33-37.  Instead, Diab employs optical scattering techniques to improve optical signal quality.  *Id.* at 20:40-44.  The light scattering medium is shown in Fig. 25 of

-38-

IPR2020-01526
Apple Inc. v. Masimo Corporation

Diab.  As shown below, Diab discloses a probe 1000 in which "optical radiation is received by the photodetector 1026 after passing through the scattering medium 1040." *Id.* at 19:64-66.



*FIG. 25*

*Id.* at Fig. 25.  The scattering medium is "clear to optical absorption, but still scatters light." *Id.* at 19:59-60.  Because tissue and muscle are easily compressible when pressure is applied to the finger, erratic patient movement "causes the change in optical path length to be erratic, making the absor[p]tion erratic, resulting in a difficult to interpret measured signal." *Id.* at 1:40-44.  With a scattering medium, "perturbations of a locality within the area of exposure will have less effect with a scattered beam over a large area than with a more concentrated signal passing through that same locality." *Id.* at 20:9-12.

73.    Diab explains that "since scattering was thought to degrade signal-to-noise ratios of optical signals, previous methods have not employed optical scattering techniques." EX1006 at 20:42-44. But Diab discovered that "scattering may be used as a method of improving optical signal quality" because "the form of the image is important for detection purposes." *Id.* at 20:39-42. Reading Diab, a POSITA would understand that the intended purpose of Diab's invention was to scatter optical radiation to improve optical signal quality. Diab achieves this purpose by incorporating a scattering medium. Diab's preferences to scatter optical radiation would have discouraged a person of skill from substituting Diab's scattering medium with a component that decreases scattering, like Benjamin's or Melby's light control film.

74.    In contrast, Benjamin's light control film 22 makes "the amount of scattered light reaching the photo-sensitive cell [] closer to constant." EX1007 at 2:57-59.



-40-

*Id.* at Fig. 1. Collimating the light as taught by Benjamin would achieve the ***opposite*** result of the Diab's scattering goals. Collimating light tends to make light rays parallel, whereas scattering light tends to make light go in random directions. These are different principles.

75. I have been informed that there is no suggestion or motivation to make the proposed modification if a proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose. As I mentioned above, the intended purpose of Diab's invention was to scatter optical radiation to improve optical signal quality. Replacing Diab's scattering medium with a light control film would reduce light scattering and would no longer scatter light across the photodetector. In my opinion, the proposed modification would render Diab unsuitable for its intended purpose of scattering optical radiation to improve optical signal quality.

76. Additionally, Benjamin explicitly discloses use of green light emissions, not its light control film 22, for decreasing the effect of motion artifacts. EX1007 at 1:67-2:14. Use of green light is known to reduce motion artifacts. EX2006 at 297. Reducing motion artifacts would improve the signal-to-noise ratio. A POSITA interested in decreasing the effect of motion artifacts using the teachings of Benjamin would have been more likely to look to the green light emissions, not the light control film.

-41-

IPR2020-01526
Apple Inc. v. Masimo Corporation

77.    Similar to Benjamin, the light control film of Melby also functions in the ***opposite*** way from the scattering medium Diab.  Melby's film decreases the amount of scattered light by absorbing light that enters the film at an angle.  EX1008 at 4:5-8, Fig. 2.  Controlling the angle of light is different from scattering light.



Light Ray
Absorbed

*Id.* at Fig. 2 (annotated).  The proposed combination would no longer scatter light across the photodetector to decrease the effect of motion artifacts, thus rendering Diab unsuitable for its intended purpose of scattering optical radiation.  *See* EX1006 at 3:4-8, 20:9-12.

78.    I have been informed that the teachings of the references are not sufficient to render claims obvious if the proposed combination would change the

-42-

principle of operation of the prior art being modified. Based on my reading of Diab, Diab's principle of operation is directed to incorporating a scattering medium to minimize the effects of local artifacts and perturbations within the material, which would improve the optical signal quality. EX1006 at 4:1-3. The proposed modification of replacing Diab's scattering medium with a light control film would remove the very feature that minimizes the effects of local artifacts and perturbations within the material. As I explained above, in Petitioner's proposed combination, the light control film would no longer scatter light. In my opinion, this modification would change Diab's principle of operation.

IPR2020-01526
Apple Inc. v. Masimo Corporation

### 2.    Apple's unexplained modification would cause Diab to perform worse

79.    Dr. Anthony provides the following annotated drawing to show its proposed modification.



EX1003 ¶ 73.   In my opinion, a POSITA would not include the additional complexity of Benjamin and/or Melby's light control film to block incident light. Because Diab's photodetector 426 is already recessed within the chamber 422, the walls surrounding the chamber 422 incident light that approaches the chamber walls. EX1006 at 7:45-50.   As shown below from the Webster reference, recessing the

photodiode narrows the angle of incidence, thus limiting the light that reaches the

photodiode.



Figure 6.6 Minimizing photodiode optical interference (adapted from Marktech International 1993).

EX1010 at Fig. 6.6.

80.     Moreover, the combination of the chamber wall and the louvers would

attenuate the signal received by the photodetector 426, compared to the chamber wall

alone, making the signal more difficult to interpret.  Even light coming straight down

from Diab's light sources 430a, 430b would be attenuated by a light control film.  As

indicated by the arrows below, the carbon black layers absorb at least some of the

light approaching Melby's film from a direction that would pass through the

IPR2020-01526
Apple Inc. v. Masimo Corporation

transparent layers 12.  Adding Melby's film to Diab would make the signal more difficult to interpret.



EX1008 at Fig. 1 (annotated).

81.    Moreover, mounting the light control film spaced apart from the photodetector 426 would cause manufacturing complexities.  Benjamin's light control film is made of a "0.030 inch thick clear cellulose acetate butyrate film." EX1007 at 2:48-50.  Melby discloses a film preferably formed of cellulose acetate butyrate and in the range of 0.15 mm to 0.5 mm.  EX1008 at 2:18-21; 5:15-16. Because light control films are so thin, additional structure would be required to mount the film within Diab's chamber 422.  *See* EX2009 at 1:19-24 (Because these films are so thin: "(1) they are by themselves not capable of structurally withstanding extreme stresses and surface abrasions, and (2) they are subject to distortion from physical stress and temperatures.")  As shown below, Benjamin provides additional

-46-

IPR2020-01526
Apple Inc. v. Masimo Corporation

structure to support the light control film.  The light control film is mounted to the underside of a lip on the casing 12.  *See* EX1007 at Fig. 1.  Diab does not include a similar structure for mounting the light control film.  But adding a lip structure to Diab would make it difficult to introduce a light control film into the casing 12.  As I have shaded below, Benjamin's casing is two parts as indicated by the change in hatch marks.  In my opinion, the two-part casing is designed to facilitate introduction of the light control film 22 within the casing 12.



EX1007 at Fig. 1 (annotated).  The light control film 22 would be introduced into the upper portion (shaded green) and then the upper portion would be joined to the lower portion (shaded blue).  Again, Diab does not include a similar two-part structure.  *See* EX1006 at Fig. 25.  A POSITA would not have been motivated to mount a light control film in Diab because there is no structure to which the film can be mounted.  Mounting the light control film in the manner depicted in Benjamin would increase manufacturing complexity and require substantial reconstruction of

-47-

the sensor. This would discourage a POSITA from combining the teachings of Diab and Benjamin.

82. If the light control film was positioned in Diab as depicted above by Dr. Anthony, the light control film would block the aperture 420 and compress the flesh. With the compression of the flesh, any patient movement would change the optical path length and create a difficult or impossible to interpret signal. *See* EX1006 at Abstract, 1:40-47, 3:2-4. The contact between the light control film and the user's flesh would also "create[] an impedance mismatch interface which is absorbtive of the optical radiation." *See id.* at 20:25-29. Further, because the light control film is a thin sheet material, physical stress applied to the light control film would distort the light control film. *See* EX2009 at 1:19-22.

83. For at least the foregoing reasons, I believe incorporating the light control film of Benjamin or Melby into Diab would significantly alter the function of Diab's optical probe and discourage a person of skill from making the proposed modifications.

### 3. <u>The proposed modifications would not have yielded predictable results</u>

84. In my opinion, applying the light control film of Benjamin or Melby to Diab would not have led to predictable results without significantly or altering the functions performed by Diab's optical probe. As explained above, introducing a light control film into Diab as taught by Benjamin would likely interfere with the optical

signal or cause damage to the light control film. Thus, the light control film would not have applied in a predictable manner to Diab's system.

85.    A significant deficiency in Dr. Anthony's analysis is the failure to address the processing changes that would be required to accommodate any change to the optical system. Introducing a light control film in the light path could require a new calibration curve. The calibration curve is used to calculate the oxygen saturation levels and is critical to the accuracy of the oxygen saturation level. EX1010 at 159. Without an updated calibration curve, the modified optical probe could provide erroneous readings. Because calibration curves are determined using empirical methods, a POSITA would have recognized that updating the calibration curve is a significant undertaking. *See id.*; *see also* EX1001 at 1:50-54.

86.    Combining Melby's light control film with Diab's sensor introduces a component in Diab's light path. FDA Guidance explains that a pulse oximeter system "that has undergone a significant change or modification *(from its currently cleared configuration) that could significantly affect the safety or effectiveness of the device*" requires a new 510(k). EX2005 at 5. Examples of significant modifications include:

- significant electro-optical sensor modifications (e.g., ***component or bandage material in the light path***, extensive re-design where a device is miniaturized); or
- significant SpO$_2$ algorithm modifications.

*Id.*

87.     In my opinion, a POSITA would have been discouraged from making any modifications without a compelling motivation because of the drawbacks of updating the signal processing, including developing a new calibration curve. A POSITA certainly would not have been motivated to modify the optical system for no perceived advantage over what Diab already provides.

### 4.    Apple fails to provide a credible motivation to add louvers

88.     I disagree with Dr. Anthony's reasons for combining Diab, Benjamin, and Melby.

89.     First, Dr. Anthony claims the proposed modification "would lead to a more consistent and accurate measurement of blood oxygen saturation." EX1003 ¶ 62. There is no evidence of this. As I explained above, Diab already provides a more consistent and accurate measurement of blood oxygen saturation. *See supra* § IX.A.1. The scattering medium already provides an improved optical signal, which would lead to a more accurate measurement of blood oxygen saturation.

90.     Second, Dr. Anthony claims a pulse oximeter could be improved "by placing a light control film over the detector to reduce the amount of light that reaches the detector but has not passed through the tissue." EX1003 ¶ 65. But Diab already [absorbs] some of the light . . . incident on the opaque walls 123 of the chamber 122 and is absorbed." EX1006 at 7:48-50. As shown below in a figure from the Webster reference, the angle of incidence can be controlled by recessing the photodiode.

IPR2020-01526

Apple Inc. v. Masimo Corporation



**Figure 6.6** Minimizing photodiode optical interference (adapted from Marktech International 1993).

EX1010 at Fig. 6.6. Thus, a POSITA would have no reason to modify Diab as suggested by Dr. Anthony.

91. Furthermore, Dr. Anthony provides no evidence that "a light control film, advantageously and as compared to other elements and devices for controlling the direction of light, is small in size and allows a device using the light control film to be small." EX1003 ¶ 68. Because Diab's scattering medium 1040 is placed within the aperture 1020, the scattering medium 1040 does not increase the overall size of the probe 1000. *See* EX1006 at Fig. 25 (reproduced below). Removing the light scattering medium would not change the overall size of the probe. Also, the

IPR2020-01526
Apple Inc. v. Masimo Corporation

scattering medium is already lightweight because it is made of reticulated foam.

Reticulated foams are known to be very porous, making them lightweight.



*FIG. 25*

*Id.* at Fig. 25.  Moreover, building a smaller device does not necessarily lower the cost of production.  Miniaturizing the device can increase manufacturing complexity, thus increasing capital costs.  Smaller optical components can increase the cost of goods.  *Id.*

92.    For at least the reasons provided above, I do not believe a person of skill would have been motivated to combine the teachings of Diab, Benjamin, and Melby in the manner suggested.

-52-

## B.   GROUND 2: THE COMBINATION OF WEBSTER AND MELBY DOES NOT TEACH THE CLAIMED INVENTION

93.     In my opinion, a POSITA would not have been motivated to combine the teachings of Webster and Melby to arrive at a sensor with a plurality of louvers. Neither Webster nor Melby discloses "a plurality of louvers positioned over the light sensitive detector," as recited by Claim 15.  Webster does not disclose a light filter positioned over the photodiode to limit the light reaching the photodiode to that which has traveled through tissue.  Melby does not disclose positioning its film over a light sensitive detector.   Moreover, the proposed modifications would make Webster's sensor perform worse.

### 1.    Apple conflates Webster's wavelength filter and Webster's light impervious barriers

94.     Webster's "light filter" does not include the "light impervious barriers." Dr. Anthony states that Webster proposes "'some type of light filter' can be placed over the detector."  EX1003 ¶ 94 (*citing* EX1010 at 79).  In the same paragraph, Dr. Anthony states that Webster "suggests the use of '[l]ight impervious barriers should be placed between . . . the photodiode in all areas where the emitted light could reach the photodiode without passing through tissue.'"  *Id.*  However, Webster's light impervious barriers are not an example of Webster's light filter.

95.     Webster's light filter and light impervious barriers address two separate optical concerns.  Webster's light filter provides optical filtering "to limit the spectral

response of the photodiode." EX1010 at 79. The light filter allows "light of wavelengths of interest to pass through the filter but does not allow light of other wavelengths to pass through the filter." *Id.* In contrast, Webster's light impervious barriers seek to block light of all wavelengths. *Id.* Accordingly, it is the light impervious barriers and specifically not the light filters that "limit the light reaching the photodiode to that which has traveled through tissue containing arterial blood." *Id.* (internal citations omitted).

96. Although Webster discloses "some type of light filter" over the detector, the referenced filter limits the wavelength of light that passes through the filter, not light from a particular direction. *See* EX1010 at 79. Examples of Webster's light wavelength filter include a red Kodak No. 29 wratten gel filter or clear plastic which absorbs UV wavelengths. *Id.* This type of light wavelength filter is not a plurality of louvers and does not limit the direction of accepted light. Rather, the light wavelength filter limits the acceptable wavelengths of light from all directions.

97. Webster's light impervious barriers are not positioned over the photodiode. Were Webster to place its barrier over the detector, the barrier would block all light from reaching the detector rendering the resulting sensor inoperative.

98. Webster relies on U.S. Patent No. 4,700,708 (New and Corenman 1987) for an example of light impervious barriers. EX1010 at 79. New and Corenman 1987 discloses "a light impervious barrier 136 is placed between

photosensor 138 and the paths to the light emitting diodes 130 and 132 which are not

through finger 14." EX2007 at 3:29-32. As shown below, "[b]arrier 136, terminating

in contact with the flesh of finger 14, make[s] the path between the respective light

emitting diodes 130, 132 and the light receiving diode 138 occur only through the

flesh of finger 14." *Id.* at 3:32-35.



*Id.* at Fig. 6 (partial). The light impervious barrier 136 does not include any structure

positioned *over* the photosensor 138 because the structure, which is disclosed as a

barrier, would block all light within the optical path between the photosensor 138

and the light emitting diodes 130, 132.

99.    This interpretation of light impervious barriers is consistent with how

the term is used in the art. As one example, U.S. Patent No. 4,938,218 to Goodman

describes a pulse oximetry probe. As shown below in Fig. 11(a), Goodman describes

"[l]ight sources 1102 and photodetector 1104 are separated by an opaque barrier

block 1124 mounted on substrate 1106." EX2010 at 15:50-53.

-55-

IPR2020-01526
Apple Inc. v. Masimo Corporation



*Id.* at Fig. 11(a). As another example, U.S. Patent No. 5,024,226 to Tan describes an epidural oxygen sensor. As shown below, "[s]eparating the LED's and the photodetector is a light barrier 25 which prevents the direct transmission of light from the LED's [22a, 22b] to the photodetector [24]." EX2011 at 2:38-41.



*Id.* at Fig. 2. As shown above, the term light "barrier" is used to describe a barrier at a periphery of the photodetector or light source, not *over* the detector.

-56-

### 2. Melby does not disclose a plurality of louvers positioned over a light sensitive detector

100. Melby does not make up for Webster's deficiencies. Melby does not disclose that its light control film is used with a sensor. *See* EX1008 at 1:23-33, 2:9-15. Instead, Melby discloses a light control film commonly used "to prevent light from automobile control panels from reaching the windshield and causing distracting and dangerous reflections at night" or "to cover the screen of a CRT or other display to prevent persons other than the operator from reading displayed thereon." *Id.* at 2:9-15. Thus, Melby does not disclose positioning its film over a light sensitive detector of a sensor.

101. As mentioned above, Webster fails to teach or suggest positioning its light impervious barriers over the detector, and Melby does not cure such deficiency.

### 3. A POSITA would not have been motivated to modify Webster to include Melby's light control film over the photodiode

102. In his analysis, Dr. Anthony conflates the light filter and light impervious barrier teachings of Webster. *See supra* § IX.B.1. Thus, Dr. Anthony's proposed modifications are unclear. But a person of skill would not have been motivated to make any of the possible changes as I note below.

103. A POSITA would not have been motivated to replace Webster's light wavelength filter with a light control film. Webster explains that its light wavelength filter "allows light of wavelengths of interest to pass through the filter but does not

-57-

allow light of other wavelengths to pass through the filter." EX1010 at 79. In contrast, the light control film in Melby controls the direction of light transmitted through the film. These are two different concepts. If louvers were used in place of the Webster's light wavelength filter, Webster's sensor would no longer limit certain wavelengths of light.

104.    A POSITA also would not have been motivated to replace Webster's light impervious barrier with Melby's light control film, there is no teaching for placing any barrier *over* the detector. Webster's light impervious barriers are not louvers. Barriers block light, while Melby's light control film accepts light directionally. Moreover, a POSITA would understand that positioning an impervious barrier over the detector would block desired light from reaching the photodiode.

105.    I disagree that a POSITA would have been motivated "to combine Webster and Melby to provide a pulse oximeter that 'minimize[s] errors' by limiting 'the light reaching the photodiode to that which has traveled through tissue containing arterial blood." *See* EX1003 ¶ 101 (*citing* EX1010 at 79). Webster already discloses light impervious barriers to minimize errors and limit the light reaching the photodiode. EX1010 at 79.

106.    Moreover, a POSITA would have recognized that the light control film would degrade the amount of the light that reaches Webster's photodiode. For example, in Melby, even if the light was approaching from the appropriate direction,

-58-

IPR2020-01526
Apple Inc. v. Masimo Corporation

e.g., from directly above the film, the louvers 14 would limit some portion of the light

coming from that direction as I have shown in the drawing below.



Fig. 1

EX1008 at Fig. 1 (annotated). The reduced light would make it more difficult

interpret the signal compared to the light impervious barrier of Webster, particularly

without changes to the signal processing which are not discussed in Dr. Anthony's

declaration. A POSITA would have been discouraged from introducing a light

control film that would have hindered the desired light from reaching the

photodiode. Thus, a POSITA would have been discouraged from incorporating

Melby's light control film in place of Webster's light impervious barriers.

107. For at least the reasons provided above, I do not believe a person of

skill would have been motivated to combine the teachings of Webster and Melby in

the manner suggested to arrive at Claim 15 of the '994 Patent.

## C.   GROUND 3: FINE DOES NOT TEACH THE CLAIMED INVENTION

### 1.   A POSITA would not have considered Fine

108.    A POSITA would **not** have considered Fine's fetal oximetry sensor. Fetal oximetry addresses an entirely different problem from the '994 Patent because fetal oximetry is attempting to measure the oxygen saturation of a fetus during passage through the birth canal. This monitoring environment of the birth canal presents challenges that prevent commercial fetal oximeters from being on the market in any great number even to this day. For example, fluids in the birth canal challenge the use of electronic components on a sensor. Also, fluids create pathways for light to reach the detector without first being attenuated by tissue. Contraction pressures also cause localized desaturation events that are biologically normal but immensely difficult to accurately monitor with oximetry algorithms. Because of these challenges, fetal oximetry sensor design attempts have looked to optical fibers that can extend outside the patient's body to external electronic components like a light source and detector. Fine's fetal sensor design includes complex and expensive optical fibers that transport light so electronic components, like the laser light source suggested in Fine, can be placed elsewhere. But sensors incorporating optical fibers are overly complex and prohibitively expensive for non-fetal use.

109.    Additionally, fetal oximetry sensors like Fine operate differently than non-fetal sensors like Benjamin. Fine states "the detector will perceive light arriving

from the reflective deep layers of the tissue in directions substantially perpendicular to [the] surface . . ." EX1009 at 17:30-18:1. In contrast, traditional oximetry on the finger, forehead, wrist, etc. seeks to probe with light only the surface capillary bed flush with arterial blood.

110.    Based on at least the foregoing, a POSITA would not have considered a complex and expensive fetal sensor.

### 2. <u>Optical fibers are not louvers</u>

111.    The optical fiber bundles 63, 64 of Fine are not a plurality of louvers. Louvers and optical fibers have different structures and operate under different principles. The angle and length of louver structures determines the direction of light that is blocked or absorbed. EX2008 at 110. The louver angle is how the louvers are oriented relative to a surface, e.g., perpendicular or at an angle as shown below. *Id.* The louver angle provides the maximum transmission angle. *Id.*



*Id.* The length of the louver influences the viewing angle. *Id.* A longer louver length restricts the angle at which rays of light can enter and exit the film compared to a shorter louver length. *Id.* With louvers, light is not designed to bounce around; rather, light of a desired range of directions passes through the louvers without redirection, while light outside of that range (incident light, e.g., FIG. 5B of '994 Patent) is blocked by the louvers.

112. In contrast, optical fibers are flexible strands that propagate light through internal reflection. Optical fibers include a core and cladding and have an annular profile as shown by the plan view in Fig. 2 of Fine. The structure of a fiber is nothing like a louver.



Fig. 2

EX1009 at Fig. 2. Moreover, optical fibers rely on internal reflection to transmit light. EX2014 at 26. Light bounces back and forth along the fiber boundary to travel

down the fiber. Thus, optical fibers have a different structure and rely on a different principle of operation than louvers.

113. Below I have provided some figures showing the difference between light that will be eventually transmitted through a fiber and light that passes through louvers. As shown below, with fibers, light destined for the fiber is shown in yellow and called the fiber's light acceptance cone. Light oblique to this cone at all 360 degrees will no transmit down the fiber. The fiber transmits the light from inside the cone through internal reflection. In contrast, louvers have a wider field of view and allow certain planes of light to pass through the open space between individual louvers. Oblique light from the top and bottom is outside the field of view and blocked or absorbed by the louvers.



114. The '994 Patent explains that, if the probe 202 is properly attached, "light rays will pass directly through the louvers 502 along a direct path 510." EX1001 at 6:30-34. But the optical fibers in Fine would not allow light rays to pass directly through the optical fiber along a direct path. Because the individual fibers of

the optical bundles 63, 64 are in an annular configuration, the fibers take a tortuous

path from the contact surface 53 to the photodetectors 65. *See* EX1009 at Fig. 4

(below).



Fig.4

Light does not even travel down the center of the tortuous path. In optical fibers,

light is transmitted by reflecting back and forth along the fiber walls to reach the

photodiodes 65. Thus, light does not pass directly through the optical fibers along a

direct path. Accordingly, a POSITA would not consider Fine's optical fibers to be

louvers.

115.    For at least these reasons, I do not believe Fine disclose every element

of Claim 15 of the '994 Patent.

-64-

IPR2020-01526
Apple Inc. v. Masimo Corporation

### D.    GROUND 4: THE COMBINATION OF FINE, BENJAMIN, AND MELBY DOES NOT TEACH THE CLAIMED INVENTION

116.    As explained above, Fine does not disclose a plurality of louvers. *See supra* § IX.C.2.  Benjamin and Melby do not make up for this deficiency.  The combination of Fine's sensor and a light control film would not yield predictable results.

### 1.    Dr. Anthony fails to explain how a light control Film could be incorporated into Fine

117.    Dr. Anthony opines that a POSITA "would have understood, from the combined disclosure of Fine and Benjamin, that a pulse oximeter can be improved by placing a light control film over the detector to reduce the amount of light that reaches the detector but has not passed through the tissue."  EX1003 ¶ 140.  A POSITA would not have been motivated to place a light control film over Fine's detectors 65.  Fine's FIG. 4 (below) shows Fine's detectors 65 (blue) at the termination of Fine's optical fibers 63, 64 (yellow).

IPR2020-01526
Apple Inc. v. Masimo Corporation



F i g . 4

EX1009 at Fig. 4 (annotated). The light control film would have no effect on the accepted light because the fibers 63, 64 would have already eliminated any ability to know the original directionality of the light. That is, once light enters Fine's fiber bundles 63, 64 at the exterior of Fine's body 51 (see green arrow), any selection of acceptable light directions was already accomplished by the cone of acceptance existing Fine's exterior 51 (green arrow) for each fiber. EX1009 at FIGS. 5-6. Using a light control film after such selection has no bearing on whether or not the light has passed through tissue. Rather, once inside the fiber, the light will directionally reflect off the fiber cladding (bounce along) as it transmits through the fiber and original directionality is eliminated. Accordingly, the light control film incorporated

IPR2020-01526
Apple Inc. v. Masimo Corporation

within Fine could not reduce the amount of light that reaches the detector without passing through the tissue.

118.    At one point, Dr. Anthony states that "Benjamin's feature is implemented in Fine's pulse oximeter just as it is in Benjamin's PPG."  EX1003 ¶ 141.  But Benjamin and Fine have different body or casing structures.  As shown below, Benjamin's light control film 22 is mounted to the underside of a lip on the casing 12 and extends extends across the light source 18 and photo-sensitive cell 20 fields of view.  EX1007 at 2:42-48.  Fine does not include similar structures for mounting the light control film.



EX1009 at Fig. 4 (annotated); EX1007 at Fig. 1 (annotated).  There is no way to implement a light control film in Fine in the same way as Benjamin.

-67-

119.    If the light control film was placed directly over Fine's photodetectors 65 or anywhere within the casing as taught by Benjamin, the light control film would have no effect on the accepted light because the fibers 63, 64 would have eliminated any ability to know the directionality of the received light. *Id.* at 17:11-14.

120.    Even if the light control film was placed at the contact surface 53 of the cylindrical body 51 (in the region colored green above), Melby's film would prevent Fine's sensor from working in an operative manner.  Fine explains that "even if a sensor according to the invention is placed on to the skin without fine adjustment, at least a portion of the annular detector will contact the skin without encountering any intervening opaque obstacles, and consequently an emitted light signal will, after passing through the tissues, be acquired by the detector terminal."  EX1009 at 6:7-11.  According to Fine, the configuration of the detector terminal and the geometry of the sensor significantly improve the signal-to-noise ratio of the sensor. *Id.* 6:11-14.  Fine also explains that "the annular shape of the detector and the geometry of the sensor ensure the stability of the optical paths for each given wavelength." *Id.* at 6:20-22.  If vertical louvers, as taught by Melby, were applied to the base of Fine's sensor, the louvers would obstruct portions of emitter fibers and detector fibers, as shown below.

IPR2020-01526
Apple Inc. v. Masimo Corporation



Fig. 2

EX1009 at Fig. 2 (annotated).  The proposed modifications would disrupt the annular configuration of fibers and worsen the signal-to-noise ratio of Fine's sensor.  The louvers would likely block some of the light emitted from the sensor and block desired light from reaching the photodetector.

121.    Even if Melby's light control film did not completely obstruct an individual fiber, the light control film would block at least a portion of the light within the acceptance cone of the fiber.  As shown below, at least some of the light received between the left-hand ray 74 and the right-hand ray 75 would be absorbed by the louvers of Melby's film.

IPR2020-01526
Apple Inc. v. Masimo Corporation

**Fine**                                    **Modified Fine**





EX1009 at Fig. 5 (annotated). Thus, the fibers would no longer enhance the acquisition of light coming out from relatively deep blood perfused layers of tissue. *See id.* at 9:10-14. Applying the teachings of Benjamin and Melby to Fine's sensor would not have led to predictable results.

122. It is unclear whether Dr. Anthony proposes to combine Fine's optical fiber bundles 63, 64 with the light control film or replace Fine's optical fiber bundles 63, 64 with a light control film. Dr. Anthony states a person of skill "would have found it obvious to modify Fine with Benjamin's disclosure of placing a light control film over the photodetector **in place of** a scattering medium [*sic*] because doing so entails the use of known solutions to improve similar systems and methods in the same way." EX1003 ¶ 141. But without the optical fibers 63, 64, very little to no light would reach the photodetectors 65. This would render Fine's sensor inoperable.

123. Dr. Anthony also suggests that "one of ordinary skill would have understood that one method of manufacturing a light control film could include

slicing a thin layer from the face of a fiber bundle," EX1003 ¶ 148, and provides the

annotated drawing provided below on the right. This appears to be the section of Fig.

4 of Fine near the photodiode.



Fig. 4

Dr. Anthony's
Proposed Modification

Fibers of Fiber
Bundle 63

Fine, FIG. 4 (Excerpt, Annotated)

*Id.* I do not believe anyone would think to slice a thin layer from the face of a fiber

bundle based on Melby's light control film, which is made of cellulose acetate

butyrate and controls light with layers of carbon black to absorb light. *See* EX1008

at 2:18-21, 2:54-55. This does not provide a motivation to slice the fibers. Moreover,

slicing the fibers near the photodiodes 65 as shown above would distort the optical

properties of the fiber and affect the accuracy of the sensor. As explained above,

modifications near the photodiodes 65 would have no effect on the light received by

the fibers because the light receiving ends of the fibers are at the opposite end (at

-71-

contact surface 53) of the sensor.  Even if a thin layer was sliced from the fiber bundle, the fibers are still not louvers.

124.    As explained above, a POSITA would not combine Melby's film with the optical fibers would limit the light received by the photodetectors.  To the extent Anthony suggests replacing the optical fiber bundles with the light control film, he fails to explain how the light would travel along the indirect path between the annular slots 58, 59 and the photodetectors 65.  As shown below in Fig. 4 of Fine, the optical fibers 63, 64 must bend to direct light from the annular slots 58, 59 to the photodetectors 65.  Without the optical fibers 63, 64, very little to no light would reach the photodetectors 65.



Fig. 4

Appx1516

Ex. 1009 at Fig. 4.  The proposed modification would have rendered Fine's sensor inoperable for its intended purpose of performing pulse oximetry.  EX1009 at 1:2-5.

125.  None of the possible combinations would yield an operable pulse oximeter.

### 2.  Apple's motivations to combine Fine, Benjamin, and Melby are conclusory and unsupported

126.  As explained above, Fine is a fetal oximetry sensor with optical fibers.  *See supra* § IX.C.1.  Benjamin is a reflective sensor with a light control film positioned in front of a light source and photo-sensitive cell.  EX1007 at Abstract.  Melby discloses a light control film for automobile control panels.  EX1008 at 2:9-12.

127.  Dr. Anthony opines that "a pulse oximeter can be improved by placing a light control film over the detector to reduce the amount of light that reaches the detector but has not passed through the tissue."  EX1003 ¶ 140.  As explained above, incorporating a light control film into Fine's sensor would have rendered the sensor inoperable.  *See supra* § IX.D.1.  Thus, a person of skill would not have been motivated to incorporate a light control film into Fine's sensor.

128.  Further, light control films do not operate in the "same way" as optical fiber bundles as suggested by Dr. Anthony.  EX1003 ¶¶ 141, 149.  As explained above, Fine's optical fibers propagate light to its photodetectors by bouncing around through internal reflection.  *See supra* § IX.C.2.  In contrast, the louvers in Melby's

-73-

film limit the amount of light transmitted through the film by absorbing light that enters from certain directions. As shown below, "[s]ome of [the] light beam 22 will enter layer 20 where, due to the relatively high concentration of carbon black, it will be absorbed." EX1008 at 4:5-8. Unlike optical fibers, louvers do not rely on reflection. Light rays that pass directly through the transparent layer will pass through the film.



*Id.* at Fig. 2. Fine's fetal, optical fiber-based sensor and Melby's automotive control panel film do not operate in the same way.

129. For at least the reasons provided above, I do not believe a person of skill would have been motivated to combine the teachings of Fine, Benjamin, and Melby in the manner suggested to arrive at Claim 15 of the '994 Patent.

-74-

IPR2020-01526
Apple Inc. v. Masimo Corporation

# X.    OATH

130.    I declare that all statements made herein of my own knowledge are true and that all statements made on information and belief are believed to be true; and further that these statements were made with the knowledge that willful false statements and the like so made are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

Dated: __7/20/21__    By: _____
Vijay K Madisetti, Ph.D

35313237

-75-

Case: 22-1894    Document: 31-2    Page: 87    Filed: 04/14/2023

6/1/2021                    Apple, Inc. v. Masimo Corp.                    Dr. Brian Anthony

Page 1

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

APPLE, INC.

Petitioner,

v.

MASIMO CORPORATION,

Patent Owner.

_____

Case IPR2020-01526

U.S. Patent 6,771,994

VIRTUAL VIDEOTAPED DEPOSITION OF

DR. BRIAN W. ANTHONY

Tuesday, June 1, 2021

11:05 a.m. Eastern Daylight Time

REPORTER:  Dawn A. Jaques, CSR, CLR

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**MASIMO 2003**
**Apple v. Masimo**
**IPR2020-01526**

**Appx1547**

Page 185

1    teach a film, a louvered film, that can be used

2    in a transmissive optical biosensor.

3         Q    Looking at Melby in isolation, if the

4    louvers were angled, the film would receive light

5    from an oblique path, correct?

6         A    I did not consider Melby in

7    isolation, but if you did angle them, they would

8    tend to receive light at that angle.  But again,

9    the combination is what I was considering, not

10   Melby in isolation.

11        Q    I'd like to go back to your

12   declaration at paragraph 69.  You say in the last

13   sentence, you state, "A POSITA would have been

14   motivated to make this modification to further

15   increase the directionality of the light signal

16   received in the combined device."

17             Do you see that?

18        A    Yes.

19        Q    What did you mean by "increase the

20   directionality of light"?

21             MR. SMITH:  Objection, form.

22             THE WITNESS:  So as I highlight in

Page 186

1    paragraph 73, for example, a person of ordinary

2    skill viewing Diab/Benjamin would have recognized

3    that Melby's film could be used in the

4    Diab/Benjamin device to control light such that

5    only light originating from the direction of the

6    light emitters reaches the detector.

7                    BY MS. LAM:

8         Q    So how does Melby film increase the

9    directionality of the light signal?

10        A    As described in the prior paragraphs,

11   a POSITA understands that we're trying to

12   minimize ambient light, light from other

13   directions other than that from the direction of

14   the transmitter, and so it's of the full spectrum

15   of direction that you could be receiving.

16                    In combination -- Melby, in

17   combination, teaches the louvers as to how the

18   direction being predominantly from the

19   transmitter that's on the opposite side from the

20   receiver.

21        Q    So Melby limits the direction of the

22   light that's received through a particular

Page 187

1  direction?

2      A    So as I again say in paragraph 73,

3  the film, Melby's film, is used to control the

4  light such that only light originating from the

5  direction of the light emitters reaches the

6  detector.

7      Q    So does that mean Melby limits the

8  direction of light that's received to a

9  particular direction?

10     A    It's controlling the light

11 originating from the direction of the light

12 emitter.  The design details of the film can

13 widen or narrow that direction, but it's

14 controlling the direction of the light emitters

15 as transmitted from the transmitter to the

16 receiver.

17     Q    And Melby is limiting the direction

18 of light that's received, correct?

19     A    It's controlling the light to come

20 from the direction of the light emitter to the

21 detector, so necessarily limiting the oblique

22 angles of the light.

Case: 22-1894    Document: 31-2    Page: 91    Filed: 04/14/2023

6/1/2021                    Apple, Inc. v. Masimo Corp.                    Dr. Brian Anthony

Page 195

1    REDUCED GHOST IMAGES."

2        Q    Okay.  Let's go to column 2, line 3.

3             You say here Melby states since the

4    index of refraction of the clear and dark layers

5    are different, light is reflected at the

6    interface between the two.  The effect of this

7    reflection is the creation of 'ghost' images."

8             So is the problem Melby is trying to

9    address the problem of ghost images, correct?

10             MR. SMITH:  Objection, form.

11             THE WITNESS:  I would highlight,

12    for example, in column 2, starting at line 9, the

13    films are used for various purposes.  One common

14    use is to prevent light from automobile control

15    panels reaching the windshield and causing

16    distracting and dangerous reflections at night.

17    Another use is to cover the screen of a CRT or

18    other display.  A problem common to all louvered

19    films arise from the difference between the clear

20    and dark layers.

21             So it's one example of how a louvered

22    film can be used.  Furthermore, in the

Page 196

1    combination, it explicitly calls out the use of

2    films for directing light.  The combination of

3    Diab, Melby -- or Diab, Benjamin and Melby

4    beneficially uses a louvered film in the

5    realization of an optical biosensor.

6              BY MS. LAM:

7         Q    But you just described examples of

8    where light control films are used, but based on

9    this passage we were looking at in the Melby

10   patent, and the title of the Melby patent, the

11   problem that Melby is trying to address is ghost

12   images, correct?

13        A    The title of the patent, as you

14   highlight correctly, is indeed light control film

15   with reduced ghost images.

16              It's a light control film, and as

17   suggested by the combination of Diab and

18   Benjamin, light control film can also be

19   beneficially used in the application for

20   biosensors.

21        Q    But any stated advantages in the

22   Melby patent are directed for the issue of

Page 197

1    resolving ghost images, right?

2         A    I do not agree with that.  That's one

3    example.  It's highlighting that films are used

4    for various purposes.  They're a common -- light

5    control films can be used.

6              Again, I didn't consider Melby in

7    isolation.  It was in the combination of

8    Diab/Benjamin, and the use of a film to control

9    the directionality of light.

10        Q    But you would agree that one problem

11   that Melby is trying to address is the issue of

12   ghost images?

13        A    As Melby describes -- again, it was

14   not considering Melby just in isolation -- there

15   are a wide variety of film parameters that are

16   possible within the scope of the invention.

17   That's in column 4, line 54.

18              And in column 5, line 8, "One

19   embodiment that is not optimized for any

20   particular application, but is useful in a wide

21   variety of applications is made of CAB and has

22   louvers having dark heavily loaded central

Page 198

1    regions."

2              So even in isolation, Melby

3    considers -- describes other applications of

4    light control film, but the combination is what I

5    considered for my opinion.

6         Q    And you think Melby is not trying to

7    address ghost images?

8              MR. SMITH:  Objection, form.

9              THE WITNESS:  I said that is one of

10   the things that indeed it is considering.

11             BY MS. LAM:

12        Q    Okay.  I'd like to introduce

13   Exhibit 1009.

14        A    Okay.

15        Q    Do you recognize this exhibit?

16        A    This is the Fine.  Where is the name

17   on that?  The Fine patent.  I don't see the name.

18   There it is, Fine, yes.

19        Q    And you reviewed this document in

20   providing your opinions in this IPR?

21        A    Yes.

22        Q    And Fine discloses optical fiber

# United States Patent [19]

## New, Jr. et al.

[11] **Patent Number:** **4,700,708**

[45] **Date of Patent:** * **Oct. 20, 1987**

[54] **CALIBRATED OPTICAL OXIMETER PROBE**

[75] Inventors: **William New, Jr.,** Woodside; **James E. Corenman,** Alameda, both of Calif.

[73] Assignee: **Nellcor Incorporated,** Hayward, Calif.

[ * ] Notice: The portion of the term of this patent subsequent to Nov. 11, 2003 has been disclaimed.

[21] Appl. No.: **911,978**

[22] Filed: **Sep. 26, 1986**

### Related U.S. Application Data

[63] Continuation of Ser. No. 827,478, Feb. 5, 1986, Pat. No. 4,621,643, which is a continuation of Ser. No. 695,402, Jan. 24, 1985, abandoned, which is a continuation of Ser. No. 414,176, Sep. 2, 1982, abandoned.

[51] Int. Cl.$^4$ ............................................. **A61B 5/00**
[52] U.S. Cl. ...................................... **128/633;** 356/41; 250/252.1
[58] Field of Search ............... 128/633, 634, 664–666; 73/1 R; 356/39–42; 280/252.1

[56] **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2,706,927 | 4/1955 | Wood | 88/14 |
| 3,638,640 | 2/1972 | Shaw | 128/2 R |
| 3,704,706 | 12/1972 | Herczfeld et al. | 128/2 R |
| 3,720,199 | 3/1973 | Rishton et al. | 128/1 D |
| 3,819,276 | 6/1974 | Kiess et al. | 356/184 |
| 3,833,864 | 9/1974 | Kiess et al. | 356/184 |
| 3,847,483 | 11/1974 | Shaw et al. | 356/41 |
| 3,880,006 | 4/1975 | Poduje | 73/362 AR |
| 3,910,701 | 10/1975 | Henderson et al. | 356/39 |
| 3,998,550 | 12/1976 | Konishi et al. | 356/39 |
| 4,059,991 | 11/1977 | Dybel et al. | 73/88.5 R |
| 4,086,915 | 5/1978 | Kofsky et al. | 128/2 L |
| 4,167,331 | 9/1979 | Nielsen | 356/39 |
| 4,225,410 | 9/1980 | Pace | 204/195 R |
| 4,236,935 | 12/1982 | Clark, III | 378/48 |
| 4,266,554 | 5/1981 | Hamaguri | 128/633 |
| 4,407,272 | 10/1983 | Yamaguchi | 128/6 |
| 4,407,290 | 10/1983 | Wilber | 128/633 |
| 4,407,298 | 10/1983 | Lentz et al. | 128/713 |
| 4,446,715 | 5/1984 | Bailey | 73/1 R |
| 4,494,550 | 1/1985 | Blazek et al. | 128/664 |
| 4,621,643 | 11/1986 | New et al. | 128/633 |

### OTHER PUBLICATIONS

Grover, Conf. Proceed. of the 26th Annual Conf. on Engr. in Med. and Biol., Minn., Minn., Sep. 20–Oct. 4, 1973.
Schibli et al., IEEE Trans. of Biomed. Engr., vol. BME–25, No. 1, Jan. 1978, pp. 94–96.
Yee et al., IEEE Trans. Biomed. Engr., vol. BME–24, No. 2, Mar. 1977, pp. 195–197.

*Primary Examiner*—Kyle L. Howell
*Assistant Examiner*—John C. Hanley

[57]    **ABSTRACT**

A probe apparatus for use with an optical oximeter is disclosed. A pair of light emitting diodes emit light of known narrow wavelengths through an appendage of a patient onto a photosensor. A resistor of coded known resistance is used to enable the oximeter to calculate the co-efficient of extinction of the wavelengths of the LEDs. The resistor, LEDs and photosensor are mounted on self-attaching hook and eye tape for mounting the probe onto the appendage of the patient. The probe is detachably wired to the oximeter, rendering the probe completely disposable. The oximeter is programmed at the factory to calculate the co-efficients of extinction of any LEDs which may be encountered in a series of disposable probes. From the co-efficients of extinction, the pulse rate and degree of arterial oxygen saturation is computed and displayed by the oximeter.

**11 Claims, 6 Drawing Figures**



**MASIMO 2007**
**Apple v. Masimo**
**IPR2020-01526**



FIG. 1.



FIG. 2.



FIG. 3.



FIG. 4.



*FIG. 5.*



*FIG. 6.*

4,700,708

1

# CALIBRATED OPTICAL OXIMETER PROBE

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of copending United States patent application Ser. No. 827,478, filed Feb. 5, 1986, now U.S. Pat. No. 4,621,643, which is a continuation of United States patent application Ser. No. 695,402, filed Jan. 24, 1985, now abandoned, which was a continuation of United States patent application Ser. No. 414,176, filed Sept. 2, 1982, now abandoned.

## FIELD OF THE INVENTION

This invention relates to solid state monitors for photoelectric determination of arterial oxygen saturation and of pulse rate in a human or animal patient, more particularly to a disposable probe calibrated through a remote sensing apparaatus including a transducer herein called an information encoding component.

## BACKGROUND OF THE INVENTION

A serious problem exists in operating rooms. Specifically, the chemical determination of oxygen level in blood consumes at least 3 to 5 minutes. A patient deprived of blood oxygen for such a duration typically incurs irreversible brain damage if not dead.

U.S. Pat. No. 2,706,927 to Wood disclosed the computation of oxygen saturation from measurements of light absorption of body tissue at two wavelengths. A series of devices and procedures have been founded using this technology.

A required peripheral device of such photoelectric oximeters is a photoelectric probe. Typically, such a probe is clamped to an appendage of a patient's body, such as an ear or a finger. Such probes require at least one light source for directing light into the appendage and at least one sensor for receiving light diffused out of the appendage. One method of obtaining light of the desired frequency had been to use a light source of indeterminate wavelength range in combination with a monochromatic filter of known output. Such devices are inefficient, and result in unwanted power demands and heat generation.

U.S. Pat. No. 3,704,706 to Herczfeld et al. disclosed the use of a solid state red laser in an optical probe with a solid state photodetector. Although lasers are useful for emitting monochromatic light of known wavelength, thereby eliminating need for a filter, they remain expensive and unwieldy.

U.S. Pat. No. 3,847,483 to Shaw et al. disclosed the use of light emitting diodes to provide the necessary monochromatic light. The probe of Shaw required expensive fiber optic cables.

A problem with all prior art devices is that they are too expensive to be readily disposable. The need for a truly disposable probe is great, given the many surgical applications in which sterility must be assured. The prior art optical probes, being more or less permanent portions of their respective oximeters, were subjected to a one time determination of the wavelength of the light sources therein and the oximeter was then programmed or adjusted to process light of the known wavelength.

A problem in developing disposable probes, therefore, has been the necessity to avoid having to reprogram or adjust the oximeter for each new probe or

2

alternately to maintain probes within narrow limits of wavelength variation, a clearly impractical task.

Re-calibration, perhaps necessitating return of the oximeters to the factory, can become necessary even for prior art devices when, for example, a probe is broken. Alternatively, a supply of light sources having consistently identical wavelengths is required. In particular, light emitting diodes are known to vary in wavelengths from unit-to-unit.

Other optical probes are shown in patents to Shaw, U.S. Pat. No. 3,683,640, Neilsen, U.S. Pat. No. 4,167,331, and Konishi, U.S. Pat. No. 3,998,550.

## SUMMARY OF THE INVENTION

The present invention provides an optical oximeter probe which includes at least one narrow bandwidth light emitting diode and at least one photoelectric sensor. An information encoding component such as a resistor of known resistance is selected to correspond to the measured wavelength of the LED and is provided with each probe. The elements are mounted on a flexible fastening medium. The wires from the electrical elements terminate at a connector for detachably connecting the probe to the related oximeter. Coding in other manners, such as the wiring of a multiconductor plug in a digital value or binary array or into a disposable memory containing the color information is disclosed.

The primary object of this invention is to provide apparatus for directing light onto a portion of a human body for the detection of oxygenated blood flow which is inexpensive, replaceable, easily applied and which overcomes the disadvantages and limitations of the prior art.

It is a further object of this invention to provide an optical probe whose wavelength emission characteristics are readily ascertainable by the attendant oximeter.

Another object of this invention is to enable factory calibration of LEDs for use in such probes. Typically, LEDs are purchased in batches of one general wavelength, but whose exact wavelength characteristics are unknown and vary from piece to piece.

It is a further object of this invention to eliminate the necessity for oximeters to be calibrated for new probes, other than the initial factory calibration.

Yet another object of this invention is to provide flexible attachment means for the probe which will allow rapid attachment to human or animal appendages of varying sizes yet maintain the photoelectric sensor in direct optical isolation from the LEDs.

Yet another object of this invention is to disclose wiring of a multiconductor plug in a binary array to transmit probe calibration.

## DESCRIPTION OF THE DRAWINGS

FIG. 1 is a part perspective, part schematic diagram of the optical probe of the preferred embodiment of the present invention.

FIG. 2 is an end view of a patient's finger showing placement of the probe of the present invention.

FIG. 3 is a side elevation of an embodiment of a photoelectric sensor of the probe.

FIG. 4 is a simplified schematic circuit diagram illustrating the method in which an oximeter microprocessor decodes the wavelength values of the probe through use of a coded resistor.

4,700,708

FIG. 5 is a schematic of the probe of this invention calibrated by a multiconductor plug and wired in a binary array; and

FIG. 6 is a circuit schematic of an oximeter utilizing the calibrated probe of this invention.

## DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to FIG. 6, the pulse oximeter of this invention is illustrated.

Conventional microprocessor 116 has a bus 117 extending therefrom. Bus 117 has connected thereto conventional ROM 118 and RAM 119. An LED display 120 is schematically illustrated having a select latch 121 and a digit designation latch 122.

Having set forth the more or less conventional portions of the microprocessor, attention will now be directed to the analog portions of the circuitry.

Finger 14 of a patient is illustrated with probe 101 having schematic detection circuitry. First light emitting diode 132 in the red range and a second light emitting diode 130 in the infrared range are sequentially pulsed to emit light in their respective frequencies by amplifiers 131, 133. Typically, LED 132 is in the 660 nanometer range with LED 130 being in the 940 nanometer range.

It is necessary that maximum light from the active light emitting diode go through the flesh in finger 14. Therefore, a light impervious barrier 136 is placed between photosensor 138 and the paths to the light emitting diodes 130 and 132 which are not through finger 14. Barrier 136, terminating in contact with the flesh of finger 14, make the path between the respective light emitting diodes 130, 132 and the light receiving diode 138 occur only through the flesh of finger 14.

Signal received from each respective light emitting diode first passes through a pre-amplifier 140. This signal is thereafter amplified in parallel at amplifiers 141, 142. As amplified, the signal is passed in parallel from each amplifier through respective phase detectors 143, 144. Passage through respective low pass filters 145, 146 thereafter occurs. Amplification at offset amplifiers 147, 148 then takes place. The pulsatile component is passed to multiplexer 150.

Multiplexer 150 has output to a comparator 152. Comparator 152 is ramped in half steps by a 12 bit digital to analog converter (hereinafter DAC) 154. DAC 154 places a comparison signal divided in one part from 4096 parts with the comparator outputting to bus 117.

The reader will recognize that not all human fingers and appendages are the same. Specifically, the difference between the races, skin pigment, weight, age, maturity and other factors all can lead to different signals being sensed at photosensor 138, even though the frequency and intensity of the light signal output at each of the diodes 130, 132 is the same.

Accordingly, microprocessor 116 is programmed to receive a signal from photosensor 138 within an optimum range. Utilizing a second operating phase of DAC 154, and communicating a signal to a sample hold 157, the individual LED's 130, 132 are given voltage outputs 160, 161. These voltage outputs 160, 161 are adjusted so that in each case photosensor 138 looks at a signal well withing the range of the DAC.

Clock 170 controls the sequential output of light from the light emitting diodes 130, 132 to a duty cycle of at least 1 in 4. This is schematically illustrated by signals φ1 through φ4. Reception of signal at detector 143

occurs during time periods φ1 and φ2 and reception of signal occurs at detector 144 during time periods φ3 and φ4.

It can be immediately realized that during respective time periods φ1, φ3 active signal from the light emitting diodes 130, 132 is being received. During the time periods φ2 and φ4, no signal and only noise is being received. As will hereinafter become apparent, by amplifying the negative signal before passage through the low pass filter, noise can be subtracted out utilizing the illustrated 1 in 4 duty cycle.

Applicants herewith incorporate by reference their United States application entitled "Pulse Oximeter," U.S. patent application Ser. No. 414,174, filed Sept. 12, 1982, abandoned in favor of U.S. patent application Ser. No. 417,311, filed Sept. 13,1982, now abandoned. FIG. 6 is a copy of the FIG. 2 from that application.

The Summary of Invention in the incorporated application is:

## SUMMARY OF INVENTION

A pulse oximeter is disclosed of the type wherein light of two different wavelengths is passed through any human or animal body pulsatile tissue bed, such as a finger, an ear, the nasal septum or the scalp, so as to be modulated by the pulsatile component of arterial blood therein, and thereby allowing indication of oxygen saturation, blood perfusion and heart rate. The level of incident light is continually adjusted for optimal detection of the pulsatile component, while permitting accommodation to variable attenuations due to skin color, flesh thickness and other invariants. At significant slope reversal of the pulsatile component to negative (indicating a wave maximum), wave form analysis of blood flow occurs. A quotient of the pulsatile component of light transmission over the constant component of light transmission is measured for each of two wavelengths by direct digital tracking. The respective quotients are thereafter converted to a ratio, which ratio may be thereafter fitted to a curve of independently derived of oxygen saturation for the purpose of calbration. The saturation versus ratio calibration curve may be characterized by various mathematical techniques including polynomial expansion whereby the coefficients of the polynomial specify the curve. An output of pulse rate, pulsatile flow and oxygen saturation is given. An incident light source duty cycle is chosen to be at least 1 in 4 so that noise, inevitably present in the signal, may be substantially eliminated and filtered.

A representative claim is:

A pulse oximeter for determining arterial oxygen saturation and arterial pulse amplitude in a patient, said oximeter comprising: first and second light emitting sources for emitting sequential light pulses in the red and infrared into the flesh of a human; a sensor sensitive to each of said light sources having an indirect light path through the flesh of said human from said first and second light sources; said sensor sequentially outputting signals to an amplifier from each of said light sources; means for digitally tracking the light absorption; means for dividing the change of light transmission due to the pulsatile component of blood flow with respect to the total light transmission to determine a quotient of light absorption for each optical wavelength; means for making a ratio related directly to the respective quotients of light transmission at each said frequency and means for fitting the ratios of light transmission to experimentally

4,700,708

5

determined saturations at said ratio to enable the optical determination of saturation.

Referring to FIG. 1, a part-schematic, part-perspective view of the optical probe 1 is shown. A suitable length of adjustable, self-fastening tape 50 is provided, such as that sold under the trademark VELCRO, obtainable from American Velcro, Inc. Incorporated into tape 50 at suitably spaced intervals are the electrical components of probe 1. Photoelectric sensor 30 is attached to the outside of tape 50 and protrudes slightly from the underside of tape 50. Sensor 30 has ground wire G and lead wire 31. Light emitting diode 10, typically emitting frequencies in the infrared range of the spectrum, is mounted to and pierces tape 50 in a similar manner to sensor 30 and at a distance from sensor 30 selected upon the basis of the typical appendage size expected to be encountered. LED 10 is connected to ground wire G and has input lead wire 11. Placed in proximity to LED 10 is a second LED 20, typically having wavelength emission characteristics in the red range of the spectrum. LED 20 attaches to ground wire G and has input lead wire 21.

Resistor 40 is shown mounted to tape 50 between sensor 30 and LED 10. However, the physical location of resistor 40 is not important and it may be mounted to probe 1 at any other convenient location. Resistor 40 has input lead wire 41 and is connected to ground wire G.

Wires G, 11, 21, 31, 41 lead to connector 52 so that probe 11 may be readily disconnected from the oximeter 60 (schematically illustrated in FIG. 4).

The probe 1 illustrated in FIG. 1 is designed for use in connection with an oximeter 60 designed to operate in conjunction with two LEDs 10, 20 sequentially transmitting light to a single sensor 30. However, the mechanism of the instant invention works equally well for oximeters requiring only a single LED and single or multiple photo sensors. Oximeters requiring more than two LEDs may be equally well accommodated by the probe of the present invention.

FIG. 2 is an end elevation of typical finger 51 of a human patient. Finger 51 is encircled by probe 1 at its tip by overlapping the ends of self-connecting tape 50. Light emitted from LEDs 10, 20 enter the flesh of finger 51 and are subjected to diffusion and scattering. Sensor 30 picks up only light which has been diffused through the flesh of finger 51.

FIG. 3 is a detailed side elevation of sensor 30, showing the manner in which it is assured that no light emitted by LEDs 10, 20 is received by sensor 30 without first passing through finger 51. Sensor element 32 is recessed somewhat within metal cylinder wall 33 of the sensor housing. Since tape 50 presses sensor 30 directly against the skin of finger 51, it is readily seen that no light passes to sensor element 32 other than through the flesh of finger 51.

Probe 1 is constructed in the following manner: LED's 10, 20 are selected from batches of LEDs with generally known wavelength characteristics. The exact wavelength characteristics of the specific LED's 10, 20 chosen are determined at this time through readily available metering means. Resistor 40 or a similar impedance reference is then selected to have an impedance or specifically a resistance whose amount is exactly specified by a table made available to the factory technician for this purpose, of all possible wavelength combinations which may be expected to be encountered from the available supplies of LEDs. The following table is

6

an example of how a single resistor 40 might be selected for any hypothetical combination of LED's 10, 20 in a case where each has only two possible wavelengths:

TABLE A

| Resistor 40 | LED 10 | LED 20 |
|---|---|---|
| 150 ohms | 940 nM | 660 nM |
| 160 ohms | 950 nM | 660 nM |
| 170 ohms | 940 nM | 670 nM |
| 180 ohms | 950 nM | 670 nM |

A typical probe will have an infrared LED 10 of wavelength 940 nanometers and a red LED 20 of wavelength 660 nanometers. According to the above table, a probe having such wavelength characteristics will be supplied at the factory with a resistor 40 of one, and only one, resistance value, in this case shown to be 150 ohms.

The value in having such a unique known resistance incorporated into probe 1 is shown by reference to FIG. 4. Oximeter 60 contains a microprocessor 61, and a read only memory 62 and random access memory 63. Table A (the same table used for calibrating probe 1 at the factory) no matter how extensive, can be easily programmed into ROM 62 at the time oximeter 60 is fabricated. Current 1 from current source 69 is passed through resistor 40. The resulting voltage (per Ohm's law) is passed through multiplexor 66 through comparator 65, to microprocessor 61.

Microprocessor 61 may be programmed to calculate the resistance of resistor 40 and thereafter to look up the wavelengths of LED's 10, 20 from Table A in ROM 62. Microprocessor 61 is also programmed to itself recalibrate the optical comparison circuitry of oximeter 60 once the wavelengths of LEDs 10, 20 are known. By this means, it is not required to recalibrate by hand oximeter 60 for each new probe 1 nor, alternatively, to require that LEDs 10, 20 be of precisely standardized wavelengths.

The specific function and design of the circuitry schematically illustrated in FIG. 4 are as obvious when taken in combination with the general description of its function. The functions of microprocessors and read only memories are well known and understood and it is well within the capability of a person with ordinary skill in the art to design and program microprocessor 61 to calculate the resistance of resistor 40 and thereby obtain the wavelengths of LEDs 10, 20 from a simple lookup table in a ROM 62.

Probe 1 may be used with any number of prior art oximeters, the method of operation of which is well understood and beyond the scope of the teaching of the present invention. Basically, for each heart beat, fresh arterial blood is pumped into the capillaries of finger 51, thereby causing a periodic increase and decrease in light intensity observed by sensor 30. The oxygen saturation of hemoglobin in the pulsatile blood may be determined by the oximeter 60. For any known wavelength, there is a known extinction coefficient B. Given B and measuring the intensity of diffused light received by sensor 30 the oxygen saturation can be computed and displayed. In fact, the coefficients B of the various wavelengths of table A can be substituted for the wavelengths directly when the table is programmed into ROM 62, thereby eliminating a computational step.

Microprocessor 61, through LED control circuitry 67, operates LEDs 10, 20. Light from LEDs 10, 20 results in current in sensor 30 which passes through

4,700,708

**7**

amplification and filtration circuitry **68** to multiplexor **66**. Comparator **65** and a digital to analog converter **70** are operative as an analog to digital converter means to present a digital signal to the microprocessor **61**, thereby allowing microprocessor **61** to determine oxygen saturation and/or pulse rate. Results are shown on display **64**.

Referring to FIG. 5, an alternate way of coding a probe of this invention is illustrated. Specifically, an eight pin connector **52** similar to the connector **52** of FIG. 4 illustrated having respective lead lines **201**, **202**, **203** respectively communicating to light emitting diode **130**, light emitting diode **132** and photodetector **138**. Conductor **204** is illustrated providing the ground connection.

It will be noted that the eight pin connector **52** of FIG. 5 has four empty channels. These channels can be provided to communicate the coded value of the probe.

For example, assuming that the connectors when provided with a common potential provide a true binary value and when independent of any potential (i.e., a high impedance or open circuit) provide a false binary value. Thus, the four conductors of plug **52**, as illustrated in FIG. 5, would communicate the binary value 1100. Thus, communication of the resistance value of the connected probe would be possible by coding the connector to a value of 1 part in 16.

Those skilled in the art will appreciate that other binary connections could as well be made. For example, by expanding the number of connectors on the probe relatively large expansions can occur.

Those skilled in the art will realize that in determining the variable transmission of light in human flesh the frequency at which the flesh is integrated by a substantially monochromatic light source is critical. If the frequency varies the results of the instrument can be inaccurate with such variation. Simply stated, at different points in the spectral frequency, oxygenated hemoglobin and reduced hemoglobin transmit varying amounts of light.

Commercially produced light emitting diodes do have variation in their spectral frequency from diode to diode. Therefore if such commercially produced diodes are going to be used as replaceable probes in an instrument it has been found that provision must be made for a probe by probe calibration of the instrument. Thus, effectively disposable probes can be readily used even though they are affecting integration at differing frequencies from probe to probe.

Some comment can be made directed specifically at calibrating the disposable probe of the instrument herein. As a practical matter, the blood of a human is interrogated through the skin by light transmission utilizing red and infrared. The rate of change of constants in the infrared is relatively flat. Therefore a variance in the frequency of the infrared diode has little effect.

Not so in the red range. It has been found that the attenuation of light in oxygenated and unoxygenated hemoglobin has a rapidly changing slope in the red range. This being the case, it is of primary concern to calibrate in the particular instrument illustrated in the red range.

Those skilled in the art will realize that there are many ways in which change of instrument calibration can occur. Specifically, separate look-up tables can be generated for various grouped relationships. Alternately, and perhaps more productively, incremental alternation to the constants of curvature between the

**8**

saturation level S and the ratio of quotients R of light transmission can be determined.

Although the foregoing invention is described in some detail by way of illustration and example for purpose of clarity of understanding, it is understood that certain changes and modifications may be practiced and equivalents employed within the spirit of the invention as limited only by the scope of the appended claims. For example, two resistors may be used in place of one, each resistor coded to the wavelength of a separate LED. Other components could be used in place of resistors, e.g., capacitors or the like. Therefore, the above description and illustrations should not be construed as limiting the scope of the invention which is defined by the appended claims.

What is claimed is:

1. An oximeter probe system for use with an oximeter, said system comprising:
a first light emitting means emitting light having a first known wavelength value;
means for sensing the light emitted by said first light emitting means;
means for detachably wiring the probe to the oximeter and for providing communication of electrical signals between the probe and the oximeter; and
encoding means for providing signals to the oximeter which are indicative of the known wavelength value of said first light emitting means.

2. The system of claim **1**, further comprising a second light emitting means emitting light having a second known wavelength value;
wherein said light sensing means also senses light emitted by said second light emitting means; and
wherein said second encoding means further provides electrical signals to the oximeter indicative of the known wavelength value of the light emitted by the second light emitting means.

3. The system of claim **1**, wherein said encoding means comprises an electrical impedance element, the value of which is preselected to correlate with said known wavelength value.

4. The system of claim 3 wherein said electrical impedance element is a resistor.

5. The system of claim 4 wherein said signals which are indicative of said known wavelength value are voltage signals produced by passing a current through said resistor.

6. The system of claim 1 wherein said means for detachably wiring the probe to the oximeter has associated therewith a plurality of connector pins, and wherein the presence or absence of electrical connections between certain of said connector pins comprises part of said encoding means.

7. An oximeter probe system comprising:
a first light emitting means emitting light having a first known wavelength value;
means for sensing the light emitted by said first light emitting means;
means for detachably wiring the probe to the oximeter and for providing communication of electrical signals between the probe and the oximeter;
encoding means for providing signals to the oximeter which are indicative of the known wavelength value of said first light emitting means, said encoding means comprising an electrical impedance element, the value of which is preselected to correlate with said known wavelength value; and

4,700,708

9

decoding means responsive to said encoded signals for selecting appropriate calibration coefficients for use in calculating oxygen saturation based upon the known wavelength of said first light emitting means.

8. The system of claim 7 wherein said electrical impedance element is a resistor.

9. The system of claim 8 wherein said signals which are indicative of said known wavelength value are voltage signals produced by passing a current through said resistor.

10. An oximeter probe system comprising:

a first light emitting means emitting light having a first known wavelength value;

means for sensing the light emitted by said first light emitting means;

means for detachably wiring the probe to the oximeter and for providing communication of electrical signals between the probe and the oximeter, said means for detachably wiring the probe to the oximeter having associated therewith a plurality of connector pins;

encoding means for providing signals to the oximeter which are indicative of the known wavelength value of said first light emitting means, the presence or absence of electrical connections between

10

certain of said connector pins comprising part of said encoding means; and

decoding means responsive to said encoded signals for selecting appropriate calibration coefficients for use in calculating oxygen saturation based upon the known wavelength of said first light emitting means.

11. An oximeter probe system comprising:

a first light emitting means emitting light having a first known wavelength value;

means for sensing the light emitted by said first light emitting means;

means for detachably wiring the probe to the oximeter and for providing communication of electrical signals between the probe and the oximeter;

encoding means for providing signals to the oximeter which are indicative of the known wavelength value of said first light emitting means; and

decoding means responsive to said encoded signals for selecting appropriate calibration coefficients for use in calculating oxygen saturation based upon the known wavelength of said first light emitting means, said decoding means comprising a programmed microprocessor.

* * * * *

# UNITED STATES PATENT AND TRADEMARK OFFICE
## CERTIFICATE OF CORRECTION

PATENT NO. : 4,700,708

DATED : October 20, 1987

INVENTOR(S) : William New, Jr. et al.

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

Column 1, line 19, "apparaatus" should be -- apparatus --.

Column 3, line 33, "make" should be -- makes --;

line 64, "withing" should be -- within --.

Column 4, line 41, "of" (second occurrence) should be deleted;

line 42, "calbration." should be -- calibration. --.

Signed and Sealed this

Second Day of August, 1988

Attest:

DONALD J. QUIGG

Attesting Officer      Commissioner of Patents and Trademarks

Downloaded from SAE International by Univ of Wisconsin - Madison, Thursday, March 06, 2025



**The Engineering
Resource For
Advancing Mobility**

400 COMMONWEALTH DRIVE WARRENDALE, PA 15096

# SAE Technical
# Paper Series

## 860347

# Light Control Systems for Automotive Instrumentation

**Diane Baum Verploegh**
3M Company
Automotive Specialties Div.
St. Paul, MN

Reprinted from SP-654-
Electronic Displays and Information Systems:
Developments and Applications

International Congress and Exposition
Detroit, Michigan
February 24–28, 1986

MASIMO 2008
Apple v. Masimo
IPR2020-01526

Downloaded from ... U.S. International at ... Madison on Thursday, ... 06, 20...

## LCF Functional Characteristics

Light Control Film combines function and aesthetics to control and direct light, prevent nighttime reflections, and improve daytime contrast of electronic instrumentation. Figure 4 demonstrates the performance of the film with a light emitting diode (LED) display. Display contrast is enhanced and reflections on a simulated windshield are eliminated. The film is suitable for use with all major types of electronic instrumentation including vacuum fluorescent displays, light emitting diodes, backlighted liquid crystal displays, gas discharge displays, cathode ray tubes, and electroluminescent panels. Furthermore, the film can be used with incandescent light sources for instrument panel clusters, switches and console displays.



**Figure 4. Contrast Enhancement and Reflection Control with Light Control Film**

Six parameters are used to describe LCF which include:

- ○ Louver Angle (maximum transmission angle)
- ○ Viewing Angle
- ○ Louver Type (louver transmission)
- ○ Filter Color
- ○ Surface Finish
- ○ Thickness

The louver angle and viewing angle are the two most important parameters for characterizing the film. The louver angle defines how the louvers are positioned relative to the outer surfaces of the film. The louvers are positioned perpendicular to the film surfaces, or at an angle. This angle is measured from a normal to the film surface, and is the angle at which maximum transmission of light through the film occurs. Figure 5 indicates the louver angles available, from 0 degrees to 45 degrees.



**Figure 5. Light Control Film – Louver Orientation**

The viewing angle, or area allowing light to pass between the louvers, is determined by the length of the louver from one side of the film to the other. As shown in Figure 5, the shorter louver length provides a greater viewing angle or "open" area. By simple geometry, the longer louver length restricts the angle at which extreme rays of light can enter and exit the film, thus reducing the viewing angle. Standard viewing angles are 48, 60, and 90 degrees. The louver angle and viewing angle are independent of each other and of over-all film thickness. Minimum film thickness is 0.030 in. (0.76 mm) and increases in increments of 0.020 in. (0.51 mm) to a maximum of 0.070 in. (1.78 mm). The distance between each louver is targeted either for 0.005 in. (0.13 mm) or 0.010 in. (0.25 mm). Louver thickness is targeted for 0.0005 in. (0.01 mm).

The optical performance and transmission characteristics of the film can be graphically represented by a response curve of percent transmission and viewing angle. LCF having a 0 degree angle and 60 degree viewing angle is represented in Figure 6. The on-axis, maximum nominal transmission is 75 percent. With a 0 degree louver angle, the maximum transmission occurs normal to the film surface, at the center of the viewing angle. The transmission decreases symmetrically about the louver angle or peak transmission (y axis), and nearly approaches zero at the limits of the total viewing angle. Viewing in the z axis is unrestricted.



**Figure 6. Light Control Film Transmission Characteristics**

The louver angle defines where the maximum transmission will occur on the response curve, either at points on the x axis equalling 0, 18, 30, or 45 degrees. The viewing angle defines the shape of the response curve, whether it is narrow with a 48 degree viewing angle or broader with a 90 degree viewing angle. The shape of the response curve is symmetrical about the peak transmission or louver angle.

The peak transmission of LCF can move to the right or left of the y axis depending upon the louver angle and its tolerances. The tolerances of a 0 degree louver angle are +/− 6 degrees. Figure 7 shows the effect of tolerances on the location of peak transmission.